**Gary M. Berne**, OSB No. 774077
gberne@stollberne.com
**Nadia H. Dahab**, OSB No. 125630
ndahab@stollberne.com
STOLL STOLL BERNE LOKTING
& SHLACHTER P.C.
209 SW Oak Street, Suite 500
Portland, OR 97204
Telephone: (503) 227-1600


**Randall J. Baron** (to seek *pro hac vice* admission)
randyb@rgrdlaw.com
**A. Rick Atwood, Jr.** (to seek *pro hac vice* admission)
ricka@rgrdlaw.com
**Eun Jin Lee** (to seek *pro hac vice* admission)
elee@rgrdlaw.com
ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: (619) 231-1058

*Attorneys for Plaintiffs*

[Additional counsel appear on signature page.]


# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| NECA-IBEW PENSION TRUST FUND (The Decatur Plan), and ANGELA LOHMANN, AS TRUSTEE FOR THE ANGELA LOHMANN REVOCABLE TRUST, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>PRECISION CASTPARTS CORP., MARK DONEGAN, DON R. GRABER, LESTER L. LYLES, DANIEL J. MURPHY, VERNON E. OECHSLE, ULRICH SCHMIDT, RICHARD L. WAMBOLD and TIMOTHY A. WICKS,<br><br>Defendants. | Case No. 3:16-cv-01756<br><br>**CLASS ACTION ALLEGATION COMPLAINT**<br><br>Violations of Securities Exchange Act of 1934 (15 U.S.C. § 78n-1, § 78t)<br><br><u>DEMAND FOR JURY TRIAL</u> |

{SSBLS Main Documents/8636/001/00603605-1 }

PAGE 1 – **CLASS ACTION ALLEGATION COMPLAINT**

Plaintiffs, by counsel, allege as follows:

## NATURE OF THE ACTION

1.      This is a stockholder class action brought on behalf of the former shareholders of Precision Castparts Corp. ("PCC" or the "Company") against PCC and certain of its current and/or former officers and directors for violations of the federal securities laws arising out of defendants' dissemination of false and misleading proxy materials in violation of §§ 14(a) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act") and Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder.

2.      PCC is a company headquartered in Portland, Oregon, and, pursuant to an acquisition announced in August 2015 and completed in January 2016 ("Acquisition"), is now a wholly owned subsidiary of Berkshire Hathaway Inc. ("Berkshire").  PCC started as a small manufacturer of investment castings and expanded into a worldwide, Fortune 500 company producing investment castings, forgings, and fasteners for aerospace, power, and general industrial customers.  PCC's growth was powered by strategic acquisitions.  Over the last decade, PCC spent more than $7 billion to complete more than 40 acquisitions.  Prior to the Acquisition, PCC's growth strategy continued to focus on acquisitions, and the Company's growth through acquisitions was not expected to slow down in the foreseeable future.  PCC expected to spend an additional $5 billion on acquisitions over the next several years according to its management plans.

3.      On July 9, 2015, Mark Donegan ("Donegan"), CEO and Chairman of the Board of PCC, met with Warren E. Buffett ("Buffett"), Chairman and CEO of Berkshire.  At this meeting, Buffett told Donegan that Berkshire was interested in acquiring the Company for $235 per share and that he wanted Donegan to continue working with the Company post-merger.

4.      Donegan pursued Buffett's offer for self-interested reasons.  Donegan was going be replaced in the near future by his Board.  As Buffett acknowledged, "[A]ll [Donegan] want[ed] to do is run Precision."  The Acquisition would allow Donegan not only to keep his job, but also to receive tens of millions of dollars in immediate payment on top of this job security.

{SSBLS Main Documents/8636/001/00603605-1 }
PAGE 1 – **CLASS ACTION ALLEGATION COMPLAINT**

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

5.      However, the only way to make Buffett's proposed price appear fair for the Company's shareholders was for Donegan to do away with the significant value component of the Company - the value associated with PCC's ongoing acquisition strategy.  Despite PCC's long history of acquisitions, and despite PCC's current and future business strategy of prioritizing acquisitions, Donegan insisted on using financial projections that assumed that PCC would not make any more acquisitions over the next five years.  Donegan provided these financial projections – which excluded all acquisitions – to the Company's financial advisor, Credit Suisse Securities (USA) LLC ("Credit Suisse"), to use in its fairness analyses.  Credit Suisse did not independently verify the projections but instead assumed that these projections were accurate for the purposes of its fairness opinion.  For its work, Credit Suisse secured a $32 million fee, wholly contingent upon the consummation of the Acquisition.

6.      The Board knowingly failed to require Credit Suisse to provide a fairness opinion based on the more accurate projections that reflected the Company's true business plans and prospects.  The Board then relied on Credit Suisse's fairness opinion, even when the Board knew that the opinion was fatally flawed for having relied on inadequate financial projections that did not present an accurate view of the value of the Company.

7.      On August 10, 2015, PCC and Berkshire jointly announced that they had entered into a definitive merger agreement ("Merger Agreement"), whereby Berkshire undertook to acquire each share of PCC stock for just $235 in cash per share.  After the closing of the Acquisition on January 29, 2016, each holder of PCC common stock received $235 in cash per share and all outstanding shares of PCC were cancelled (the "Merger Consideration").  The Company continues to do business under the Precision Castparts name as a wholly owned subsidiary of Berkshire.  Donegan serves as CEO of the post-merger company.  Notably, the post-merger company then admitted that it is expected to continue its acquisitions growth strategy; as Buffett wrote in his 2016 annual letter to Berkshire shareholders, "In building his business, Mark [Donegan] has made many acquisitions and will make more."  Neither plaintiffs nor the proposed class will participate in such future growth.

{SSBLS Main Documents/8636/001/00603605-1 }
PAGE 2 – **CLASS ACTION ALLEGATION COMPLAINT**

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

8.      The consideration of $235 per share was unfair for the Company's public shareholders. The $235-per-share Merger Consideration was well below the target price of $299 per share on the Company set by an analyst at BOE Securities, the $252-per-share price set by an analyst at Buckingham Research Group, and the $244-per-share price set by an analyst at UBS, on June 6, May 19, and April 20, 2015, respectively. In the last two years, PCC common stock traded as high as $275.09 per share on June 9, 2014. Its 52-week high was $247.04 on September 18, 2014. Most recently it traded above the Merger Consideration – at $238.03 per share – on January 5, 2015. Also, over the preceding two years, the Board had recommended share repurchases at prices implying a fair value takeover price of $325 per share, or $90 above the Merger Consideration price. Finally, and most importantly, the Merger Consideration was substantially lower than the fair value of the Company when calculated by using projections that reflected the Company's true business plans and prospects.

