1            IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF OREGON

3   NECA-IBEW PENSION TRUST FUND      )
    (THE DECATUR PLAN) and ANGELA     )
4   LOHMANN, as Trustee for the       )
    Angela Lohmann Revocable Trust,   )
5   individually and on behalf of     )
    all others similarly situated,    )
6                                     )
              Plaintiffs,             ) No. 3:16-cv-01756-YY
7                                     )
         vs.                          ) July 26, 2017
8                                     )
    PRECISION CASTPARTS CORP., MARK   ) Portland, Oregon
9   DONEGAN, DON R. GRABER, LESTER    )
    L. LYLES, DANIEL J. MURPHY,       )
10  VERNON E. OECHSLE, ULRICH         )
    SCHMIDT, RICHARD L. WAMBOLD and   )
11  TIMOTHY A. WICKS,                 )
                                      )
12            Defendants.             )
    --------------------------------

13

14

15

16

17                      **MOTION HEARING**

18              TRANSCRIPT OF PROCEEDINGS

19          BEFORE THE HONORABLE YOULEE YIM YOU

20      UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

21

22

23

24

25

```
 1                          APPEARANCES

 2   FOR THE PLAINTIFFS:  A. Rick Atwood
                          Robbins Geller Rudman & Dowd LLP
 3                        655 West Broadway
                          Suite 1900
 4                        San Diego, CA  92101

 5                        Robin Switzenbaum
                          Berger & Montague
 6                        1622 Locust Street
                          Philadelphia, PA 19103
 7
                          Nadia H. Dehab
 8                        Stoll Stoll Berne Lokting & Shlachter PC
                          209 S. W. Oak Street
 9                        Suite 500
                          Portland, OR  97204
10
     FOR THE DEFENDANTS:  Robert H. Baron
11                        Omid H. Nasab
                          Cravath Swaine & Moore, LLP
12                        825 Eighth Avenue
                          New York, NY 10019-7475
13
                          Joel A. Mullin
14                        Stoel Rives LLP
                          760 S. W. Ninth Avenue
15                        Suite 3000
                          Portland, OR  97205
16
     COURT REPORTER:      Nancy M. Walker, CSR, RMR, CRR
17                        United States District Courthouse
                          1000 S. W. Third Avenue, Room 301
18                        Portland, OR  97204
                          (503) 326-8186
19

20

21

22

23

24

25
```

<pre>
 1                    P R O C E E D I N G S
 2              THE COURT:  Good afternoon.  Have a seat, please.
 3              THE CLERK:  Your Honor, now is the time set for oral
 4    argument in Civil Case 3:16-cv-1756-YY, NECA-IBEW Pension
 5    Trust Fund, et al. versus Precision Castparts Corp., et al.
 6              Beginning with plaintiffs' counsel, please state your
 7    appearances for the record.
 8              Thank you.
 9              MR. ATWOOD:  Good afternoon, Your Honor, Rick Atwood
10    from Robbins Geller for plaintiffs.
11              MS. SWITZENBAUM:  Robin Switzenbaum from Berger &
12    Montague for plaintiffs.
13              MS. DAHAB:  Nadia Dahab from Stoll Berne, also for
14    plaintiffs.
15              MR. MULLIN:  Your Honor, Joel Mullin of Stoel Rives
16    for the defendants.
17              MR. BARON:  Robert Baron from Cravath, Swaine & Moore
18    for the defendants.
19              MR. NASAB:  Omid Nasab from Cravath, Swaine & Moore
20    for defendants.
21              THE COURT:  All right.  Thank you.
22              Good afternoon again.  Just one moment while I get my
23    computer going here.
24              (Pause) We're here on the defendants' motion to
25    dismiss pursuant to Rule 12(b)(6).  The motion, opposition,
</pre>

1    and reply have been submitted, as well as a number of

2    exhibits.

3              I want to start with some questions for plaintiffs'

4    counsel.  And I understand -- is it Mr. Atwood, you're going

5    to be arguing, correct?

6              MR. ATWOOD:  Yes, Your Honor.

7              THE COURT:  All right.

8              (Audio feedback.)

9              THE COURT:  So sorry for that.

10             MR. ATWOOD:  Hope that wasn't me.

11             THE COURT:  No, it surely wasn't.

12             Okay.  So I'm familiar with the case law regarding

13   material omissions.  What I'd like to do is make sure I

14   understand your argument, so I'm hoping that you can walk me

15   through it.  I'm referring specifically to page 24 of the

16   plaintiffs' opposition.  It's page 24 of the opposition.

17   Also, it would be ECF No. 59.

18             I'll tell you, it's going to be a while, so you might

19   want to have a seat.  You can all remain seated for your

20   arguments because you're probably going to want to have to, as

21   I am going to refer to a number of different documents.

22             So here on page 29 -- or 24, it states in the last

23   paragraph, "Here, plaintiffs allege that defendants partially

24   disclosed PCC's projections and omitted material information

25   from PCC's projections necessary for stockholders to assess

1   the value of PCC's long-standing acquisition strategy embedded

2   in the May forecast with acquisitions missing from the revised

3   company forecasts."  And then it refers to paragraphs 83

4   through 90.

5         Can you -- can we go through the paragraphs, starting

6   with 83, and can you explain to me how you feel -- well,

7   basically what you're arguing here and how you feel it meets

8   the standard with respect to material omissions?  So we could

9   start with paragraph 83.

10         MR. ATWOOD:  Sure.  And I'll just preface it by

11   saying that some of these are not the main focus of the

12   Complaint.  These are in the "also" category.

13         I think if the Court is familiar with the *Hot Topic*

14   opinion, it was a similar situation there where the focus of

15   the plaintiffs' argument was mostly on the projections and

16   what was and was not included in the projections.  But on top

17   of that there are some line item issues that are pertinent to

18   the opinion of the investment bank that is advising on the

19   fairness of the transaction that both in that case and here,

20   it was our view that they did not provide shareholders with

21   enough information to accurately assess the value of the

22   company.

23         So the Court, I know, is familiar, this case arises

24   out of a merger transaction.  And what shareholders are being

25   asked to do in the proxy is vote whether to take $235 a share

1  for their stock or to turn that down.  The case law, *Hot*

2  *Topic*, the *Blount* case --

3             THE COURT REPORTER:  Counsel, I couldn't hear you.

4             THE COURT:  B-l-o-u-n-t.

5             MR. ATWOOD:  There is debate amongst counsel as to

6  whether that's pronounced Blunt (ph) or Blount.

7             THE COURT:  Let's go with Blunt (ph) today.

8             MR. ATWOOD:  Well, I agree.  I grew up in Tennessee.

9  There's a county called Blount County that's spelled the same

10 way, so I appreciate that.

11            The *Hot Topic* case, the *Blount* case, other cases talk

12 about the most fundamental information that a shareholder is

13 going to want in voting on a merger transaction is information

14 that shows the value of their stock.  So you can compare the

15 value of, in this case, Precision Castparts' stock to the $235

16 a share that's being offered by the acquirer in deciding to

17 vote yes or no.

18            That value information is contained in the proxy

19 primarily through the opinion of the investment advisor that's

20 advising on the transaction.  And whether that information is

21 complete in important details -- which I'll get to those

22 important details in just a minute, because I think that's

23 where you're going -- that bears on shareholders' ability to

24 make their own assessment in light of full and fair disclosure

25 as to whether to accept the deal or not.

1          So with specific respect to paragraph 83, this one I

2   think goes more to the heart of the case.  That has to do with

3   what are the true financial prospects of the company.

4          And I think -- and I had actually brought some

5   materials that are excerpts from the Complaint or the proxy or

6   the briefing to kind of focus some of these arguments.  I can

7   hand it up if it's helpful to the Court or just go through it

8   now, because these are all documents that you have in front of

9   you.  I had just pulled out and highlighted certain sentences

10  or paragraphs for purposes of trying to explain what we are

11  seeking here and why we believe that the Court should deny the

12  motion to dismiss.

13          THE COURT:  Sure.  If you think that would be helpful

14  for me to see that, that's fine.  And you provided a copy, I

15  see, to opposing counsel.

16          MR. ATWOOD:  Yes.  I've handed them out like candy,

17  Your Honor.

18          THE COURT:  Okay.

19          MR. ATWOOD:  So I have a couple here.

20          THE COURT:  Could we have two?

21          MR. ATWOOD:  (Handing)  And I promise I won't go too

22  far afield.  I'll come back.  I just think some of this helps

23  frame.

24          So tab 9 is what is Annex B to the proxy, and that is

25  the letter from Credit Suisse opining on the fairness of the

1  transaction.  And if the Court were to look at the very last

2  paragraph, which is on the second page, B-2, it says, "Based

3  upon and subject to the foregoing, it is our opinion that as

4  of the date hereof, the merger consideration to be received by

5  the holders of common stock other than parent and its

6  affiliates" -- I'll skip on ahead a bit -- "is fair, from a

7  financial point of view, to such holders other than parent and

8  its affiliates."  So that's the ultimate conclusion of the

9  bank, that the price here was fair.

10          Now, if the Court were to flip back a page -- and

11  I've highlighted the text there towards the bottom.  And this

12  is where we start to get to some of the points that we're

13  asking about.  The bank discloses here -- and it's also

14  disclosed under tab 7, which is an excerpt from the proxy

15  itself -- basically the same information.

16          Credit Suisse says, "With respect to the company

17  projections" -- and that's what we're talking about here in

18  paragraph 83 -- "management of the company has advised us and

19  we have assumed that the company projections have been

20  reasonably prepared on bases reflecting the best currently

21  available estimates and judgments of management of the company

22  as to the future financial performance of the company and are

23  a reasonable basis on which to evaluate the company and the

24  proposed merger."

25          So the whole opinion of Credit Suisse, opining that

1    this deal is fair, is caveated on information that Credit

2    Suisse was directed to use, the projections that it was

3    directed to use by the company.

4         So this ties in even more directly -- if the Court

5    were to turn to tab No. 6, this is an excerpt from the merger

6    proxy, page 37, where there is a discussion of the evaluation

7    analyses performed by Credit Suisse.  And Credit Suisse

8    performed several different analyses you see on the same page.

9    Selected transactions analysis, there are comparable

10   companies.

11        But when Courts -- and this happens most frequently

12   in Delaware, because the bulk of merger litigation takes place

13   place in Delaware.  Courts typically hold up the discounted

14   cash flow analysis as sort of the gold standard of business

15   valuation.  And they do that because when you buy a business,

16   you don't really care what it did yesterday or last year; you

17   care what it's going to do tomorrow and next year.

18        That's where the true value -- like take a gold mine,

19   for example.  You can look at past gold mine transactions and

20   say, Well, I have a gold mine.  It should be worth the same

21   amount of money.  But if it's played out, it's not going to be

22   worth as much as one with a lot of gold still to be pulled

23   out.

24        So the discounted cash flow analysis section which

25   I've highlighted here talks about the methodology that Credit

1    Suisse used to come up with a valuation range for the company

2    under the discounted cash flow analysis.  They used projected

3    after-tax, unlevered free cash flows of the company based on

4    the projections that we're here arguing about.

5         And they applied -- I'm skipping past -- I didn't

6    highlight all of it.  I probably should have.  It goes on to

7    say, "Credit Suisse applied a range of terminal value

8    multiples of 9.5 times to 10.5 times to the company's

9    estimated fiscal year 2021 EBITDA of $4.21 billion, per

10   company management."

11        So now I'm going to ask the Court to turn to another

12   tab, keeping in mind that what Credit Suisse did was apply a

13   discounted cash flow analysis primarily to these, for purposes

14   of future value -- the "terminal value" it's called here -- to

15   the company's estimated fiscal year 2021 EBITDA.

16        And if the Court turns to tab No. 4, this is the

17   section of the proxy where the projections are disclosed.  And

18   I think this highlights the issue that's being raised here in

19   paragraph 83, particularly if the Court flips in a couple of

20   pages to what is page 32 and 33 of the proxy.  Those are the

21   charts.

22        And so we're talking about two different sets of

23   forecasts here.  We're talking about what is referred to as

24   the company forecasts.  That's the first chart on the page.

25   Those are the ones that were used by the bank to opine that

1    the deal was fair, at the instruction of the company.

2            And then down below that are the pre-existing

3    forecasts, the May forecast that include the "with

4    acquisitions" component.  And that's important to other parts

5    of our argument, which I'm sure we'll get to later.  I hope to

6    have the opportunity to walk the Court through why

7    acquisitions is so vitally important to this case.

8            But one thing I would just point out from looking at

9    the chart and again the chart on the next page, same thing,

10   company forecasts and then the May forecasts, I've highlighted

11   the disclosures with respect to the company forecasts that

12   include the EBITDA numbers that the bank used to assess the

13   value of the company.  But what's missing from the disclosures

14   with respect to the May forecasts on both pages is any EBITDA

15   number.

16           So what that means is for a shareholder who wants to

17   look at the work that Credit Suisse did, but has flagged this

18   issue that, wait a second, they're valuing the company without

19   any acquisitions, despite that being the number one priority

20   of the company for years past and moving into the future.  How

21   do we get apples to apples?  How do we get from valuing the

22   company with acquisitions that the company has continually

23   maintained it's going to continue to do without the EBITDA

24   numbers that are necessary to do the discounted cash flow

25   analysis?

1          So I'm sorry for the long roundabout tour through the
2    proxy to get to the answer to the Court's question, which is
3    why we believe the omitted information with respect to the
4    acquisitions and with respect to the EBITDA portion of the
5    acquisitions is material to shareholders.
6          THE COURT:  And you're talking about only the 2021
7    numbers; is that right?
8          MR. ATWOOD:  The 2021 numbers are what was used
9    to -- Okay.  So I don't know how much the Court knows about
10   valuing companies, and I'm not going to --
11         THE COURT:  You can assume not a lot.
12         MR. ATWOOD:  So I'm not a business valuation person
13   either.  I do litigate these cases, and I hire bankers to
14   actually crunch the numbers.  So I'm kind of like the
15   commercial where I slept at a Holiday Inn Express last night.
16         So my understanding of it, from having done this for
17   a number of years, is there's basically two components to the
18   value of a DCF.  There's the projections period, and then
19   there's forever more.  And that's what's referred to here as
20   the terminal value.  And so you add these four or five years
21   that are disclosed here to the terminal period.  And the
22   terminal period is usually 80 or 90 percent of the total
23   value, because you're saying what's this company going to do
24   in perpetuity based off of an end-point year, which in this
25   case is 2021.

1            And that's not disclosed at all.  They disclose

2    EBITDA out to 2020 and then they stop.  But the bank said they

3    used 2021 numbers to calculate the majority of the value of

4    the company in the terminal period, and they don't disclose

5    what that number is.

6            So that makes it even more difficult for shareholders

7    who want to figure out for themselves, instead of just, you

8    know, "Trust me.  Take our word for it.  This is a fair deal.

9    You should vote yes."  They can't do that, and that's why that

10   is a component of our Complaint.

11           THE COURT:  Okay.

12           MR. ATWOOD:  And all of this exercise, Your Honor,

13   the whole purpose of a discounted cash flow analysis, it's a

14   present value calculation.  It's basically saying what is it

15   worth today based on the prospects of the company.

16           THE COURT:  All right.  So that's paragraph 83.

17           MR. ATWOOD:  Yes.

18           THE COURT:  All right.  I think I understand.

19           MR. ATWOOD:  Okay.  And that continues on to

20   paragraph 85, I guess 84 and 85.

21           Paragraph 86, it's just further explanation of the

22   issue that's flagged.

23           Paragraph 87, it's hard to know from the proxy

24   disclosures what all information was given to Credit Suisse as

25   opposed to what Credit Suisse was instructed to use ultimately

1   to perform its fairness opinion.  Because if the Court were to

2   look -- and I think I may have tabbed this -- Okay.  Yes.

3   It's in tab 4, the second page under that tab, which is page

4   31 of the merger proxy.

5          And it's the first highlighted paragraph:  "In July

6   2015, company management updated the May forecasts" -- and

7   that's a plural, because if you recall, the May numbers had

8   both a with acquisition number and without, with acquisition

9   set and without acquisition set.  They updated the May

10   forecasts "in order to provide the board with its current view

11   of the future financial performance of the company and assist

12   the board in evaluating the proposal" for merger.

13          So what we can't tell from the proxy -- and we

14   haven't had discovery yet, so we don't know ultimately what

15   they did, but we don't know if when they initially prepared

16   the July update to the May forecasts -- which are just a

17   few -- I mean, May, June, July, two months before.  We don't

18   know if initially they revised the with acquisition set or

19   not.

20          But that's what paragraph 87 talks about.  It's

21   unclear whether Credit Suisse was given revised acquisition

22   forecasts and whether they then used that to do any of their

23   preliminary analysis.  Because reflected in the proxy -- and

24   this is under another tab, but I don't know that we need to go

25   there at this exact moment -- is a chronology of what happened

1    and who met with who, when, and what happened.  And there's

2    detail about both meetings between management and Berkshire

3    Hathaway and there's detail about meetings of the board.

4    There's detail about meetings between the board and its

5    investment advisor, Credit Suisse, and what's talked about at

6    those meetings.

7            And it's hard to tell, based on the disclosures,

8    whether the -- because you can tell from the proxy that there

9    were preliminary evaluation analyses that were being done by

10   Credit Suisse.  You have a board meeting and you're trying to

11   assess the merger.  This is prior to the quote, unquote,

12   fairness opinion that comes at the end.  We just don't know

13   right now whether in those earlier meetings, with some

14   valuation materials, whether there was or was not an

15   evaluation of the acquisition plan.  So that's what paragraph

16   87 is about.

17           Do you want me to continue to go through this section

18   of the Complaint?

19           THE COURT:  Yes.  I'd like you to -- You refer to

20   paragraphs 83 through 90.

21           MR. ATWOOD:  Okay.  So we're through 87.

22           88 -- 88 is still following on this issue of exactly

23   to what extent acquisitions are included.  And I think part of

24   this is the timing -- the timing on some of this, based on the

25   disclosures in the proxy, leads us to to believe that -- Okay.

1   So I'm going to take a step back.  This process lasted a few

2   weeks, five, six weeks, sometime from, you know, early July,

3   when Warren Buffett came and said, "I want to hire you, Mark

4   Donegan, and I want to buy your company," a

5   take-it-or-leave-it price, to a merger agreement being signed.

6   That's a space of less than two months.

7           And the first thing that the board did when Donegan

8   came to the board and said, "I've set this meeting with Warren

9   Buffett.  He wants to hire me and he wants to buy our company.

10  What are we going to do?," it says that the board wanted an

11  update to the projections.  That was a July 11 or 12 meeting.

12  Let's see.  I might have tabbed that.

13          Okay.  Yeah.  That's under tab 5.  So the first

14  highlighted sentence, there's a July 11 board meeting, and he

15  reported on the July 9 meeting with Mr. Buffett.  So I guess

16  the merger agreement was signed on August 8th, so that's less

17  than a month.  I guess I overestimated the amount of time that

18  this all went on.

19          So there's a July 11 board meeting.  He reports on

20  his July 9 meeting with Warren Buffett.  And at the conclusion

21  of that meeting it says, "The board" -- and this is the second

22  highlighted part of that paragraph -- "The board concluded

23  that it should consider Berkshire's proposal further, after

24  receiving additional information, including an update of the

25  company's multi-year forecast that had been provided to the

1   board at its May meeting."

2           So that's July 11.  The next thing that happens, at

3   least according to what's revealed in the proxy, is 10 days

4   later, on July 21, there's another board meeting.  And among

5   other things, it says, kind of halfway down the

6   paragraph -- I've highlighted it -- "Company management

7   presented an update of the company's multi-year forecast."

8           So from reading the proxy, it looks like on the 11th

9   the board said, "Update these."  Ten days later the board came

10  in and said, "Here you go.  We've updated them."

11          So the next thing that happens pertinent to our

12  discussion or potentially pertinent to our discussion is on

13  July 30.  That's at the bottom of this page.  There's another

14  board meeting.  And there's kind of a long discussion here of

15  what happened at the board meeting, but I think it's

16  pertinent.  Once I go through that, I'm going to backtrack and

17  fill in a couple things that are missing from that chronology

18  to illustrate why paragraph 88 is incomplete.

19          So on July 30 there's a board meeting, and it says,

20  "Company management provided additional information relating

21  to the company's multi-year forecast, which had been requested

22  by the board following review of such forecast at the July 21

23  board meeting."

24          Now, I know this is long, but I think it's pertinent

25  to the discussion, so I'm going to read it into the record,

1    with the Court's indulgence, and I'll try to read slowly for

2    the court reporter.

3            "Among the risks discussed were the potential impact

4    of a slowdown in China and in key markets, the potential

5    impact of depressed oil prices on the company's business and

6    future growth prospect, both in terms of the equipment demand

7    in the oil and gas industry and more broadly in the aerospace

8    industry, where high oil prices had previously driven demand

9    for and development of more fuel-efficient aircraft engines,

10   the duration of the current arrow space upcycle and how it

11   compared to previous cycles and the implications of a downward

12   shift in the cycle, and a potential slowdown in the market for

13   industrial gas turbine engines.  The opportunities discussed

14   include the potential end of destocking by an aerospace engine

15   customer, the potential for share gains with current

16   customers, and the potential for an increase in demand from

17   aerospace customers."

