UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

NECA-IBEW PENSION TRUST FUND
(THE DECATUR PLAN) and ANGELA
LOHMANN, as Trustee for the Angela
Lohmann Revocable Trust, individually and
on behalf of all others similarly situated,

               Plaintiffs,

     v.

PRECISION CASTPARTS CORP., MARK
DONEGAN, DON R. GRABER, LESTER L.
LYLES, DANIEL J. MURPHY,VERNON E.
OECHSLE, ULRICH SCHMIDT, RICHARD
L. WAMBOLD, and TIMOTHY A. WICKS,

               Defendants.

Case No. 3:16-cv-01756-YY

FINDINGS AND
RECOMMENDATION

YOU, Magistrate Judge:

## I.    INTRODUCTION

Plaintiffs are former shareholders of Precision Castparts Corp. ("PCC" or "the

Company") who have brought a stockholder class action against PCC and certain of its current

and former officers and directors for disseminating purportedly false and misleading proxy

materials in violation of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("1934

Act" or "Exchange Act") (codified at 15 U.S.C. § 78n(a) and 15 U.S.C. § 78t(a)) and Securities

and Exchange Commission ("SEC") Rule 14a-9 (codified at 17 C.F.R. § 240.14a-9) promulgated thereunder.

Defendants PCC, Mark Donegan ("Donegan"), Don R. Graber, Lester L. Lyles, Daniel J. Murphy, Vernon E. Oechsle, Ulrich Schmidt, Richard L. Wambold and Timothy A. Wicks ("Director Defendants") (together with PCC, "Defendants") have filed a Motion to Dismiss the Amended Complaint (ECF #57) pursuant to FRCP 12(b)(6), for failure to state a claim upon which relief may be granted.  For the reasons discussed below, the motion should be DENIED.

## II.    BACKGROUND

### A.    PCC and Director Defendants

"PCC started as a small manufacturer of investment castings and expanded into a worldwide, Fortune 500 company producing investment castings, forgings, and fasteners for aerospace, power, and general industrial customers."  Amended Class Action Allegation Complaint ¶ 2, ECF #56 ("Am. Compl.").  Pursuant to an acquisition announced in August 2015 and completed in January 2016 ("Acquisition"), PCC is now a wholly owned subsidiary of Berkshire Hathaway Inc. ("Berkshire").  *Id.* ¶¶ 2, 7, 11, 18.  The Director Defendants were the members of PCC's Board of Directors:  one inside director—Donegan, who was the Chairman and CEO—and seven independent directors who were not PCC employees:  Don Graber, Lester Lyles, Daniel Murphy, Vernon Oechsle, Ulrich Schmidt, Richard Wambold and Timothy Wicks. *Id.* ¶¶ 19-26.  Berkshire now employs Donegan.  *Id.* ¶ 19.

Plaintiffs contend that PCC's growth has been powered by a vigorous acquisition strategy.  *Id.* ¶ 38.  In fiscal year 2012, PCC completed eight acquisitions of approximately $1.4 billion.  Its 2012 Annual Report stated:

> Our growth strategy includes the acquisition of strategic operations. In recent years, we have completed a number of acquisition transactions. We expect that we

will continue to seek acquisitions of complementary businesses, products and technologies to add products and services for our core customer base and for related markets, and to expand each of our businesses geographically.

*Id.* ¶ 39.  On January 24, 2013, Donegan stated at a Q3 2013 earnings call:

We have been, and we will continue to be, a company that focuses on M&A first. We still have numerous opportunities available moving forward. We are not at a loss of ideas. They're all in our current space, so we're not looking to go off in some new direction. But as you can see from this chart, we will continue to be a very strong driver of cash flow moving forward. And look at what we're expecting. We are expecting roughly $5 billion to deploy through fiscal year '16.

*Id.* ¶ 40.

In fiscal year 2013, PCC completed 12 acquisitions in the amount approximately $1

billion.  *Id.* ¶ 42.  PCC continued to affirm:

Our growth strategy includes the acquisition of strategic operations and capital equipment. In recent years, including fiscal 2013, we have completed a number of acquisition transactions, including the acquisition of Titanium Metals Corporation ('TIMET') in fiscal 2013, a manufacturer of a full range of titanium products, including ingot and slab, forging billet and mill forms. We expect that we will continue to seek acquisitions of complementary businesses, products, capital equipment and technologies to add products and services for our core customer base and for related markets, and will also continue to expand each of our businesses geographically.

*Id.*  At a Q2 2013 earnings call on October 24, 2013, Donegan stated:

And if I look at this, our acquisition mentality and what we expect, it is a very clearly defined, almost surgical process that we go in, identifying the opportunities, clearly putting them on everybody's plate, resourcing an effective manner to get and then driving them through. And the management teams, to their credit, across all these have been able to accept and deliver these levels and a very, very solid response.

*Id.* ¶ 43.  At a Q4 2014 earnings call on May 8, 2014, Donegan reiterated the same:

We're going to continue to systematically identify the right acquisitions – not any acquisition, the right ones for us. Once we acquire, we're going to rapidly drive our integration process. We're going to deliver substantially improved performance on our end markets. And we're always going to do it in an environment that each plant feels as though they are the whole company. We want

them to feel that their results are the company's results. This is the DNA of the company, and it will continue to be unrelenting in that manner.

*Id.* ¶ 44.

On May 29, 2014, PCC filed its Annual Report in which it disclosed it had completed seven acquisitions in fiscal year 2013 in the amount of approximately $1 billion. *Id.* ¶ 45. PCC stated that "[g]oing forward, we see solid acquisition opportunities and expect to continue to focus our cash redeployment in this area for the foreseeable future." *Id.* PCC further continued to affirm:

> Our growth strategy includes the acquisition of strategic operations and capital equipment. We have completed a number of acquisition transactions in recent years. We expect that we will continue to seek acquisitions of complementary businesses, products, capital equipment and technologies to add products and services for our core customer base and for related markets, and will also continue to expand each of our businesses geographically.

*Id.* ¶ 45.

At a Q3 2015 earnings call on January 22, 2015, Donegan stated that "M&A is always going to be our primary objective," and that there were "numerous opportunities sitting in front of us of which all are right for the business." *Id.* ¶ 48. At a Q4 2015 earnings call on May 13, 2015, Donegan reiterated, "M&A will continue to remain our top priority" and stated, "we are targeting $3 billion to $5 billion over the next two years." *Id.* ¶ 49.

