UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| NECA-IBEW PENSION TRUST FUND (THE DECATUR PLAN) and ANGELA LOHMANN, as Trustee for the Angela Lohmann Revocable Trust, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>        v.<br><br>PRECISION CASTPARTS CORP., MARK DONEGAN, DON R. GRABER, LESTER L. LYLES, DANIEL J. MURPHY, VERNON E. OECHSLE, ULRICH SCHMIDT, RICHARD L. WAMBOLD, and TIMOTHY A. WICKS,<br><br>        Defendants. | Case No. 3:16-cv-01756-YY<br><br>OPINION AND ORDER |

YOU, Magistrate Judge:

Plaintiffs have filed a motion to compel "proxy documents." ECF #99.[1] The "proxy documents" that plaintiffs seek are identified as items from defendants' privilege log, set forth in Exhibit A of the declaration of Nadia Dahab, and consist of: "(1) internal Company emails

---

[1] "Pretrial discovery matters are considered non-dispositive, and Magistrate Judges therefore possess authority to enter orders resolving discovery disputes." *U.S. v. Hansen*, 233 F.R.D. 665, 669 (S.D. Cal. 2005) (collecting cases).

1 – OPINION AND ORDER

discussing draft, factual language for the Proxy; and (2) documents containing draft language for the factual background section of the Proxy." Mot. Compel 1-2, ECF #99. Defendants contend that these emails and documents are protected by the attorney-client privilege. The court has conducted an *in camera* review of the documents and, for the reasons discussed below, plaintiffs' motion is denied.

**I.     Law Regarding Attorney-Client Privilege**

Federal common law governs issues concerning the application of the attorney-client privilege in this federal securities action. *See United States v. Ruehle*, 583 F.3d 600, 608 (9th Cir. 2009). "The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law. Its aim is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 169 (2011) (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)) (internal quotations marks and citations omitted). "The attorney-client privilege protects confidential disclosures made by a client to an attorney in order to obtain legal advice, as well as an attorney's advice in response to such disclosures." *Ruehle*, 583 F.3d at 608 (quoting *United States v. Bauer*, 132 F.3d 504, 507 (9th Cir. 1997)) (alterations omitted).

> The attorney-client privilege applies to communications between lawyers and their clients when the lawyers act in a counseling and planning role, as well as when lawyers represent their clients in litigation. Indeed, the axiom that 'every man knows the law' presupposes that everyone can find it out by consulting a lawyer, before being hauled into court for violating the law.

*United States v. Chen*, 99 F.3d 1495, 1501 (9th Cir. 1996) (quoting 8 JOHN H. WIGMORE, EVIDENCE 547-48 (McNaughton rev. ed. 1961)).

However, "[t]he fact that a person is a lawyer does not make all communications with that person privileged." *Ruehle*, 583 F.3d at 607 (quoting *United States v. Martin,* 278 F.3d 988, 999 (9th Cir. 2002)). "Because it impedes full and free discovery of the truth, the attorney-client privilege is strictly construed." *Id.* (quoting *Martin*, 278 F.3d at 999). "The privilege stands in derogation of the public's right to every man's evidence and as an obstacle to the investigation of the truth, . . . it ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle." *Id.* (quoting *In re Horowitz*, 482 F.2d 72, 81 (2d Cir. 1973)) (internal quotation marks and original alterations omitted).

In the Ninth Circuit, an eight-part test determines whether a communication is covered by the attorney-client privilege, where the party asserting the privilege bears the burden of proving each element:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection be waived.

*Id.* (internal citations omitted).

## II.     Discussion

Only three elements of the eight-part test are at issue here: whether the proxy documents pertain to legal advice, whether Precision Castparts Corp. (PCC) intended to keep them confidential, and whether PCC waived the privilege by making a disclosure to a third party.

### A.     Legal Advice

"There is general agreement that the protection of the privilege applies only if the primary or [predominant] purpose of the attorney-client consultations is to seek legal advice or assistance." *In re Banc of California Sec. Litig.*, No. SA CV 17-00118-AG (DFMx), 2018 WL

6167907, at *1 (C.D. Cal. Nov. 26, 2018) (citations and alterations omitted). What matters is whether the lawyers were employed with reference to their knowledge and discretion in the law. *Chen*, 99 F.3d at 1502.