9.      On October 13, 2015, as detailed herein, defendants, to secure shareholder support for the unfair Acquisition of the Company by Berkshire, issued a materially false and misleading Definitive Proxy Statement Pursuant to § 14(a) of the Securities Exchange Act of 1934 (the "Proxy").

10.     The Proxy contained numerous material misleading statements or omissions in an attempt to secure approval of the Acquisition. Most importantly, the Proxy misled the Company's stockholders as to what they were being asked to give up for $235 per share. The business valued and presented in the Proxy was a business that assumed no acquisitions over the next five years – a mythical business, far less valuable than the real PCC, with its significant pipeline of past, ongoing, and future acquisitions materially bolstering the assets, revenues, and prospects of the real company. Thus, shareholders were misled about the most important decision facing them with regard to their vote on the Merger – the value of their shares and the future profitability of the Company. These defects in the Proxy prevented the Company's shareholders from making a fully informed decision on the shareholder vote on the Acquisition.

{SSBLS Main Documents/8636/001/00603605-1 }
PAGE 3 – **CLASS ACTION ALLEGATION COMPLAINT**

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

11.     Pursuant to an uninformed shareholder vote, Berkshire completed the Acquisition on January 29, 2016.

12.     In short, the Proxy, which recommended that PCC's shareholders vote in favor of the Acquisition and was an essential link in the accomplishment of the unfair Acquisition, omitted and/or misrepresented material information in contravention of §§ 14(a) and 20(a) of the 1934 Act, and SEC Rule 14a-9 promulgated thereunder, regarding the unfair consideration offered in the Acquisition and the actual intrinsic value of the Company.  As a consequence, PCC's shareholders were injured.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over all claims asserted herein pursuant to § 27 of the 1934 Act for violations of §§ 14(a) and 20(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.  This Court has supplemental jurisdiction under 28 U.S.C. § 1367.

14.     This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because defendant PCC's headquarters are located at 4650 SW Macadam Avenue, Suite 400, Portland, Oregon, 97239, and defendants include an officer and/or director who resides in Oregon.

## PARTIES

16.     Plaintiff NECA-IBEW Pension Trust Fund (The Decatur Plan) was at all times relevant hereto a shareholder of PCC.

17.     Plaintiff Angela Lohmann, as Trustee for the Angela Lohmann Revocable Trust was at all times relevant hereto a shareholder of PCC.

18.     Defendant PCC was an Oregon corporation headquartered in Portland, Oregon.  PCC, as a result of the Acquisition, is now 100% owned by Berkshire.

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

19.    Defendant Mark Donegan was the CEO and Chairman of the Board of PCC and was at all relevant times a director and Chairman of the Board, and is now an employee of Berkshire.

20.    Defendant Don R. Graber was at all relevant times a director of PCC.

21.    Defendant Lester L. Lyles was at all relevant times a director of PCC.

22.    Defendant Daniel J. Murphy was at all relevant times a director of PCC.

23.    Defendant Vernon E. Oechsle was at all relevant times a director of PCC.

24.    Defendant Ulrich Schmidt was at all relevant times a director of PCC.

25.    Defendant Richard L. Wambold was at all relevant times a director of PCC.

26.    Defendant Timothy A. Wicks was at all relevant times a director of PCC.

27.    The defendants named above in ¶¶ 19-26 are sometimes collectively referred to herein as the "Individual Defendants."

## CLASS ACTION ALLEGATIONS

28.    Plaintiffs' claims are brought as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of all public holders of PCC stock who were harmed by defendants' actions described below (the "Class"). Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendants.

29.    Plaintiffs' claims are properly maintainable as a class action under Federal Rule of Civil Procedure 23.

30.    The Class is so numerous that joinder of all members is impracticable. According to the Proxy, as of October 9, 2015, there were more than 137.5 million shares of PCC common stock outstanding.

31.    There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member. The common questions include, *inter alia*, the following:

(a)    whether defendants have disseminated a false and misleading proxy statement in violation of §§ 14(a) and 20(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder; and

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

(b)     whether misstatements and/or omissions in the Proxy caused injury to plaintiffs and the Class.

32.     Plaintiffs' claims are typical of the claims of the other members of the Class, and plaintiffs do not have any interests adverse to the Class.

33.     Plaintiffs are adequate representatives of the Class, have retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

34.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class.

35.     Plaintiffs anticipate that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

36.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## THE ACQUISITION

37.     At the time of the Acquisition, PCC was a market leader in manufacturing complex structural investment castings and forged components for aerospace markets, machined airframe components, highly engineered, critical fasteners for aerospace applications, and airfoil castings for the aerospace and industrial gas turbine markets.  PCC was organized into three segments: Investment Cast Products, Forged Products, and Airframe Products.  The Company's Investment Cast Products segment made investment castings for aircraft and industrial gas turbine engines and other industrial components.  The Company's Forged Products segment made components that are used in commercial and military engines and industrial gas turbine power plants.  The Company's Airframe Products segment made fasteners, fastener systems, aerostructures, and precision

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

components for aerospace applications.  The Company's long-term, key customers included General Electric, Pratt & Whitney, Rolls-Royce, Boeing, and Airbus.

38.    In the years leading up to the Acquisition, PCC was a vigorous acquirer.  During this period, PCC completed numerous acquisitions and repeatedly assured its investors that the Company would continue to complete acquisitions as they were an integral part of the Company's business plan; and that the Company's shareholders could expect to derive value from the Company's acquisition strategy in the upcoming years.

39.    On May 31, 2012, the Company filed its Annual Report on Form 10-K with the SEC. In that document, the Company disclosed that it had completed eight acquisitions in fiscal 2012 of approximately $1.4 billion, and that the "[t]otal assets and revenues of these acquisitions represent approximately 16.8% and 5.7%, respectively, of the related consolidated financial statement amounts as of and for the fiscal year ended April 1, 2012."  The Company further stated, "Our growth strategy includes the acquisition of strategic operations.  In recent years, we have completed a number of acquisition transactions.  We expect that we will continue to seek acquisitions of complementary businesses, products and technologies to add products and services for our core customer base and for related markets, and to expand each of our businesses geographically."