18           Then it says, "Representatives of Credit Suisse also

19   reviewed with the board some additional information relating

20   to recent transactions in the aerospace sector and provided a

21   perspective on global macroeconomic trends."

22           That's the end of what the proxy talks about with

23   respect to the creation and modification of the projections.

24   But there's a couple of things that are happening in this

25   four-week period, five-week period, one-month period that

1    aren't in here that are pertinent to paragraph 88 and to our

2    arguments overall.

3          On July 13 Precision Castparts announced yet another

4    acquisition, this of Composite Horizons.  And we talk about

5    that in paragraph 58 of the Complaint.

6          Then on July 27 Precision Castparts announced the

7    acquisition of Noranco.  That's paragraph 60 of our Complaint.

8    It doesn't -- there was not a lot of information about the

9    size of the Composite Horizons acquisition, but Noranco is

10   hundreds of millions of dollars, 5, 6, 700 million.  It's in

11   the Complaint.  I don't have the number off the top of my

12   head.

13         And what we cannot tell, based on the description

14   that I've just read to the Court about the revisions to the

15   projection, is whether any of that was included in the changes

16   to the projections.

17         THE COURT:  Any of what?

18         MR. ATWOOD:  Either of the Composite Horizons

19   acquisition or the Noranco acquisition, which are in this time

20   period when the board is apparently telling the bank to only

21   use a no acquisitions valuation, and yet the company is still

22   continuing to do acquisitions at the same time.

23         It's unclear to us whether either the Composite

24   Horizons acquisition or the Noranco acquisition were baked

25   into the revisions to the projections that the board had asked

1   for.  And looking at the description of what changes were made

2   as discussed at the July 30 meeting, it does not look like

3   they were, because that's not mentioned at all.  They talk

4   about a lot of other things that management considered in

5   revising these projections.  There's no discussion at all of

6   the recent acquisitions.  So that's why paragraph 88 is in

7   there.

8           It looks to us like the projections that they're

9   using are already stale or outdated because the company has

10  done more acquisitions, which they always say these are going

11  to be immediately accretive to the company's results.

12          So that's part of the reason why we're attacking the

13  falsity of the projections that were used was not only do you

14  use no acquisition, but you're also still doing acquisitions

15  and you're saying no acquisitions.  And it didn't even look

16  like you were factoring those acquisitions into the

17  projections that you were telling the bank to use to value the

18  company --

19          THE COURT REPORTER:  You will need to slow down,

20  Counsel.

21          MR. ATWOOD:  Sorry.  I get excited.

22          THE COURT:  Actually, could you restate what you just

23  said, if you can --

24          MR. ATWOOD:  I'm sorry.

25          THE COURT:  -- because I think it pretty much sums up

1    your argument there.

2         MR. ATWOOD:  I apologize.  I tried to get it all in

3    one breath.

4         So part of what we're talking about here in this

5    paragraph is that we can't tell from the proxy, and, in fact,

6    it looks like to us that the very same time the company is

7    directing Credit Suisse to value the company based on no

8    future acquisitions in perpetuity, the company is already

9    doing more acquisitions.  It does not appear from the

10   description in the proxy that those acquisitions that are

11   happening in this very same month are being factored into the

12   projections that the banker is being told to use to value the

13   company as part of telling shareholders that this deal price

14   is fair.

15        So that's why we have this paragraph in here.

16        THE COURT:  All right.  Just a minute.

17        (Pause)  All right.  So paragraph 89.

18        MR. ATWOOD:  Yes.  So paragraph 89, in all candor, is

19   a paragraph that came from discussions with our consultant.

20   This gets sort of to a level that I -- I'm sure there are a

21   lot of people who are involved in the stock market who are

22   more sophisticated in these financial matters than I am.

23   That's part of the reason I don't play the stock market.

24        But the purpose of paragraph 89 is that with respect

25   to some of the benchmarks or comparisons that Credit Suisse

1  used to do its selected companies analysis, it's hard to tell
2  basically from what's disclosed in the proxy what their
3  methodology was for that, who they decided to use and why,
4  more the why.

5          And then on the DCF, this is a little more direct to
6  the discussion that we already had.  The process by which
7  Credit Suisse decided how much to discount the company's
8  projections to come up with a discounted cash flow analysis,
9  the process by which Credit Suisse calculated what the
10  perpetuity growth rates ought to be to calculate the terminal
11  value are not disclosed.

12          I will say, in all candor, that I think these are
13  squarely within that "other information" category from the *Hot*
14  *Topic* opinion.  It may be if the case proceeds and we get into
15  discovery that there's nothing there.  It may be that there is
16  something interesting there.  I've seen both happen.  But for
17  now, that's just flagged as a "We can't tell" omission.
18  That's ancillary to the main set of what we think are false
19  statements and omissions.

20          THE COURT:  All right.  So that's -- I think that's
21  essentially it, because paragraph 90 is a summation.

22          MR. ATWOOD:  Correct.

23          THE COURT:  Okay.  So then getting back to your
24  briefing, on page 24 you say, "Plaintiffs allege that the
25  omitted financial information was material because PCC

1    expected to continue its acquisition strategy as reflected in

2    the May forecast with acquisitions."

3            So I don't think I need further clarification on that

4    point.  Just one moment.

5            (Pause)  And then the next line in your briefing,

6    we've reviewed that, paragraphs 86 and 87.

7            I think your next argument there on paragraph -- I'm

8    sorry -- on page 25 refers to paragraphs 90 and 91.  I think

9    that's clear.  And then the next sentence, the last sentence

10   in that paragraph is clear.

11           So you initially mentioned that you had your main

12   arguments and then kind of your add-on arguments.  So could

13   you recap for me what the main arguments are?

14           MR. ATWOOD:  Yes.  So the main argument in this case

15   is -- and it's helpful, I think, to go back to my tabs again.

16   I'll direct the Court to what I have tabbed as tab 1.  But I

17   do think for purposes of the broader discussion, turning to

18   various paragraphs in the Complaint would help flesh out the

19   point.

20           So paragraph 64, to some extent, summarizes the true

21   business plan of the company.  These are a couple of excerpts

22   from the CEO, from, you know, a few months, effectively,

23   before this all happened, saying -- and I'll just read the

24   quotes here:  "M&A is always going to be our primary

25   objective.  And I know there are these moments in time where

1    we see these pauses, and that's perceived by a lot of people

2    saying, geez, they don't have opportunities.  We've numerous

3    opportunities sitting in front of us, which all are right for

4    the business."

5              That's January of 2015.

6              THE COURT:  Let me stop you there.  I looked at the

7    Complaint.  I saw that similar statements -- statements were

8    made, I think, going back as far as, you've alleged in the

9    Complaint, 2012.

10             MR. ATWOOD:  Yes.

11             THE COURT:  Okay.  So I'm familiar with -- is it

12   Donegan?

13             MR. ATWOOD:  Donegan.

14             THE COURT:  -- Donegan's statements about how the

15   primary objective is acquisitions.  So that's the basis, I

16   understand, for some of your argument.  So assuming that,

17   what's next?

18             MR. ATWOOD:  Then those same paragraphs, some of

19   them -- they're chronological, so some of them are updates and

20   some of them are a summary of what's happened over the last

21   year in sort of detailed statements from the public filings to

22   show the significant amount of impact on the company's bottom

23   line these acquisitions have had on a year-by-year basis.  I

24   mean, one year it was more than 30 percent of the company's

25   (indiscernible) revenues.  And we can jump to the specific

1  paragraphs if it's helpful to the Court, but I know you've

2  seen them.

3         And then again here, the next quote on paragraph 64,

4  there's basically a two-year time frame between when a company

5  is identified and you get to a deal.  And those same kinds of

6  statements are also repeated by Donegan other places that we

7  have in the Complaint.

8         So the pertinent issue for us with respect to that is

9  this is a company that its lifeblood, its number one

10  objective, is growth through acquisitions.  And there's a lot

11  of opportunities on the horizon; they're actively working on

12  them.  And we've got at least a two-year pipeline for

13  companies that they've identified as a target between right

14  now when he's making the statement and how long it typically

15  takes to get one of these deals done.  Sometimes they're

16  faster.

17         The company had and still has a web page advertising

18  to the world, "We like to buy companies.  If you have a

19  company, come talk to us."  So that's the -- has always been

20  and still is the actual true business plan of the company.

21         And so from the perspective of our clients, when you

22  are instructing your banker to value the company assuming no

23  more acquisitions ever, in perpetuity, that's not a true value

24  of the company.  That's not valuing the company's actual

25  business plan.

1          So the heart of the case for purposes of the 14(a)

2   claim is management opining or expressing that the no

3   acquisitions projections were the accurate projections of the

4   company when that was not the business plan of the company,

5   and everyone admits it's not the business plan of the company.

6   And their own motion papers -- I have a couple of tabs in my

7   binder here of quotes from their motion papers, one in their

8   opening brief and one in their reply, saying, "Yes, of course

9   we were always going to continue doing acquisitions."

10          So, to us, that goes directly to the subjective

11   falsity prong in the case.  They, themselves, admit that they

12   were always going to do acquisitions, even though they had the

13   company valued based on no acquisitions.

14          It also goes to the objective falsity prong because

15   that's what their plan was and that's what they did and that's

16   what they've continued to do, even today.  You know, by

17   "today," I mean since the merger closed, they have continued

18   to do acquisitions.

19          THE COURT:  What about in the defendants' reply, they

20   mention -- or they take issue with the fact that a portion of

21   the proxy statement was not included in your argument.  And

22   I'm looking specifically at page 6 of their reply.

23          MR. ATWOOD:  Yes, I see that.

24          THE COURT:  So could you respond to that argument?

25   They're saying that this clarifying language forecloses your

1    argument.

2            MR. ATWOOD:  We disagree.

3            THE COURT:  I assumed so, but I'd like to know why.

4            MR. ATWOOD:  So the pertinent -- the pertinent issue

5    is the company's business plan was to continue to do

6    acquisitions.  That's what it had been doing, what it was

7    going to continue to do.  And they said for purposes of

8    valuing it, we are going to assume zero acquisitions, even

9    though that was not the business plan.

10           So when it gets to updating the forecasts, they were

11   updated "to reflect the impact on interest expense of the

12   company's $2 billion bond issuance that took place" -- that's

13   not pertinent to what we are alleging is the problem here --

14   "compared to the expected $3 billion bond issuance included in

15   the May forecasts that assumed future acquisitions and the

16   expected $1 billion bond issuance included in the May

17   forecasts that did not assume future acquisitions, the actual

18   business results through the first quarter of fiscal year

19   2016" -- and so far that's all -- that doesn't have to do with

20   what we are complaining about; that's just the mechanics of

21   what they did, but not the import of it -- "the anticipated

22   impact of recent acquisitions" -- and here's where we get back

23   to paragraph 88, I think it was, where it's unclear to us,

24   based on the timing and the disclosures in the proxy, what

25   recent acquisitions were or were not baked into these new

projections; and based on what's in there, we have cause to

believe that the most recent acquisitions from July of 2015

were not, but we don't have discovery on that yet -- "but did

not assume future acquisitions" -- and that's -- that's --

yes, they did not assume future acquisitions, and that's

exactly the problem -- "the then-current market price of the

company common stock for purposes of share repurchases and a

revised commercial outlook, including the assumption of more

modest growth rates of the company's industrial gas turbines

end market."

So long story short, Your Honor, there is nothing in

that paragraph that goes to the issue that we're complaining

about, other than to admit that they were preparing valuations

that were not the actual business plan of the company; i.e.,

no acquisitions in perpetuity.

THE COURT:  So I'm trying to wrap my brain around

this massive amount of factual information.

So is your argument that there was insufficient or

there was no information in the proxy statement to tell

shareholders that the bank was basing its valuation on a no

acquisitions strategy?

MR. ATWOOD:  No.  I think it was clear in the proxy

that the bank was basing its valuation on a no acquisitions

strategy.  And we think that is based on a false statement by

the board that the no acquisitions projections were the best,

1   most accurate, most up-to-date projections.  That is a false

2   statement.

3          THE COURT:  So the false statement was more

4   specifically what?

5          MR. ATWOOD:  I thought I flagged it in my binder

6   here, but I think there are several that go to the same end.

7   I have it here.

8          So I think tab No. 4, from what I handed up earlier,

9   the second page, it's the second highlighted portion, "The

10   board relied primarily on," it starts, "and, for purposes of

11   its analyses and opinion, directed Chris Suisse to use the

12   company forecasts" -- which are the no acquisitions

13   ones -- "rather than the May forecasts as" -- and this is

14   where the board gets into expressing its opinion that we are

15   challenging -- "as the company forecasts reflected

16   management's most up-to-date and accurate forecasts."

17          I think that is -- there is a dovetail to that when

18   we first talked about the fairness letter from Credit Suisse

19   and then the corresponding proxy disclosure where it

20   relates -- I'll point to the proxy here, which is tab No. 7,

21   relating that "Management of the company advised Credit

22   Suisse, and Credit Suisse assumed, that the company forecasts

23   were reasonably prepared on bases reflecting the best

24   currently available estimates and judgments of management of

25   the company as to the future financial performance of the

1   company and were a reasonable basis on which to evaluate the

2   company and the proposed merger."

3          Then I guess there is another corollary to that

4   where -- this, I think, is -- this is, again, under tab 4.  I

5   don't know why I didn't highlight it, but it's on the third

6   page under that tab, the one where the charts begin.  There is

7   a sentence just above the chart:  "The company forecasts did

8   not assume any acquisitions other than those that were

9   previously announced or completed because of the inherent

10  uncertainty of consummating acquisitions with third parties on

11  terms that would be attractive to the company or at all."

12         But primarily it's the first one that I read to the

13  Court, which is no acquisitions projections were the most

14  up-to-date and accurate forecasts that our clients take issue

15  with, because that was not the business plan of the company;

16  and, so, therefore, they're not accurate.  And they may not be

17  up to date, based on the acquisitions that happened in July.

18  We can't tell if they were up to date or not, but they're

19  certainly not accurate.

20         It's very similar to in the *Hot Topic* case, when

21  plaintiffs alleged that in the revised projections the *Hot*

22  *Topic* company downgraded its store growth projections, which

23  was contrary to what it had previously said.  And the Court

24  found that that was a material misstatement, given the true

25  plans of the company.  Same here with no acquisitions versus

1  continuing acquisitions.

2          THE COURT:  Okay.  Just one moment.

3          (Pause)  All right.  Okay.  So let me give -- let me

4  give the other side an opportunity to respond.

5          I understand that you will be arguing.  Is that

6  correct, Counsel?

7          MR. BARON:  That's correct, Your Honor.  Thank you.

8          If I might, I think it would make sense for me to

9  start with the omissions issue that the Court raised first,

10  because I think that there's a -- there's a very clear

11  statement of the legal standard by the Ninth Circuit that's

12  just gone completely missing from this discussion.

13          The law in the Ninth Circuit, the legal standard --

14  and this is the *Brody* case from 2002, just recently reaffirmed

15  in 2017, I think, in the *LifeLock* case.  It says, "An omission

16  must be misleading; in other words, it must affirmatively

17  create an impression of a state of affairs that differs in a

18  material way from the one that actually exists."

19          And the -- I think the *LifeLock* case says Section 14

20  does not require completeness.  It requires that the

21  statements made not be misleading.  So you cannot allege an

22  omission claim based on saying, "It would be nice to know.  We

23  can't tell.  The proxy does not give us enough information to

24  make a -- to do our own DCF analysis."  That isn't the law in

25  the Ninth Circuit.  It isn't federal law.

1          It isn't the law in Delaware either.  The law in

2    Delaware is that a fair summary of the financial analysis is

3    what's required, not that the plaintiff has to be able to

4    conduct his own discounted cash flow analysis.

5          We've cited numerous federal cases from the District

6    Court saying the same thing.  They're in our brief:  the *Malon*

7    case, the *Himmel* case, the *Erickson* case.  Fundamentally, the

8    rule is the one that I've referred to from the Ninth Circuit,

9    which says you can't just say, "I want to know more."  Your

10   desire to know more is not the test of what pleads an

11   actionable omission.  An omission is actionable only if it

12   makes the statements that are made in the proxy misleading.

13         And that is simply not true of any of the information

14   that's referred to in the paragraphs 83 to 89 that Mr. Atwood

15   described.  They're all, "Tell me more.  I'd like to

16   understand more about this."  They all -- the beginning, the

17   central argument is "We can't do our own DCF analysis in order

18   to value the company with different assumptions unless you

19   give us more information."

20         The second point I would make about the alleged

21   omissions is that they assume, without any -- there's no

22   allegation that we hid something.  There's an assumption built

23   in there that the forecast ran through 2021.  It didn't.

24   And so what is disclosed in the proxy with respect to the May

25   forecast is what there was.

1           But most fundamentally, what the plaintiffs are

2    alleging is that they didn't have information provided to them

3    in the proxy that made it possible for them to value

4    Precision's acquisition strategy.  And that is just flatly

5    wrong.  The whole -- the premise of the plaintiffs' case is

6    that they have invented a change in PCC's strategy, which was

7    that Precision abandoned its acquisition strategy or said it

8    was abandoning its acquisition strategy.

9           It didn't abandon it and it didn't say it was

10   abandoning it.  It said consummating -- and Mr. Atwood just

11   referred to the proxy disclosure on this in, I think, tab 4 of

12   his -- of what he handed you, that what we said was

13   consummating acquisitions on attractive terms, favorable,

14   accretive terms, terms that are going to enhance the earnings

15   of the business, is inherently uncertain.

16          That is not only not objectively false, it's not even

17   objectively arguable.  It's perfectly clear that they were

18   inherently uncertain.  And that's what the proxy said.  The

19   proxy told stockholders, "We don't know.  We can't predict

20   with confidence what the actual outcomes are going to be with

21   respect to acquisitions because they're inherently uncertain."

22          But it did much more than that.  If you -- if you

23   look at the tables that are in tab 4 of the handout that

24   Mr. Atwood gave you, we disclosed the May forecasts without

25   acquisitions and the May forecasts with acquisitions.

1          THE COURT:  I'm sorry.  What are you referring to?

2          MR. BARON:  Well, if you look at the proxy statement,

3    pages 32 and 33, they disclose the actual forecasts that had

4    been made by the company in the ordinary course of its

5    business, before any acquisition proposal was made by

6    Mr. Buffett or anyone else.  These were not created for a

7    special purpose or for merger consideration, for merger

8    purposes, merger valuation purposes.  These were the

9    existing -- the existing forecasts.  And they had a forecast

10   that -- that looked at the company without acquisitions and a

11   forecast that looked at the company's results with

12   acquisitions.

13         THE COURT:  So you're saying that those two May

14   forecasts, one including acquisitions and one without

15   acquisitions, were prepared and made independently of any

16   discussion regarding merger.

17         MR. BARON:  Yes, because the discussion regarding

18   merger, the acquisition proposal arrived after those forecasts

19   had been proposed.

20         THE COURT:  Is there anything in the record

21   explaining why in May there would have been -- when there was

22   such strong emphasis on an acquisition strategy, why in May

23   the company management wanted these two different forecasts,

24   one with acquisitions and one without?

25         MR. BARON:  The -- I don't want to -- I don't want

1  to testify beyond what's in the record.  What's in the record

2  is --

3       THE COURT:  Yeah, don't testify.  I'm just curious

4  whether there's anything, because that just stood out to me.

5  But if it's not in there, then it's not in there.

6       MR. BARON:  I don't think I can -- I could tell you,

7  but I can't testify to statements of reasons with respect

8  to -- beyond the reason that is provided in the proxy, which

9  is they did not update in July in the manner that they

10  described in detail they updated the no acquisitions arm of

11  the forecasts.  And the reason that's stated in the proxy is

12  that the results of future acquisition activity were

13  inherently uncertain.

14       But by providing both the acquisition case and the no

15  acquisition case, the stockholders were provided with very

16  detailed information that enabled them to do precisely what

17  Mr. Atwood is complaining they weren't able to do.  All you

18  need is a pocket calculator to compare the numbers, including

19  for earnings per share, the all-important earnings-per-share

20  number, which is typically the basis of Wall Street stock

21  estimates.

22       And you can quickly compare what the company was

23  telling the stockholders they could expect in terms of the

24  enhanced earnings that the company could generate if -- if it

25  was able to successfully execute an acquisition program at the

1    rate of $1.5 billion per year.

2            That is an aggressive acquisition program, as

3    Mr. Atwood has alleged in his Complaint.  The historical rate

4    of acquisitions by the company was less than half that.  I

5    think it's about $7 billion over the prior 10 years.

6            But what the company did was provided in detail the

7    tools.  And you don't need a -- you don't need a Ph.D.  As I

8    said, a pocket calculator will enable you to determine from

9    the face of pages 32 and 33 of the proxy that if the company

10   were able to execute on acquisitions at that pace

11   successfully, that earnings per share would be higher by 9

12   percent in 2018, fiscal 2018, by 12 percent in fiscal 2019,

13   and by nearly 16 percent in fiscal 2020.  So --

14           THE COURT:  Can you repeat that, please?

15           MR. BARON:  If you compare -- What I'm looking at is

16   a comparison of the May forecasts without acquisitions, which

17   are summarized in detail at the bottom of page 32 of the

18   proxy, and then the May forecasts with acquisitions, which are

19   summarized at the top of page 33.