In May 2015, PCC management prepared a set of financial forecasts (the "May Forecasts"). *Id.* ¶ 51. According to the Proxy, the May Forecasts were prepared contemplating two scenarios: one that assumed continued acquisitions activity consistent with PCC's historical approach, and another that assumed no acquisitions. *See* Proxy Statement, Decl. of Omid H. Nasab, Ex. 1, at 41, ECF #58-1 ("Proxy") ("The May Forecasts were prepared under two separate sets of assumptions regarding acquisition activity. The first set assumes no acquisitions

and a $1 billion issuance of bonds. The second set assumes approximately $1.5 billion of

acquisition expenditures per annum and a $3 billion issuance of bonds.").

On May 28, 2015, PCC filed its Annual Report in which it disclosed that it completed

two acquisitions in fiscal 2015 in the amount of approximately $637 million.  Am Compl. ¶ 52.

PCC also stated:

> • "Our growth strategy includes the acquisition of strategic operations and capital equipment. We have completed a number of acquisition transactions in recent years. We expect that we will continue to seek acquisitions of complementary businesses, products, capital equipment and technologies to add products and services for our core customer base and for related markets, and will also continue to expand each of our businesses geographically."
>
> • "Our capital allocation framework supports a multi-pronged strategy that prioritizes internal investment and value-creating acquisitions, with excess cash returned to shareholders in the form of share repurchases once the first two criteria are met."
>
> • "We continue to be very active on the acquisition front, with several potential opportunities in front of us."
>
> • "We remain committed to our value-creating capital deployment strategy, focused on growing the business organically and through acquisitions and on returning excess cash to shareholders via share repurchases."
>
> • "We have also been expanding our international activities during the past several years, primarily through acquisitions and the development of overseas subsidiaries. This expansion is part of our strategy to acquire and develop businesses that complement our core competencies, provide low-cost manufacturing, have strong growth prospects and maintain leading positions in their respective market niches."

*Id.*

## B.    The Acquisition

On July 9, 2015, Donegan met with Warren E. Buffett ("Buffett"), CEO of Berkshire.  *Id.*

¶¶ 3, 53.  Berkshire owned 2,695,109 shares of PCC common stock.  *Id.* ¶ 53.  Additionally, the

pension funds of certain Berkshire subsidiaries owned an additional 1,505,683 shares of PCC

common stock.  *Id.*  Buffett told Donegan that Berkshire was interested in acquiring PCC for $235 per share and that he wanted Donegan to continue working with PCC after the Acquisition. *Id.* ¶ 55.  Berkshire's offer was 21.2% higher than the closing price of PCC's stock on the trading day prior to the Board's approval of the merger agreement.  Proxy at 37, 85.

On July 11, 2015, the Board met to discuss Berkshire's offer.  Am. Compl. ¶ 57.  After the meeting, Donegan caused a new set of projections to be developed, i.e., the "Revised Forecasts."  *Id.*  Unlike the May Forecasts, which contemplated one scenario with acquisitions and another without, the Revised Forecasts consisted of a single scenario—one without any acquisitions for the next 5 years.  *Id.* ¶ 57.  Two days later, PCC announced its acquisition of Composites Horizons, LLC and stated this "cash acquisition will be immediately accretive to earnings."  *Id.*

The Board met again on July 21, 2015, to review the Revised Forecasts.  *Id.* ¶ 59. Management informed the Board that the Revised Forecasts assumed PCC would not pursue or complete any additional acquisitions, and the Board agreed to provide the Revised Forecasts to Credit Suisse for purposes of valuing PCC against Berkshire's offer of $235 per share.  *Id.*  Six days later, PCC announced its acquisition of Noranco.  *Id.* ¶ 60.

Defendants asked Credit Suisse to issue a fairness opinion based solely on the Revised Forecast, which assumed no future acquisitions, although acquisitions were clearly a core component of PCC's growth strategy, as outlined *supra* Part II.A.  *See id.* ¶¶ 59-60, 64; Proxy at 45-47.  On August 8, 2015, Credit Suisse provided its fairness opinion to the Board.  *Id.* ¶ 63. Using the Revised Forecasts, Credit Suisse implied a standalone valuation reference range of $215 to $256 per share as compared to the $235-per-share offer from Berkshire.  *Id.*

The $235-per-share offer from Berkshire was below other estimates, specifically the $299-per-share price determined by an analyst at BOE Securities, the $252-per-share price set by an analyst at Buckingham Research Group, and the $244-per-share price set by an analyst at UBS, on June 6, May 19, and April 20, 2015, respectively. *Id.* ¶ 65. In the previous two years, PCC common stock traded as high as $275.09 per share on June 9, 2014, its 52-week high was $247.04 per share on September 18, 2014, and it traded at $238.03 per share on January 5, 2015. *Id.* Also over the past two years, the Board recommended share repurchases at prices that implied a fair value takeover price of $325 per share. *Id.* However, Berkshire's offer was 21.2% higher than the closing share price on the trading day prior to the Board's approval of the Acquisition. Defendant's Motion to Dismiss at 6, ECF #57 ("Defs' Mot.").

On August 10, 2015, PCC and Berkshire jointly announced the Acquisition. *Id.* ¶ 68. On October 13, 2015, PCC filed the Proxy, recommending that the shareholders vote to approve the Acquisition. *Id.* ¶ 70. Berkshire completed the Acquisition on January 29, 2016, pursuant to a vote of approval from the shareholders. *Id.* ¶ 72.

On March 7, 2016, Buffett stated that PCC would continue buying companies under Donegan. *Id.* ¶ 74. Buffett stated that "[i]n building his business, [Donegan] has made many acquisitions and will make more. . . . We look forward to having him deploy Berkshire's capital." *Id.*

On April 8, 2016, PCC filed its Transition Report disclosing that it acquired five businesses during fiscal 2016 and that "[t]otal assets and revenues of these acquisitions represent approximately 5.9% and 1.2%, respectively, of the related consolidated financial statement amounts as of and for the fiscal year ended January 3, 2016." *Id.* ¶ 75. PCC continued to affirm:

> Our growth strategy includes the acquisition of strategic operations and capital equipment. We have completed a number of acquisition transactions in recent

years. We expect that we will continue to seek acquisitions of complementary
businesses, products, capital equipment and technologies to add products and
services for our core customer base and for related markets, and will also continue
to expand each of our businesses geographically.