Plaintiffs seek the "proxy documents" because "[t]his case involves false and misleading statements in the Proxy," and "[t]he Proxy Documents will show how the language at issue in the Proxy was formulated and/or evolved." Mot. Compel 2, ECF #99. Otherwise stated, plaintiffs contend they are entitled to see the prior drafts of the proxy statement. Plaintiffs argue that the proxy documents are not protected by the attorney-client privilege because they "do not pertain to predominantly legal advice." *Id.* at 5. Specifically, they assert that "through the Proxy Documents, Precision's attorneys were attempting to gather the underlying *factual* data and information from the Precision employees and directors to put into the Proxy—not to provide legal advice." *Id.* at 7 (emphasis in original). Plaintiffs cite to portions of the privilege log that use the terms "Background of Merger" and "Prospective Financial Information," and argue that the privilege log descriptions "themselves demonstrate that the Proxy Documents are fact-based, business-related materials." *Id.*

Defendants counter that they "have not asserted privilege as to the underlying facts" and claim they have produced "thousands of documents reflecting facts discussed in the proxy, including non-privileged board presentations, board minutes, financial projections, text messages, calendar invites and emails." Opp. Mot. Compel 4, ECF #105. As defendants correctly contend, "communications between PCC and its lawyers *about* those facts *are* privileged." *Id.* (emphasis in original); *c.f. Upjohn*, 449 U.S. at 395 ("The privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney.").

4 – OPINION AND ORDER

This court has carefully reviewed what plaintiffs have termed the proxy documents. PCC and Berkshire Hathaway Inc. (Berkshire) retained outside counsel to prepare a proxy statement pursuant to Section 14(a) of the Securities Exchange Act of 1934, for the pending acquisition of PCC by Berkshire. In all but one privilege log entry, addressed below, outside counsel prepared drafts of the proxy statement, sent them to PCC's in-house counsel and various corporate executives and members of the board of directors, who circulated the drafts and made comments and edits at outside counsel's request, and coordinated their response before sending them back to outside counsel for further development. Outside counsel also sent emails and drafts with changes tracked asking for clarification or approval of additional modifications. This back-and-forth between and among outside counsel, PCC's in-house counsel, and the executives and board members concern crafting a proxy statement that complies with securities laws. These are exactly the types of communications the attorney-client privilege was meant to protect when the client is a corporation. Defendants represent that the "presentation of information in a proxy requires judgments as to materiality, the appropriate level of detail and disclosure, and the necessity and wording of cautionary language [and] risk disclosures—all of which carry potential legal ramification." Opp. Mot. Compel 4-5, ECF #105. This is nearly self-evident, as the underlying lawsuit alleges "violations of the federal securities laws arising out of defendants' dissemination of false and misleading proxy materials in violation of [federal securities law]." Am. Class Action Complaint, ECF #56.

Plaintiff's characterization of the proxy documents is an equivocation. That legal advice concerns the factual background section of the proxy statement does not transform the legal advice into a fact that the attorney-client privilege does not cover. "A client is entitled to hire a lawyer, and have his secrets kept, for legal advice regarding the client's business affairs." *Chen*,

99 F.3d at 1501. "Consultation as to the scope of the provisions of the [Securities Exchange] Act, as to language, and as to how best to legally comply with SEC regulations, for instance, are precisely the type of day-to-day guidance for which a corporation would likely rely on counsel." *Roth v. Aon Corp.*, 254 F.R.D. 538, 541 (N.D. Ill. 2009); *see also In re Premera Blue Cross Customer Data Sec. Breach Litig.*, 329 F.R.D. 656, 662 (D. Or. 2019) ("The fact that a document may be prepared for a business purpose does not preclude it from being privileged if it is sent to an attorney for the purpose of receiving legal advice relating to that document.").[2] PCC's in-house and outside counsel were not merely gathering business-related facts, as plaintiffs contend, but instead "were employed for their legal knowledge." *Chen*, 99 F.3d at 1502.