40.    On January 24, 2013, the Company held a Q3 2013 earnings call.  In this call, Donegan indicated that management expected cash flow contributions from future acquisitions:

> We have been, and we will continue to be, a company that focuses on M&A first. We still have numerous opportunities available moving forward. We are not at a loss of ideas. They're all in our current space, so we're not looking to go off in some new direction. But as you can see from this chart, we will continue to be a very strong driver of cash flow moving forward. And look at what we're expecting. We are expecting roughly $5 billion to deploy through fiscal year '16.

*See also* Proxy at 30 ("In response to requests from certain of the Company's investors for greater visibility into the expected future performance of the Company, in January 2013 the Company provided a high level financial outlook for the 2016 fiscal year, and more recently continued to further develop its long-term forecasting capabilities.").

{SSBLS Main Documents/8636/001/00603605-1 }

PAGE 7 –  **CLASS ACTION ALLEGATION COMPLAINT**

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

41.     On May 19, 2013, the Company held a Q4 2013 earnings call.  During this call, Donegan explained the Company's long-term approach for its acquisition strategy: "There has – again, our acquisitions tend to – very rarely do we get an acquisition that comes up in a short period of time.  Typically, our acquisitions, our assets that we've been working on for a long period of time, usually, in the 1 to 2 years.  So in that, obviously, we have been working, and we are continuing to work, on transactions that make sense for us."

42.     On May 30, 2013, the Company filed its Annual Report on Form 10-K with the SEC. In this document, the Company disclosed that it had completed 12 acquisitions in fiscal 2013 in the amount of approximately $1 billion, and that the "[t]otal assets and revenues of these acquisitions represent approximately 37.2% and 10.9%, respectively, of the related consolidated financial statement amounts as of and for the fiscal year ended March 31, 2013."  The Company stated, "We have focused on and have been diligent in acquiring the right assets over the last few years, and now those acquisitions have started to deliver on the value we anticipated."  The Company continued to affirm that "[o]ur growth strategy includes the acquisition of strategic operations and capital equipment.  In recent years, including fiscal 2013, we have completed a number of acquisition transactions, including the acquisition of Titanium Metals Corporation ('TIMET') in fiscal 2013, a manufacturer of a full range of titanium products, including ingot and slab, forging billet and mill forms.  We expect that we will continue to seek acquisitions of complementary businesses, products, capital equipment and technologies to add products and services for our core customer base and for related markets, and will also continue to expand each of our businesses geographically."

43.     On October 24, 2013, the Company held a Q2 2014 earnings call.  During this call, Donegan described the Company's acquisition strategy in the following manner: "And if I look at this, our acquisition mentality and what we expect, it is a very clearly defined, almost surgical process that we go in, identifying the opportunities, clearly putting them on everybody's plate, resourcing an effective manner to get and then driving them through.  And the management teams, to

{SSBLS Main Documents/8636/001/00603605-1 }
PAGE 8 – **CLASS ACTION ALLEGATION COMPLAINT**

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

their credit, across all these have been able to accept and deliver these levels and a very, very solid response."

44.    On May 8, 2014, the Company held a Q4 2014 earnings call.  During this call, Donegan stated: "We're going to continue to systematically identify the right acquisitions – not any acquisition, the right ones for us.  Once we acquire, we're going to rapidly drive our integration process.  We're going to deliver substantially improved performance on our end markets.  And we're always going to do it in an environment that each plant feels as though they are the whole company.  We want them to feel that their results are the company's results.  This is the DNA of the company, and it will continue to be unrelenting in that manner."  Donegan also confirmed that "we are not at any loss of ideas or opportunities to redeploy our cash into the M&A world."

45.    On May 29, 2014, the Company filed its Annual Report on Form 10-K with the SEC.  In this document, the Company disclosed that it had completed seven acquisitions in fiscal 2013 in the amount of approximately $1 billion, and that the "[t]otal assets and revenues of these acquisitions represent approximately 6.9% and 1.8%, respectively, of the related consolidated financial statement amounts as of and for the fiscal year ended March 30, 2014."  The Company stated that "[g]oing forward, we see solid acquisition opportunities and expect to continue to focus our cash redeployment in this area for the foreseeable future."  The Company further continued to affirm that "[o]ur growth strategy includes the acquisition of strategic operations and capital equipment.  We have completed a number of acquisition transactions in recent years.  We expect that we will continue to seek acquisitions of complementary businesses, products, capital equipment and technologies to add products and services for our core customer base and for related markets, and will also continue to expand each of our businesses geographically."

46.    On July 24, 2014, the Company held a Q1 2015 earnings call.  During this call, Donegan indicated that management's expectations on acquisitions were included in the Company's long term earnings per share targets:

> Now if you look at how we kind of derive that number, we took what we know is out there, the market share, the bill rates, the positions, the content, the value, what we

{SSBLS Main Documents/8636/001/00603605-1 }
PAGE 9 – **CLASS ACTION ALLEGATION COMPLAINT**

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

think is going to happen in M&A, our ability to take cost out, same way we basically said for 5, 6, 7 years ago, that we thought we could drop through 35% incremental margins. We've demonstrated over year over year over year that we are dropping through higher than that. But we felt confident at that point in time that was a good baseline to use and to let it go up there. So it is what we know is going to happen in the M&A market. It's what we know we're going to be able to do once we get something. It's looking at 11 years of what we get in the first 12 months, 3 years, 5 years, rate of acceleration. It's looking at the content we already have locked in. In terms of the airframe, it's looking at the share gains we already have and the content we have in the IGT. It's looking at the interconnect pipe. It's all that blended in, and the long haul lets us feel that, that is a reasonable way to look at this business. I personally believe at the end of the day that growing EPS is what I am paid and hired to do. It's not necessarily to lay a number out there and make it low and beat it. Or I believe our obligation to the shareholders is to grow that EPS in the face of any obstacle. That is what I view our obligation to the shareholders is now. That's kind of how we look at it. As we get deeper out into it, you'll find us probably beat. If the market moves more aggressively, we'll be the higher end of that. If something happens in the market that it stalls, we'll probably be to the lower end of that, and we will come after cost or M&A and whatever the case may be. It's a center point. It's what it is. It's not exact. We move around it. And again, over the last 4 years, we've moved around that and we've averaged almost 17%.