20           THE COURT:  I see.

21           Okay.  Thank you.  That's helpful.

22           MR. BARON:  You can see those.  They're EPS lines.

23   And if you compare the EPS figures for the with acquisitions

24   forecast to the without acquisitions forecast, you can -- the

25   shareholder can determine, here's how much better earnings

 1  will be if -- though it is uncertain, and the company hadn't

 2  been generating acquisitions at that pace in the past, but if

 3  they were able to execute successfully acquisitions at the

 4  pace that's disclosed -- the assumption is disclosed in the

 5  proxy, $1.5 billion a year -- that was the estimated favorable

 6  impact on earnings per share.

 7          So it simply isn't accurate that the stockholders

 8  weren't provided ample information to value the acquisition

 9  strategy, assuming, for purposes of argument, that the law

10  requires them to be provided with that.  But given what they

11  were provided, the argument that any of the omitted

12  information was misleading, the absence of that information

13  was misleading to stockholders, I think is a nonstarter.

14          I'd like to turn to a point that Mr. Atwood made.  I

15  think it was paragraph 64 of the Complaint that he referred

16  you to as kind of a summary of the -- of the plaintiffs' sort

17  of core theory here.  And it says, if you look at the

18  last -- the summary sentence at the very end, it says, "The

19  board deliberately turned" --

20          THE COURT:  Can you tell me, Counsel, where are you

21  referring again?

22          MR. BARON:  Paragraph 64 of the Amended Complaint,

23  the last sentence says, "The board deliberately turned a blind

24  eye and accepted Credit Suisse's flawed fairness opinion that

25  was based on zero new acquisitions, willfully blinding

1   themselves to the true value of the company."

2          That is a complaint about the process that the board

3   followed in arriving at and approving and recommending this

4   acquisition.  That is not the province of federal law.  That

5   is the province of state law; in this case, Oregon state law.

6   And these same plaintiffs originally alleged claims based on

7   Oregon state law, and they stayed those claims.

8          This is a disclosure case.  And the core of the

9   plaintiffs' argument here is they don't like the fact that the

10  board elected to direct Credit Suisse to use the no

11  acquisitions scenario, while disclosing to stockholders the

12  with acquisitions forecast and the impact that that would have

13  if it could be successfully executed on the company's

14  earnings.  But they elected to have Credit Suisse use the no

15  acquisition forecast because, they stated, they felt that the

16  acquisition activity in the future with third parties and the

17  terms on which transactions could be executed was inherently

18  uncertain.

19         And so the question is:  Were the stockholders given

20  accurate information about what the -- what the company's

21  prospects were?  Were the statements that were made accurate

22  or were they misleading to the stockholders?

23         Now, I want to turn to what we consider really both

24  a central point and, frankly, the simplest and most direct

25  route to the answer, which is that this case should be

1    dismissed.  And that is the plaintiffs in their brief, at page

2    9, describe their own allegations.  They say, "Plaintiffs

3    alleged that defendants made material misstatements in the

4    proxy regarding their beliefs about PCC's future prospects."

5           This case is all about disclosures with respect to

6    the future prospects of this company.  This case is a classic

7    forward-looking statements case.  You could not -- you

8    couldn't conjure up a more classic forward-looking statements

9    case that is covered by the safe harbor provisions of the

10   Private Securities Litigation Reform Act.

11          The Act defines forward-looking statements to

12   include -- and I'm quoting -- "a statement containing a

13   projection of revenues, income, earnings per share, or other

14   financial items."  It goes on.  A forward-looking statement

15   includes -- and I'm quoting -- "a statement of the plans and

16   objectives of management for future operations."

17          It continues:  "a statement of future economic

18   performance."  And, finally and critically, "any statement of

19   the assumptions underlying or relating to any statement

20   described in the previous three subparagraphs."

21          And any statement that falls within that definition

22   of forward-looking statements that is accompanied by

23   meaningful cautionary language is insulated from liability.

24   It's critical here.  It doesn't matter whether the speaker

25   thought that it was accurate or thought that maybe it was

1    accurate or maybe it wasn't or even thought that it wasn't

2    accurate, even if we -- I'm sorry.

3              THE COURT:  What's the cautionary language that you

4    rely on?

5              MR. BARON:  I actually have highlighted all the

6    cautionary language in the section of the proxy that is

7    fundamentally in dispute.  For ease of reference, I could hand

8    it up.  You already have most of the words in front of you in

9    tab 4 of Mr. Atwood's binder.  But if I could, I've

10   highlighted it, because there is extensive cautionary language

11   throughout this entire section.

12             So if I could --

13             THE COURT:  Have you provided a copy to opposing

14   counsel?

15             (Defense counsel confer off the record.)

16             MR. BARON:  I'm told that we have one copy, so I

17   apologize, Your Honor, and I'll proceed using --

18             THE COURT:  Well, I would like to see that copy.  So

19   I think we could make some copies for you.

20             MR. ATWOOD:  What page is it?

21             MR. BARON:  What I have done is excerpted from the

22   proxy page 15, pages 31, 32, and 33 of the proxy, as well as

23   the risk factors -- We do have copies, Your Honor --

24             THE COURT:  Great.

25             MR. BARON:  -- as well as the risk factors that are

1   incorporated by reference on page 15.

2           I apologize, Your Honor.

3           THE COURT:  Oh, no.  That's great.  Thanks.

4           THE CLERK:  (Handing).

5           (There is a brief pause in the proceedings.)

6           MR. ATWOOD:  So these are not all in the proxy?

7   These are from other prior public filings?

8           MR. BARON:  Everything in these pages is in the

9   proxy, except for the item in the red box, which is -- If you

10  look at the highlighted piece on the first page, it says,

11  "other factors and financial operation and legal risks or

12  uncertainties described in the company's annual report on Form

13  10-K for the year ended March 29."  And that -- a portion of

14  those -- that description is reproduced in the red box.

15  Otherwise, the pages are identical to those in your tab 4.

16          MR. ATWOOD:  Thank you.

17          THE COURT:  Let me also let you know that these

18  documents that you have submitted to me, which are very

19  helpful, are not going to be made part of the record unless

20  you separately file them.

21          So, of course, this case is going to be reviewed by a

22  district judge.  If you want that judge to see -- to have the

23  benefit of these items that you've provided, highlighted items

24  that you've provided to me, then you should separately file

25  them.

1          MR. BARON:  Thank you, Your Honor.  We'll do that.

2          THE COURT:  All right.  So these are the cautionary

3    statements that you rely upon.

4          MR. BARON:  Yes.

5          And in addition to -- and I'm not going to read

6    through all of them, but among the most obvious -- first, the

7    forecasts are specifically -- all of these forecasts are

8    specifically identified as forward-looking statements and "are

9    subject to risks and uncertainties that could cause actual

10   results to differ materially from the results forecasted,

11   including the risks set forth in the company's periodic

12   reports."

13          It goes on to say, "There can be no assurance that

14   the projected results will be realized or that actual results

15   will not be significantly higher or lower than projected."

16          It says, "Neither the company forecasts nor the May

17   forecasts can be considered a reliable predictor of future

18   results, and neither should be relied upon as such," and then

19   points out that the forecasts "cover multiple years, and such

20   information by its nature becomes less predictive with each

21   successive year."

22          It continues with the language that we've already

23   talked about on the following page, which says the company

24   forecast -- it highlights that the July forecasts do "not

25   assume any acquisitions other than those that were previously

1    announced or completed."

2            And I submit, Your Honor, that the date of this

3    definitive proxy is October of 2015.  And previously -- again,

4    I don't want to testify, but I don't think that there is in

5    fact a doubt that the -- that the July forecast was updated to

6    include the then very recent acquisitions.  And at the time

7    this document was filed in October, those were -- those were

8    the recent acquisitions referred to.

9            But the -- it goes on.  What we're really focused on

10   here is the future.  What are the next years, the next several

11   years, what are the ultimate long-term prospects of the

12   company?  And it explains that the July forecasts don't assume

13   acquisitions "other than those that were previously announced

14   or completed because of the inherent uncertainty of

15   consummating acquisitions with third parties on terms that

16   would be attractive to the company or at all."

17           Finally -- and, to me, most importantly, because the

18   proxy discloses the with acquisitions forecast that was made

19   in May and permits the stockholder to compare that forecast

20   with the no acquisition forecast that was made in May and to

21   determine for himself, at a billion and a half dollars of

22   acquisitions executed per year, here's the incremental

23   earnings performance of the company.  Here's the incremental

24   sales.  Here's the incremental EBIT, which is earnings before

25   interest and taxes.  And here's the incremental earnings per

share.  And it literally takes a calculator and five minutes to run those calculations.

There is powerful cautionary language in here that says, if we're doing -- if reality, if the future, if what the future ultimately holds is that we're able to execute successfully on acquisitions at the stated $1.5 billion pace, then the results will be higher, hearkening back to the disclosure two pages earlier that says actual results may be significantly higher or lower than those forecasts.

Under the case law, these are ample cautionary disclosures to protect this entire section of the proxy, all of which is forward-looking statements, with absolute liability under the Section 1(a), prong 1(a) of the safe harbor provision.

And the *Cutera* decision, which Mr. Atwood referred to, makes it crystal clear that if the statement is a forward-looking statement under that broad definition that I supplied the Court with a few moments ago, it doesn't matter what the state of mind of the speaker was.  Even if you assume -- I think it's irrational to suppose that the board of directors was really telling stockholders that the company was abandoning all hope of doing acquisitions in the future and was just dropping that like a hot potato.  It never said that. Those words don't appear in the proxy.

And, in fact, both before and after the proxy, in the

1    company's public statements, up to and including the 10-Q that

2    was filed two weeks before the stockholder vote, the company

3    said, "We're going to try -- We want to do acquisitions,

4    central to our strategy."

5          But even if you -- if you take Mr. Atwood's view of

6    the world, that the directors didn't believe the

7    forward-looking statements, they're not actionable because of

8    the safe harbor.  *Cutera* could not say that more plainly.

9    And, again, these cautionary statements are ample, I think

10   considerably more than are required to cloak the

11   forward-looking statements in the protection of the safe

12   harbor.

13         THE COURT:  All right.  So could we go back?  I'll

14   certainly give plaintiffs an opportunity to respond to that

15   argument.  But could we go back to the language that

16   plaintiffs rely upon that is in tab 4, second page, first full

17   paragraph?

18         MR. BARON:  Yes, Your Honor.

19         THE COURT:  Can you explain your argument contained

20   in your reply on page 6?

21         MR. BARON:  Sure.  The argument is straightforward:

22   You don't pull one sentence out of context from a proxy

23   statement.  Sentences, words, portions of sentences have to be

24   read in their full context.

25         THE COURT:  But what does that second -- what does

1    that second sentence say?

2          MR. BARON:  It tells -- so there's a reference to

3    "most up-to-date and accurate forecasts."  And what the

4    paragraph goes on to do is explain in detail to the

5    stockholder what's changed, what assumptions are different,

6    what has changed since the May forecast, because, after all,

7    the May forecasts had only been done two months earlier.

8          And the aggregate impact of the changes is not all

9    from the no acquisition scenario that the company ultimately

10   uses as the company forecasts and the no acquisition scenario

11   that it had been using as one of its forecast approaches prior

12   to any potential sale of the company being under

13   consideration.

14         The difference between the two is rather modest, as

15   you can tell from looking at the numbers in the tables.  But

16   because this is the definitive forecast that was given to

17   Credit Suisse to use for purposes of its fairness analysis,

18   there is considerably -- there is detail about what the

19   updates were:  the impact on interest expense, the actual bond

20   issuance that the company did, which had not happened at the

21   time of the May forecasts, so they were able to use the

22   precise number rather than use a different estimate based on

23   the acquisition or no acquisition scenario.

24         The change with respect to the outlook for the

25   industrial gas turbines market, which the plaintiffs haven't

1   challenged -- they're not arguing that these changes that were

2   made between May and July were inaccurate or false or

3   misleading.  What they take issue with is the first sentence.

4           And what we're arguing is that the balance of the

5   paragraph -- and, critically, the balance of the entire

6   section -- makes it clear that they're not saying, "Oh, we've

7   gotten out" -- they're not telling stockholders that they're

8   out of the acquisition business.  What they're telling

9   stockholders is "These are the changes we made to update the

10  May forecast to the July version that is defined here as the

11  company forecast.  These are the particular revisions that

12  have been made."

13          And the section is -- the section on the

14  forward-looking statements on the company's financial

15  prospects goes on to explain that they chose the no

16  acquisition scenario because of the view that acquisition

17  activity was inherently uncertain.  And then they go on to

18  provide both the May forecasts, so the stockholders can judge

19  for themselves, what would be the impact of a hypothetical

20  level of acquisition activity in the future.

21              THE COURT:  Okay.  All right.  Thank you very much.

22              MR. BARON:  You're welcome, Your Honor.

23              THE COURT:  All right.  Any response?

24              MR. ATWOOD:  I have a lot of responses.  And I'm

25  sorry that we're going to go past 3:00.

1          THE COURT:  Perhaps I'm the only one in the room

2     that's not surprised we're going past 3:00.

3          MR. ATWOOD:  Should I go ahead?

4          THE COURT:  Yes.

5          MR. ATWOOD:  Okay.  So lots of stuff was said, so

6     this is just going to kind of be not in any particular order.

7          I thought it was very interesting that counsel went

8     into detail about using a pocket calculator to calculate

9     earnings per share.  It's rather puzzling.  And I would refer

10    the Court to the proxy and, in particular, to pages 34 through

11    37; and that is the summary of the Credit Suisse valuation

12    fairness opinion provided to shareholders.  And unless I'm

13    just missing it, I don't see any EPS valuation technique used.

14    It's not pertinent.  So whether shareholders can use a

15    calculator to calculate EPS has no bearing on the present

16    value of the company, which is what the whole fairness opinion

17    is about.

18          Mr. Baron started off talking about how omissions

19    have to be somehow tied to something that is misleading.  $235

20    a share as being fair is misleading.  That's premised on

21    calculating the value of the company not based on its actual

22    business plan.  So, yes, those omissions are tied to something

23    that is misleading; and that is the conclusion that this deal

24    price is fair, given what it was based on, which was not the

25    actual business plan.

1    I also thought it was surprising to hear that there

2    is no 2021 EBITDA, because I will agree that that information

3    is not disclosed in the proxy per se, but when we look at what

4    I had previously handed up as tab 6, which is an excerpt from

5    the fairness opinion section of the Credit Suisse analysis, on

6    the first page under tab 6, towards the bottom, discounted

7    cash flow analysis, there it is, the company's estimated

8    fiscal year 2021 EBITDA.

9    So I'm not sure what counsel is referring to, that

10   that did not exist, because there it is referenced, even

11   though it's not in the chart.  So, again, that's another issue

12   we have here on the disclosures here and the valuation that

13   was done.

14   With regard to the allegations about the company

15   abandoning the acquisition strategy, that's the effective

16   import of excluding them from all valuation.  If you instruct

17   your banker to value the company based on the premise that

18   you will never, ever again, in perpetuity, do an acquisition,

19   that is effectively giving the shareholders the value of a

20   company that has abandoned its acquisition strategy, the value

21   of a company that is not Precision Castparts because that is

22   not what the company's plan was, and counsel has admitted

23   that.

24   I think that when we get into some of this, you know,

25   it's interesting.  The case law holds -- you know, I realize

1    that these disclosure cases are very complicated and there's

2    lots of nuances.  The case law makes clear that even the truth

3    can be misleading in context.  And so to say that when we

4    revised our projections, the, quote, unquote, omitted

5    paragraph or sentence from the brief or the Complaint that

6    talks about updating for interest, expenses, and so on, and

7    counsel describing that as just, "Well, that's what we mean as

8    the most accurate and up to date is we did all these things,"

9    well, guess what was in there?  No acquisitions.  Yes,

10   exactly.  Your most accurate -- quote, unquote, most accurate

11   and up-to-date projections exclude acquisitions, even though

12   that's not the business plan, and that's the point.

13            THE COURT:  So are you saying that in the proxy

14   statement PCC misled shareholders by -- by valuing the company

15   based on a non-acquisition strategy when it actually intended

16   the accurate strategy was an acquisition strategy?

17            MR. ATWOOD:  Yes.

18            THE COURT:  So let me just play devil's advocate with

19   you.

20            MR. ATWOOD:  Sure.

21            THE COURT:  Wouldn't that be obvious from all the

22   information they had, the last quarterly earnings call where

23   Donegan says -- or the series of statements by Donegan that

24   they're going to pursue an acquisition strategy, the fact that

25   there had been two acquisitions in 2015?

1      MR. ATWOOD:  They told shareholders that it was a
2  fair price based on an analysis that was done of no
3  acquisitions projections.  They told shareholders that the no
4  acquisitions projections were the most accurate and reliable,
5  up-to-date projections.  That was not true.  That is an
6  untrue, quote, unquote, opinion.
7      That's exactly what happened in the *Hot Topic* case.
8  It's exactly what happened in the *Blount* case.  In the *Hot
9  Topic* case, counsel pointed out, well, gee, you know, they
10 disclosed these May projections and they disclosed the
11 acquisitions thing.  That's the same thing that happened in
12 *Hot Topic*.  But when you denigrate one set of projections in
13 favor of another set of projections based on false reasons,
14 that is a proxy violation.
15     There's only three elements here for this claim:  a
16 material misstatement or omission, in a document effectively
17 that calls for shareholder action -- such as a merger proxy
18 clearly fits within that category -- and the shareholders are
19 harmed.  And the standard is negligence.  It's clear from the
20 *Hot Topic* case.  It's clear from the *Blount* case.  For 14(a)
21 claims in the Ninth Circuit, it's a negligence standard.
22     THE COURT:  So --
23     MR. ATWOOD:  So that's why it's pertinent -- I'm
24 sorry.  I didn't mean to talk over you.
25     THE COURT:  Go ahead.

1      MR. ATWOOD:  That's why it's pertinent that -- the

2  May projections are very pertinent when the rationale of the

3  *Hot Topic* case, for example, is looked at, because one of the

4  things that the Court in *Hot Topic* looks at, under the

5  knowledge of falsity prong, the subject of falsity -- and this

6  is on -- I've got a Westlaw version of it here, so I'm not

7  sure how the pagination works, but it's pages 5 and 6 of the

8  Westlaw version of the *Hot Topic* case.

9      It talks about, with respect to the board, that the

10  higher set of projections that the board was now running away

11  from to justify the merger were used by management and the

12  board throughout 2012 without any doubt as to the

13  appropriateness of the assumptions underlying the projections.

14  The board meeting at which they were discussed, there was no

15  mention of their inadequacy or inaccuracy, suggesting that the

16  board accepted those projections.

17      That's the state -- that's what's here as well.

18  Having -- As counsel basically put it, those were projections

19  that were created to run the business.  They were not created

20  for purposes of the merger.  Those are the real projections.

21  Those are the ones that the board is using from May, until

22  Warren Buffett shows up, to run the company, to plan, to do

23  their job.

24      Now, when Warren Buffett shows up, all of a sudden we

25  have new projections that completely exclude the acquisition

1    strategy.  And they characterize them as -- and that's a

2    present statement:  These are the most accurate and reliable.

3    And I think that gets to -- I want to make sure I don't have

4    anything else before I jump to that.

5            THE COURT:  Could I ask you a question?

6            MR. ATWOOD:  Oh, yes.

7            THE COURT:  So it seems that one of the arguments,

8    PCC's arguments, is that the proxy statement refers more than

9    once to the uncertainty, the inherent uncertainty of --

10   perhaps this isn't completely accurate -- but the inherent

11   uncertainty of valuing a company based on potential

12   acquisitions.

13           MR. ATWOOD:  Yes.

14           THE COURT:  So when you -- and I have to say, I

15   haven't read every word of the proxy statement.  But if you

16   look at the proxy statement as a whole and you consider that

17   PCC is telling its shareholders that it is valuing the company

18   based on a non-acquisition strategy, and it's also telling the

19   shareholders that valuing it on an acquisition strategy

20   contains some inherent uncertainty, how is that -- how is all

21   that, when it's viewed in that context, misleading?

22           MR. ATWOOD:  It is misleading because -- well, I'll

23   say this.  I think what the Court is talking about is really

24   pertinent to projections as a whole.  These are the best

25   estimates of the business prospects of the company, whether

1    that is in your turbine division or in an acquisition.

2         And so I would point the Court to -- this is under

3    tab 4 of what I had handed up earlier, under "Prospective

4    Financial Information," and it talks about how as far back as

5    2013 the company had started doing these longer range

6    projections and "had continued to develop its long-term

7    forecasting capabilities."

8         So effectively -- This is not the only answer.  This

9    is part of the answer.  Effectively this is a company that for

10   years has been doing acquisitions.  It knows the pace.  It

11   knows the targets.  It knows its abilities to deliver on those

12   acquisitions.  It's done so year after year.  And so

13   management has its best estimate of the business, and that

14   includes the best estimate of acquisitions.

15        But when you add to that the statements that we have

16   repeatedly quoted from the CEO, that these things don't happen

17   overnight -- It's not like you're walking down the road and an

18   acquisition just falls out of the sky, and, oh, that was

19   completely uncertain and unexpected.  They have identified

20   targets, and they have a two-year pipeline from identifying

21   the target to executing.