*Id.*

Members of the Board and PCC's senior management collectively owned over 1.3
million PCC shares for which they received an immediate cash payment of over $306.7 million.
*Id.* ¶ 67. Moreover, PCC's officers and directors received millions of dollars in special
payments—not being made to ordinary shareholders—for currently unvested stock options,
performance units, and restricted shares, all of which, upon the Acquisition's closing, became
fully vested and exercisable. *Id.* Donegan secured $51.8 million from his options. *Id.* PCC's
senior management also received over $23 million in change-of-control payments. *Id.* In
addition, Donegan and members of PCC's management have stayed on after the Acquisition. *Id.*

## C.    Procedural History

After PCC filed its preliminary proxy on September 4, 2015, several plaintiffs—
including one of the lead plaintiffs in this case—filed complaints in Oregon state court alleging
that the preliminary proxy omitted material information, and sought injunctive relief to address
the proxy's allegedly deficient disclosures. *See* Defs' Mot., Ex. 4 ¶¶ 11, 58-59, ECF #58-4
(NECA/IBEW Pension Trust Fund Class Action Compl., 15-cv-26664 (Oct. 2, 2015)). After the
shareholders voted to approve the Acquisition in January 2016, the pending state court actions,
including several other putative class actions filed before the preliminary proxy was filed, were
consolidated into a single proceeding (the "State Court Action"). Defs' Mot. at 9. The plaintiffs
in the State Court Action filed their first consolidated class-action complaint in February 2016.
*See id.* Ex. 5, ECF #58-5 (Consolidated Amended Class Action and Derivative Complaint). PCC
and the Director Defendants moved to dismiss the State Court Action in April 2016, and then

again in July 2016, after plaintiffs amended the pleadings. Defs' Mot. at 9. Instead of

responding to the motion to dismiss, the plaintiffs filed this case in federal court and agreed to

stay the State Court Action until this case is resolved. *See id.*, Ex. 6, ECF #58-6 (Stipulation for

Stay).

### III.    STANDARDS

To state a claim for relief, a pleading must contain "a short and plain statement of the

claim showing that the pleader is entitled to relief[.]" FRCP 8(a)(2). This standard "does not

require 'detailed factual allegations,'" but does demand "more than an unadorned, the-defendant-

unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "A pleading that offers 'labels and conclusions'

or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting

*Twombly*, 550 U.S. at 555). The complaint "may not simply recite the elements of a cause of

action, but must contain sufficient allegations of underlying facts to give fair notice and to enable

the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir.

2011).

To survive a motion to dismiss for failure to state a claim pursuant to FRCP 12(b)(6), "a

complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'" *Ashcroft*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "A claim

has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at

678 (citing *Twombly*, 550 U.S. at 556).

In evaluating a motion to dismiss, the court must accept the allegations of material fact

as true and construe those allegations in the light most favorable to the non-moving party. *Parks*

*Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). In addition to the allegations of the complaint, the court may also consider documents whose authenticity no party questions that are attached to, or incorporated by reference into, the complaint, as well as matters capable of judicial notice. *Knievel v. ESPN*, 393 F3d 1068, 1076 (9th Cir. 2005). The court need not accept as true allegations in the complaint that contradict these sources. *Lazy Y Ranch, Ltd., v. Behren*s, 546 F.3d 580, 588 (9th Cir. 2008).

Moreover, as discussed further *infra* Part IV.B.3, plaintiffs "must meet both the heightened pleading requirements for fraud claims under [FRCP] 9(b), which requires that the complaint 'state with particularity the circumstances constituting fraud,' and the 'exacting pleading requirements' of the [PSLRA], which require that the complaint 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *In re Quality Sys., Inc. Sec. Litig.*, No. 15-55173, 2017 WL 3203558, at *6 (9th Cir. July 28, 2017) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) and 15 U.S.C. § 78u-4(b)(2)(A)).

## IV.    FINDINGS

Defendants move to dismiss plaintiffs' claims on the grounds that (1) plaintiffs have not sufficiently alleged a material misstatement or omission, (2) the bespeaks caution doctrine and the PLSRA safe harbor bar plaintiffs' allegations, and (3) plaintiffs have failed to plead scienter with particularity or meet the standards of FRCP 9(b). For the reasons that follow, defendants' arguments lack merit and the motion to dismiss should, therefore, be denied.

### A.    Relevant Law

Exchange Act Section 14(a) and SEC Rule 14a-9 prohibit the "solicitation of a proxy by a statement that contains either (1) a false or misleading declaration of material fact, or (2) an

omission of material fact that makes any portion of the statement misleading." *Desaigoudar v. Meyercord*, 223 F.3d 1020, 1023 (9th Cir. 2000), *cert. denied*, 121 S.Ct. 1962 (2001).  "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

The Private Securities Litigation Reform Act of 1995 ("PSLRA") imposes a heightened pleading standard in securities litigation.  *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1107-08 (9th Cir. 2010).  Thus, a plaintiff must:

(1) "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . all facts on which that belief is made," 15 U.S.C. § 78u-4(b)(1)(B);

(2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," *id*. § 78u-4(b)(2)(A); and

(3) establish that "the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages," *id*. § 78u-4(b)(4).

Otherwise stated, "[t]o state a claim under § 14(a) and Rule 14a-9, a plaintiff must establish that '(1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction.'" *N.Y.C. Emps.' Ret. Sys. v. Jobs*, 593 F.3d 1018, 1022 (9th Cir. 2010) ("*Jobs*") (quoting *Tracinda Corp v. DaimlerChrysler AG*, 502 F.3d 212, 228 (3d Cir. 2007)), *overruled on other grounds by Lacey v. Maricopa County*, 693 F.3d 896 (9th Cir. 2012) (en banc).  A complaint failing to meet these requirements "shall" be dismissed.  15 U.S.C. § 78u-4(b)(3)(A).

11 – FINDINGS AND RECOMMENDATION

**B.      Analysis**

**1.        Section 14(a) and Rule 14a-9**

Plaintiffs contend that the Proxy is misleading in that it contains the following language:

"The Board relied primarily on, and for purposes of its analyses and opinion directed Credit

Suisse to use, the Company Forecasts rather than the May Forecasts, as the Company Forecasts

reflected management's *most up-to-date and accurate* forecasts."  Proxy at 40 (emphasis added).

On the same page, the Proxy also states that "the Company Forecasts did not assume any

acquisitions other than those that were previously announced or completed *because of the*

*inherent uncertainty* of consummating acquisitions with third parties on terms that would be

attractive to the Company or at all."  *Id.* (emphasis added).  Plaintiffs claim these statements

were false and misleading because "there was no actual plan for the Company to suddenly

abandon its acquisition strategy in July 2015," and "the Company's growth through acquisitions

was not expected to slow down in the foreseeable future."  Am. Compl. ¶ 80.  Plaintiffs contend

that, rather than what was represented in the Proxy, the "most up-to-date and accurate" forecast

would have been one based on the acquisition strategy that PCC was, in fact, pursuing—not a

"mythical company"—and they should have been correctly advised to that effect.  *Id.* ¶¶ 10, 78.