Plaintiff's heavy reliance on *In re Micropro Sec. Litig.*, No. C-85-7428 EFL, 1988 WL 109973 (N.D. Cal. Feb. 26, 1988), is misplaced. Mot. Compel 5-6, ECF #99. The *Micropro* court conducted an *in camera* review of over 3,500 documents and found that a subset of drafts of offer materials related to an initial public offering submitted by employees to in-house counsel were not covered by the attorney-client privilege. *Id.* at *1-*2. The court found that "[a]side from a few editorial changes, all of the handwritten notations made by MicroPro employees concern[ed] the addition or amendment of factual data contained in the draft offering materials." *Id.* at *2. The court found that the communications did not call for legal opinion or analysis as they consisted of factual information, and that the attorneys "were essentially serving as a conduit for factual data, and were not acting primarily as lawyers." *Id.* The court also stated, however, that

> [b]y the foregoing[,] we do not intend to issue a blanket ruling denying attorney-client protection to draft offering documents containing handwritten

---

[2] *In re Premera* concerned application of Washington State law, not federal common law, but "the Washington Supreme Court has adopted the U.S. Supreme Court's 'flexible' approach set forth in [*Upjohn*.]" 296 F. Supp. 3d at 1238.

6 – OPINION AND ORDER

> communications between MicroPro and its attorneys. Each document submitted for review has been considered separately and judgment rendered on the merits of each document. The privilege has been upheld as to those documents or portions of documents which meet the required criteria.

*Id.* The court then granted the motion to compel in part, ordering defendants to produce some documents, but also denied the motion in part, finding that several sets of documents were protected by the attorney-client privilege. *Id.* at *3. Although decided in 1988, *Micropro* appears to be consistent with modern precedent. The decision is not inconsistent with the many other cases holding that providing legal advice concerning draft SEC documents is privileged. And it is not inconsistent with the finding, here, that the proxy documents concern "editorial changes" informed by PCC's in-house counsel and outside counsel's legal knowledge. *Id.* at *2.

Plaintiffs further rely on two cases from the Northern District of Illinois, which held that drafts of proxy statements are categorically outside the scope of the privilege. Mot. Compel 6, ECF #99. These cases were heavily criticized in a later case from the same district, *Roth v. Aon Corp.*, 254 F.R.D. 538, 541 (N.D. Ill. 2009). This court need not weigh in on an intra-district split in the Seventh Circuit. Suffice it to say, the reasoning in *Roth* is overwhelmingly persuasive.

Plaintiffs also rely on deposition testimony from two members of the board of directors for the proposition that they did not seek legal advice concerning the proxy or drafts of the proxy. Mot. Compel 7, ECF #99. One board member testified that he did not recall receiving legal advice with respect to the proxy, and the other testified that he did not receive personal legal advice. Dahab Decl. Exs. H-I, ECF ##100-8–100-9. *In camera* review of the communications between these board members and PCC's in-house counsel reveal the communications' primary purpose was to enable PCC's attorneys to provide PCC with legal advice.

7 – OPINION AND ORDER

Finally, defendants emphasize that seven shareholder lawsuits were pending when PCC's outside counsel circulated drafts of the proxy statement for revision and comment, and that an eighth lawsuit was filed between the time PCC filed the preliminary proxy statement and the definitive proxy statement. During oral argument, defendants' counsel compared drafting the proxy statement under these circumstances to drafting a complaint, reasoning that because drafts of a complaint would not be subject to discovery under the attorney-client privilege, drafts of proxy documents should likewise not be discoverable. However, the proxy was not drafted for the purpose of the pending litigation; it was drafted for the purpose of the acquisition, which is a business function. By definition, a complaint *is* litigation related—it is the only way to commence a lawsuit. F.R.C.P. 3. While proxy statements are often the subject of litigation, their purpose generally is to solicit approval from shareholders. *See* 15 U.S.C. § 78n. All this is to say—the proxy documents are not categorically legal advice. Regardless, the presence of pending litigation targeting the very document that plaintiffs' claims arise from tends to show defendants solicited legal advice in their communications to outside counsel related to drafting that document. The court's *in camera* review confirms this.

Defendants have carried their burden to show the proxy documents concern legal advice.

### B.    Intent to Keep Confidential

Plaintiffs next contend that because the preliminary and definitive proxy statements were publicly disclosed, defendants did not intend to keep drafts of them confidential. Mot. Compel 8, ECF #99. This is neither a reasonable inference nor the law. "[E]ven when a final product is disclosed to the public, the underlying privilege attached to drafts of the final product remains intact." *Roth v. Aon Corp.*, 254 F.R.D. 538, 541 (N.D. Ill. 2009) (collecting cases); *see also*, *e.g.*, *United States v. Murra*, 879 F.3d 669, 682 (5th Cir. 2018), *reh'g denied*, (Feb. 23, 2018), *cert.*