47.    On October 23, 2014, the Company held a Q2 2015 earnings call. During this call,

Donegan indicated that PCC was not finding it difficult to complete acquisitions:

So we probably average 2 years from when we start making a contact or start trying to extract, to start engaging in conversations, until we get a deal done. So from our vantage point, I'd say no, it feels the same in terms of that. It – so we're not out normally just kind of buying haphazardly things that may be for sale and then the difficulty comes in. Usually by the time we go through, it's been a very long courtship, for lack of a better word, that together, we've gotten comfortable with the balancing of future dynamics, risk and that's kind of like the spot we drive in. So I'd say right now, it feels about the same from my vantage point. But again, you got to realize that we – our time is typically 2 years, so no, it feels about the same to me from what we're looking at.

48.    On January 22, 2015, the Company held a Q3 2015 earnings call. During this call,

Donegan indicated that PCC was committed to its acquisition strategy and had numerous

opportunities in the foreseeable future:

I never say never, I think that we're firmly committed now to – M&A is always going to be our primary objective. And I know there are these moments in time where we see these pauses and that's perceived by a lot of people saying, geez, they don't have opportunities. We've numerous opportunities sitting in front of us of which all are right for the business. So I would say that number one that's going to be our primary objective. I think we're very committed and you will see us stay very committed to share repurchase so I would say for the foreseeable future those would be the two dynamics that we want to go after, again it will be M&A first, share repurchase. I think if we saw a point . . . where those two didn't effectively use our

{SSBLS Main Documents/8636/001/00603605-1 }

PAGE 10 –   CLASS ACTION ALLEGATION COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

cash, we'll have to consider other alternatives, but looking at what's sitting in front of us and the M&A opportunity as well as what we think we can do in share repurchase, I think again for the next 12 months I think that's kind of where we want to be.

49.    On May 13, 2015, the Company held a Q4 2015 earnings call.  During this call, Donegan stated,

> What I really want to focus on now is our capital allocation framework.  We have two primary objectives which have been the key drivers for us for years.
>
> *    *    *
>
> Second, we will continue to execute our acquisition strategy that we have established and have been executing over the last 12 years.  At the heart of this, we will pursue the right assets that capitalize on our core competencies.  We will remain a disciplined buyer to ensure we have the proper return criteria.  There are cases in times where it is not uncommon for our M&A from the time we make initial contact until we complete a transaction to be two plus years.  Again, we are searching and extracting the right assets for us.
>
> *    *    *
>
> If I look at our performance over the last three years, our CapEx, our internal investments have totaled $1.1 billion, acquisition have control of $6.7 billion and share our repurchases has been $2.2 billion.  To be clear, we have the desire and the capacity to deliver all three given our strong cash generating capability and the strength of our balance sheet.  I want to take a closer look at our M&A framework.  It has been the large component of our allocation.  We have deployed $8.5 billion from fiscal year '12 through Q1 of fiscal year '16.  It has been a very rigorous and focused execution over the last 12 years and we will continue to focus around our core competencies.
>
> *    *    *
>
> M&A will continue to remain our top priority.  We are actively pursuing today strategic acquisitions both, large and small.  We will continue to be a disciplined buy, but we are targeting $3 billion to $5 billion over the next two years.

50.    According to the Proxy, as part of announcing the Company's Q4 2015 results, PCC "began providing annual financial guidance to its investors" and in connection with providing annual financial guidance, "the Company's management prepared and the Board reviewed a set of forecasts (the 'May Forecasts')."

51.    According to the Proxy, the May Forecasts were prepared contemplating two scenarios: one that assumed continued acquisitions activity consistent with the Company's historical

{SSBLS Main Documents/8636/001/00603605-1 }
PAGE 11 –    CLASS ACTION ALLEGATION COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

approach; and another that assumed no acquisitions. *See* Proxy at 32 ("The May Forecasts were prepared under two separate sets of assumptions regarding acquisition activity. The first set assumes no acquisitions and a $1 billion issuance of bonds. The second set assumes approximately $1.5 billion of acquisition expenditures per annum and a $3 billion issuance of bonds.").

52.     On May 28, 2015, the Company filed its Annual Report on Form 10-K with the SEC. In this document, the Company disclosed that it completed two acquisitions in fiscal 2015 in the amount of approximately $637 million, and that the "[t]otal assets and revenues of these acquisitions represent approximately 4.2% and 1.9%, respectively, of the related consolidated financial statement amounts as of and for the fiscal year ended March 29, 2015." The Company also stated,

- "Our growth strategy includes the acquisition of strategic operations and capital equipment. We have completed a number of acquisition transactions in recent years. We expect that we will continue to seek acquisitions of complementary businesses, products, capital equipment and technologies to add products and services for our core customer base and for related markets, and will also continue to expand each of our businesses geographically."

- "Our capital allocation framework supports a multi-pronged strategy that prioritizes internal investment and value-creating acquisitions, with excess cash returned to shareholders in the form of share repurchases once the first two criteria are met."

- "We continue to be very active on the acquisition front, with several potential opportunities in front of us."

- "We remain committed to our value-creating capital deployment strategy, focused on growing the business organically and through acquisitions and on returning excess cash to shareholders via share repurchases."

- "We have also been expanding our international activities during the past several years, primarily through acquisitions and the development of overseas subsidiaries. This expansion is part of our strategy to acquire and develop businesses that complement our core competencies, provide low-cost manufacturing, have strong growth prospects and maintain leading positions in their respective market niches."

53.     On July 9, 2015, Donegan met with Buffett. Buffett is the CEO of Berkshire. Berkshire engages in diverse business activities, including property and casualty insurance and reinsurance, utilities and energy, freight rail transportation, finance, manufacturing, and retailing services. Around the time of the Acquisition, Berkshire beneficially owned 2,695,109 shares of

{SSBLS Main Documents/8636/001/00603605-1 }

PAGE 12 –    **CLASS ACTION ALLEGATION COMPLAINT**

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600    FAX (503) 227-6840

Company common stock, and pension funds of certain subsidiaries of Berkshire owned an additional 1,505,683 shares of Company common stock.

54.     Around the time of his meeting with Buffett, Donegan knew that the Board was looking at candidates to replace him as CEO of the Company.

55.     At the July 9, 2015 meeting, Buffett told Donegan that Berkshire was interested in acquiring the Company for $235 per share and that he wanted Donegan to continue working with the Company post-merger.  As Buffett acknowledged that "all [Donegan] wants to do is run Precision."  Buffett stated, "If we treat him right, he will be running [PCC] for decades and decades, and that's what he wants to do."

56.     In order to secure this offer from Buffett and obtain tens of millions of dollars in personal payouts, Donegan took active steps to make sure that Berkshire's attempt to acquire PCC would be successful.