22        So the answer that I have to the Court on that is

23   certainly there's uncertainty, but that doesn't prohibit a

24   company from being able to prepare its best view of the

25   company and its prospects.  And that includes this acquisition

1    program that they are very skilled at executing on, they've

2    been doing it for a long time, especially when you add to it

3    their, quote, unquote, having, you know, "continued to further

4    develop its long-term forecasting capabilities."

5         Now, I think this sort of segues into this whole

6    notion of a forward-looking statement.  Now, this is a merger

7    case.  And what shareholders are being provided with,

8    effectively, is a current value of the company based, in part,

9    on its prospects.  But more importantly than that, when the

10   board is telling the shareholders with respect to these July

11   projections, "These are our most up-to-date and accurate

12   forecasts," that's a present statement of opinion.  Now, it

13   may refer to projections, but it's the present statement that

14   we are contending is false.  And the law in this circuit is

15   very clear that when you are mixing the present statement with

16   a future statement, the present statement is still actionable.

17   It is not governed by the safe harbor.

18        And I know that this isn't in the paper because a lot

19   of this stuff came out in the reply brief, but there's a case

20   that came out yesterday from the Central District of

21   California.  It's *Hsu*, I think H-s-u, *v. Puma Biotechnology*,

22   published on Lexis, I guess yesterday, July 25.  The cite is

23   2017 U.S. Dist. Lexis 116488.

24        And this is just one of many examples where the

25   Court -- effectively that representations were being made that

1   the company anticipated certain test results to come back from

2   medication that was, I guess, in human testing.  And then they

3   wanted to say, "Because we said, quote, unquote, anticipated,

4   that makes it a future statement and therefore governed by the

5   safe harbor."

6           And the Central District of California said, "As

7   District Courts in the Ninth Circuit have consistently

8   recognized, statements concerning, quote, past or present

9   facts, are not covered by the safe harbor provision merely

10  because they're tied to forward-looking statements."  And then

11  that cites a case called *Mulligan v. Impax Labs*, 36 F.Supp.3d

12  942; pinpoint cite is 965.

13          To say that as of the date of the board making this

14  determination of which projections to use, that those were, in

15  the board's opinion, the most accurate and up-to-date

16  projections is a statement of present facts.  Just because it

17  involves future projections does not leap it completely into a

18  safe harbor.

19          That's not the end of the story on the safe harbor

20  either, because I think the Court focused in on assuming that

21  the statement that these are the most accurate and up-to-date,

22  reliable, reasonable forecasts -- because there are different

23  words in different parts of the proxy that describe them --

24  even assuming that the Court were to view that as a strictly

25  forward-looking statement, although we believe it's a present

1   state of mind present statement and pertains to the present

2   value of the company, the cautionary language that was

3   highlighted by counsel never goes so far as to say, "Hey,

4   we've told you we are not valuing this company based on the

5   future acquisitions.  That remains our business plan, we've

6   got to tell you.  Let's be honest, we're going to continue to

7   try.  And it's possible that even though we claim it's

8   uncertain, that we may be as effective in the future as we

9   have been in the past and as we have been this last month, as

10  we were negotiating this deal and doing more acquisitions.

11  And if that happens, this company is worth a lot more than the

12  $235 a share, just putting it out there as our cautionary

13  statement."

14          That's not -- there is nothing even close to what we

15  would view as adequate cautionary language under the

16  circumstances of this case and under the circumstances of what

17  happened.

18          So even assuming that it's not a present fact and

19  it's not a mixed present and future fact, both of which we

20  think are -- certainly we think the first is true and, worst

21  case scenario, the second is true -- even assuming it's purely

22  a forward-looking statement, we still don't think the

23  cautionary language addresses in sufficient specificity and

24  detail the issue that we're talking about so as to insulate

25  defendants from liability for it.

1    With respect to counsel saying, "Well, you know, now
2    that I look at the proxy, it's from October, and so I'm sure
3    that when we said updated for recent acquisitions back in
4    July, we meant the July acquisitions," I'll again say, we
5    don't know.

6    But I will point out -- and we allege this in
7    paragraph 75 of our Complaint -- that there were five
8    acquisitions in 2015, not just the two in July.  So it doesn't
9    answer the question to say, "When we said in October that when
10   we said in July that it was up to date," that based on the
11   language that we went through before from the proxy about what
12   happened at each of those board meetings, that those July
13   acquisitions were baked in or not.

14   Counsel took issue with using the "willful blindness"
15   phraseology at one paragraph in the Complaint.  I'll again
16   reiterate the standard is negligence to state this claim.  So
17   I don't think anybody would dispute that willful blindness can
18   qualify as negligence.

19   (Pause) I'm just checking my notes, Your Honor.

20   I know there was a lot that was thrown out there, but
21   that's all that I have noted to respond to.

22   THE COURT:  Okay.  So it's defendants' motion.  I'll
23   give you the last word, if you'd like.

24   MR. BARON:  Just briefly, Your Honor.  I will not
25   detain us long with the response with respect to the

significance of earnings per share and the financial metrics

that are provided.  Those are the metrics that the company

had, and they -- from the May forecasts, and they were

disclosed.

The same is true with respect to my earlier

statement.  I thought it was clear.  If it wasn't, the 2021

forecasts that they're complaining are missing were not in the

May forecasts.  They were in the July forecast.  But they're

not in the May -- there weren't 2021 numbers to disclose for

May.  So they're asking for disclosure of something that

didn't exist.  I didn't say, and I apologize if I was heard to

say that there were no -- there was no 2021 forecast number,

because there was one prepared and there was one disclosed.

The law is not that the omission must be tied through

some circuitous route to something misleading.  The omission

itself must be misleading.  That's the Ninth Circuit's

formulation of the standard.

With respect to the argument made that the statements

here are present tense statements, they're not forward-looking

statements, I have two responses.  One, the definition

specifically refers to a statement of the assumptions

underlying or relating to any statement described above, which

includes statements containing projections of revenues,

income, earnings per share, and plans and objectives and

management.

1          And, further, if you can get around the safe harbor

2     simply by saying, "So the projections that they -- that they

3     put up are bad, that they gave to the shareholders are bad

4     projections, but they are saying they're good projections,"

5     you just walk right out of the safe harbor forever.  I mean,

6     the *Cutera* case is a nullity that says that Congress's intent

7     is clear that with respect to this category of information, we

8     want to encourage people to put it out there.

9          And even if it's put out there, and the -- and the

10    projections, as Counsel is alleging, are knowingly false, and

11    the statements of assumptions are knowingly false, that still

12    doesn't get you out of the safe harbor, so long as the

13    statements are forward looking, which I think these are

14    classic forward-looking statements.

15         They're not statements about tests.  I haven't seen

16    the case that's referred to that came out yesterday, and we'll

17    look at it.  And if we need to address it, we'll ask for leave

18    to address it.  But financial projections are at the core of

19    what the Reform Act was all about, encouraging companies to

20    disclose, because they had become reluctant to disclose it for

21    fear of being sued.  And it gave them -- it basically said if

22    you say these are forward looking and you wrap cautionary

23    language around them that's meaningful -- and that's for the

24    Court to decide; I think we've exhibited ample cautionary

25    language here -- the statement is insulated from liability.

1    And the test that Mr. Atwood is referring to simply isn't

2    applicable.

3            And with that, Your Honor, I'll just thank you for

4    your time this afternoon.

5            THE COURT:  Thank you so much.

6            Oh, one tiny, tiny, tiny point, if you would like.

7            MR. ATWOOD:  The test in the Ninth Circuit for

8    whether it's a forward-looking statement is if you have to

9    wait until later to see if it was true.  Saying what we

10   believe right now is not something you have to wait until

11   later to see if it's true.  That's a statement of now.  It's

12   in the moment.  You don't have to wait.

13           THE COURT:  We'll take a closer look.

14           All right.  Thanks so much, everyone, for all of your

15   hard work and helpful briefing and arguments.

16           THE CLERK:  Court is in recess.

17

18

19           (Proceedings concluded.)

20

21

22

23

24

25

1                              --oOo--

2

3              I certify, by signing below, that the

4         foregoing is a correct transcript of the record

5         of proceedings in the above-titled cause.  A

6         transcript without an original signature,

7         conformed signature or digitally signed signature

8         is not certified.

9

10

11

         /s/ Nancy M. Walker                 8-4-17
12        _____   _____

         NANCY M. WALKER, CSR, RMR, CRR       DATE
13        Official Court Reporter
         Oregon CSR No. 90-0091
14

15

16

17

18

19

20

21

22

23

24

25

1

**$**

**$235** [4] - 5:25, 6:15, 48:19, 57:12
**$4.21** [1] - 10:9

**/**

**/s** [1] - 62:11

**1**

**1** [2] - 23:16, 27:16
**1(a** [2] - 44:13
**1.5** [3] - 36:1, 37:5, 44:6
**10** [2] - 17:3, 36:5
**10-K** [1] - 41:13
**10-Q** [1] - 45:1
**10.5** [1] - 10:8
**1000** [1] - 2:17
**10019-7475** [1] - 2:12
**11** [4] - 16:11, 16:14, 16:19, 17:2
**116488** [1] - 55:23
**11th** [1] - 17:8
**12** [2] - 16:11, 36:12
**12(b)(6)** [1] - 3:25
**13** [1] - 19:3
**14** [1] - 31:19
**14(a** [2] - 26:1, 51:20
**15** [2] - 40:22, 41:1
**16** [1] - 36:13
**1622** [1] - 2:6
**1900** [1] - 2:3
**19103** [1] - 2:6

**2**

**2** [1] - 27:12
**2002** [1] - 31:14
**2012** [2] - 24:9, 52:12
**2013** [1] - 54:5
**2015** [6] - 14:6, 24:5, 28:2, 43:3, 50:25, 58:8
**2016** [1] - 27:19
**2017** [3] - 1:7, 31:15, 55:23
**2018** [2] - 36:12
**2019** [1] - 36:12
**2020** [2] - 13:2, 36:13
**2021** [12] - 10:9, 10:15, 12:6, 12:8, 12:25, 13:3, 32:23, 49:2, 49:8, 59:6, 59:9, 59:12
**209** [1] - 2:8
**21** [2] - 17:4, 17:22
**24** [4] - 4:15, 4:16,

4:22, 22:24
**25** [2] - 23:8, 55:22
**26** [1] - 1:7
**27** [1] - 19:6
**29** [2] - 4:22, 41:13

**3**

**3** [1] - 27:14
**30** [4] - 17:13, 17:19, 20:2, 24:24
**3000** [1] - 2:15
**301** [1] - 2:17
**31** [2] - 14:4, 40:22
**32** [5] - 10:20, 34:3, 36:9, 36:17, 40:22
**326-8186** [1] - 2:18
**33** [5] - 10:20, 34:3, 36:9, 36:19, 40:22
**34** [1] - 48:10
**36** [1] - 56:11
**37** [2] - 9:6, 48:11
**3:00** [2] - 47:25, 48:2
**3:16-cv-01756-YY** [1] - 1:6
**3:16-cv-1756-YY** [1] - 3:4

**4**

**4** [10] - 10:16, 14:3, 29:8, 30:4, 33:11, 33:23, 40:9, 41:15, 45:16, 54:3

**5**

**5** [3] - 16:13, 19:10, 52:7
**500** [1] - 2:9
**503** [1] - 2:18
**58** [1] - 19:5
**59** [1] - 4:17

**6**

**6** [7] - 9:5, 19:10, 26:22, 45:20, 49:4, 49:6, 52:7
**60** [1] - 19:7
**64** [4] - 23:20, 25:3, 37:15, 37:22
**655** [1] - 2:3

**7**

**7** [3] - 8:14, 29:20, 36:5
**700** [1] - 19:10
**75** [1] - 58:7

**760** [1] - 2:14

**8**

**8-4-17** [1] - 62:11
**80** [1] - 12:22
**825** [1] - 2:12
**83** [9] - 5:3, 5:6, 5:9, 7:1, 8:18, 10:19, 13:16, 15:20, 32:14
**84** [1] - 13:20
**85** [2] - 13:20
**86** [2] - 13:21, 23:6
**87** [5] - 13:23, 14:20, 15:16, 15:21, 23:6
**88** [6] - 15:22, 17:18, 19:1, 20:6, 27:23
**89** [4] - 21:17, 21:18, 21:24, 32:14
**8th** [1] - 16:16

**9**

**9** [5] - 7:24, 16:15, 16:20, 36:11, 39:2
**9.5** [1] - 10:8
**90** [5] - 5:4, 12:22, 15:20, 22:21, 23:8
**90-0091** [1] - 62:13
**91** [1] - 23:8
**92101** [1] - 2:4
**942** [1] - 56:12
**965** [1] - 56:12
**97204** [2] - 2:9, 2:18
**97205** [1] - 2:15

**A**

**abandon** [1] - 33:9
**abandoned** [2] - 33:7, 49:20
**abandoning** [4] - 33:8, 33:10, 44:22, 49:15
**abilities** [1] - 54:11
**ability** [1] - 6:23
**able** [8] - 32:3, 35:17, 35:25, 36:10, 37:3, 44:5, 46:21, 54:24
**above-titled** [1] - 62:5
**absence** [1] - 37:12
**absolute** [1] - 44:12
**accept** [1] - 6:25
**accepted** [2] - 37:24, 52:16
**accompanied** [1] - 39:22
**according** [1] - 17:3
**accretive** [2] - 20:11, 33:14
**accurate** [23] - 26:3,

29:1, 29:16, 30:14, 30:16, 30:19, 37:7, 38:20, 38:21, 39:25, 40:1, 40:2, 46:3, 50:8, 50:10, 50:16, 51:4, 53:2, 53:10, 55:11, 56:15, 56:21
**accurately** [1] - 5:21
**acquirer** [1] - 6:16
**acquisition** [52] - 5:1, 14:8, 14:9, 14:18, 14:21, 15:15, 19:4, 19:7, 19:9, 19:19, 19:24, 20:14, 23:1, 33:4, 33:7, 33:8, 34:5, 34:18, 34:22, 35:12, 35:14, 35:15, 35:25, 36:2, 37:8, 38:4, 38:15, 38:16, 43:20, 46:9, 46:10, 46:23, 47:8, 47:16, 47:20, 49:15, 49:18, 49:20, 50:15, 50:16, 50:24, 52:25, 53:18, 53:19, 54:1, 54:18, 54:25
**acquisitions** [95] - 5:2, 11:4, 11:7, 11:19, 11:22, 12:4, 12:5, 15:23, 19:21, 19:22, 20:6, 20:10, 20:14, 20:15, 20:16, 21:8, 21:9, 21:10, 23:2, 24:15, 24:23, 25:10, 25:23, 26:3, 26:9, 26:12, 26:13, 26:18, 27:6, 27:8, 27:15, 27:17, 27:22, 27:25, 28:2, 28:4, 28:5, 28:15, 28:21, 28:23, 28:25, 29:12, 30:8, 30:10, 30:13, 30:17, 30:25, 31:1, 33:13, 33:21, 33:25, 34:10, 34:12, 34:14, 34:15, 34:24, 35:10, 36:4, 36:10, 36:16, 36:18, 36:23, 36:24, 37:2, 37:3, 37:25, 38:11, 38:12, 42:25, 43:6, 43:8, 43:13, 43:15, 43:18, 43:22, 44:6, 44:22, 45:3, 50:9, 50:11, 50:25, 51:3, 51:4, 51:11, 53:12, 54:10, 54:12, 54:14, 57:5, 57:10, 58:3, 58:4, 58:8, 58:13
**Act** [3] - 39:10, 39:11,

60:19
**action** [1] - 51:17
**actionable** [4] - 32:11, 45:7, 55:16
**actively** [1] - 25:11
**activity** [4] - 35:12, 38:16, 47:17, 47:20
**actual** [12] - 25:20, 25:24, 27:17, 28:14, 33:20, 34:3, 42:9, 42:14, 44:8, 46:19, 48:21, 48:25
**add** [4] - 12:20, 23:12, 54:15, 55:2
**add-on** [1] - 23:12
**addition** [1] - 42:5
**additional** [3] - 16:24, 17:20, 18:19
**address** [2] - 60:17, 60:18
**addresses** [1] - 57:23
**adequate** [1] - 57:15
**admit** [2] - 26:11, 28:13
**admits** [1] - 26:5
**admitted** [1] - 49:22
**advertising** [1] - 25:17
**advised** [2] - 8:18, 29:21
**advising** [2] - 5:18, 6:20
**advisor** [2] - 6:19, 15:5
**advocate** [1] - 50:18
**aerospace** [4] - 18:7, 18:14, 18:17, 18:20
**affairs** [1] - 31:17
**affiliates** [2] - 8:6, 8:8
**affirmatively** [1] - 31:16
**afield** [1] - 7:22
**after-tax** [1] - 10:3
**afternoon** [4] - 3:2, 3:9, 3:22, 61:4
**aggregate** [1] - 46:8
**aggressive** [1] - 36:2
**ago** [1] - 44:18
**agree** [2] - 6:8, 49:2
**agreement** [2] - 16:5, 16:16
**ahead** [3] - 8:6, 48:3, 51:25
**aircraft** [1] - 18:9
**al** [2] - 3:5
**all-important** [1] - 35:19
**allegation** [1] - 32:22
**allegations** [2] - 39:2, 49:14
**allege** [4] - 4:23,

22:24, 31:21, 58:6
**alleged** [6] - 24:8, 30:21, 32:20, 36:3, 38:6, 39:3
**alleging** [3] - 27:13, 33:2, 60:10
**Amended** [1] - 37:22
**amount** [4] - 9:21, 16:17, 24:22, 28:17
**ample** [4] - 37:8, 44:10, 45:9, 60:24
**analyses** [4] - 9:7, 9:8, 15:9, 29:11
**analysis** [18] - 9:9, 9:14, 9:24, 10:2, 10:13, 11:25, 13:13, 14:23, 22:1, 22:8, 31:24, 32:2, 32:4, 32:17, 46:17, 49:5, 49:7, 51:2
**ancillary** [1] - 22:18
**ANGELA** [1] - 1:3
**Angela** [1] - 1:4
**Annex** [1] - 7:24
**announced** [5] - 19:3, 19:6, 30:9, 43:1, 43:13
**annual** [1] - 41:12
**answer** [6] - 12:2, 38:25, 54:8, 54:9, 54:22, 58:9
**anticipated** [3] - 27:21, 56:1, 56:3
**apologize** [4] - 21:2, 40:17, 41:2, 59:11
**appear** [2] - 21:9, 44:24
**appearances** [1] - 3:7
**APPEARANCES** [1] - 2:1
**apples** [2] - 11:21
**applicable** [1] - 61:2
**applied** [2] - 10:5, 10:7
**apply** [1] - 10:12
**appreciate** [1] - 6:10
**approaches** [1] - 46:11
**appropriateness** [1] - 52:13
**approving** [1] - 38:3
**arguable** [1] - 33:17
**arguing** [6] - 4:5, 5:7, 10:4, 31:5, 47:1, 47:4
**argument** [20] - 3:4, 4:14, 5:15, 11:5, 21:1, 23:7, 23:14, 24:16, 26:21, 26:24, 27:1, 28:18, 32:17,

37:9, 37:11, 38:9, 45:15, 45:19, 45:21, 59:18
**arguments** [9] - 4:20, 7:6, 19:2, 23:12, 23:13, 53:7, 53:8, 61:15
**arises** [1] - 5:23
**arm** [1] - 35:10
**arrived** [1] - 34:18
**arriving** [1] - 38:3
**arrow** [1] - 18:10
**assess** [4] - 4:25, 5:21, 11:12, 15:11
**assessment** [1] - 6:24
**assist** [1] - 14:11
**assume** [10] - 12:11, 27:8, 27:17, 28:4, 28:5, 30:8, 32:21, 42:25, 43:12, 44:20
**assumed** [4] - 8:19, 27:3, 27:15, 29:22
**assuming** [7] - 24:16, 55:22, 37:9, 56:20, 56:24, 57:18, 57:21
**assumption** [3] - 28:8, 32:22, 37:4
**assumptions** [6] - 32:18, 39:19, 46:5, 52:13, 59:21, 60:11
**assurance** [1] - 42:13
**attacking** [1] - 20:12
**attractive** [3] - 30:11, 33:13, 43:16
**Atwood** [11] - 2:2, 3:9, 4:4, 32:14, 33:10, 33:24, 35:17, 36:3, 37:14, 44:15, 61:1
**ATWOOD** [45] - 3:9, 4:6, 4:10, 5:10, 6:5, 6:8, 7:16, 7:19, 7:21, 12:8, 12:12, 13:12, 13:17, 13:19, 15:21, 19:18, 20:21, 20:24, 21:2, 21:18, 22:22, 23:14, 24:10, 24:13, 24:18, 26:23, 27:2, 27:4, 28:22, 29:5, 40:20, 41:6, 41:16, 47:24, 48:3, 48:5, 50:17, 50:20, 51:1, 51:23, 52:1, 53:6, 53:13, 53:22, 61:7
**Atwood's** [2] - 40:9, 45:5
**Audio** [1] - 4:8
**August** [1] - 16:16
**available** [2] - 8:21, 29:24
**Avenue** [3] - 2:12,