As mentioned above, "[a]n omitted [or misrepresented] fact is material if there is a

substantial likelihood that a reasonable shareholder would consider it important in deciding how

to vote."  *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).  The standard

contemplates "a showing of a substantial likelihood that, under all the circumstances, the omitted

[or misrepresented] fact would have assumed actual significance in the deliberations of the

reasonable shareholder."  *Id.* at 449.  "Put another way, there must be a substantial likelihood

that the disclosure of the omitted [or misrepresented] fact would have been viewed by the

reasonable investor as having significantly altered the 'total mix' of information made available." *Id.*

"No matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not." *Brody v. Transitional Hosps. Corp.,* 280 F.3d 997, 1006 (9th Cir.2002). "[I]f the standard of materiality is unnecessarily low, not only may the corporation and its management be subjected to liability for insignificant omissions or misstatements, but also management's fear of exposing itself to substantial liability may cause it simply to bury the shareholders in an avalanche of trivial information . . . ." *TSC Indus.*, 426 U.S. at 448-49. Thus, "[t]o be actionable under the securities laws, an omission must be misleading; in other words it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody*, 280 F.3d at 1006.

"The question of materiality . . . is an objective one, involving the significance of an omitted or misrepresented fact to a reasonable investor." *TSC Indus.*, 426 U.S. at 445. "Knowingly false statements of reasons, opinion, or belief, even though conclusory in form, may be actionable under § 14(a) as misstatements of material fact." *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1083 (1991) (holding that a proxy's statement that $42 per share was a "high value" and a "fair price" for minority stock could be materially misleading). However, misleading opinions give rise to a claim "only if the complaint alleges with particularity that the statements were both objectively and subjectively false or misleading." *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1162 (9th Cir. 2009) (citing *Va. Bankshares*, 501 U.S. at 1096)). Thus, statements of reasons, opinion, or belief are actionable false statements if they are (1) objectively false, i.e., they are false or misleading with respect to the underlying subject matter,

and (2) subjectively false; i.e., they misstate the actual opinions, beliefs, or motivation of the speaker. *See id.*

Here, plaintiffs have alleged that the statements were objectively false or misleading: the Amended Complaint contains many examples of how, contrary to the Proxy statement, PCC's acquisition strategy was a continuing part of its business plan. Between 2013 and 2015, Donegan repeatedly made statements such as: "We have been, and we will continue to be, a company that focuses on M&A first," Am. Compl. ¶ 40, "M&A is always going to be our primary objective," *id*. ¶ 48, and, "This is the DNA of the company, and it will continue to be unrelenting in that manner." *Id.* ¶ 44. In PCC's Q4 2015 earnings call, Donegan stated that PCC would continue to make acquisitions over the next two years:

> M&A will continue to remain our top priority. We are actively pursuing today strategic acquisitions both, large and small. We will continue to be a disciplined buy, but we are targeting $3 billion to $5 billion over the next two years.

*Id.* ¶ 49. In fact, PCC acquired two companies in July 2015, made more acquisitions after filing the Proxy statement, and acknowledged that it "intended to continue pursuing acquisition opportunities." *Id.* ¶ 52; Defs' Mot., at 5. Based on these facts, plaintiffs have met their burden of showing that the Proxy statements were objectively false and misleading in that the Revised Forecasts were not the most accurate and up-to-date and future acquisitions were completely excluded from it.

Plaintiffs also have alleged that the statements were subjectively false or misleading. Plaintiffs have alleged that—although defendants were pursuing the acquisition strategy outlined above—they prepared and disseminated the Proxy, which stated that the Revised Forecasts were PCC's most accurate forecast when they knew that it was not. This allegation is evidenced by the many statements Donegan made during earnings calls and PCC's statements in annual and

14 – FINDINGS AND RECOMMENDATION

transitional reports: "We still have numerous opportunities available moving forward. We are not at a loss of ideas." Am. Compl. ¶ 40. "We expect that we will continue to seek acquisitions of complementary businesses, products, capital equipment and technologies to add products and services for our core customer base and for related markets, and will also continue to expand each of our businesses geographically." *Id.* ¶¶ 39, 42, 45, 52. "[O]ur acquisition mentality and what we expect, it is *a very clearly defined, almost surgical process* that we go in, identifying the opportunities, *clearly* putting them on everybody's plate, resourcing an effective manner to get and then driving them through. *Id.* ¶ 43 (emphasis added). These statements show defendants believed in the continued success of their acquisition program and contradicts their claim to shareholders that such a strategy was "inherently uncertain."

Additionally, plaintiffs have alleged materiality. As the court noted in *In re Hot Topic, Inc. Sec. Litig.*, No. CV 13-02939 SJO JCX, 2014 WL 7499375, at *8 (C.D. Cal. May 2, 2014), "[w]hich of two projections is more accurate would be important to a reasonable shareholder trying to determine if a stock buyout is a fair deal, especially if, as alleged here, the long-term prospects of the company differ significantly between the two projections." Plaintiffs allege that by falsely stating or misrepresenting that the Revised Forecasts reflected the most accurate view of PCC's future prospects, defendants induced stockholders to vote in favor of the Acquisition based on inaccurate projections that "valued and presented . . . a business that assumed no acquisitions over the next five years—a mythical business, far less valuable than the real PCC, with its significant pipeline of past, ongoing, and future acquisitions materially bolstering the assets, revenues, and prospects of the real company." Am. Comp. ¶ 78.

Defendant's arguments to the contrary are unavailing.  Regarding the first statement, defendants contend it is not false or misleading when taken in the context of the full paragraph, which states:

> "The Board relied primarily on, and for purposes of its analyses and opinion directed Credit Suisse to use, the Company Forecasts rather than the May Forecasts, as the Company Forecasts reflected management's most up-to-date and accurate forecasts. In particular, the Company Forecasts were updated to reflect the impact on interest expense of the Company's $2 billion bond issuance that took place in June 2015 compared to the expected $3 billion bond issuance included in the May Forecasts that assumed future acquisitions and the expected $1 billion bond issuance included in the May Forecasts that did not assume future acquisitions, the actual business results through the first quarter of fiscal year 2016, the anticipated impact of recent *acquisitions (but did not assume additional future acquisitions)*, the then-current market price of the Company common stock for purposes of share repurchases and a revised commercial outlook, including the assumption of more modest growth rates for the Company's industrial gas turbines end market."

Proxy at 40 (emphasis added).

Defendants argue that, when read together with the subsequent sentence, the phrase "most up-to-date and accurate" does not mean that the forecasts were the most up-to-date and accurate in the sense that they correctly represented the future value of the company, but instead that the forecasts were updated accurately from May to July.  Defs' Reply at 6-7, ECF #61. However, the second sentence simply explains how the May forecasts were updated; it does not alter the assertion that management believed the Company Forecast was the most accurate forecast—the meaning that a reasonable shareholder would have assigned to the statement. Stating the Company Forecasts are the most up-to-date and accurate i.e., they are the most correct and authentic, is different than stating the forecasts were updated accurately, i.e., that the process of updating itself was done correctly.  The Proxy used the former, not the later.  Thus, at best, the statement is misleading.