*denied*, 139 S. Ct. 94 (2018)) ("Public disclosure of facts does not destroy the attorney-client privilege with respect to confidential communications *about* those facts"); *In re Premera Blue Cross Customer Data Sec. Breach Litig.*, 329 F.R.D. 656, 662 (D. Or. 2019) (citing *Roth* and collecting additional cases); *In re Banc of California Sec. Litig.*, 2018 WL 6167907, at *2 ("When a client sends a draft disclosure document to an attorney for comment or input, the attorney-client privilege attaches to the draft and remains intact even after the final document is disclosed."); *SCF Waxler Marine LLC v. M/V ARIS T*, No. CV 16-1022, 2017 WL 2558871, at *3 (E.D. La. June 13, 2017) (collecting cases and stating: "Often, drafts of a document exchanged between an attorney and client will reflect the client's request for advice regarding how to present the facts and the attorney's advice in response."); *Waters v. Drake*, No. 2:14-CV-1704, 2016 WL 8118193, at *2 (S.D. Ohio Feb. 4, 2016) (quoting *Roth* and stating that "a draft of a document which becomes public record does not thereby lose that privilege. Otherwise, clients with a public reporting obligation could never consult in confidence with their attorneys about the contents of the report."); *U.S. v. New York Metropolitan Transp. Authority*, 03-CV-02139-SLT-MDG, 2006 WL 3833120, at *2 (E.D.N.Y. 2006) (holding that although final document was publicly disclosed, "it is clear from review that the client still intended that his communications with his attorney prior to the finalization of the document remain confidential."); *Ideal Elec. Co. v. Flowserve Corp.*, 230 F.R.D. 603, 607 (D. Nev. 2005) (holding explicit disclosure of draft affidavit was necessary to constitute waiver of privilege covering drafts). Plaintiff's non-binding authorities to the contrary are unpersuasive.

9 – OPINION AND ORDER

**C.     Waiver**

Plaintiffs argue defendants waived attorney-client privilege as to item 326 because the "communication is not logically connected to legal advice" and the communication was sent from PCC's in-house counsel to employees of PCC's public relations firm, Abernathy MacGregor Group, Inc. (AMG), a third party.  Mot. Compel 9, ECF #99.  Defendants counter that because AMG is the functional equivalent of an employee, disclosure to AMG does not constitute a waiver.  Opp. Mot. Compel 9-10, ECF #105.

"As fictitious entities, corporations can seek and receive legal advice and communicate with counsel only through individuals empowered to act on behalf of the corporation." *Admiral Ins. Co. v. U.S. Dist. Ct. for Dist. of Arizona*, 881 F.2d 1486, 1492 (9th Cir. 1989).  In *Upjohn*, the Supreme Court rejected the notion that only a corporation's high-level "control group" could communicate with attorneys without the privilege being waived; instead, the Court held that lower level employees could properly be used as agents of a corporation where they had "relevant information needed by corporate counsel if [counsel] is adequately to advise the client with respect to such actual or potential difficulties."  449 U.S. at 391; *U.S. v. Graf*, 610 F.3d 1148, 1158 (9th Cir. 2010) ("a corporation's privilege extends to communications between corporate employees and corporate counsel as long as the communications are 'made at the direction of corporate superiors in order to secure legal advice.'") (quoting *Chen*, 99 F.3d at 1502).

"The Eighth Circuit . . . applied *Upjohn* to cover communications between corporate counsel and outside consultants" when the outside consultant "was in all relevant respects the functional equivalent of an employee." *Graf*, 610 F.3d at 1158 (citations omitted); *see id.* at 1158-59 (adopting this approach under the principles set forth by the Eighth Circuit in *In re*

*Bieter Co.*, 16 F.3d 929, 938 (8th Cir. 1994)).  As explained in *Schaeffer v. Gregory Vill. Partners, L.P.*, "functional employees are agents of a corporation that fall within the privilege's scope under *Upjohn*."  78 F. Supp. 3d 1198, 1203 (N.D. Cal. 2015).

Plaintiffs rely on *Universal Standard Inc. v. Target Corp.*, 331 F.R.D. 80 (S.D.N.Y. 2019), to support their position.  There, two employees of the plaintiff's public relations firm were copied on several otherwise privileged emails chains between the plaintiff corporation and its attorneys.  *Id.* at 84.  The court considered three exceptions to the third-party waiver rule, including the functional employee exception articulated in *Bieter*.  *Id.* at 86-92.  The court considered several factors to determine whether the consulting PR firm was functionally an employee, including

> whether the consultant exercised independent decision-making on the company's behalf; possessed information held by no one else at the company; served as a company representative to third parties; maintained an office at the company or otherwise spent a substantial amount of time working for it; and sought legal advice from corporate counsel to guide his or her work for the company.