57.     On July 11, 2015, the Board met to discuss, for the first time, Berkshire's $235 offer.  At this meeting, the Board acknowledged that it needed to assess the Company's financial prospects in order to adequately assess Berkshire's $235 offer.  Immediately thereafter, Donegan caused a new set of projections to be developed that unreasonably excluded the acquisition scenario and assumed that Company would not pursue and/or complete any more acquisitions over the next five year period (the "Revised Company Forecasts").

58.     Only two days later, on July 13, 2015, PCC announced that it agreed to acquire Composites Horizons, LLC ("CHI"), the leading independent supplier of high-temperature carbon and ceramic composite components for use in next-generation aerospace engines.  The Company stated: "The cash acquisition will be immediately accretive to earnings.  Subject to regulatory approvals, the transaction is expected to be completed during the second quarter of fiscal 2016, after which its results will be reported as part of the Investment Cast Products segment."

59.     On July 21, 2015, the Board met to review the Revised Company Forecasts presented by PCC's management.  Management informed the Board that the Revised Company Forecasts

{SSBLS Main Documents/8636/001/00603605-1 }
PAGE 13 –   CLASS ACTION ALLEGATION COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

assumed that the Company would not pursue or complete additional acquisitions in the future because of the purported uncertainty of such acquisitions, even though the Company had inked the CHI acquisition only days before. The Board accepted this assumption even though the Board knew the assumption to be false. The Board agreed that management should provide the Revised Company Forecasts to Credit Suisse to use to value the Company's shares against Berkshire's $235 offer, even though the Board knew that the Revised Company Forecasts ignored a significant value component of the Company's future prospects.

60. Less than one week later, the absurdity of excluding acquisitions from the Company's financial projections and valuation calculus was further underscored when, on July 27, 2015, PCC announced that it agreed to acquire Noranco – a premier supplier of complex machined and fabricated components for aero-engine, landing gear and airframe applications – for $560 million. The Company stated that "[t]he cash acquisition will be immediately accretive to earnings. Subject to regulatory approvals, the transaction is expected to be completed during the third quarter of fiscal 2016, after which its results will be reported as part of the Airframe Products segment."

61. Despite these ongoing acquisitions and the 2+ year acquisition pipeline that the Company was actively creating, in late July 2015, Donegan provided the Revised Company Forecasts, which assumed no acquisitions, to Credit Suisse to use for its fairness opinion. In so doing, Donegan ensured that Credit Suisse could tell the Board that the $235-per-share offer from Buffett was financially fair to the Company's shareholders, when it was not.

62. On July 31, 2015, PCC completed its acquisition of CHI.

63. On August 8, 2015, Credit Suisse provided its fairness opinion to the Board. Credit Suisse – which received approximately $5.1 million in fees from Berkshire in the last two years as compared to less than $500,000 from the Company – did not independently verify the Revised Company Forecasts or the assumptions underlying these projections and simply assumed that the projections were accurate for the purposes of its fairness opinion. Using the Revised Company Forecasts, Credit Suisse implied a standalone valuation reference range of $215 to $256 as compared

{SSBLS Main Documents/8636/001/00603605-1 }

PAGE 14 –    **CLASS ACTION ALLEGATION COMPLAINT**

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

to the $235 offer from Berkshire.  For rubberstamping the deal based on patently unreasonable projections, Credit Suisse secured a $32 million fee upon the consummation of the Merger.

64.     The Board knew that it could not rely on Credit Suisse's fairness opinion because it was based on the Revised Company Forecasts.  As discussed above, the Board knew that the Revised Company Forecasts, which abandoned the Company's core business strategy of growth through acquisitions, were unreasonable.  The Board knew the Company was going to continue its acquisition strategy.  *See* Transcript of Q3 2015 Earnings Call (Jan. 22, 2015) (Donegan asserting that "M&A is always going to be our primary objective.  And I know there are these moments in time where we see these pauses and that's perceived by a lot of people saying, geez, they don't have opportunities.  We've numerous opportunities sitting in front of us of which all are right for the business.").  The Board also knew that, as of August 8, 2015, the Company had at least two years' worth of acquisitions in the pipeline.  *See* Transcript of Q2 2015 Earnings Call (Oct. 23, 2014) (Donegan stating, "So we probably average 2 years from when we start making a contact or start trying to extract, to start engaging in conversations, until we get a deal done.").  And even in the midst of the merger discussions with Berkshire, which barely lasted a month, PCC inked two additional acquisitions as part of its ongoing acquisition program.  Yet the Board deliberately turned a blind eye and accepted Credit Suisse's flawed fairness opinion that was based on zero new acquisitions, willfully blinding themselves to the true value of the Company.

65.     The consideration of $235 per share was unfair to the Company's shareholders.  The $235-per-share Merger Consideration was well below the target price of $299-per-share on the Company's stock set by an analyst at BOE Securities, the $252-per-share price set by an analyst at Buckingham Research Group, and the $244-per-share price set by an analyst at UBS, on June 6, May 19, and April 20, 2015, respectively.  In the last two years, PCC common stock traded as high as $275.09 per share on June 9, 2014, its 52-week high was $247.04 per share on September 18, 2014 and, more recently, it traded above the Merger Consideration price - at $238.03 per share - on January 5, 2015.  Also over the past two years, the Board recommended share repurchases at prices

{SSBLS Main Documents/8636/001/00603605-1 }

PAGE 15 –    **CLASS ACTION ALLEGATION COMPLAINT**

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

that implied a fair value takeover price of $325 per share.  Finally, and most importantly, the Merger Consideration was substantially below the fair value of the Company calculated using projections that reflect the Company's true business plans and prospects.

66.     As one investor of the Company put it, "We think that in 18 months the company would have been worth $400 per share"; "It's a classic example of Berkshire buying a depressed asset at a great price"; "The shareholders get cashed out, so they don't get to participate in the upside."

67.     While shareholders were cashed out at an unfair price, the directors and executives were richly rewarded by the Acquisition.  Members of the Board and the Company's senior management collectively owned over 1.3 million PCC shares for which they received immediate cash payment (over $306.7 million from the Merger).  Moreover, PCC's officers and directors received millions of dollars in special payments – not being made to ordinary shareholders – for currently unvested stock options, performance units, and restricted shares, all of which, upon the Merger's closing, became fully vested and exercisable.  Donegan himself secured a whopping $51.8 million from his options.  The Company's senior management also received over $23 million in change-of-control payments.  In addition, Donegan and the members of the Company's management have stayed on after the Merger.