2:14, 2:17

**B**

**B-2** [1] - 8:2
**B-l-o-u-n-t** [1] - 6:4
**backtrack** [1] - 17:16
**bad** [2] - 60:3
**baked** [3] - 19:24, 27:25, 58:13
**balance** [2] - 47:4, 47:5
**bank** [10] - 5:18, 8:9, 8:13, 10:25, 11:12, 13:2, 19:20, 20:17, 28:20, 28:23
**banker** [3] - 21:12, 25:22, 49:17
**bankers** [1] - 12:13
**Baron** [3] - 2:10, 3:17, 48:18
**BARON** [21] - 3:17, 31:7, 34:2, 34:17, 34:25, 35:6, 36:15, 36:22, 37:22, 40:5, 40:16, 40:21, 40:25, 41:8, 42:1, 42:4, 45:18, 45:21, 46:2, 47:22, 58:24
**based** [27] - 10:3, 12:24, 13:15, 15:7, 15:24, 19:13, 21:7, 26:13, 27:24, 28:1, 28:24, 30:17, 31:22, 37:25, 38:6, 46:22, 48:21, 48:24, 49:17, 50:15, 51:2, 51:13, 53:11, 53:18, 55:8, 57:4, 58:10
**Based** [1] - 8:2
**bases** [2] - 8:20, 29:23
**basing** [2] - 28:20, 28:23
**basis** [5] - 8:23, 24:15, 24:23, 30:1, 35:20
**bearing** [1] - 48:15
**bears** [1] - 6:23
**become** [1] - 60:20
**becomes** [1] - 42:20
**BEFORE** [1] - 1:19
**begin** [1] - 30:6
**beginning** [2] - 3:6, 32:16
**behalf** [1] - 1:5
**beliefs** [1] - 39:4
**below** [2] - 11:2, 62:3
**benchmarks** [1] - 11:25
**benefit** [1] - 41:23
**Berger** [2] - 2:5, 3:11

**Berkshire** [1] - 15:2
**Berkshire's** [1] - 16:23
**Berne** [2] - 2:8, 3:13
**best** [7] - 8:20, 28:25, 29:23, 53:24, 54:13, 54:14, 54:24
**better** [1] - 36:25
**between** [6] - 15:2, 15:4, 25:4, 25:13, 46:14, 47:2
**beyond** [2] - 35:1, 35:8
**billion** [9] - 10:9, 27:12, 27:14, 27:16, 36:1, 36:5, 37:5, 43:21, 44:6
**binder** [3] - 26:7, 29:5, 40:9
**Biotechnology** [1] - 55:21
**bit** [1] - 8:6
**blind** [1] - 37:23
**blinding** [1] - 37:25
**blindness** [2] - 58:14, 58:17
**Blount** [6] - 6:2, 6:6, 6:9, 6:11, 51:8, 51:20
**Blunt** [2] - 6:6, 6:7
**board** [41] - 14:10, 14:12, 15:3, 15:4, 15:10, 16:7, 16:8, 16:10, 16:14, 16:19, 16:21, 16:22, 17:1, 17:4, 17:9, 17:14, 17:15, 17:19, 17:22, 17:23, 18:19, 19:20, 19:25, 28:25, 29:10, 29:14, 37:19, 37:23, 38:2, 38:10, 44:20, 52:9, 52:10, 52:12, 52:14, 52:16, 52:21, 55:10, 56:13, 58:12
**board's** [1] - 56:15
**bond** [4] - 27:12, 27:14, 27:16, 46:19
**bottom** [5] - 8:11, 17:13, 24:22, 36:17, 49:6
**box** [2] - 41:9, 41:14
**brain** [1] - 28:16
**breath** [1] - 21:3
**brief** [6] - 26:8, 32:6, 39:1, 41:5, 50:5, 55:19
**briefing** [4] - 7:6, 22:24, 23:5, 61:15
**briefly** [1] - 58:24
**broad** [1] - 44:17
**broader** [1] - 23:17

**broadly** [1] - 18:7
**Broadway** [1] - 2:3
**Brody** [1] - 31:14
**brought** [1] - 7:4
**Buffett** [7] - 16:3, 16:9, 16:15, 16:20, 34:6, 52:22, 52:24
**built** [1] - 32:22
**bulk** [1] - 9:12
**business** [25] - 9:14, 9:15, 12:12, 18:5, 23:21, 24:4, 25:20, 25:25, 26:4, 26:5, 27:5, 27:9, 27:18, 28:14, 30:15, 33:15, 34:5, 47:8, 48:22, 48:25, 50:12, 52:19, 53:25, 54:13, 57:5
**buy** [4] - 9:15, 16:4, 16:9, 25:18

**C**

**CA** [1] - 2:4
**calculate** [4] - 13:3, 22:10, 48:8, 48:15
**calculated** [1] - 22:9
**calculating** [1] - 48:21
**calculation** [1] - 13:14
**calculations** [1] - 44:2
**calculator** [5] - 35:18, 36:8, 44:1, 48:8, 48:15
**California** [2] - 55:21, 56:6
**candor** [2] - 21:18, 22:12
**candy** [1] - 7:16
**cannot** [2] - 19:13, 31:21
**capabilities** [2] - 54:7, 55:4
**care** [2] - 9:16, 9:17
**Case** [1] - 3:4
**case** [50] - 4:12, 5:19, 5:23, 6:1, 6:2, 6:11, 6:15, 7:2, 11:7, 12:25, 22:14, 23:14, 26:1, 26:11, 30:20, 31:14, 31:15, 31:19, 32:7, 33:5, 35:14, 35:15, 38:5, 38:8, 38:25, 39:5, 39:6, 39:7, 39:9, 41:21, 44:10, 49:25, 50:2, 51:7, 51:8, 51:9, 51:20, 52:3, 52:8, 55:7, 55:19, 56:11, 57:16, 57:21, 60:6, 60:16

**cases** [4] - 6:11, 12:13, 32:5, 50:1
**cash** [10] - 9:14, 9:24, 10:2, 10:3, 10:13, 11:24, 13:13, 22:8, 32:4, 49:7
**CASTPARTS** [1] - 1:8
**Castparts** [4] - 3:5, 19:3, 19:6, 49:21
**Castparts'** [1] - 6:15
**category** [4] - 5:12, 22:13, 51:18, 60:7
**cautionary** [14] - 39:23, 40:3, 40:6, 40:10, 42:2, 44:3, 44:10, 45:9, 57:2, 57:12, 57:15, 57:23, 60:22, 60:24
**caveated** [1] - 9:1
**central** [3] - 32:17, 38:24, 45:4
**Central** [2] - 55:20, 56:6
**CEO** [2] - 23:22, 54:16
**certain** [2] - 7:9, 56:1
**certainly** [4] - 30:19, 45:14, 54:23, 57:20
**certified** [1] - 62:8
**certify** [1] - 62:3
**challenged** [1] - 47:1
**challenging** [1] - 29:15
**change** [2] - 33:6, 46:24
**changed** [2] - 46:5, 46:6
**changes** [5] - 19:15, 20:1, 46:8, 47:1, 47:9
**characterize** [1] - 53:1
**chart** [5] - 10:24, 11:9, 30:7, 49:11
**charts** [2] - 10:21, 30:6
**checking** [1] - 58:19
**China** [1] - 18:4
**chose** [1] - 47:15
**Chris** [1] - 29:11
**chronological** [1] - 24:19
**chronology** [2] - 14:25, 17:17
**Circuit** [7] - 31:11, 31:13, 31:25, 32:8, 51:21, 56:7, 61:7
**circuit** [1] - 55:14
**Circuit's** [1] - 59:16
**circuitous** [1] - 59:15
**circumstances** [2] - 57:16

**cite** [2] - 55:22, 56:12
**cited** [1] - 32:5
**cites** [1] - 56:11
**Civil** [1] - 3:4
**claim** [5] - 26:2, 31:22, 51:15, 57:7, 58:16
**claims** [3] - 38:6, 38:7, 51:21
**clarification** [1] - 23:3
**clarifying** [1] - 26:25
**classic** [1] - 39:6, 39:8, 60:14
**clear** [13] - 23:9, 23:10, 28:22, 31:10, 33:17, 44:16, 47:6, 50:2, 51:19, 51:20, 55:15, 59:6, 60:7
**clearly** [1] - 51:18
**CLERK** [3] - 3:3, 41:4, 61:16
**clients** [2] - 25:21, 30:14
**cloak** [1] - 45:10
**close** [1] - 57:14
**closed** [1] - 26:17
**closer** [1] - 61:13
**commercial** [2] - 12:15, 28:8
**common** [2] - 8:5, 28:7
**companies** [6] - 9:10, 12:10, 22:1, 25:13, 25:18, 60:19
**company** [107] - 5:3, 5:22, 7:3, 8:16, 8:18, 8:19, 8:21, 8:22, 8:23, 9:3, 10:1, 10:3, 10:10, 10:24, 11:1, 11:10, 11:11, 11:13, 11:18, 11:20, 11:22, 12:23, 13:4, 13:15, 14:6, 14:11, 16:4, 16:9, 19:21, 20:9, 20:18, 21:6, 21:7, 21:8, 21:13, 23:21, 25:4, 25:9, 25:17, 25:19, 25:20, 25:22, 25:24, 26:4, 26:5, 26:13, 28:7, 28:14, 29:12, 29:15, 29:21, 29:22, 29:25, 30:1, 30:2, 30:7, 30:11, 30:15, 30:22, 30:25, 32:18, 34:4, 34:10, 34:23, 35:22, 35:24, 36:4, 36:6, 36:9, 37:1, 38:1, 39:6, 42:16, 42:23, 43:12, 43:16, 43:23, 44:21, 45:2, 46:9, 46:10,

46:12, 46:20, 47:11, 48:16, 48:21, 49:14, 49:17, 49:20, 49:21, 50:14, 52:22, 53:11, 53:17, 53:25, 54:5, 54:9, 54:24, 54:25, 55:8, 56:1, 57:2, 57:4, 57:11, 59:2
**Company** [2] - 17:6, 17:20
**company's** [23] - 10:8, 10:15, 16:25, 17:7, 17:21, 18:5, 20:11, 22:7, 24:22, 24:24, 25:24, 27:5, 27:12, 28:9, 34:11, 38:13, 38:20, 41:12, 42:11, 45:1, 47:14, 49:7, 49:22
**comparable** [1] - 9:9
**compare** [6] - 6:14, 35:18, 35:22, 36:15, 36:23, 43:19
**compared** [2] - 18:11, 27:14
**comparison** [1] - 36:16
**comparisons** [1] - 21:25
**complaining** [4] - 27:20, 28:12, 35:17, 59:7
**Complaint** [17] - 5:12, 7:5, 13:10, 15:18, 19:5, 19:7, 19:11, 23:18, 24:7, 24:9, 25:7, 36:3, 37:15, 37:22, 50:5, 58:7, 58:15
**complaint** [1] - 38:2
**complete** [1] - 6:21
**completed** [3] - 30:9, 43:1, 43:14
**completely** [5] - 31:12, 52:25, 53:10, 54:19, 56:17
**completeness** [1] - 31:20
**complicated** [1] - 50:1
**component** [2] - 11:4, 13:10
**components** [1] - 12:17
**Composite** [4] - 19:4, 19:9, 19:18, 19:23
**computer** [1] - 3:23
**concerning** [1] - 56:8
**concluded** [2] - 16:22, 61:19
**conclusion** [3] - 8:8,

16:20, 48:23
**conduct** [1] - 32:4
**confer** [1] - 40:15
**confidence** [1] - 33:20
**conformed** [1] - 62:7
**Congress's** [1] - 60:6
**conjure** [1] - 39:8
**consider** [3] - 16:23, 38:23, 53:16
**considerably** [2] - 45:10, 46:18
**consideration** [3] - 8:4, 34:7, 46:13
**considered** [2] - 20:4, 42:17
**consistently** [1] - 56:7
**consultant** [1] - 21:19
**consummating** [4] - 30:10, 33:10, 33:13, 43:15
**contained** [2] - 6:18, 45:19
**containing** [2] - 39:12, 59:23
**contains** [1] - 53:20
**contending** [1] - 55:14
**context** [4] - 45:22, 45:24, 50:3, 53:21
**continually** [1] - 11:22
**continue** [7] - 11:23, 15:17, 23:1, 26:9, 27:5, 27:7, 57:6
**continued** [4] - 26:16, 26:17, 54:6, 55:3
**continues** [3] - 13:19, 39:17, 42:22
**continuing** [2] - 19:22, 31:1
**contrary** [1] - 30:23
**copies** [2] - 40:19, 40:23
**copy** [4] - 7:14, 40:13, 40:16, 40:18
**core** [3] - 37:17, 38:8, 60:18
**corollary** [1] - 30:3
**Corp** [1] - 3:5
**CORP** [1] - 1:8
**correct** [5] - 4:5, 22:22, 31:6, 31:7, 62:4
**corresponding** [1] - 29:19
**Counsel** [5] - 6:3, 20:20, 31:6, 37:20, 60:10
**counsel** [15] - 3:6, 4:4, 6:5, 7:15, 40:14, 40:15, 48:7, 49:9, 49:22, 50:7, 51:9,

52:18, 57:3, 58:1, 58:14
**county** [1] - 6:9
**County** [1] - 6:9
**couple** [6] - 7:19, 10:19, 17:17, 18:24, 23:21, 26:6
**course** [3] - 26:8, 34:4, 41:21
**court** [2] - 18:2, 61:16
**COURT** [68] - 1:1, 1:20, 2:16, 3:2, 3:21, 4:7, 4:9, 4:11, 6:3, 6:4, 6:7, 7:13, 7:18, 7:20, 12:6, 12:11, 13:13, 13:16, 13:18, 15:19, 19:17, 20:19, 20:22, 20:25, 21:16, 22:20, 22:23, 24:6, 24:11, 24:14, 26:19, 26:24, 27:3, 28:16, 29:3, 31:2, 34:1, 34:13, 34:20, 35:3, 36:14, 36:20, 37:20, 40:3, 40:13, 40:18, 40:24, 41:3, 41:17, 42:2, 45:13, 45:19, 45:25, 47:21, 47:23, 48:1, 48:4, 50:13, 50:18, 50:21, 51:22, 51:25, 53:5, 53:7, 53:14, 58:22, 61:5, 61:13
**Court** [31] - 5:13, 5:23, 7:7, 7:11, 8:1, 8:10, 9:4, 10:11, 10:16, 10:19, 11:6, 12:9, 14:1, 19:14, 23:16, 25:1, 30:13, 30:23, 31:9, 32:6, 44:18, 48:10, 52:4, 53:23, 54:2, 54:22, 55:25, 56:20, 56:24, 60:24, 62:13
**Court's** [2] - 12:2, 18:1
**Courthouse** [1] - 2:17
**Courts** [2] - 9:11, 56:7
**courts** [1] - 9:13
**cover** [1] - 42:19
**covered** [2] - 39:9, 56:9
**Cravath** [3] - 2:11, 3:17, 3:19
**create** [1] - 31:17
**created** [3] - 34:6, 52:19
**creation** [1] - 18:23
**Credit** [29] - 7:25, 8:16, 8:25, 9:1, 9:7, 9:25, 10:7, 10:12,

11:17, 13:24, 13:25, 14:21, 15:5, 15:10, 18:18, 21:7, 21:25, 22:7, 22:9, 29:18, 29:21, 29:22, 37:24, 38:10, 38:14, 46:17, 48:11, 49:5
**critical** [1] - 39:24
**critically** [2] - 39:18, 47:5
**CRR** [2] - 2:16, 62:12
**crunch** [1] - 12:14
**crystal** [1] - 44:16
**CSR** [3] - 2:16, 62:12, 62:13
**curious** [1] - 35:3
**current** [5] - 14:10, 18:10, 18:15, 28:6, 55:8
**customer** [1] - 18:15
**customers** [2] - 18:16, 18:17
**Cutera** [3] - 44:15, 45:8, 60:6
**cycle** [1] - 18:12
**cycles** [1] - 18:11

## D

**DAHAB** [1] - 3:13
**Dahab** [1] - 3:13
**DANIEL** [1] - 1:9
**DATE** [1] - 62:12
**date** [16] - 8:4, 29:1, 29:16, 30:14, 30:17, 30:18, 43:2, 46:3, 50:8, 50:11, 51:5, 55:11, 56:13, 56:15, 56:21, 58:10
**days** [2] - 17:3, 17:9
**DCF** [4] - 12:18, 22:5, 31:24, 32:17
**deal** [8] - 6:25, 9:1, 11:1, 13:8, 21:13, 25:5, 48:23, 57:10
**deals** [1] - 25:15
**debate** [1] - 6:5
**DECATUR** [1] - 1:3
**decide** [1] - 60:24
**decided** [2] - 22:3, 22:7
**deciding** [1] - 6:16
**decision** [1] - 44:15
**DEFENDANTS** [1] - 2:10
**Defendants** [1] - 1:12
**defendants** [6] - 3:16, 3:18, 3:20, 4:23, 39:3, 57:25
**defendants'** [3] - 3:24,

26:19, 58:22
**defense** [1] - 40:15
**defined** [1] - 47:10
**defines** [1] - 39:11
**definition** [3] - 39:21, 44:17, 59:20
**definitive** [2] - 43:3, 46:16
**Dehab** [1] - 2:7
**Delaware** [4] - 9:12, 9:13, 32:1, 32:2
**deliberately** [2] - 37:19, 37:23
**deliver** [1] - 54:11
**demand** [3] - 18:6, 18:8, 18:16
**denigrate** [1] - 51:12
**deny** [1] - 7:11
**depressed** [1] - 18:5
**describe** [2] - 39:2, 56:23
**described** [5] - 32:15, 35:10, 39:20, 41:12, 59:22
**describing** [1] - 50:7
**description** [4] - 19:13, 20:1, 21:10, 41:14
**desire** [1] - 32:10
**despite** [1] - 11:19
**destocking** [1] - 18:14
**detail** [10] - 15:2, 15:3, 15:4, 35:10, 36:6, 36:17, 46:4, 46:18, 48:8, 57:24
**detailed** [2] - 24:21, 35:16
**details** [2] - 6:21, 6:22
**detain** [1] - 58:25
**determination** [1] - 56:14
**determine** [3] - 36:8, 36:25, 43:21
**develop** [2] - 54:6, 55:4
**development** [1] - 18:9
**devil's** [1] - 50:18
**Diego** [1] - 2:4
**differ** [1] - 42:10
**difference** [1] - 46:14
**different** [9] - 4:21, 9:8, 10:22, 32:18, 34:23, 46:5, 46:22, 56:22, 56:23
**differs** [1] - 31:17
**difficult** [1] - 13:6
**digitally** [1] - 62:7
**direct** [4] - 22:5, 23:16, 38:10, 38:24

**directed** [3] - 9:2, 9:3, 29:11
**directing** [1] - 21:7
**directly** [2] - 9:4, 26:10
**directors** [2] - 44:21, 45:6
**disagree** [1] - 27:2
**disclose** [6] - 13:1, 13:4, 34:3, 59:9, 60:20
**disclosed** [16] - 4:24, 8:14, 10:17, 12:21, 13:1, 22:2, 22:11, 32:24, 33:24, 37:4, 49:3, 51:10, 59:4, 59:13
**discloses** [2] - 8:13, 43:18
**disclosing** [1] - 38:11
**disclosure** [7] - 6:24, 29:19, 33:11, 38:8, 44:8, 50:1, 59:10
**disclosures** [9] - 11:11, 11:13, 13:24, 15:7, 15:25, 27:24, 39:5, 44:11, 49:12
**discount** [1] - 22:7
**discounted** [9] - 9:13, 9:24, 10:2, 10:13, 11:24, 13:13, 22:8, 32:4, 49:6
**discovery** [3] - 14:14, 22:15, 28:3
**discussed** [4] - 18:3, 18:13, 20:2, 52:14
**discussion** [11] - 9:6, 17:12, 17:14, 17:25, 20:5, 22:6, 23:17, 31:12, 34:16, 34:17
**discussions** [1] - 21:19
**dismiss** [2] - 3:25, 7:12
**dismissed** [1] - 39:1
**dispute** [2] - 40:7, 58:17
**Dist** [1] - 55:23
**district** [1] - 41:22
**District** [5] - 2:17, 32:5, 55:20, 56:6, 56:7
**DISTRICT** [3] - 1:1, 1:2, 1:20
**division** [1] - 54:1
**document** [2] - 43:7, 51:16
**documents** [3] - 4:21, 7:8, 41:18
**dollars** [2] - 19:10,

43:21
**DON** [1] - 1:9
**done** [9] - 12:16, 15:9, 20:10, 25:15, 40:21, 46:7, 49:13, 51:2, 54:12
**Donegan** [7] - 16:4, 16:7, 24:12, 24:13, 25:6, 50:23
**DONEGAN** [1] - 1:9
**Donegan's** [1] - 24:14
**doubt** [2] - 43:5, 52:12
**dovetail** [1] - 29:17
**Dowd** [1] - 2:2
**down** [5] - 6:1, 11:2, 17:5, 20:19, 54:17
**downgraded** [1] - 30:22
**downward** [1] - 18:11
**driven** [1] - 18:8
**dropping** [1] - 44:23
**duration** [1] - 18:10