Defendants' characterization of the second statement is also unavailing. Defendants argue the statement is "objectively truthful and not misleading" because plaintiffs cannot "show that there was no 'inherent uncertainty' in PCC's ability to execute future acquisitions, with unknown companies at unknown terms and prices, profitably during a five-year forecast window . . ." and that even if they could show "PCC [was] certain that it would continue to make some acquisitions on some terms, there plainly was (and is) great inherent uncertainty in forecasting the financial impact of hypothetical future acquisitions." Defs' Reply at 10-11, ECF #61. Defendants, however, neglect the operative word "because" in the misleading statement. Of course, there is inherent uncertainty with any forecast or projection—to claim otherwise is logically unassailable. But the statement reads that the Revised Forecasts did not assume any future acquisitions "*because of* the inherent uncertainty of consummating acquisitions." Proxy at 40. Donegan's previous characterization of PCC's acquisition program as "*a very clearly defined, almost surgical process*" is directly at odds with defendants' later characterization that an acquisition strategy is inherently uncertain. Moreover, as plaintiff's aptly state: "The fact that defendants were continuing to complete acquisitions in the same month they agreed to eliminate acquisitions in the forecasts, along with the fact that PCC had a +2 year pipeline for acquisitions, demonstrates the falsity of defendants' claim that the Revised Forecasts did not assume any acquisitions because of the 'inherent uncertainty' of consummating acquisitions." Plaintiffs' Response at 23 n.10, ECF #59 (Pls' Resp.). The amended complaint sufficiently alleges that defendants did not include future acquisitions in the Company Forecasts, not because of the uncertainty involved with an acquisition strategy but because they needed to suppress the true value of the company in order to personally benefit from the Acquisition.

Defendants also argue that the statements are not material because both May Forecasts were disclosed in the Proxy. This argument, however, entirely discounts the persuasiveness of the fairness opinion issued by Credit Suisse, which at the defendants' direction relied only on a version of the May Forecasts that assumed a non-acquisition strategy and surely must have been a factor in a reasonable shareholder's decision-making process. As the Supreme Court in *Virginia Bankshares, Inc. v. Sandberg* noted:

> Shareholders know that directors usually have knowledge and expertness far exceeding the normal investor's resources, and the directors' perceived superiority is magnified even further by the common knowledge that state law customarily obliges them to exercise their judgment in the shareholders' interest . . . . Naturally, then, the shareowner faced with a proxy request will think it important to know the directors' beliefs about the course they recommend and their specific reasons for urging the stockholders to embrace it.

501 U.S. 1083, 1091 (1991). Thus, plaintiffs have adequately pled both that the Proxy "was an essential link in the accomplishment of the transaction[,]'" *Jobs*, 593 F.3d at 1022 (quoting *Tracinda*, 502 F.3d at 228), and have alleged facts establishing the economic loss was caused by defendants misrepresentation. *Knollenberg*, 152 F. App'x at 685 (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005).

Skirting the primary holding in *Virginia Bankshares*, defendants cite *In re Morton's Rest. Grp., Inc. S'holders Litig.*, 74 A.3d 656, 674 (Del. Ch. 2013), for the notion that even if the statements were false or misleading they could not have misled the shareholders because defendants disclosed both May Forecasts and all the material information necessary for them to make their own decision about whether to approve the Acquisition. Defs' Reply at 13. *Morton's* is distinguishable, however, because it dealt not only with false or misleading proxy statements but also with a "non-exculpated claim of breach of fiduciary duty." 74 A.3d at 663, 673. Moreover, statements of reason and opinion are actionable when objective and subjective falsity

are adequately pled—which plaintiffs have done here.  *See Rubke*, 551 F.3d at 1162 (citing Va.

Bankshares, 501 U.S. at 1096)).

Accordingly, plaintiffs have specified "each statement alleged to have been misleading,

the reason or reasons why the statement is misleading, and, if an allegation regarding the

statement or omission is made on information and belief, . . . all facts on which that belief is

made,"  15 U.S.C. § 78u-4(b)(1)(B), and established that "the act or omission of the defendant

alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages."

*Id*. § 78u-4(b)(4).  The PSLRA's second requirement, regarding whether defendants acted with

the required state of mind, is discussed more directly *infra* Part IV.B.3.

## 2.    Bespeaks Caution Doctrine and Forward-Looking Statements

Defendants contend that plaintiffs' claims are barred by the Ninth Circuit's bespeaks

caution doctrine and the PSLRA's safe harbor for forward-looking statements.  The court will

consider these two doctrines simultaneously.  *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d

857, 876 (N.D. Cal. 2004).

"The bespeaks caution doctrine provides a mechanism by which a court can rule as a

matter of law (typically in a motion to dismiss for failure to state a cause of action or a motion

for summary judgment) that defendants' forward-looking representations contained enough

cautionary language or risk disclosure to protect the defendant against claims of securities

fraud."  *Emp'rs Teamsters Local Nos. 175 and 505 Pension Tr. Fund v. Clorox Co.*, 353 F.3d

1125, 1132 (9th Cir. 2004) (quoting *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1413 (9th

Cir. 1994)).  "The PSLRA created a statutory version of this doctrine by providing a safe harbor

for forward-looking statements identified as such, which are accompanied by meaningful

cautionary statements."  *Id.*  The safe harbor was adopted "to enhance market efficiency by

19 – FINDINGS AND RECOMMENDATION

encouraging companies to disclose *forward-looking* information."  H.R. Conf. Rep. 104-369, at

43 (1995) (emphasis added).  "But the safe harbor is not designed to protect companies and their

officials when they knowingly make a materially false or misleading statement about current or

past facts."  *In re Quality Systems, Inc. Sec. Litig.*, No. 15-55173, 2017 WL 3203558, at *19 (9th

Cir. July 28, 2017).

      The safe harbor applies only to forward-looking statements.  15 U.S.C. § 78u-5(a).  The

PSLRA defines forward-looking statements as:

> (A)  a statement containing a projection of revenues, income (including income loss),
> earnings (including earnings loss) per share, capital expenditures, dividends,
> capital structure, or other financial terms;

> (B)  a statement of the plans and objectives of management for future operations,
> including plans or objectives relating to the products or services of the issuer;

> (C)  a statement of future economic performance, including any such statement
> contained in a discussion and analysis of financial condition by the management
> or in the results of operations included pursuant to the rules and regulations of the
> Commission;

> (D)  any statement of the assumptions underlying or relating to any statement
> described [above] . . . .