*Id.* at 89 (quoting *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 352 F. Supp. 3d 207, 213 (E.D.N.Y. 2019)).  The plaintiff represented that the PR firm had "certain unspecified independent decision-making authority regarding [plaintiff's] public relations and public relations strategy, and that [the PR firm was] responsible for handling [plaintiff's] public relations needs."  *Id.* at 89-90 (quotation marks and citations to record omitted).  The court found, however, that none of the PR firm's duties were related to seeking legal advice.  *Id.* at 90. The PR firm merely had to "monitor and respond to any and all relevant inquiries directed to an email address that was used for public relations and press inquiries," and otherwise performed the functions of an ordinary public relations firm.  *Id.* at 90 (quotation marks and citations to record omitted).  The PR firm did not have independent authority to decide to issue a press

11 – OPINION AND ORDER

release or to issue a press release when the underlying litigation commenced. *Id.* The defendant had only retained the PR firm for a six-month test period. *Id.* And most importantly, there was no evidence the PR "sought legal advice from corporate counsel to guide its work for the company." *Id.* (quoting *In re Restasis*, 352 F. Supp. 3d at 213) (alteration omitted). The court ultimately concluded that the PR firm was not the functional equivalent of an employee and "any privilege that attached to the emails was waived because the public relations firm took part in the email exchanges." *Id.* at 83.

Here, by contrast, AMG is the functional equivalent of an employee under *Upjohn* and *Graf*. PCC retained AMG in August 2014 to provide "public relations counsel and other strategic communications services." Decl. Justin Clarke, Ex. G, at '749, ECF #105-8. AMG's retainer was not a test run, as the relationship was established by the time Berkshire and PCC began talks in March 2015 and was apparently maintained throughout the acquisition. Under the terms of its engagement, AMG was required to "take instructions from [PCC], and . . . consult with other members of [PCC] management and with [PCC's] legal and financial advisors as necessary," while PCC promised to "provide AMG with the information and resources necessary to carry out [PCC's] instructions." *Id.* AMG agreed that its work product, including "[a]ll reports, press releases, Q&A's, and other materials prepared, purchased, procured and/or furnished by AMG," belonged to PCC. *Id.* at '750. And AMG was obligated to maintain the confidentiality of "all information not in the public domain" including information received from "[PCC's] attorneys and financial advisors." *Id.* at '749.

Sent on Monday, August 31, 2015, item 326 is an email from PCC's in-house counsel forwarding an unfinished draft of the preliminary proxy statement to several AMG employees. PCC filed the preliminary proxy statement with the SEC four days later, on Friday, September 4,

2015.  Seven shareholder lawsuits were pending at the time, and an eighth lawsuit specifically targeting the proxy statement—this lawsuit—was filed shortly afterward.  Unlike in *Universal Standard*, AMG was clearly receiving "legal advice from corporate counsel to guide its work for the company."  331 F.R.D. at 90 (internal citation omitted).

Two of the cases defendants rely on lend support to this finding.  Opp. Mot. Compel 9-10, ECF #105.  In *Medversant Techs., L.L.C. v. Morrisey Associates, Inc*, the court noted that the communication at issue contained a "comment from the lawyer [which] was significant because what he's trying to say is that 'You've got to be very careful how this is worded. You don't want to throw in things that would be inappropriate here,' and I think that it was important for the press-release agency to be aware of that."  CV 09-05031 MMM (FFMx), 2011 WL 13124128, at *2 (C.D. Cal. July 20, 2011).  In *In re Copper Mkt. Antitrust Litig.*, the agent performed "a corporate function that was necessary in the context of the government investigation, actual and anticipated private litigation."  200 F.R.D. 213, 219 (S.D.N.Y. 2001).  Here, defendants have shown, and *in camera* review confirms, that the communication included advice from counsel instructing AMG on how to provide its services and that AMG's function was necessary in the context of pending and anticipated litigation.  Thus, under these circumstances, AMG is the functional equivalent of an employee and disclosure to AMG does not constitute waiver of the attorney-client privilege.

For the reasons set forth above, plaintiffs' motion (ECF #99) is denied.

DATED  September 27, 2019.

           /s/ Youlee Yim You
        Youlee Yim You
        United States Magistrate Judge