68.     On August 10, 2015, PCC and Berkshire jointly announced that they had entered into the Merger Agreement, whereby Berkshire agreed to acquire each share of PCC stock for just $235 in cash per share.

69.     The press release announcing the Merger Agreement stated in pertinent part,

BERKSHIRE  HATHAWAY  INC.  TO  ACQUIRE  PRECISION  CASTPARTS CORP. FOR $235 PER SHARE IN CASH

PCC will remain headquartered in Portland, Ore. as a wholly owned subsidiary of Berkshire Hathaway.

. . . The boards of directors of Berkshire Hathaway Inc. and Precision Castparts Corp. ("PCC") have unanimously approved a definitive agreement for Berkshire Hathaway to acquire, for $235 per share in cash, all outstanding PCC

{SSBLS Main Documents/8636/001/00603605-1 }

PAGE 16 –    **CLASS ACTION ALLEGATION COMPLAINT**

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

shares.  The transaction is valued at approximately $37.2 billion, including outstanding PCC net debt.

"I've admired PCC's operation for a long time.  For good reasons, it is the supplier of choice for the world's aerospace industry, one of the largest sources of American exports. Berkshire's Board of Directors is proud that PCC will be joining Berkshire," said Warren E. Buffett, Berkshire Hathaway chairman and chief executive officer.

"We are very pleased to be joining forces with Berkshire Hathaway," said Mark Donegan, PCC's chairman and chief executive officer.  "We see a unique alignment between Warren's management and investment philosophy and how we manage PCC for the long-term.  We believe that as part of Berkshire Hathaway, PCC will be exceptionally well-positioned to support our customers' needs into the future. This transaction offers compelling and immediate value for our shareholders, and allows PCC's employees to continue to operate in the same manner that has generated many years of exceptional service and performance to our customers."

The transaction requires approval by a majority of PCC's outstanding shares. Closing is expected to occur during the first quarter of calendar 2016, subject to customary closing conditions, including clearance under the Hart-Scott-Rodino Act and competition clearance in certain foreign jurisdictions.

PCC will continue to do business around the world under the Precision Castparts name and maintain its headquarters in Portland, Oregon.

In light of this announcement, the three nominees who would have joined PCC's Board of Directors if elected at PCC's upcoming Annual Meeting of Shareholders, Peter B. Delaney, James F. Palmer and Janet C. Wolfenbarger, have withdrawn their candidacy.  None of Mr. Delaney, Mr. Palmer or Ms. Wolfenbarger currently serves on PCC's Board of Directors and PCC does not intend to nominate replacement directors for election at the Annual Meeting in their place.  Other than Mr. Delaney, Mr. Palmer and Ms. Wolfenbarger, the nominees named in the Proxy Statement sent or made available to PCC shareholders, all of whom currently serve on PCC's Board of Directors, intend to stand for election at the Annual Meeting. PCC intends to convene its Annual Meeting on August 11, 2015 as currently scheduled and, without conducting any business, adjourn the Annual Meeting to August 17, 2015 at 10:00 a.m., Pacific Time, in the Bella Vista Room of the Aquariva Restaurant, 0470 SW Hamilton Court, Portland, Oregon.

Credit Suisse acted as financial advisor to PCC and PCC's legal counsel is Cravath, Swaine & Moore LLP and Stoel Rives LLP. Berkshire Hathaway's legal counsel is Munger, Tolles & Olson LLP.

70.    On October 13, 2015, PCC filed the Proxy, recommending that the Company's shareholders vote to approve the Acquisition.  The Proxy contained numerous material misleading statements or omissions in an attempt to secure approval of the Acquisition, as discussed below.

71.    On October 30, 2015, the Company completed the acquisition of Noranco.

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

72.     On January 29, 2016, pursuant to an uninformed shareholder vote, Berkshire completed the Acquisition.

73.     On February 2, 2016, PCC "completed a small acquisition in the Airframe Products segment."

74.     On March 7, 2016, Buffett stated that PCC will continue buying companies under Donegan. "In building his business, Mark has made many acquisitions and will make more," Buffett stated. "We look forward to having him deploy Berkshire's capital."

75.     On April 8, 2016, the Company filed its Transition Report on Form 10-KT with the SEC. In this document, the Company disclosed that it acquired five businesses during fiscal 2016 and that "[t]otal assets and revenues of these acquisitions represent approximately 5.9% and 1.2%, respectively, of the related consolidated financial statement amounts as of and for the fiscal year ended January 3, 2016." The Company continued to affirm that: "Our growth strategy includes the acquisition of strategic operations and capital equipment. We have completed a number of acquisition transactions in recent years. We expect that we will continue to seek acquisitions of complementary businesses, products, capital equipment and technologies to add products and services for our core customer base and for related markets, and will also continue to expand each of our businesses geographically."

76.     To date, the Company's website touts that PCC "has achieved solid top- and bottom-line growth not only through its legacy operations, but also through acquisition of businesses specifically targeted to complement those operations." PCC's website states,

> With a focus on aerospace and power markets, acquisition candidates are selected in accordance with our core capabilities: production of complex components for critical applications; a direct relationship with the original equipment manufacturer; process control; similarity in metals or technologies; and improvement of underperforming assets. We value businesses fairly and, as disciplined buyers, will pay a reasonable multiple based on that valuation. To date, our acquisitions have been immediately accretive to earnings, with post-acquisition synergies generating increased shareholder value.

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

## THE MATERIALLY MISLEADING PROXY

77.    In connection with the Acquisition, defendants disseminated the materially misleading Proxy.  The Proxy, which recommended that PCC's shareholders vote in favor of the Acquisition and was an essential link in the accomplishment of the Acquisition, omitted and/or misrepresented material information about the intrinsic value of the Company, which misled PCC's public shareholders into voting in favor of the Acquisition without material information regarding the critical decision they faced.  Specifically the Proxy omitted/or misrepresented the material information set forth below in contravention of §§ 14(a) and 20(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder regarding the true value and prospects of the Company.  There is no more material information to shareholders in a merger than the information underlying or supporting the purported "fair value" of their shares.  PCC shareholders were entitled to the information necessary to make an informed decision as to the adequacy of the Acquisition consideration, including the value of the Company's true prospects based on its actual business plan that involved continuing acquisitions rather than zero acquisitions.  Here, Credit Suisse's analysis incorporated certain critical assumptions (zero acquisitions) – and failed to incorporate other assumptions (continuing acquisitions) – that significantly affected the output (valuation) of the analyses.  Without this material information, shareholders were precluded from making an informed decision as to the adequacy of Berkshire's offer.