## E

**early** [1] - 16:2
**earnings** [16] - 33:14, 35:19, 35:24, 36:11, 36:25, 37:6, 38:14, 39:13, 43:23, 43:24, 43:25, 48:9, 50:22, 59:1, 59:24
**earnings-per-share** [1] - 35:19
**ease** [1] - 40:7
**EBIT** [1] - 43:24
**EBITDA** [9] - 10:9, 10:15, 11:12, 11:14, 11:23, 12:4, 13:2, 49:2, 49:8
**ECF** [1] - 4:17
**economic** [1] - 39:17
**effective** [2] - 49:15, 57:8
**effectively** [7] - 23:22, 49:19, 51:16, 54:8, 54:9, 55:8, 55:25
**efficient** [1] - 18:9
**Eighth** [1] - 2:12
**either** [5] - 12:13, 19:18, 19:23, 32:1, 56:20
**elected** [2] - 38:10, 38:14
**elements** [1] - 51:15
**embedded** [1] - 5:1
**emphasis** [1] - 34:22
**enable** [1] - 36:8
**enabled** [1] - 35:16
**encourage** [1] - 60:8

**encouraging** [1] - 60:19
**end** [8] - 12:24, 15:12, 18:14, 18:22, 28:10, 29:6, 37:18, 56:19
**end-point** [1] - 12:24
**ended** [1] - 41:13
**engine** [1] - 18:14
**engines** [2] - 18:9, 18:13
**enhance** [1] - 33:14
**enhanced** [1] - 35:24
**entire** [3] - 40:11, 44:11, 47:5
**EPS** [4] - 36:22, 36:23, 48:13, 48:15
**equipment** [1] - 18:6
**Erickson** [1] - 32:7
**especially** [1] - 55:2
**essentially** [1] - 22:21
**estimate** [2] - 46:22, 54:13, 54:14
**estimated** [4] - 10:9, 10:15, 37:5, 49:7
**estimates** [4] - 8:21, 29:24, 35:21, 53:25
**et** [2] - 3:5
**evaluate** [2] - 8:23, 30:1
**evaluating** [1] - 14:12
**evaluation** [3] - 9:6, 15:9, 15:15
**exact** [1] - 14:25
**exactly** [5] - 15:22, 28:6, 50:10, 51:7, 51:8
**example** [2] - 9:19, 52:3
**examples** [1] - 55:24
**except** [1] - 41:9
**excerpt** [3] - 8:14, 9:5, 49:4
**excerpted** [1] - 40:21
**excerpts** [2] - 7:5, 23:21
**excited** [1] - 20:21
**exclude** [2] - 50:11, 52:25
**excluding** [1] - 49:16
**execute** [4] - 35:25, 36:10, 37:3, 44:15
**executed** [2] - 38:13, 38:17, 43:22
**executing** [2] - 54:21, 55:1
**exercise** [1] - 13:12
**exhibited** [1] - 60:24
**exhibits** [1] - 4:2
**exist** [2] - 49:10, 59:11
**existing** [3] - 11:2,

34:9
**exists** [1] - 31:18
**expect** [1] - 35:23
**expected** [3] - 23:1, 27:14, 27:16
**expense** [2] - 27:11, 46:19
**expenses** [1] - 50:6
**explain** [5] - 5:6, 7:10, 45:19, 46:4, 47:15
**explaining** [1] - 34:21
**explains** [1] - 43:12
**explanation** [1] - 13:21
**Express** [1] - 12:15
**expressing** [2] - 26:2, 29:14
**extensive** [1] - 40:10
**extent** [2] - 15:23, 23:20
**eye** [1] - 37:24

## F

**F.Supp.3d** [1] - 56:11
**face** [1] - 36:9
**fact** [8] - 21:5, 26:20, 38:9, 43:5, 44:25, 50:24, 57:18, 57:19
**factored** [1] - 21:11
**factoring** [1] - 20:16
**factors** [3] - 40:23, 40:25, 41:11
**facts** [2] - 56:9, 56:16
**factual** [1] - 28:17
**fair** [11] - 6:24, 8:6, 8:9, 9:1, 11:1, 13:8, 21:14, 32:2, 48:20, 48:24, 51:2
**fairness** [10] - 5:19, 7:25, 14:1, 15:12, 29:18, 37:24, 46:17, 48:12, 48:16, 49:5
**falls** [2] - 39:21, 54:18
**false** [10] - 22:18, 28:24, 29:1, 29:3, 33:16, 47:2, 51:13, 55:14, 60:10, 60:11
**falsity** [5] - 20:13, 26:11, 26:14, 52:5
**familiar** [4] - 4:12, 5:13, 5:23, 24:11
**far** [5] - 7:22, 24:8, 27:19, 54:4, 57:3
**faster** [1] - 25:16
**favor** [1] - 51:13
**favorable** [2] - 33:13, 37:5
**fear** [1] - 60:21
**federal** [3] - 31:25,

32:5, 38:4
**feedback** [1] - 4:8
**felt** [1] - 38:15
**few** [4] - 14:17, 16:1, 23:22, 44:18
**figure** [1] - 13:7
**figures** [1] - 36:23
**file** [2] - 41:20, 41:24
**filed** [2] - 43:7, 45:2
**filings** [2] - 24:21, 41:7
**fill** [1] - 17:17
**finally** [2] - 39:18, 43:17
**Financial** [1] - 54:4
**financial** [13] - 7:3, 8:7, 8:22, 14:11, 21:22, 22:25, 29:25, 32:2, 39:14, 41:11, 47:14, 59:1, 60:18
**fine** [1] - 7:14
**first** [14] - 10:24, 14:5, 16:7, 16:13, 27:18, 29:18, 30:12, 31:9, 41:10, 42:6, 45:16, 47:3, 49:6, 57:20
**fiscal** [7] - 10:9, 10:15, 27:18, 36:12, 36:13, 49:8
**fits** [1] - 51:18
**five** [5] - 12:20, 16:2, 18:25, 44:1, 58:7
**five-week** [1] - 18:25
**flagged** [4] - 11:17, 13:22, 22:17, 29:5
**flatly** [1] - 33:4
**flawed** [1] - 37:24
**flesh** [1] - 23:18
**flip** [1] - 8:10
**flips** [1] - 10:19
**flow** [9] - 9:14, 9:24, 10:2, 10:13, 11:24, 13:13, 22:8, 32:4, 49:7
**flows** [1] - 10:3
**focus** [3] - 5:11, 5:14, 7:6
**focused** [2] - 43:9, 56:20
**followed** [1] - 38:3
**following** [3] - 15:22, 17:22, 42:23
**FOR** [3] - 1:2, 2:2, 2:10
**forecast** [27] - 5:2, 11:3, 16:25, 17:7, 17:21, 17:22, 23:2, 32:23, 32:25, 34:9, 34:11, 36:24, 38:12, 38:15, 42:24, 43:5,

43:18, 43:19, 43:20, 46:6, 46:11, 46:16, 47:10, 47:11, 59:8, 59:12
**forecasted** [1] - 42:10
**forecasting** [2] - 54:7, 55:4
**forecasts** [50] - 5:3, 10:23, 10:24, 11:3, 11:10, 11:11, 11:14, 14:6, 14:10, 14:16, 14:22, 27:10, 27:15, 27:17, 29:12, 29:13, 29:15, 29:16, 29:22, 30:7, 30:14, 33:24, 33:25, 34:3, 34:9, 34:14, 34:18, 34:23, 35:11, 36:16, 36:18, 42:7, 42:16, 42:17, 42:19, 42:24, 43:12, 44:9, 46:3, 46:7, 46:10, 46:21, 47:18, 55:12, 56:22, 59:3, 59:7, 59:8
**forecloses** [1] - 26:25
**foregoing** [2] - 8:3, 62:4
**forever** [2] - 12:19, 60:5
**Form** [1] - 41:12
**formulation** [1] - 59:17
**forth** [1] - 42:11
**forward** [20] - 39:7, 39:8, 39:11, 39:14, 39:22, 42:8, 44:12, 44:17, 45:7, 45:11, 47:14, 55:6, 56:10, 56:25, 57:22, 59:19, 60:13, 60:14, 60:22, 61:8
**forward-looking** [18] - 39:7, 39:8, 39:11, 39:14, 39:22, 42:8, 44:12, 44:17, 45:7, 45:11, 47:14, 55:6, 56:10, 56:25, 57:22, 59:19, 60:14, 61:8
**four** [2] - 12:20, 18:25
**four-week** [1] - 18:25
**frame** [2] - 7:23, 25:4
**frankly** [1] - 38:24
**free** [1] - 10:3
**frequently** [1] - 9:11
**front** [3] - 7:8, 24:3, 40:8
**fuel** [1] - 18:9
**fuel-efficient** [1] - 18:9
**full** [3] - 6:24, 45:16, 45:24

**FUND** [1] - 1:3
**Fund** [1] - 3:5
**fundamental** [1] - 6:12
**fundamentally** [3] - 32:7, 33:1, 40:7
**future** [29] - 8:22, 10:14, 11:20, 14:11, 18:6, 21:8, 27:15, 27:17, 28:4, 28:5, 29:25, 35:12, 38:16, 39:4, 39:6, 39:16, 39:17, 42:17, 43:10, 44:4, 44:5, 44:22, 47:20, 55:16, 56:4, 56:17, 57:5, 57:8, 57:19

## G

**gains** [1] - 18:15
**gas** [4] - 18:7, 18:13, 28:9, 46:25
**gee** [1] - 51:9
**geez** [1] - 24:2
**Geller** [2] - 2:2, 3:10
**generate** [1] - 35:24
**generating** [1] - 37:2
**given** [7] - 13:24, 14:21, 30:24, 37:10, 38:19, 46:16, 48:24
**global** [1] - 18:21
**gold** [5] - 9:14, 9:18, 9:19, 9:20, 9:22
**governed** [2] - 55:17, 56:4
**GRABER** [1] - 1:9
**great** [2] - 40:24, 41:3
**grew** [1] - 6:8
**growth** [5] - 18:6, 22:10, 25:10, 28:9, 30:22
**guess** [7] - 13:20, 16:15, 16:17, 30:3, 50:9, 55:22, 56:2

## H

**half** [2] - 36:4, 43:21
**halfway** [1] - 17:5
**hand** [2] - 7:7, 40:7
**handed** [5] - 7:16, 29:8, 33:12, 49:4, 54:3
**handing** [1] - 7:21
**handing)** [1] - 41:4
**handout** [1] - 33:23
**harbor** [12] - 39:9, 44:14, 45:8, 45:12, 55:17, 56:5, 56:9, 56:18, 56:19, 60:1,

60:5, 60:12
**hard** [4] - 13:23, 15:7, 22:1, 61:15
**harmed** [1] - 51:19
**Hathaway** [1] - 15:3
**head** [1] - 19:12
**hear** [2] - 6:3, 49:1
**heard** [1] - 59:11
**HEARING** [1] - 1:17
**hearkening** [1] - 44:7
**heart** [2] - 7:2, 26:1
**help** [1] - 23:18
**helpful** [7] - 7:7, 7:13, 23:15, 25:1, 36:21, 41:19, 61:15
**helps** [1] - 7:22
**hereof** [1] - 8:4
**hid** [1] - 32:22
**high** [1] - 18:8
**higher** [5] - 36:11, 42:15, 44:7, 44:9, 52:10
**highlight** [2] - 10:6, 30:5
**highlighted** [14] - 7:9, 8:11, 9:25, 11:10, 14:5, 16:14, 16:22, 17:6, 29:9, 40:5, 40:10, 41:10, 41:23, 57:3
**highlights** [2] - 10:18, 42:24
**Himmel** [1] - 32:7
**himself** [1] - 43:21
**hire** [3] - 12:13, 16:3, 16:9
**historical** [1] - 36:3
**hold** [1] - 9:13
**holders** [2] - 8:5, 8:7
**holds** [2] - 44:5, 49:25
**Holiday** [1] - 12:15
**honest** [1] - 57:6
**Honor** [18] - 3:3, 3:9, 3:15, 4:6, 7:17, 13:12, 28:11, 31:7, 40:17, 40:23, 41:2, 42:1, 43:2, 45:18, 47:22, 58:19, 58:24, 61:3
**HONORABLE** [1] - 1:19
**hope** [3] - 4:10, 11:5, 44:22
**hoping** [1] - 4:14
**horizon** [1] - 25:11
**Horizons** [4] - 19:4, 19:9, 19:18, 19:24
**hot** [1] - 44:23
**Hot** [13] - 5:13, 6:1, 6:11, 22:13, 30:20,

30:21, 51:7, 51:8, 51:12, 51:20, 52:3, 52:4, 52:8
**Hsu** [1] - 55:21
**HSU** [1] - 55:21
**human** [1] - 56:2
**hundreds** [1] - 19:10
**hypothetical** [1] - 47:19

**I**

**i.e** [1] - 28:14
**IBEW** [1] - 1:3, 3:4
**identical** [1] - 41:15
**identified** [4] - 25:5, 25:13, 42:8, 54:19
**identifying** [1] - 54:20
**illustrate** [1] - 17:18
**immediately** [1] - 20:11
**impact** [10] - 18:3, 18:5, 24:22, 27:11, 27:22, 37:6, 38:12, 46:8, 46:19, 47:19
**impax** [1] - 56:11
**implications** [1] - 18:11
**import** [2] - 27:21, 49:16
**important** [5] - 6:21, 6:22, 11:4, 11:7, 35:19
**importantly** [2] - 43:17, 55:9
**impression** [1] - 31:17
**IN** [1] - 1:1
**inaccuracy** [1] - 52:15
**inaccurate** [1] - 47:2
**inadequacy** [1] - 52:15
**include** [5] - 11:3, 11:12, 18:14, 39:12, 43:6
**included** [6] - 5:16, 15:23, 19:15, 26:21, 27:14, 27:16
**includes** [3] - 39:15, 54:14, 54:25, 59:23
**including** [6] - 16:24, 28:8, 34:14, 35:18, 42:11, 45:1
**income** [2] - 39:13, 59:24
**incomplete** [1] - 17:18
**incorporated** [1] - 41:1
**increase** [1] - 18:16
**incremental** [4] - 43:22, 43:23, 43:24,

43:25
**independently** [1] - 34:15
**indiscernible** [1] - 24:25
**individually** [1] - 1:5
**indulgence** [1] - 18:1
**industrial** [3] - 18:13, 28:9, 46:25
**industry** [2] - 18:7, 18:8
**information** [31] - 4:24, 5:21, 6:12, 6:13, 6:18, 6:20, 8:15, 9:1, 12:3, 13:24, 16:24, 17:20, 18:19, 19:8, 22:13, 22:25, 28:17, 28:19, 31:23, 32:13, 32:19, 33:2, 35:16, 37:8, 37:12, 38:20, 42:20, 49:2, 50:22, 60:7
**Information** [1] - 54:4
**inherent** [5] - 30:9, 43:14, 53:9, 53:10, 53:20
**inherently** [6] - 33:15, 33:18, 33:21, 35:13, 38:17, 47:17
**Inn** [1] - 12:15
**instead** [1] - 13:7
**instruct** [1] - 49:16
**instructed** [1] - 13:25
**instructing** [1] - 55:22
**instruction** [1] - 11:1
**insufficient** [1] - 25:9
**insulate** [1] - 57:24
**insulated** [2] - 39:23, 60:25
**intended** [1] - 50:15
**intent** [1] - 60:6
**interest** [4] - 27:11, 43:25, 46:19, 50:6
**interesting** [3] - 22:16, 48:7, 49:25
**invented** [1] - 33:6
**investment** [3] - 5:18, 6:19, 15:5
**involved** [1] - 21:21
**involves** [1] - 56:17
**irrational** [1] - 44:20
**issuance** [4] - 27:12, 27:14, 27:16, 46:20
**issue** [14] - 10:18, 11:18, 13:22, 15:22, 25:8, 26:20, 27:4, 28:12, 30:14, 31:9, 47:3, 49:11, 57:24, 58:14
**issues** [1] - 5:17

**item** [2] - 5:17, 41:9
**items** [3] - 39:14, 41:23
**itself** [2] - 8:15, 59:16

**J**

**January** [1] - 24:5
**job** [1] - 52:23
**Joel** [2] - 2:13, 3:15
**judge** [3] - 41:22, 47:18
**JUDGE** [1] - 1:20
**judgments** [2] - 8:21, 29:24
**July** [34] - 1:7, 14:5, 14:16, 14:17, 16:2, 16:11, 16:14, 16:15, 16:19, 16:20, 17:2, 17:4, 17:13, 17:19, 17:22, 19:3, 19:6, 20:2, 28:2, 30:17, 35:9, 42:24, 43:5, 43:12, 47:2, 47:10, 55:10, 55:22, 58:4, 58:8, 58:10, 58:12, 59:8
**jump** [2] - 24:25, 53:4
**June** [1] - 14:17
**justify** [1] - 52:11

**K**

**keeping** [1] - 10:12
**key** [1] - 18:4
**kind** [7] - 7:6, 12:14, 17:5, 17:14, 23:12, 37:16, 48:6
**kinds** [1] - 25:5
**knowingly** [2] - 60:10, 60:11
**knowledge** [1] - 52:5
**knows** [4] - 12:9, 54:10, 54:11

**L**

**Labs** [1] - 56:11
**language** [14] - 26:25, 39:23, 40:3, 40:6, 40:10, 42:22, 44:3, 45:15, 57:2, 57:15, 57:23, 58:11, 60:23, 60:25
**last** [11] - 4:22, 8:1, 9:16, 12:15, 23:9, 24:20, 37:18, 37:23, 50:22, 57:9, 58:23
**lasted** [1] - 16:1
**law** [17] - 4:12, 6:1,

31:13, 31:24, 31:25, 32:1, 37:9, 38:4, 38:5, 38:7, 44:10, 49:25, 50:2, 55:14, 59:14
**leads** [1] - 15:25
**leap** [1] - 56:17
**least** [2] - 17:3, 25:12
**leave** [2] - 16:5, 60:17
**legal** [3] - 31:11, 31:13, 41:11
**less** [4] - 16:6, 16:16, 36:4, 42:20
**LESTER** [1] - 1:9
**letter** [2] - 7:25, 29:18
**level** [2] - 21:20, 47:20
**Lexis** [2] - 55:22, 55:23
**liability** [4] - 39:23, 44:13, 57:25, 60:25
**lifeblood** [1] - 25:9
**LifeLock** [2] - 31:15, 31:19
**light** [1] - 6:24
**line** [3] - 5:17, 23:5, 24:23
**lines** [1] - 36:22
**literally** [1] - 44:1
**litigate** [1] - 12:13
**litigation** [1] - 9:12
**Litigation** [1] - 39:10
**LLP** [3] - 2:2, 2:11, 2:14
**Locust** [1] - 2:6
**LOHMANN** [1] - 1:4
**Lohmann** [1] - 1:4
**Lokting** [1] - 2:8
**long-standing** [1] - 5:1
**long-term** [3] - 43:11, 54:6, 55:4
**look** [15] - 8:1, 9:19, 11:17, 14:2, 20:2, 20:15, 33:23, 34:2, 37:17, 41:10, 49:3, 53:16, 58:2, 60:17, 61:13
**looked** [4] - 24:6, 34:10, 34:11, 52:3
**looking** [25] - 11:8, 20:1, 26:22, 36:15, 39:7, 39:8, 39:11, 39:14, 39:22, 42:8, 44:12, 44:17, 45:7, 45:11, 46:15, 47:14, 55:6, 56:10, 56:25, 57:22, 59:19, 60:13, 60:14, 60:22, 61:8
**looks** [4] - 17:8, 20:8, 21:6, 52:4

**lower** [2] - 42:15, 44:9
**LYLES** [1] - 1:9

**M**

**M&A** [1] - 23:24
**macroeconomic** [1] - 18:21
**MAGISTRATE** [1] - 1:20
**main** [5] - 5:11, 22:18, 23:11, 23:13, 23:14
**maintained** [1] - 11:23
**majority** [1] - 13:3
**Malon** [1] - 32:6
**Management** [1] - 29:21
**management** [15] - 8:18, 8:21, 10:10, 14:6, 15:2, 17:6, 17:20, 20:4, 26:2, 29:24, 34:23, 39:16, 52:11, 54:13, 59:25
**management's** [1] - 29:16
**manner** [1] - 35:9
**March** [1] - 41:13
**Mark** [1] - 16:3
**MARK** [1] - 1:8
**market** [6] - 18:12, 21:21, 21:23, 28:6, 28:10, 46:25
**markets** [1] - 18:4
**massive** [1] - 28:17
**material** [9] - 4:13, 4:24, 5:8, 12:5, 22:25, 30:24, 31:18, 39:3, 51:16
**materially** [1] - 42:10
**materials** [2] - 7:5, 15:14
**matter** [2] - 39:24, 44:18
**matters** [1] - 21:22
**mean** [6] - 14:17, 24:24, 26:17, 50:7, 51:24, 60:5
**meaningful** [2] - 39:23, 60:23
**means** [1] - 11:16
**meant** [1] - 58:4
**mechanics** [1] - 27:20
**medication** [1] - 56:2
**meeting** [16] - 15:10, 16:8, 16:11, 16:14, 16:15, 16:19, 16:20, 16:21, 17:1, 17:4, 17:14, 17:15, 17:19, 17:23, 20:2, 52:14
**meetings** [6] - 15:2,