15 U.S.C. § 78u-5(i)(1)(A)-(D).

      Courts have further refined the definition of forward-looking statements.  For example,

statements that can be demonstrably proven false at the time they are made are not forward-

looking.  *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 965 (N.D. Cal. 2014); *Wesley v.*

*Oclaro, Inc.*, 897 F. Supp. 2d 902, 918 (N.D. Cal. 2012); *In re NutriSystem, Inc. Sec. Litig.*, 653

F. Supp. 2d 563, 579 (E.D. Pa. 2009) (citing *Harris v. Ivax Corp.*, 182 F.3d 799, 805 (11th Cir.

1999)).  Further, "statements concerning historical or current facts are not forward-looking, even

if couched in terms of the future."  *Mallen v. Alphatec Holdings, Inc.*, 861 F. Supp. 2d 1111,

1126 (S.D. Cal. 2012); *see also Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 984, 990 (9th

Cir. 2008) (finding statements about a company's backlog—defined as the dollar value of the work the company had contracted to do but had yet to perform—were present statements and not forward-looking); *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*, 320 F.3d 920, 936-37 (9th Cir. 2003) (finding statement that company was "not anticipating any major increase in maintenance costs . . . going forward" due to a fine was a "description of the present effect[]" of the fine); *In re Copper Mountain*, 311 F. Supp. 2d at 880 (finding statements that business was "'strong" and "solid" were not properly considered forward-looking to the extent they rested on "a characterization of the present state of the company"); *In re Secure Computing Corp. Sec. Litig.*, 120 F. Supp. 2d 810, 818 (N.D. Cal. 2000) (finding statements that business was on track to meet expectations were not considered forward-looking statements to the extent they related to "current business conditions").

As discussed above, plaintiffs argue that two statements in the Proxy are misleading. Pls.' Resp. at 14 n.4 (citing Am. Compl. ¶ 79).  First, the Proxy states that "[t]he Board relied primarily on, and for purposes of its analyses and opinion directed Credit Suisse to use, the Company Forecasts rather than the May Forecasts, as the [Revised Forecasts] reflected management's most up-to-date and accurate forecasts."  Am. Compl. ¶ 79.  Second, the Proxy states that "the Company Forecasts did not assume any acquisitions other than those that were previously announced or completed because of the inherent uncertainty of consummating acquisitions with third parties on terms that would be attractive to the Company or at all."  *Id.*

To the extent these statements relate to the conditions at the time the Board was formulating an opinion on the merger, they are not forward-looking.  For example, the statement that the Revised Forecasts "reflected management's most up-to-date and accurate forecasts" is a statement about past or present conditions.  *Id.*  More to the point, as the Revised Forecasts do

not include an acquisition strategy, the statement could be construed as a warning that the company does not presently intend to continue its acquisition strategy. *Id.* ¶ 79. Although the statement relates to the forecasts, the statement is properly construed as a present assessment of the company's intentions at the time of the proposed merger. *See Wesley v. Oclaro, Inc.*, 897 F. Supp. 2d 902, 918 (N.D. Cal. 2012) ("The fact remains that a statement about a past or current fact can demonstrably be proven false. That is what distinguishes such facts from forward-looking predictions.").

Similarly, the second statement, which justifies the use of the forecast that does not include acquisitions "because of the inherent uncertainty of consummating acquisitions," is not a forward-looking statement. Am. Compl. ¶ 79. Rather, it is a present statement explaining defendants' reason for excluding acquisitions from their forecast. Whether defendants decided to exclude acquisitions from their forecast "because of the inherent uncertainty of consummating acquisitions" at the time the statement was made is a testable hypothesis that is not informed by hindsight. *Id.; Wesley*, 897 F. Supp. 2d at 918.

Defendants argue that plaintiffs' allegations turn on whether defendants knew that the statements at issue were false when made and, as such, they are foreclosed by *Cutera*. Defs' Reply, ECF #61, at 21 (citing *In re Cutera* 610 F.3d at 1112). Under *Cutera*, "the state of mind of the individual making the statement is irrelevant, and the statement is not actionable regardless of the plaintiff's showing of scienter." 610 F.3d at 1112. However, *Cutera* dealt with whether scienter was relevant to *forward-looking* statements. *Id. Cutera* does not apply to statements that are not forward-looking, like the statements in this case. *See Cutera*, 610 F.3d at 1112—13 (analyzing whether "actual knowledge would overcome a claim of safe harbor

protection even for statements identified as forward-looking and accompanied by meaningful cautionary language").

Defendants also argue that "every forward-looking statement expresses a present belief or opinion about a *future* event or projection." ECF #61, at 22. Defendants contend that plaintiffs do violence to *Cutera* by re-characterizing their forward-looking statements as knowingly false present opinions. However, defendants' argument proves too much. Even if all forward-looking statements express a present belief about a future event, all present beliefs are not forward-looking statements. As noted above, if the statements can demonstrably be proven false at the time they were made, as they were in this case, they are not forward-looking statements. *Mulligan*, 36 F. Supp. 3d at 965; *Westley*, 897 F. Supp. 2d at 918.

Finally, to the extent that the challenged statements could be construed as mixed forward-looking and non-forward-looking statements, if at all, the statements were not accompanied by meaningful cautionary statements. The Ninth Circuit recently ruled in *In re Quality Systems, Inc. Securities Litigation*, that "[w]here a forward-looking statement is accompanied by a non-forward-looking factual statement that supports the forward-looking statement, cautionary language must be understood in the light of the non-forward-looking statement." 2017 WL 3203558, at 30. "If the non-forward-looking statement is materially false or misleading, it is likely that no cautionary language—short of an outright admission of the false or misleading nature of the non-forward-looking statement—would be 'sufficiently meaningful' to qualify the statement for the safe harbor." *Id.* In essence, cautionary language accompanying a mixed statement that conveys current or past facts must warn that these facts are or may be untrue. *Id.* at 33.

Here, there were no statements sufficiently warning or admitting that the present statements at issue were or might be untrue. As there was insufficient cautionary language and the safe harbor was not "designed to protect [companies and their officials] when they make a materially false or misleading statement about current or past facts, and combine that statement with a forward-looking statement," the safe harbor does not apply. *Id.* at 19.

### 3.    Scienter and Sounds in Fraud

Defendants also move to dismiss plaintiffs' complaint for failure to plead scienter with particularity under the PSLRA's safe harbor provision and for failure to comply with FRCP 9(b).[1] These arguments lack merit, as explained below.