78.    To that end, the Proxy misled the Company's shareholders as to what they were actually giving up for $235 per share.  The business valued and presented in the Proxy was a business that assumed no acquisitions over the next five years – a mythical business, far less valuable than the real PCC, with its significant pipeline of past, ongoing, and future acquisitions materially bolstering the assets, revenues, and prospects of the real company.  Thus, shareholders were misled as to the value of their shares.  Information regarding the value of their shares was the most important factor to shareholders in deciding how to vote on the Acquisition.

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

79.    The Proxy misled the Company's shareholders as to the reasonableness and reliability of the Revised Company Forecasts.  On Page 31 of the Proxy, the Proxy stated that: "The Board relied primarily on, and for purposes of its analyses and opinion directed Credit Suisse to use, the Company Forecasts rather than the May Forecasts, as the [Revised Company Forecasts] reflected management's most up-to-date and accurate forecasts."  On the same page, the Proxy also stated that "the Company Forecasts did not assume any acquisitions other than those that were previously announced or completed because of the inherent uncertainty of consummating acquisitions with third parties on terms that would be attractive to the Company or at all."

80.    These statements gave shareholders at least two false impressions.  First, these statements asserted that the Revised Company Forecasts were reliable because they included "up-to-date" information – *i.e.*, they suggested that the decision to exclude acquisitions from the Revised Company Forecasts was based on the Company's "up-to-date" business plan that excluded acquisitions.  That was false – there was no actual plan for the Company to suddenly abandon its acquisition strategy in July 2015.  Only a month earlier, the Company had stated, "We continue to be very active on the acquisition front, with several potential opportunities in front of us."  Moreover, the Company's growth through acquisitions was not expected to slow down in the foreseeable future.  To that end, in July 2015, even as Donegan and the Board were excluding acquisitions from the analysis of the Company's fair value, the Company announced two additional acquisitions.  PCC expected to spend an additional $5 billion on acquisitions over the next few years, in line with the $7 billion it has spent on acquisitions over the past several years.  And, as Buffett has admitted, the Company is expected to continue its acquisitions growth strategy now that defendants have consummated the Merger.

81.    Second, the statements suggested that it was appropriate to exclude acquisitions in the Revised Company Forecasts because such exercise valuation would be too uncertain.  As demonstrated above, however, management was able to and did previously value the Company's acquisition strategy over the long-term, and was confident in their ability to reliably assess the value

{SSBLS Main Documents/8636/001/00603605-1 }

PAGE 20 –    **CLASS ACTION ALLEGATION COMPLAINT**

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

of PCC's acquisition strategy. And even during the single month of Acquisition negotiations that took place, while defendants were directing Credit Suisse to value the Company based on a zero acquisition set of projections, the Company made two more acquisitions totaling more than $560 million dollars.

82.   The statements made in the Proxy, by falsely giving shareholders the impression that Revised Company Forecasts – and the fairness opinion based on these projections – were reasonable and reliable, prevented shareholders from being able to make the basic decision of whether they wanted to give up their shares and the opportunity to share in the future upside of the Company for $235 per share. In short, the Proxy falsely represented the true value of the Company. Yet, as alleged above, information regarding the value of their shares was the most important factor to shareholders in deciding how to vote on the Acquisition.

83.   In addition to the above, the Proxy also did not disclose the following critical financial information in the May Forecasts and Revised Company Forecasts:

- With respect to the May Forecasts – Without Acquisitions and the May Forecasts – With Acquisitions, the following projections: EBITDA (2021 only);

- With respect to the Revised Company Forecasts, the May Forecasts – Without Acquisitions and the May Forecasts – With Acquisitions, the following projections: (i) Revenue (2021 only); (ii) EBIT (or D&A) (2021 only); (iii) Taxes (or tax rate) (2021 only); (iv) Capital expenditures; (v) Changes in net working capital; (vi) Stock-based compensation expense; (vii) Any other adjustments to unlevered free cash flow; and (viii) Unlevered free cash flow; and

- Information necessary to ascertain whether the "risks" and "opportunities" set forth in the Revised Company Forecasts were incorporated in the May Forecasts.

84.   The above omissions prevented the Company's shareholders from being able to assess the value of the acquisitions strategy that defendants eliminated from the Revised Company Forecasts.

85.   For example, without the year 2021 projections, the Company's shareholders were unable to compare a discounted cash flow ("DCF") valuation of the Company based on the Revised Company Forecasts excluding acquisitions versus the May Forecasts including acquisitions. A DCF analysis involves: (1) projecting operating cash flows out to a valuation horizon; (2) determining a

{SSBLS Main Documents/8636/001/00603605-1 }

PAGE 21 –    **CLASS ACTION ALLEGATION COMPLAINT**

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

terminal value which represents the business' value at the horizon; and (3) discounting all cash flows to their present value.

86.    On page 37, the Proxy disclosed a summary of Credit Suisse's DCF analysis based on the Revised Company Forecasts excluding acquisitions, and indicated that the valuation horizon for the Company was year 2021: "Credit Suisse also performed a discounted cash flow analysis of the Company by calculating the estimated net present value of the projected after-tax, unlevered free cash flow of the Company based on the [Revised] Company Forecasts.  Credit Suisse applied a range of terminal value multiples of 9.5x to 10.5x to the Company's estimated FY 2021E EBITDA of $4.21 billion (per Company Management) and discount rates ranging from 7.0% to 9.0%.  The discounted cash flow analysis of the Company based on the Company Forecasts indicated an implied valuation reference range of $215 to $256 per share of Company common stock, as compared to the proposed merger consideration of $235 per share of Company common stock in the merger pursuant to the merger agreement."

87.    It is uncertain whether Credit Suisse additionally performed a DCF valuation using the May Forecasts including acquisitions.  If Credit Suisse did, the Proxy failed to disclose the results of any such valuation.  If Credit Suisse did not, the Proxy did not disclose the year 2021 projections which Company's shareholders required to make this calculation on their own.   This omission prevented the Company's shareholders from rejecting Credit Suisse's DCF valuation as inadequate.