15:3, 15:4, 15:6, 15:13, 58:12
**meets** [1] - 5:7
**mention** [2] - 26:20, 52:15
**mentioned** [2] - 20:3, 23:11
**merely** [1] - 56:9
**merger** [22] - 5:24, 6:13, 8:4, 8:24, 9:5, 9:12, 14:4, 14:12, 15:11, 16:5, 16:16, 26:17, 30:2, 34:7, 34:8, 34:16, 34:18, 51:17, 52:11, 52:20, 55:6
**met** [1] - 15:1
**methodology** [2] - 9:25, 22:3
**metrics** [2] - 59:1, 59:2
**might** [3] - 4:18, 16:12, 31:8
**million** [1] - 19:10
**millions** [1] - 19:10
**mind** [3] - 10:12, 44:19, 57:1
**mine** [3] - 9:18, 9:19, 9:20
**minute** [2] - 6:22, 21:16
**minutes** [1] - 44:1
**misleading** [15] - 31:16, 31:21, 32:12, 37:12, 37:13, 38:22, 47:3, 48:19, 48:20, 48:23, 50:3, 53:21, 53:22, 59:15, 59:16
**misled** [1] - 50:14
**missing** [6] - 5:2, 11:13, 17:17, 31:12, 48:13, 59:7
**misstatement** [2] - 30:24, 51:16
**misstatements** [1] - 39:3
**mixed** [1] - 57:19
**mixing** [1] - 55:15
**modest** [2] - 28:9, 46:14
**modification** [1] - 18:23
**moment** [5] - 3:22, 14:25, 23:4, 31:2, 61:12
**moments** [2] - 23:25, 44:18
**money** [1] - 9:21
**Montague** [2] - 2:5, 3:12

**month** [4] - 16:17, 18:25, 21:11, 57:9
**months** [4] - 14:17, 16:6, 23:22, 46:7
**Moore** [3] - 2:11, 3:17, 3:19
**most** [21] - 6:12, 9:11, 28:2, 29:1, 29:16, 30:13, 33:1, 38:24, 40:8, 42:6, 43:17, 46:3, 50:8, 50:10, 51:4, 53:2, 55:11, 56:15, 56:21
**mostly** [1] - 5:15
**MOTION** [1] - 1:17
**motion** [6] - 3:24, 3:25, 7:12, 26:6, 26:7, 58:22
**moving** [1] - 11:20
**MR** [68] - 3:9, 3:15, 3:17, 3:19, 4:6, 4:10, 5:10, 6:5, 6:8, 7:16, 7:19, 7:21, 12:8, 12:12, 13:12, 13:17, 13:19, 15:21, 19:18, 20:21, 20:24, 21:2, 21:18, 22:22, 23:14, 24:10, 24:13, 24:18, 26:23, 27:2, 27:4, 28:22, 29:5, 31:7, 34:2, 34:17, 34:25, 35:6, 36:15, 36:22, 37:22, 40:5, 40:16, 40:20, 40:21, 40:25, 41:6, 41:8, 41:16, 42:1, 42:4, 45:18, 45:21, 46:2, 47:22, 48:3, 48:5, 48:5, 50:17, 50:20, 51:1, 51:23, 52:1, 53:6, 53:13, 53:22, 58:24, 61:7
**MS** [2] - 3:11, 3:13
**Mulligan** [1] - 56:11
**Mullin** [2] - 2:13, 3:15
**MULLIN** [1] - 3:15
**multi** [3] - 16:25, 17:7, 17:21
**multi-year** [3] - 16:25, 17:7, 17:21
**multiple** [1] - 42:19
**multiples** [1] - 10:8
**MURPHY** [1] - 1:9
**must** [4] - 31:16, 59:14, 59:16

**N**

**Nadia** [2] - 2:7, 3:13
**Nancy** [1] - 62:11

**nancy** [1] - 2:16
**NANCY** [1] - 62:12
**Nasab** [2] - 2:11, 3:19
**NASAB** [1] - 3:19
**nature** [1] - 42:20
**nearly** [1] - 36:13
**NECA** [2] - 1:3, 3:4
**NECA-IBEW** [2] - 1:3, 3:4
**necessary** [2] - 4:25, 11:24
**need** [7] - 14:24, 20:19, 23:3, 35:18, 36:7, 60:17
**negligence** [4] - 51:19, 51:21, 58:16, 58:18
**negotiating** [1] - 57:10
**never** [3] - 44:23, 49:18, 57:3
**New** [1] - 2:12
**new** [3] - 27:25, 37:25, 52:25
**next** [11] - 9:17, 11:9, 17:2, 17:11, 23:5, 23:7, 23:9, 24:17, 25:3, 43:10
**nice** [1] - 31:22
**night** [1] - 12:15
**Ninth** [9] - 2:14, 31:11, 31:13, 31:25, 32:8, 51:21, 56:7, 59:16, 61:7
**non** [2] - 50:15, 53:18
**non-acquisition** [2] - 50:15, 53:18
**nonstarter** [1] - 37:13
**Noranco** [4] - 19:7, 19:9, 19:19, 19:24
**noted** [1] - 58:21
**notes** [1] - 58:19
**nothing** [3] - 22:15, 28:11, 57:14
**notion** [1] - 55:6
**nuances** [1] - 50:2
**nullity** [1] - 60:6
**number** [12] - 4:1, 4:21, 11:15, 11:19, 12:17, 13:5, 14:8, 19:11, 25:9, 35:20, 46:22, 59:12
**numbers** [10] - 11:12, 11:24, 12:7, 12:8, 12:14, 13:3, 14:7, 35:18, 46:15, 59:9
**numerous** [2] - 24:2, 32:5
**NY** [1] - 2:12

**O**

**Oak** [1] - 2:8
**objective** [4] - 23:25, 24:15, 25:10, 26:14
**objectively** [2] - 33:16, 33:17
**objectives** [2] - 39:16, 59:24
**obvious** [2] - 42:6, 50:21
**October** [4] - 43:3, 43:7, 58:2, 58:9
**OECHSLE** [1] - 1:10
**OF** [2] - 1:2, 1:18
**offered** [1] - 6:16
**Official** [1] - 62:13
**oil** [3] - 18:5, 18:7, 18:8
**Omid** [2] - 2:11, 3:19
**omission** [8] - 24:17, 31:15, 31:22, 32:11, 51:16, 59:14, 59:15
**omissions** [7] - 4:13, 5:8, 22:19, 31:9, 32:21, 48:18, 48:22
**omitted** [5] - 4:24, 12:3, 22:25, 37:11, 50:4
**once** [2] - 17:16, 53:9
**one** [35] - 3:22, 7:1, 9:22, 11:8, 11:19, 18:25, 21:3, 23:4, 24:24, 25:9, 25:15, 26:7, 26:8, 30:6, 30:12, 31:2, 31:18, 32:8, 34:14, 34:24, 40:16, 45:22, 46:11, 48:1, 51:12, 52:3, 53:7, 55:24, 58:15, 59:13, 59:20, 61:6
**one-month** [1] - 18:25
**ones** [3] - 10:25, 29:13, 52:21
**oOo** [1] - 62:1
**opening** [1] - 26:8
**operation** [1] - 41:11
**operations** [1] - 39:16
**opine** [1] - 10:25
**opining** [3] - 7:25, 8:25, 26:2
**opinion** [17] - 5:14, 5:18, 6:19, 8:3, 8:25, 14:1, 15:12, 22:14, 29:11, 29:14, 37:24, 48:12, 48:16, 49:5, 51:6, 55:12, 56:15
**opportunities** [4] - 18:13, 24:2, 24:3, 25:11

**opportunity** [3] - 11:6, 31:4, 45:14
**opposed** [1] - 13:25
**opposing** [2] - 7:15, 40:13
**opposition** [3] - 3:25, 4:16
**OR** [3] - 2:9, 2:15, 2:18
**oral** [1] - 3:3
**order** [3] - 14:10, 32:17, 48:6
**ordinary** [1] - 34:4
**OREGON** [1] - 1:2
**Oregon** [4] - 1:8, 38:5, 38:7, 62:13
**original** [1] - 62:6
**originally** [1] - 38:6
**otherwise** [1] - 41:15
**ought** [1] - 22:10
**outcomes** [1] - 33:20
**outdated** [1] - 20:9
**outlook** [2] - 28:8, 46:24
**overall** [1] - 19:2
**overestimated** [1] - 16:17
**overnight** [1] - 54:17
**own** [6] - 6:24, 26:6, 31:24, 32:4, 32:17, 39:2

**P**

**PA** [1] - 2:6
**pace** [5] - 36:10, 37:2, 37:4, 44:6, 54:10
**page** [30] - 4:15, 4:16, 4:22, 8:2, 8:10, 9:6, 9:8, 10:20, 10:24, 11:9, 14:3, 17:13, 22:24, 23:8, 25:17, 26:22, 29:9, 30:6, 36:17, 36:19, 39:1, 40:20, 40:22, 41:1, 41:10, 42:23, 45:16, 45:20, 49:6
**pages** [10] - 10:20, 11:14, 34:3, 36:9, 40:22, 41:8, 41:15, 44:8, 48:10, 52:7
**pagination** [1] - 52:7
**paper** [1] - 55:18
**papers** [2] - 26:6, 26:7
**paragraph** [41] - 4:23, 5:9, 7:1, 8:2, 8:18, 10:19, 13:16, 13:20, 13:21, 13:23, 14:5, 14:20, 15:15, 16:22, 17:6, 17:18, 19:1, 19:5, 19:7, 20:6,

**periodic** [1] - 42:11
**permits** [1] - 43:19
**perpetuity** [6] - 12:24, 21:8, 22:10, 25:23, 28:15, 49:18
**person** [1] - 12:12
**perspective** [2] - 18:21, 25:21
**pertains** [1] - 57:1
**pertinent** [15] - 5:17, 17:11, 17:12, 17:16, 17:24, 19:1, 25:8, 27:4, 27:13, 48:14, 51:23, 52:1, 52:2, 53:24
**ph** [2] - 6:6, 6:7
**Ph.D** [1] - 36:7
**Philadelphia** [1] - 2:6
**phraseology** [1] - 58:15
**piece** [1] - 41:10
**pinpoint** [1] - 56:12
**pipeline** [2] - 25:12, 54:20
**place** [3] - 9:12, 9:13, 27:12
**places** [1] - 25:6
**plainly** [1] - 45:8
**plaintiff** [1] - 32:3
**PLAINTIFFS** [1] - 2:2
**plaintiffs** [11] - 3:10, 3:12, 3:14, 4:23, 30:21, 33:1, 38:6, 39:1, 45:14, 45:16, 46:25
**Plaintiffs** [3] - 1:6, 22:24, 39:2
**plaintiffs'** [7] - 3:6, 4:3, 4:16, 5:15, 33:5, 37:16, 38:9
**plan** [17] - 15:15, 23:21, 25:20, 25:25, 26:4, 26:5, 26:15, 27:5, 27:9, 28:14, 30:15, 48:22, 48:25, 49:22, 50:12, 52:22, 57:5
**PLAN** [1] - 1:3
**plans** [3] - 30:25, 39:15, 59:24
**play** [2] - 21:23, 50:18
**played** [1] - 9:21
**pleads** [1] - 32:10
**plural** [1] - 14:7
**pocket** [3] - 35:18, 36:8, 48:8
**point** [13] - 8:7, 11:8, 12:24, 23:4, 23:19, 29:20, 32:20, 37:14, 38:24, 50:12, 54:2,

**periodic** [1] - 42:11

21:5, 21:15, 21:17, 21:18, 21:19, 21:24, 22:21, 23:7, 23:10, 23:20, 25:3, 27:23, 28:12, 37:15, 37:22, 45:17, 46:4, 47:5, 50:5, 58:7, 58:15
**paragraphs** [10] - 5:3, 5:5, 7:10, 15:20, 23:6, 23:8, 23:18, 24:18, 25:1, 32:14
**parent** [2] - 8:5, 8:7
**part** [9] - 15:23, 16:22, 20:12, 21:4, 21:13, 21:23, 41:19, 54:9, 55:8
**partially** [1] - 4:23
**particular** [3] - 47:11, 48:6, 48:10
**particularly** [1] - 10:19
**parties** [3] - 30:10, 38:16, 43:15
**parts** [2] - 11:4, 56:23
**past** [8] - 9:19, 10:5, 11:20, 37:2, 47:25, 48:2, 56:8, 57:9
**Pause** [5] - 3:24, 21:17, 23:5, 31:3, 58:19
**pause** [1] - 41:5
**pauses** [1] - 24:1
**PC** [1] - 2:8
**PCC** [3] - 22:25, 50:14, 53:17
**PCC's** [6] - 4:24, 4:25, 5:1, 33:6, 39:4, 53:8
**Pension** [1] - 3:4
**PENSION** [1] - 1:3
**people** [3] - 21:21, 24:1, 60:8
**per** [13] - 10:9, 35:19, 36:1, 36:11, 37:6, 39:13, 43:22, 43:25, 48:9, 49:3, 59:1, 59:24
**perceived** [1] - 24:1
**percent** [5] - 12:22, 24:24, 36:12, 36:13
**perfectly** [1] - 33:17
**perform** [1] - 14:1
**performance** [5] - 8:22, 14:11, 29:25, 39:18, 43:23
**performed** [2] - 9:7, 9:8
**perhaps** [2] - 48:1, 53:10
**period** [8] - 12:18, 12:21, 12:22, 13:4, 18:25, 19:20

58:6, 61:6
**pointed** [1] - 51:9
**points** [2] - 8:12, 42:19
**portion** [4] - 12:4, 26:20, 29:9, 41:13
**portions** [1] - 45:23
**Portland** [4] - 1:8, 2:9, 2:15, 2:18
**possible** [2] - 33:3, 57:7
**potato** [1] - 44:23
**potential** [8] - 18:3, 18:4, 18:12, 18:14, 18:15, 18:16, 46:12, 53:11
**potentially** [1] - 17:12
**powerful** [1] - 44:3
**pre** [1] - 11:2
**pre-existing** [1] - 11:2
**precise** [1] - 46:22
**precisely** [1] - 35:16
**Precision** [6] - 3:5, 6:15, 19:3, 19:6, 33:7, 49:21
**PRECISION** [1] - 1:8
**Precision's** [1] - 33:4
**predict** [1] - 33:19
**predictive** [1] - 42:20
**predictor** [1] - 42:17
**preface** [1] - 5:10
**preliminary** [2] - 14:23, 15:9
**premise** [2] - 33:5, 49:17
**premised** [1] - 48:20
**prepare** [1] - 54:24
**prepared** [5] - 8:20, 14:15, 29:23, 34:15, 59:13
**preparing** [1] - 28:13
**present** [15] - 13:14, 48:15, 53:2, 55:12, 55:13, 55:15, 55:16, 56:8, 56:16, 56:25, 57:1, 57:18, 57:19, 59:19
**presented** [1] - 17:7
**pretty** [1] - 20:25
**previous** [2] - 18:11, 39:20
**previously** [7] - 18:8, 30:9, 30:23, 42:25, 43:3, 43:13, 49:4
**price** [6] - 8:9, 16:5, 21:13, 28:6, 48:24, 51:2
**prices** [2] - 18:5, 18:8
**primarily** [1] - 6:19, 10:13, 29:10, 30:12

**primary** [2] - 23:24, 24:15
**priority** [1] - 11:19
**Private** [1] - 39:10
**problem** [2] - 27:13, 28:6
**proceed** [1] - 40:17
**PROCEEDINGS** [1] - 1:18
**proceedings** [3] - 41:5, 61:19, 62:5
**proceeds** [2] - 22:14
**process** [4] - 16:1, 22:6, 22:9, 38:2
**program** [3] - 35:25, 36:2, 55:1
**prohibit** [1] - 54:23
**projected** [2] - 10:2, 42:14, 42:15
**projection** [2] - 19:15, 39:13
**projections** [56] - 4:24, 4:25, 5:15, 5:16, 8:17, 8:19, 9:2, 10:4, 10:17, 12:18, 16:11, 18:23, 19:16, 19:25, 20:5, 20:8, 20:13, 20:17, 21:12, 22:8, 26:3, 28:1, 28:25, 29:1, 30:13, 30:21, 30:22, 50:4, 50:11, 51:3, 51:4, 51:5, 51:10, 51:12, 51:13, 52:2, 52:10, 52:20, 52:25, 53:24, 54:6, 55:11, 55:13, 56:14, 56:16, 56:17, 59:23, 60:2, 60:4, 60:10, 60:18
**promise** [1] - 7:21
**prong** [4] - 26:11, 26:14, 44:13, 52:5
**pronounced** [1] - 6:6
**proposal** [4] - 14:12, 16:23, 34:5, 34:18
**proposed** [3] - 8:24, 30:2, 34:19
**prospect** [1] - 18:6
**Prospective** [1] - 54:3
**prospects** [10] - 7:3, 13:15, 38:21, 39:4, 39:6, 43:11, 47:15, 53:25, 54:25, 55:9
**protect** [1] - 44:11
**protection** [1] - 45:11
**provide** [3] - 5:20, 14:10, 47:18
**provided** [17] - 7:14, 16:25, 17:20, 18:20,

33:2, 35:8, 35:15, 36:6, 37:8, 37:10, 37:11, 40:13, 41:23, 41:24, 48:12, 55:7, 59:2
**providing** [1] - 35:14
**province** [2] - 38:4, 38:5
**provision** [2] - 44:14, 56:9
**provisions** [1] - 39:9
**proxy** [63] - 5:25, 6:18, 7:5, 7:24, 8:14, 9:6, 10:17, 10:20, 12:2, 13:23, 14:4, 14:13, 14:23, 15:8, 15:25, 17:3, 17:8, 18:22, 21:5, 21:10, 22:2, 26:21, 27:24, 28:19, 28:22, 29:19, 29:20, 31:23, 32:12, 32:24, 33:3, 33:11, 33:18, 33:19, 34:2, 35:8, 35:11, 36:9, 36:18, 37:5, 39:4, 40:6, 40:22, 41:6, 41:9, 43:3, 43:18, 44:11, 44:24, 44:25, 45:22, 48:10, 49:3, 50:13, 51:14, 51:17, 53:8, 53:15, 53:16, 56:23, 58:2, 58:11
**public** [3] - 24:21, 41:7, 45:1
**published** [1] - 55:22
**pull** [1] - 45:22
**pulled** [2] - 7:9, 9:22
**puma** [1] - 55:21
**purely** [1] - 57:21
**purpose** [3] - 13:13, 21:24, 34:7
**purposes** [12] - 7:10, 10:13, 23:17, 26:1, 27:7, 28:7, 29:10, 34:8, 37:9, 46:17, 52:20
**pursuant** [1] - 3:25
**pursue** [1] - 50:24
**put** [4] - 52:18, 60:3, 60:8, 60:9
**putting** [1] - 57:12
**puzzling** [1] - 48:9

# Q

**qualify** [1] - 58:18
**quarter** [1] - 27:18
**quarterly** [1] - 50:22
**questions** [1] - 4:3
**quickly** [1] - 35:22

**quote** [8] - 15:11, 25:3, 50:4, 50:10, 51:6, 55:3, 56:3, 56:8
**quoted** [1] - 54:16
**quotes** [2] - 23:24, 26:7
**quoting** [2] - 39:12, 39:15

## R

**raised** [2] - 10:18, 31:9
**ran** [1] - 32:23
**range** [3] - 10:1, 10:7, 54:5
**rate** [2] - 36:1, 36:3
**rates** [2] - 22:10, 28:9
**rather** [4] - 29:13, 46:14, 46:22, 48:9
**rationale** [1] - 52:2
**read** [8] - 17:25, 18:1, 19:14, 23:23, 30:12, 42:5, 45:24, 53:15
**reading** [1] - 17:8
**reaffirmed** [1] - 31:14
**real** [1] - 52:20
**reality** [1] - 44:4
**realize** [1] - 49:25
**realized** [1] - 42:14
**really** [5] - 9:16, 38:23, 43:9, 44:21, 53:23
**reason** [4] - 20:12, 21:23, 35:8, 35:11
**reasonable** [2] - 8:23, 30:1, 56:22
**reasonably** [2] - 8:20, 29:23
**reasons** [2] - 35:7, 51:13
**recap** [1] - 23:13
**received** [1] - 8:4
**receiving** [1] - 16:24
**recent** [8] - 18:20, 20:6, 27:22, 27:25, 28:2, 43:6, 43:8, 58:3
**recently** [1] - 31:14
**recess** [1] - 61:16
**recognized** [1] - 56:8
**recommending** [1] - 38:3
**record** [8] - 3:7, 17:25, 34:20, 35:1, 40:15, 41:19, 62:4
**red** [2] - 41:9, 41:14
**refer** [4] - 4:21, 15:19, 48:9, 55:13
**reference** [3] - 40:7,