Defendants first contend that plaintiffs must plead scienter because the PSLRA safe harbor requires dismissal "unless plaintiffs allege facts that would create a strong inference that the defendants made [the statements] with 'actual knowledge that they were false or misleading.'" *Cutera*, 610 F.3d at 1112 (quoting 15 U.S.C. § 78u-5(c)(1)(B)(i)). However, 15 U.S.C. § 78u-5 "only applies to forward-looking statements." 15 U.S.C. § 78u-5(a). The Ninth Circuit has expressly held "that non-forward-looking portions of mixed statements are not eligible for the safe harbor provisions of the PSLRA, 15 U.S.C. § 78u-5." *In re Quality Sys., Inc. Sec. Litig.*, 2017 WL 3203558, at *14. As discussed *supra* Part IV.B.2., the false or misleading

---

[1] To the extent that defendants move to dismiss Plaintiffs' Section 20(a) claims pursuant to FRCP 9(b)'s heightened pleading requirements, if at all, the court finds that these pleading requirements do not apply to plaintiffs' Section 20(a) claims. *See In re Am. Apparel, Inc. S'holder Litig.*, 2013 WL 10914316, at *33 n.249 (C.D. Cal. Aug. 8, 2013) ("Although allegations of fraud and scienter must satisfy heightened pleading requirements, district courts in the Ninth Circuit have concluded that because fraud is not a necessary element of a control person claim, the pleading of such a claim need only meet the requirements of Rule 8(a).") (citing *Teamsters Local 617 Pension and Welfare Funds v. Apollo Group, Inc.*, 690 F. Supp. 2d 959, 967-68 (D. Ariz. 2010)); *see also In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1201 (C.D. Cal. 2008) (finding that while "the circumstances of the primary violators' fraud must be pled with particularity under Rule 9(b) and the PSLRA, the control element is not a circumstance that constitutes fraud and therefore need not be pled with particularity").

statements in this case escape the safe harbor because they are non-forward looking and

otherwise lack sufficient cautionary language.

Defendants next argue that plaintiffs must plead scienter because the complaint sounds in

fraud under FRCP 9(b).  Defs' Mot. at 31; Defs' Reply at 26-27.  Generally, "scienter is not

required to establish a violation of Rule 14a-9's prohibitions against material misstatements and

omissions in connection with a proxy solicitation."  THOMAS HAZEN, TREATISE ON THE LAW OF

SECURITIES REGULATION 91 (6th ed, vol. 3) ("HAZEN").

> [U]nlike Section 10(b), Section 14(a) 'lacks any reference to a manipulative
> device or contrivance . . . to indicate a requirement of scienter.' *In re McKesson
> HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1263 (N.D. Cal. 2000).
> Accordingly, negligence is sufficient to support a claim for a violation of Section
> 14(a) for both forward looking and non-forward looking statements. *Id.* at 1267
> ("a Section 14(a) plaintiff must plead with particularity facts that give rise to a
> strong inference of negligence").

*Knollenberg*, 152 F. App'x at 682-83.  "Although a few scattered decisions have indicated that

scienter is required in actions brought under Rule 14a-9, the reasoning underlying the Supreme

Court's ruling in [*Aaron v. SEC*, 446 U.S. 680 (1980)] mandates that a showing of negligent

conduct will suffice."  HAZEN at 92 (footnotes omitted); *see also Azar v. Blount Int'l, Inc.*, No.

3:16-CV-483-SI, 2017 WL 1055966 (D. Or. Mar. 20, 2017) (applying negligence standard); *Hot

Topic*, 2014 WL 7499375 (same).

"To ascertain whether a complaint 'sounds in fraud,' [courts] must determine, after a

close examination of the language and structure of the complaint, whether the complaint 'alleges

a unified course of conduct' and 'relies entirely on that course of conduct as the basis of a

claim.'"  *Rubke*, 551 F.3d at 1161 (quoting *Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097,

1103-04 (9th Cir. 2003)).  Courts often find that where complaints allege Section 10(b)

Exchange Act claims and Section 14(a) claims, the Section 14(a) claims sound in fraud.  *See,*

*e.g.*, *Shaev v. Baker*, No. 16-CV-05541-JST, 2017 WL 1735573, at *15 (N.D. Cal. May 4, 2017) (finding that Section 14(a) claim sounded in fraud where Section 10(b) and breach of fiduciary duty claims were brought as well); *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1056, 1082 (C.D. Cal. 2008); *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 636 (S.D.N.Y. 2005) (finding that Section 14(a) claim sounded in fraud where "plaintiffs' Section 14(a) claim rest[ed] on the same charges of fraudulent conduct as their Section 10(b) claim"); *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1258, 1266 (N.D. Cal. 2000); *see also Rubke*, 551 F.3d at 1161 (finding that where "a complaint employs the exact same factual allegations to allege violations of section 11 as it uses to allege fraudulent conduct under section 10(b) of the Exchange Act, we can assume that it sounds in fraud").  However, the "sounds in fraud" doctrine does not depend on whether a non-fraudulent claim (i.e., a Section 14(a) claim) is alleged along with a fraudulent claim (i.e., a Section 10(b) claim), but only whether a claim is alleged to be part of a "unified course of fraudulent conduct."  *Vess*, 317 F.3d at 1104.  "Fraud allegations may damage a defendant's reputation regardless of the cause of action in which they appear, and they are therefore properly subject to Rule 9(b) in every case."  *Id.* at 1103-04.

Here, there is no Section 10(b), Rule 10b-5, or common-law fraud claims alleged in the amended complaint.  Pls' Resp. at 34.  Indeed, plaintiffs argue this is a "straightforward § 14(a) case based on defendants' misstatements and omissions in a merger proxy with no other causes of actions or claims alleging fraud."  *Id* [2]  However, plaintiffs claim that Donegan took active

---

[2]  Plaintiffs liken this case to *Hot Topic* and *Blount*.  However, in those cases, the sounds-in-fraud doctrine was not applied.  *Id.*  In *Hot Topic*, the plaintiffs alleged the defendant directors received special benefits for their role in a merger, where they had initiated the creation of revised projections that undervalued the company for the purpose of the merger.  *Hot Topic*, 2014 WL 7499375, at *3.  The plaintiffs claimed these later projections, which were relied on in

steps to mislead shareholders into undervaluing their shares for job security and personal payouts and that the board members deliberately and willfully blinded themselves to the true value of the company by accepting the Revised Forecasts and Credit Suisse's fairness option.  Am. Compl. ¶¶ 56, 64, 67.  This unified course of conduct is a common thread throughout the amended complaint.  Therefore, the amended complaint sounds in fraud.