88.    Additionally, on pages 32 and 33, the Proxy disclosed a partial summary of the Revised Company Forecasts and May Forecasts.  This partial summary did not provide a clear view of how management included the assumptions and value of the Company's acquisitions strategy into one set of forecasts, and eliminated them from the other.  Without the information identified above, the partially disclosed summaries of the Revised Company Forecasts and May Forecasts were materially incomplete.  Without the information identified above, the Company's shareholders could

{SSBLS Main Documents/8636/001/00603605-1 }

PAGE 22 –    **CLASS ACTION ALLEGATION COMPLAINT**

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

not assess the value of the acquisitions strategy that they were giving up in an offer that was being recommended excluding that acquisitions strategy.

89.    Additional omissions from Credit Suisse's fairness analyses muddied the picture for the Company's shareholders.  The Proxy omitted:

- With respect to Credit Suisse's Selected Companies Analysis: whether Credit Suisse performed any type of benchmarking analysis for PCC in relation the selected companies; and

- With respect to Credit Suisse's DCF Analysis: (i) the individual inputs and assumptions that Credit Suisse used for the selection of discount rates of 7.0%-9.0%; (ii) the implied perpetuity growth rates observed from this analysis; and (iii) whether Credit Suisse treated stock-based compensation as a cash or non-cash expense.

90.    Those omissions, coupled with the other disclosure flaws, damaged the Company's shareholders' ability to make an informed decision on the Acquisition.  Without the above financial disclosures, the Company's shareholders were unable to reject the subjective inputs selected by Credit Suisse, had no basis on which to judge the inadequacy of the Merger Consideration and were misled as to value of their shares and the purported "fairness" of the offer from Berkshire.  Without the above financial disclosures, the Company's shareholders were in the dark about what they gave up in return for the inadequate Merger Consideration because information regarding the value of their shares was the most important factor to shareholders in deciding how to vote on the Acquisition.

91.    Without the above information, and in conjunction with the disclosure flaws identified above, shareholders were unable to assess the desirability of alternatives to the Acquisition and were misled about the Acquisition and the true value of the Company.

## COUNT I

### Against Defendants for Violations of § 14(a) of the 1934 Act and SEC Rule 14a-9 Promulgated Thereunder

92.    Plaintiffs repeat and reallege every allegation contained above as if fully set forth herein.

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

93.     During the relevant period, defendants disseminated the false and misleading Proxy specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

94.     The Proxy was an essential link in the accomplishment of the Acquisition, and was prepared, reviewed and/or disseminated by defendants.  It misrepresented and/or omitted material facts, including material information about the unfair consideration offered in the Acquisition and the actual intrinsic value of the Company.

95.     In so doing, defendants made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of § 14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.  By virtue of their positions within the Company and/or roles in the process and in the preparation of the Proxy, defendants were aware of this information and of their duty to disclose this information in the Proxy.

96.     Defendants were at least negligent in filing the Proxy with these materially false and misleading statements.

97.     The omissions and false and misleading statements in the Proxy are material in that a reasonable shareholder would consider them important in deciding how to vote on the Acquisition. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to shareholders.

98.     By reason of the foregoing, defendants have violated § 14(a) of the 1934 Act and SEC Rule 14a-9(a) promulgated thereunder.

99.     Because of the false and misleading statements in the Proxy, plaintiffs and the Class were injured.

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

## COUNT II

### Against Defendants for Violation of § 20(a) of the 1934 Act

100.     Plaintiffs repeat and reallege each allegation contained above as if fully set forth herein.

101.     Defendants acted as controlling persons of PCC within the meaning of § 20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of PCC, and/or their participation in and/or awareness of the Company's operations and/or intimate knowledge of the false or misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiffs contend are false and misleading.

102.     Each of the defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

103.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Acquisition.  They were thus directly involved in the making of this document.

104.     PCC also had direct supervisory control over composition of the Proxy and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Proxy.

105.     In addition, as the Proxy sets forth at length, and as described herein, defendants were each involved in negotiating, reviewing, and approving the Acquisition.  The Proxy purports to

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

describe the various issues and information that they reviewed and considered, descriptions which had input from all defendants.

106.    By virtue of the foregoing, defendants have violated § 20(a) of the 1934 Act.

107.    As set forth above, defendants had the ability to exercise control over and did control a person or persons who have each violated § 14(a) of the 1934 Act and SEC Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to § 20(a) of the 1934 Act.  As a direct and proximate result of defendants' conduct, plaintiffs and the Class have been injured.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs demand relief, in favor of plaintiffs and the Class against defendants, as follows:

A.    Declaring that plaintiffs' claims are properly maintainable as a class action;

B.    Awarding damages to plaintiffs and the Class;

C.    Awarding plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees;

D.    Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a Class Representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel; and

E.    Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

DATED:  September 2, 2016

**STOLL STOLL BERNE LOKTING
    & SHLACHTER P.C.**


By: s/ Nadia H. Dahab
    **GARY M. BERNE**, OSB No. 774077
    gberne@stollberne.com
    **NADIA H. DAHAB**, OSB No. 125630
    ndahab@stollberne.com
209 SW Oak Street, Suite 500
Portland, OR  97204
Telephone: (503) 227-1600

*Liaison Counsel for Plaintiffs*

**ROBBINS GELLER RUDMAN & DOWD LLP**
RANDALL J. BARON (to seek *pro hac vice*
admission)
randyb@rgrdlaw.com
A. RICK ATWOOD, JR. (to seek *pro hac vice*
admission)
ricka@rgrdlaw.com
EUN JIN LEE (to seek *pro hac vice* admission)
elee@rgrdlaw.com
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone: (619) 231-1058

**BERGER & MONTAGUE, P.C.**
SHERRIE R. SAVETT (to seek *pro hac vice*
admission)
ssavett@bm.net
MERRILL G. DAVIDOFF (to seek *pro hac vice*
admission)
mdavidoff@bm.net
ROBIN SWITZENBAUM (to seek *pro hac vice*
admission)
rswitzenbaum@bm.net
LAWRENCE DEUTSCH (to seek *pro hac vice*
admission)
ldeutsch@bm.net
1622 Locust Street
Philadelphia, PA  19103
Telephone:  (215) 875-3000

*Attorneys for Plaintiffs*

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600  FAX (503) 227-6840

**CAVANAGH & O'HARA**
PATRICK J. O'HARA (to seek *pro hac vice*
admission)
patrick@cavanagh-ohara.com
2319 West Jefferson Street
Springfield, IL 62702
Telephone: (217) 544-1771

*Of Counsel for Plaintiff NECA-IBEW Pension
Trust Fund*

PAGE 28 –    **CLASS ACTION ALLEGATION COMPLAINT**