41:1, 46:2
**referenced** [1] - 49:10
**referred** [9] - 10:23, 12:19, 32:8, 32:14, 33:11, 37:15, 43:8, 44:15, 60:16
**referring** [5] - 4:15, 34:1, 37:21, 49:9, 61:1
**refers** [4] - 5:3, 23:8, 53:8, 59:21
**reflect** [1] - 27:11
**reflected** [3] - 14:23, 23:1, 29:15
**reflecting** [2] - 8:20, 29:23
**Reform** [2] - 39:10, 60:19
**regard** [1] - 49:14
**regarding** [4] - 4:12, 34:16, 34:17, 39:4
**reiterate** [1] - 58:16
**relates** [1] - 29:20
**relating** [5] - 17:20, 18:19, 29:21, 39:19, 59:22
**reliable** [4] - 42:17, 51:4, 53:2, 56:22
**relied** [2] - 29:10, 42:18
**reluctant** [1] - 60:20
**rely** [3] - 40:4, 42:3, 45:16
**remain** [1] - 4:19
**remains** [1] - 57:5
**repeat** [1] - 36:14
**repeated** [1] - 25:6
**repeatedly** [1] - 54:16
**reply** [6] - 4:1, 26:8, 26:19, 26:22, 45:20, 55:19
**report** [1] - 41:12
**reported** [1] - 16:15
**REPORTER** [3] - 2:16, 6:3, 20:19
**reporter** [1] - 18:2
**Reporter** [1] - 62:13
**reports** [2] - 16:19, 42:12
**representations** [1] - 55:25
**Representatives** [1] - 18:18
**reproduced** [1] - 41:14
**repurchases** [1] - 28:7
**requested** [1] - 17:21
**require** [1] - 31:20
**required** [2] - 32:3, 45:10

**requires** [2] - 31:20, 37:10
**respect** [22] - 5:8, 7:1, 8:16, 11:11, 11:14, 12:3, 12:4, 18:23, 21:24, 25:8, 32:24, 33:21, 35:7, 39:5, 46:24, 52:9, 55:10, 58:1, 58:25, 59:5, 59:18, 60:7
**respond** [4] - 26:24, 31:4, 45:14, 58:21
**response** [2] - 47:23, 58:25
**responses** [2] - 47:24, 59:20
**restate** [1] - 20:22
**results** [12] - 20:11, 27:18, 34:11, 35:12, 42:10, 42:14, 42:18, 44:7, 44:8, 56:1
**revealed** [1] - 17:3
**revenues** [3] - 24:25, 39:13, 59:23
**review** [1] - 17:22
**reviewed** [3] - 18:19, 23:6, 41:21
**revised** [6] - 5:2, 14:18, 14:21, 28:8, 30:21, 50:4
**revising** [1] - 20:5
**revisions** [3] - 19:14, 19:25, 47:11
**Revocable** [1] - 1:4
**RICHARD** [1] - 1:10
**Rick** [1] - 3:9
**rick** [1] - 2:2
**risk** [2] - 40:23, 40:25
**risks** [4] - 18:3, 41:11, 42:9, 42:11
**Rives** [2] - 2:14, 3:15
**RMR** [2] - 2:16, 62:12
**road** [1] - 54:17
**Robbins** [2] - 2:2, 3:10
**Robert** [2] - 2:10, 3:17
**robin** [1] - 3:11
**Robin** [1] - 2:5
**room** [1] - 48:1
**Room** [1] - 2:17
**roundabout** [1] - 12:1
**route** [2] - 38:25, 59:15
**Rudman** [1] - 2:2
**rule** [1] - 32:8
**Rule** [1] - 3:25
**run** [3] - 44:2, 52:19, 52:22
**running** [1] - 52:10

## S

**safe** [12] - 39:9, 44:13, 45:8, 45:11, 55:17, 56:5, 56:9, 56:18, 56:19, 60:1, 60:5, 60:12
**sale** [1] - 46:12
**sales** [1] - 43:24
**San** [1] - 2:4
**saw** [1] - 24:7
**scenario** [6] - 38:11, 46:9, 46:10, 46:23, 47:16, 57:21
**SCHMIDT** [1] - 1:10
**se** [1] - 49:3
**seat** [2] - 3:2, 4:19
**seated** [1] - 4:19
**second** [11] - 8:2, 11:18, 14:3, 16:21, 29:9, 32:20, 45:16, 45:25, 46:1, 57:21
**Section** [2] - 31:19, 44:13
**section** [10] - 9:24, 10:17, 15:17, 40:6, 40:11, 44:11, 47:6, 47:13, 49:5
**sector** [1] - 18:20
**Securities** [1] - 39:10
**see** [13] - 7:14, 7:15, 9:8, 16:12, 24:1, 26:23, 36:20, 36:22, 40:18, 41:22, 48:13, 61:9, 61:11
**seeking** [1] - 7:11
**segues** [1] - 55:5
**selected** [2] - 9:9, 22:1
**sense** [1] - 31:8
**sentence** [10] - 16:14, 23:9, 30:7, 37:18, 37:23, 45:22, 46:1, 47:3, 50:5
**sentences** [2] - 7:9, 45:23
**separately** [2] - 41:20, 41:24
**series** [1] - 50:23
**set** [10] - 3:3, 14:9, 14:18, 16:8, 22:18, 42:11, 51:12, 51:13, 52:10
**sets** [1] - 10:22
**several** [3] - 9:8, 29:6, 43:10
**share** [15] - 5:25, 6:16, 18:15, 28:7, 35:19, 36:11, 37:6, 39:13, 44:1, 48:9, 48:20, 57:12, 59:1, 59:24

**shareholder** [4] - 6:12, 11:16, 36:25, 51:17
**shareholders** [18] - 5:20, 5:24, 12:5, 13:6, 21:13, 28:20, 48:12, 48:14, 49:19, 50:14, 51:1, 51:3, 51:18, 53:17, 53:19, 55:7, 55:10, 60:3
**shareholders'** [1] - 6:23
**shift** [1] - 18:12
**Shlachter** [1] - 2:8
**short** [1] - 28:11
**show** [1] - 24:22
**shows** [3] - 6:14, 52:22, 52:24
**side** [1] - 31:4
**signature** [3] - 62:6, 62:7
**signed** [3] - 16:5, 16:16, 62:7
**significance** [1] - 59:1
**significant** [1] - 24:22
**significantly** [2] - 42:15, 44:9
**signing** [1] - 62:3
**similar** [3] - 5:14, 24:7, 30:20
**similarly** [1] - 1:5
**simplest** [1] - 38:24
**simply** [4] - 32:13, 37:7, 60:2, 61:1
**sitting** [1] - 24:3
**situated** [1] - 1:5
**situation** [1] - 5:14
**six** [1] - 16:2
**size** [1] - 19:9
**skilled** [1] - 55:1
**skip** [1] - 8:6
**skipping** [1] - 10:5
**sky** [1] - 54:18
**slept** [1] - 12:15
**slow** [1] - 20:19
**slowdown** [2] - 18:4, 18:12
**slowly** [1] - 18:1
**sometime** [1] - 16:2
**sometimes** [1] - 25:15
**sophisticated** [1] - 21:22
**sorry** [9] - 4:9, 12:1, 20:21, 20:24, 23:8, 34:1, 40:2, 47:25, 51:24
**sort** [5] - 9:14, 21:20, 24:21, 37:16, 55:5
**space** [2] - 16:6, 18:10
**speaker** [2] - 39:24,

44:19
**special** [1] - 34:7
**specific** [2] - 7:1, 24:25
**specifically** [6] - 4:15, 26:22, 29:4, 42:7, 42:8, 59:21
**specificity** [1] - 57:23
**spelled** [1] - 6:9
**squarely** [1] - 22:13
**stale** [1] - 20:9
**standard** [8] - 5:8, 9:14, 31:11, 31:13, 51:19, 51:21, 58:16, 59:17
**standing** [1] - 5:1
**start** [4] - 4:3, 5:9, 8:12, 31:9
**started** [2] - 48:18, 54:5
**starting** [1] - 5:5
**starts** [1] - 29:10
**state** [9] - 3:6, 31:17, 38:5, 38:7, 44:19, 52:17, 57:1, 58:16
**statement** [42] - 25:14, 26:21, 28:19, 28:24, 29:2, 29:3, 31:11, 34:2, 39:12, 39:14, 39:15, 39:17, 39:18, 39:19, 39:21, 44:16, 44:17, 45:23, 50:14, 53:2, 53:8, 53:15, 53:16, 55:6, 55:12, 55:13, 55:15, 55:16, 56:4, 56:16, 56:21, 56:25, 57:1, 57:13, 57:22, 59:6, 59:21, 59:22, 60:25, 61:8, 61:11
**statements** [34] - 22:19, 24:7, 24:14, 24:21, 25:6, 31:21, 32:12, 35:7, 38:21, 39:7, 39:8, 39:11, 39:22, 42:3, 42:8, 44:12, 45:1, 45:7, 45:9, 45:11, 47:14, 50:23, 54:15, 56:8, 56:10, 59:18, 59:19, 59:20, 59:23, 60:11, 60:13, 60:14, 60:15
**states** [1] - 4:22
**STATES** [2] - 1:1, 1:20
**States** [1] - 2:17
**stayed** [1] - 38:7
**step** [1] - 16:1
**still** [9] - 9:22, 15:22, 19:21, 20:14, 25:17, 25:20, 55:16, 57:22,

60:11
**stock** [8] - 6:1, 6:14, 6:15, 8:5, 21:21, 21:23, 28:7, 35:20
**stockholder** [3] - 43:19, 45:2, 46:5
**stockholders** [13] - 4:25, 33:19, 35:15, 35:23, 37:7, 37:13, 38:11, 38:19, 38:22, 44:21, 47:7, 47:9, 47:18
**Stoel** [2] - 2:14, 3:15
**Stoll** [3] - 2:8, 3:13
**stood** [1] - 35:4
**stop** [2] - 13:2, 24:6
**store** [1] - 30:22
**story** [2] - 28:11, 56:19
**straightforward** [1] - 45:21
**strategy** [20] - 5:1, 23:1, 28:21, 28:24, 33:4, 33:6, 33:7, 33:8, 34:22, 37:9, 45:4, 49:15, 49:20, 50:15, 50:16, 50:24, 53:1, 53:18, 53:19
**Street** [3] - 2:6, 2:8, 35:20
**strictly** [1] - 56:24
**strong** [1] - 34:22
**stuff** [2] - 48:5, 55:19
**subject** [3] - 8:3, 42:9, 52:5
**subjective** [1] - 26:10
**submit** [1] - 43:2
**submitted** [2] - 4:1, 41:18
**subparagraphs** [1] - 39:20
**successfully** [5] - 35:25, 36:11, 37:3, 38:13, 44:6
**successive** [1] - 42:21
**sudden** [1] - 52:24
**sued** [1] - 60:21
**sufficient** [1] - 57:23
**suggesting** [1] - 52:15
**Suisse** [29] - 7:25, 8:16, 8:25, 9:2, 9:7, 10:1, 10:7, 10:12, 11:17, 13:24, 13:25, 14:21, 15:5, 15:10, 18:18, 21:7, 21:25, 22:7, 22:9, 29:11, 29:18, 29:22, 38:10, 38:14, 46:17, 48:11, 49:5
**Suisse's** [1] - 37:24

**Suite** [3] - 2:3, 2:9, 2:15
**summarized** [2] - 36:17, 36:19
**summarizes** [1] - 23:20
**summary** [5] - 24:20, 32:2, 37:16, 37:18, 48:11
**summation** [1] - 22:21
**sums** [1] - 20:25
**supplied** [1] - 44:18
**suppose** [1] - 44:20
**surely** [1] - 4:11
**surprised** [1] - 48:2
**surprising** [1] - 49:1
**Swaine** [3] - 2:11, 3:17, 3:19
**SWITZENBAUM** [1] - 3:11
**Switzenbaum** [2] - 2:5, 3:11

## T

**tab** [22] - 7:24, 8:14, 9:5, 10:12, 10:16, 14:3, 14:24, 16:13, 23:16, 29:8, 29:20, 30:4, 30:6, 33:11, 33:23, 40:9, 41:15, 45:16, 49:4, 49:6, 54:3
**tabbed** [3] - 14:2, 16:12, 23:16
**tables** [2] - 33:23, 46:15
**tabs** [2] - 23:15, 26:6
**take-it-or-leave-it** [1] - 16:5
**talks** [6] - 9:25, 14:20, 18:22, 50:6, 52:9, 54:4
**target** [2] - 25:13, 54:21
**targets** [2] - 54:11, 54:20
**tax** [1] - 10:3
**taxes** [1] - 43:25
**technique** [1] - 48:13
**ten** [1] - 17:9
**Tennessee** [1] - 6:8
**tense** [1] - 59:19
**term** [3] - 43:11, 54:6, 55:4
**terminal** [7] - 10:7, 10:14, 12:20, 12:21, 12:22, 13:4, 22:10
**terms** [8] - 18:6, 30:11, 33:13, 33:14,

35:23, 38:17, 43:15
**test** [4] - 32:10, 56:1, 61:1, 61:7
**testify** [4] - 35:1, 35:3, 35:7, 43:4
**testing** [1] - 56:2
**tests** [1] - 60:15
**text** [1] - 8:11
**THE** [74] - 1:1, 1:2, 1:3, 1:19, 2:2, 2:10, 3:2, 3:3, 3:21, 4:7, 4:9, 4:11, 6:3, 6:4, 6:7, 7:13, 7:18, 7:20, 12:6, 12:11, 13:11, 13:16, 13:18, 15:19, 19:17, 20:19, 20:22, 20:25, 21:16, 22:20, 22:23, 24:6, 24:11, 24:14, 26:19, 26:24, 27:3, 28:16, 29:3, 31:2, 34:1, 34:13, 34:20, 35:3, 36:14, 36:20, 37:20, 40:3, 40:13, 40:18, 40:24, 41:3, 41:4, 41:17, 42:2, 45:13, 45:19, 45:25, 47:21, 47:23, 48:1, 48:4, 50:13, 50:18, 50:21, 51:22, 51:25, 53:5, 53:7, 53:14, 58:22, 61:5, 61:13, 61:16
**themselves** [4] - 13:7, 26:11, 38:1, 47:19
**then-current** [1] - 28:6
**theory** [1] - 37:17
**therefore** [2] - 30:16, 56:4
**they've** [3] - 25:13, 26:16, 55:1
**Third** [1] - 2:17
**third** [4] - 30:5, 30:10, 38:16, 43:15
**three** [2] - 39:20, 51:15
**throughout** [2] - 40:11, 52:12
**thrown** [1] - 58:20
**tied** [4] - 48:19, 48:22, 56:10, 59:14
**ties** [1] - 9:4
**timing** [3] - 15:24, 27:24
**TIMOTHY** [1] - 1:11
**tiny** [3] - 61:6
**titled** [1] - 62:5
**today** [4] - 6:7, 13:15, 26:16, 26:17
**tomorrow** [1] - 9:17
**took** [2] - 27:12, 58:14

**tools** [1] - 36:7
**top** [3] - 5:16, 19:11, 36:19
**Topic** [13] - 5:13, 6:2, 6:11, 22:14, 30:20, 30:22, 51:7, 51:9, 51:12, 51:20, 52:3, 52:4, 52:8
**total** [1] - 12:22
**tour** [1] - 12:1
**towards** [2] - 8:11, 49:6
**transaction** [5] - 5:19, 5:24, 6:13, 6:20, 8:1
**transactions** [4] - 9:9, 9:19, 18:20, 38:17
**transcript** [2] - 62:4, 62:6
**TRANSCRIPT** [1] - 1:18
**trends** [1] - 18:21
**tried** [1] - 21:2
**true** [14] - 7:3, 9:18, 23:20, 25:20, 25:23, 30:24, 32:13, 38:1, 51:5, 57:20, 57:21, 59:5, 61:9, 61:11
**TRUST** [1] - 1:3
**Trust** [3] - 1:4, 3:5, 13:8
**Trustee** [1] - 1:4
**truth** [1] - 50:2
**try** [3] - 18:1, 45:3, 57:7
**trying** [3] - 7:10, 15:10, 28:16
**turbine** [2] - 18:13, 54:1
**turbines** [2] - 28:9, 46:25
**turn** [5] - 6:1, 9:5, 10:11, 37:14, 38:23
**turned** [2] - 37:19, 37:23
**turning** [1] - 23:17
**turns** [1] - 10:16
**two** [17] - 7:20, 10:22, 12:17, 14:17, 16:6, 25:4, 25:12, 34:13, 34:23, 44:8, 45:2, 46:7, 46:14, 50:25, 54:20, 58:8, 59:20
**two-year** [3] - 25:4, 25:12, 54:20
**typically** [3] - 9:13, 25:14, 35:20

## U

**U.S** [1] - 55:23

**ULRICH** [1] - 1:10
**ultimate** [2] - 8:8, 43:11
**ultimately** [4] - 13:25, 14:14, 44:5, 46:9
**uncertain** [9] - 33:15, 33:18, 33:21, 35:13, 37:1, 38:18, 47:17, 54:19, 57:8
**uncertainties** [2] - 41:12, 42:9
**uncertainty** [7] - 30:10, 43:14, 53:9, 53:11, 53:20, 54:23
**unclear** [3] - 14:21, 19:23, 27:23
**under** [17] - 8:14, 10:2, 14:3, 14:24, 16:13, 30:4, 30:6, 44:10, 44:13, 44:17, 46:12, 49:6, 52:4, 54:2, 54:3, 57:15, 57:16
**underlying** [3] - 39:19, 52:13, 59:22
**unexpected** [1] - 54:19
**United** [1] - 2:17
**UNITED** [2] - 1:1, 1:20
**unless** [3] - 32:18, 41:19, 48:12
**unlevered** [1] - 10:3
**unquote** [6] - 15:11, 50:4, 50:10, 51:6, 55:3, 56:3
**untrue** [1] - 51:6
**up** [28] - 6:8, 7:7, 9:13, 10:1, 20:25, 22:8, 29:1, 29:8, 29:16, 30:14, 30:17, 30:18, 39:8, 40:8, 45:1, 46:3, 49:4, 50:8, 50:11, 51:5, 52:22, 52:24, 54:3, 55:11, 56:15, 56:21, 58:10, 60:3
**up-to-date** [9] - 29:1, 29:16, 30:14, 46:3, 50:11, 51:5, 55:11, 56:15, 56:21
**upcycle** [1] - 18:10
**update** [6] - 14:16, 16:11, 16:24, 17:7, 35:9, 47:9
**Update** [1] - 17:9
**updated** [7] - 14:6, 14:9, 17:10, 27:11, 35:10, 43:5, 58:3
**updates** [2] - 24:19, 46:19
**updating** [2] - 27:10,

50:6
**uses** [1] - 46:10

## V

**valuation** [12] - 9:15, 10:1, 12:12, 15:14, 19:21, 28:20, 28:23, 34:8, 48:11, 48:13, 49:12, 49:16
**valuations** [1] - 28:13
**value** [32] - 5:1, 5:21, 6:14, 6:15, 6:18, 9:18, 10:7, 10:14, 11:13, 12:18, 12:20, 12:23, 13:3, 13:14, 20:17, 21:7, 21:12, 22:11, 25:22, 25:23, 32:18, 33:3, 37:8, 38:1, 48:16, 48:21, 49:17, 49:19, 49:20, 55:8, 57:2
**valued** [1] - 26:13
**valuing** [10] - 11:18, 11:21, 12:10, 25:24, 27:8, 50:14, 53:11, 53:17, 53:19, 57:4
**various** [1] - 23:18
**VERNON** [1] - 1:10
**version** [3] - 47:10, 52:6, 52:8
**versus** [2] - 3:5, 30:25
**view** [8] - 5:20, 8:7, 14:10, 45:5, 47:16, 54:24, 56:24, 57:15
**viewed** [1] - 53:21
**violation** [1] - 51:14
**vitally** [1] - 11:7
**vote** [4] - 5:25, 6:17, 13:9, 45:2
**voting** [1] - 6:13
**vs** [1] - 1:7

## W

**wait** [4] - 11:18, 61:9, 61:10, 61:12
**walk** [3] - 4:14, 11:6, 60:5
**WALKER** [1] - 62:12
**Walker** [2] - 2:16, 62:11
**walking** [1] - 54:17
**Wall** [1] - 35:20
**WAMBOLD** [1] - 1:10
**wants** [3] - 11:16, 16:9
**Warren** [5] - 16:3, 16:8, 16:20, 52:22, 52:24
**web** [1] - 25:17

**week** [2] - 18:25
**weeks** [3] - 16:2, 45:2
**welcome** [1] - 47:22
**West** [1] - 2:3
**Westlaw** [2] - 52:6, 52:8
**whole** [7] - 8:25, 13:13, 33:5, 48:16, 53:16, 53:24, 55:5
**WICKS** [1] - 1:11
**willful** [2] - 58:14, 58:17
**willfully** [1] - 37:25
**word** [3] - 13:8, 53:15, 58:23
**words** [5] - 31:16, 40:8, 44:24, 45:23, 56:23
**works** [1] - 52:7
**world** [2] - 25:18, 45:6
**worst** [1] - 57:20
**worth** [4] - 9:20, 9:22, 13:15, 57:11
**wrap** [2] - 28:16, 60:22

## Y

**year** [24] - 9:16, 9:17, 10:9, 10:15, 12:24, 16:25, 17:7, 17:21, 24:21, 24:23, 24:24, 25:4, 25:12, 27:18, 36:1, 37:5, 41:13, 42:21, 43:22, 49:8, 54:12, 54:20
**year-by-year** [1] - 24:23
**years** [8] - 11:20, 12:17, 12:20, 36:5, 42:19, 43:10, 43:11, 54:10
**yesterday** [4] - 9:16, 55:20, 55:22, 60:16
**YIM** [1] - 1:19
**York** [1] - 2:12
**YOU** [1] - 1:19
**YOULEE** [1] - 1:19

## Z

**zero** [2] - 27:8, 37:25