Claims that sound in fraud must meet both the heightened pleading standard of FRCP 9(b) in addition to the particularity requirements of the PSLRA § 78u-4(b)(1).  *Desaigoudar*, 223 F.3d at 1022; *Kelley v. Rambus*, No. C 07–1238 JF (HRL), 2008 WL 5170598, at *2 (N.D. Cal. Dec. 9, 2008).  Specifically, when a complaint alleges a Section 14(a) claim that sounds in fraud, "[t]he PSLRA [] modifies Rule 9(b), providing that a securities fraud plaintiff shall identify:  (1) each statement alleged to have been misleading; (2) the reason or reasons why the statement is misleading; and (3) all facts on which that belief is formed."  *Desaigoudar*, 223 F.3d at 1023.

In a situation like the one presented in this case, the court in *Countrywide* found that both FRCP 9(b) and PSLRA § 78u-4(b)(1) were satisfied.  There, the plaintiffs alleged that materially misleading "proxy statements failed to disclose that Countrywide abandoned its underwriting

---

the proxy statement, were both material and misleading.  *Id.* at *4-*5.  Similarly, in *Blount*, the plaintiffs alleged that a buyout premised on "watered-down" projections and the defendants' omissions of earlier projections in the proxy were material and misleading.  *Blount*, 2017 WL 1055966, at *5.  There were no Section 10(b), Rule 10(b)-5, or common-law fraud claims brought in either case.  The *Hot Topic* plaintiffs alleged the individual defendants "knowingly misstated material facts," 2014 WL 7499375, at *8, and the *Blount* plaintiffs alleged the individual defendants "knowingly caused the creation of the misleading [projections]," 2017 WL 1055966, at *9.  The courts in both cases applied a negligence standard to the plaintiffs' Section 14(a) and Rule 14a-9 claims.  *Hot Topic*, 2014 WL 7499375, at *10 ("For § 14(a) claims, the required state of mind is generally negligence."); *Blount*, 2017 WL 1055966, at *9 (citing *Knollenberg*, 152 Fed.Appx. at 682-83) ("The requisite level of culpability, or mental state, for a claim under § 14(a) is negligence.").  However, the sounds-in-fraud doctrine was not raised by the defendants or addressed by the court in either case.  Thus, although these cases are analogous to the situation presented in this case, they are not persuasive because the sounds-in-fraud doctrine was not at issue.

standards, thus exposing itself to an undisclosed level of heightened risk." 554 F.Supp.2d at 1076-77. The court found that "the essence of Plaintiffs' proxy-related allegation is the failure to disclose the true operational and financial state of Countrywide to shareholders," *id.* at 1075, and that "[i]n particular, Plaintiffs allege that it was false and misleading to omit, in Countrywide's 2005, 2006, and 2007 proxy materials, 'the material fact that Individual Defendants . . . [were] making undisclosed fundamental changes to the Company's business model that relied on riskier products . . . in order to inflate its stock price and drive its short-term performance.'" *Id.* at 1075 (citing the complaint) (alterations in original). After finding that the plaintiffs' Section 14(a) and Rule 14a-9 claims sounded in fraud, the district court found the plaintiffs had "adequately identified which statements they believe to be materially misleading, and why" and concluded the plaintiffs had "adequately stated a § 14(a) and Rule 14a-9 claim. . . ." *Id.* at 1076.

Here, plaintiffs' amended complaint satisfies both FRCP 9(b) and PSLRA § 78u-4(b)(1). As discussed *supra* Part IV.B.1., plaintiffs identify two false and misleading statements. Am. Compl. ¶ 79. Plaintiffs also identify the reasons why the statements are misleading. *See id.* ¶ 80 (alleging the "up to date and accurate" statement is misleading because it suggests that the decision to exclude acquisitions from the Revised Forecasts was based on the company's up-to-date business plan that excluded acquisitions); *id.* ¶ 81 (alleging the statements were misleading because they suggested that it was appropriate to exclude acquisitions from the Revised Forecasts because of the uncertainty involved in valuing them); *id.* ¶ 88-91 (discussing how partial disclosure did not provide a clear view of how management included the assumptions and value of PCC's acquisitions strategy into one set of forecasts, and excluded from the other). Additionally, plaintiffs identify with sufficient particularity the facts on which these beliefs are formed. *See id.* ¶¶ 4, 54-56, 67 (alleging Donegan was assured job security, and that he and the

board members secured tens of millions of dollars in immediate payment for currently unvested stock options, performance units, and restricted shares); *id.* ¶¶ 39-50, 52 (discussing in detail PCC's history of acquisitions from 2012 until and including the acquisitions taking place after the Revised Forecasts were issued, cash flow contributions from future acquisitions, and the reliability of acquisition program and of future acquisitions through earnings calls and Annual Reports); *id.* ¶ 57 (discussing the creation of the Revised Forecasts in response to Buffet's offer); *id.* ¶ 59 (discussing how board members knew the assumption that acquisitions were uncertain was false); *id.* ¶¶ 58, 60 (identifying two additional acquisitions); *id.* ¶¶ 63, 64 (describing Credit Suisse's potential bias in "rubber stamping the deal" by making payment contingent on the Acquisition, describing why assumptions made in the Revised Forecasts were unfair).  Finally, these facts give rise to a strong inference of negligence.  Thus, plaintiffs have met both the heightened pleading standards under FRCP 9(b) and the particularity requirements of the PSLRA § 78u-4(b)(1).

Furthermore, the fact that the amended complaint "does not specifically allege what respective roles the [director defendants] played in preparing [the misleading proxy statements]" does not mean the complaint fails to meet FRCP 9(b*)*.  *In re Real Estate Assocs. Ltd. P'ship Litig.*, 223 F. Supp. 2d 1142, 1148 (C.D. Cal. 2002) ("*Real Estate Assocs.*").  Indeed, like the situation in *Real Estate Assocs.*, the allegations here are sufficiently particular.  There, the "defendants knew that the Solicitations contained misstatements about overstated actual Local GP Buyout Costs; the defendants utilized outdated and inflated mortgage balances, and the defendants omitted the magnitude and overcharged the class for the Soft Notes.  *Id.* at 1148 (internal citations to amended complaint omitted).  Likewise, here, plaintiffs allege the director defendants knew the proxy contained (at best) misleading misstatements about whether the

Revised Forecasts were the most up-to-date and accurate and why future acquisitions were excluded from the forecasts and the defendants used this proxy statement to mislead shareholders into voting to approve the Acquisition by Berkshire.

## V.    RECOMMENDATION

For the reasons stated above, the motion (ECF #57) should be DENIED in its entirety.

## VI.    SCHEDULING ORDER

These Findings and Recommendation will be referred to a district judge.  Objections, if any, are due Tuesday, October 17, 2017.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

## VII.    NOTICE

These Findings and Recommendation are not an order that is immediately appealable to the Ninth Circuit Court of Appeals.  Any Notice of Appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of a judgment.

DATED  October 3, 2017.

/s/ Youlee Yim You
_____
Youlee Yim You
United States Magistrate Judge