# Exhibit X1

10-K 1 a2082140z10-k.htm FORM 10-K

[QuickLinks](#) -- Click here to rapidly navigate through this document

# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

# FORM 10-K

**(Mark One)**

☒   **Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**For the Fiscal Year Ended March 31, 2002**

**or**

☐   **Transition Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**For the Transition Period From _____ to _____**

**Commission File No. 1-10348**

# PRECISION CASTPARTS CORP.

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **OREGON** | **93-0460598** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **4650 S.W. Macadam Ave., Suite 440** | **97201 97201-4254** |
| **Portland, OR** | (Zip Code) |
| (Address of principal executive offices) | |

Registrant's telephone number, including area code: **(503) 417-4800**

**SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:**

| TITLE OF EACH CLASS | NAME OF EACH EXCHANGE ON WHICH REGISTERED |
|---|---|
| **Common Stock, without par value** | **New York Stock Exchange** |
| **Series A Preferred Stock Purchase Rights** | **New York Stock Exchange** |

SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT: **None**

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months, (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes  _X_    No ___

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. / /

**Exhibit X1**

https://www.sec.gov/Archives/edgar/data/79958/000091205702023829/a2082140z10-k.htm

The aggregate market value of voting stock held by non-affiliates of the registrant as of June 6, 2002, was $1,821,346,871.

As of the close of business on June 6, 2002, Registrant had 52,307,492 shares of Common Stock, without par value, outstanding.

## DOCUMENTS INCORPORATED BY REFERENCE

Exhibit 13, the "Financial Section of the 2002 Annual Report to Shareholders of Precision Castparts Corp." for the year ended March 31, 2002, is incorporated by reference in Parts II and IV and appended hereto.

Portions of the Registrant's Proxy Statement to be filed in connection with the 2002 Annual Meeting of Shareholders are incorporated by reference in Part III.

FORM 10-K
ANNUAL REPORT
TABLE OF CONTENTS

|  |  |  | Page |
|---|---|---|---|
| PART I |  |  |  |
| | Item 1. | BUSINESS | 1 |
| | | Products and Markets | 1 |
| | | Sales and Distribution | 11 |
| | | Major Customers | 13 |
| | | Backlog | 13 |
| | | Competition | 13 |
| | | Research and Development | 14 |
| | | Employees | 14 |
| | | Patents and Trade Secrets | 14 |
| | | Materials and Supplies | 14 |
| | | Government Regulations | 15 |
| | | International Operations | 15 |
| | | Environmental Compliance | 15 |
| | | Forward-looking Statements | 17 |
| | Item 2. | PROPERTIES | 18 |
| | Item 3. | LEGAL PROCEEDINGS | 18 |
| | Item 4. | SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS | 18 |
| | Item 4a. | EXECUTIVE OFFICERS OF THE REGISTRANT | 19 |
| PART II |  |  |  |
| | Item 5. | MARKET FOR REGISTRANT'S COMMON EQUITY AND RELATED STOCKHOLDER MATTERS | 21 |
| | Item 6. | SELECTED FINANCIAL DATA | 21 |
| | Item 7. | MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 21 |
| | Item 7a. | QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 22 |
| | Item 8. | FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA | 22 |
| | Item 9. | CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE | 22 |
| PART III |  |  |  |
| | Item 10. | DIRECTORS OF THE REGISTRANT | 23 |
| | Item 11. | EXECUTIVE COMPENSATION | 23 |
| | Item 12. | SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT | 23 |
| | Item 13. | CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS | 23 |
| PART IV |  |  |  |
| | Item 14. | EXHIBITS, FINANCIAL STATEMENT SCHEDULES AND REPORTS ON FORM 8-K | 23 |
| | | Signatures | 26 |

**Exhibit X1**

Case 3:16-cv-01756-XX   Document 143-1   Filed 10/07/20   Page 4 of 61
https://www.sec.gov/Archives/edgar/data/79958/000091205702023829/a2082140z10-k.htm

| Financial Statement Schedule | 28 |
| Report of Independent Accountants on Financial Statement Schedule | 29 |

# PART I

## ITEM 1.  BUSINESS

Precision Castparts Corp. is a worldwide manufacturer of complex metal components and products. We are the market leader in manufacturing large, complex structural investment castings, and we are the leading manufacturer of airfoil investment castings used in jet aircraft engines. In addition, we have expanded into the power generation, structural airframe, fluid management, industrial metalworking tools and machines and other metal products markets. Wyman-Gordon Company ("Wyman-Gordon" or "WGC"), which we acquired in November 1999, is the market leader in high-quality, technologically advanced forgings for aircraft engines and a leading manufacturer of investment castings for the aerospace industry and forgings for the power generation and general industrial markets.

### Products and Markets

We manufacture complex metal components and products in four principal business segments: Investment Cast Products, Forged Products, Fluid Management Products and Industrial Products. Each of these four business segments is described below.

### *Investment Cast Products*

Our Investment Cast Products segment includes our subsidiaries PCC Structurals, PCC Airfoils and the Wyman-Gordon Aluminum Castings operations. These three operations manufacture investment castings for aircraft engines, industrial gas turbine ("IGT") engines, airframes, medical prostheses and other industrial applications primarily in the aerospace and power generation markets.

The Investment Cast Products segment accounted for approximately 52 percent of our sales in fiscal 2002.

We are the market leader in manufacturing large, complex structural investment castings, and we are the leading manufacturer of airfoil investment castings used in jet aircraft engines. We manufacture investment castings for every jet aircraft engine program in production or under development by our key customers. Recently, we have become one of the market leaders in manufacturing structural and airfoil investment castings for IGT and aeroderivative engines used for electric power generation, and we have expanded into the structural airframe market. In addition, we make investment castings for use in the automotive, medical prosthesis, satellite launch vehicle and general industrial markets.

Investment casting technology involves a technical, multi-step process that uses ceramic molds in the manufacture of metal components with more complex shapes, closer tolerances and finer surface finishes than parts manufactured using other casting methods. The investment casting process begins with the creation of a wax pattern of the part to be cast, along with pathways through which molten metal flows into the ceramic mold. A ceramic shell is then formed around the wax pattern, followed by removal of the wax from the ceramic shell by melting and draining the wax. Finally, molten metal is poured into the ceramic shell, the shell is removed after the metal cools, and the part undergoes final processing and inspection.

Because of the complexity of the manufacturing process and the application of proprietary technologies, we believe we currently are the only manufacturer that can consistently produce the largest complex structural investment castings in quantities sufficient to meet our customers' quality and delivery requirements. Our emphasis on low-cost, high-quality products and timely delivery has enabled us to become the leading supplier of structural and airfoil castings for jet aircraft and IGT engines and to expand into the structural airframe market.

1

The commercial aerospace market cycle is a critical determinant of demand for our precision investment casting products. Beginning in 1995, demand for aerospace investment castings strengthened, primarily due to increased demand from the commercial aerospace industry, which had been in a cyclical downturn since 1991. However, during fiscal 1999, demand decreased in the commercial aerospace market as worldwide aircraft production reached its peak. The decrease in demand was due in part to a decline in wide-body aircraft orders for the Asian market, where depressed economic conditions curbed spending for new aircraft. This decreased demand continued through fiscal 2000, but the market rebounded in fiscal 2001 due, in part, to increased demand for wide-body aircraft from Asian airlines and

Exhibit X1

Case 3:16-cv-01756-X-X Document 143-1 Filed 10/07/20 Page 5 of 61
https://www.sec.gov/Archives/edgar/data/79958/000091205702023829/a2082140z10-k.htm

growing demand in the regional jet engine market. In fiscal 2002, the major economies of the United States and Europe began to slow, and, with the terrorist attacks on September 11, 2001, a significant drop in air travel resulted, followed later in fiscal 2002 by reduced demand for our commercial aerospace products. Military production, however, has increased in the aftermath of September 11 and is helping to compensate for the weak market conditions in the commercial aerospace industry.

Large jet aircraft engines are manufactured by a small number of suppliers, including General Electric, Pratt & Whitney, Rolls-Royce and several joint ventures. As a result, we believe a high level of customer service and strong, long-term customer relationships will continue to be important to achieving our goals. We have been supplying castings for jet engines to GE for more than 25 years, and we have been supplying Pratt & Whitney (a division of United Technologies) with castings for more than 20 years for its military jet engines and for more than 15 years for its commercial jet engines. In addition, we have supplied small structural investment castings to Rolls-Royce for more than 10 years, and we have more recently begun supplying Rolls-Royce with large, structural castings for use in its new Trent series of aircraft jet engines. As we have been able to cast larger and more complex parts, manufacturers of large jet aircraft engines have made increasing use of our structural castings.

*Aerospace Structural Castings*

Our structural castings business includes the largest diameter stainless steel, nickel-based superalloy and titanium investment castings in the world, as well as a variety of smaller structural castings. These castings are stationary components that form portions of the fan, compressor, combustor and turbine sections of a jet aircraft engine, where strength and structural integrity are critical. Structural investment castings are sold primarily as original equipment to jet aircraft engine manufacturers.

We believe that trends in the manufacturing of aircraft jet engines will continue to increase our revenue per engine. As the design of new generation aircraft engines has emphasized increased thrust, higher fuel efficiency and reduction of noise and exhaust emissions, engine operating temperatures and pressures have increased. These conditions require the use of engine parts made of alloys that are able to withstand extreme operating conditions and provide an optimum strength-to-weight ratio. Many of these alloys are particularly suited for use in the investment castings we manufacture. In addition, titanium, a metal with a lower melting temperature than stainless steel or superalloys, is used in all but the hottest parts of the engine because of its considerable weight savings. Titanium is an exceptionally difficult metal to cast because of its reactivity to other elements. However, we have developed the necessary technology and manufacturing processes to cast large, complex investment castings in titanium alloys. Many new generation engines, which are expected to be built through the next decade and beyond, make significantly greater use of our products than did previous engine designs. We manufacture structural investment castings for all three jet aircraft engines used on the Boeing 777 aircraft. We also manufacture the intermediate case and the tail bearing housing for the new Rolls-Royce Trent series of engines. These are the largest structural investment castings for jet aircraft engines in the world.

We have also expanded into the structural airframes market through the production of airframe components manufactured primarily from titanium and aluminum alloys. Aircraft manufacturers have

2

---

begun to show substantial interest in using investment castings for airframe applications such as titanium aileron and flap hinges, pylons (engine mounts), wing spars and wing ribs, as well as aluminum alloy nacelle segments (thrust reversers), cascades, aircraft access doors, electronic boxes and pump housings for hydraulic and fuel systems.

*Aerospace Airfoil Castings*

We manufacture precision cast airfoils, which include the stationary vanes and rotating blades used in the turbine section of jet aircraft engines. This engine section is considered the "hot" section, where temperatures may exceed 2,400 degrees Fahrenheit. These conditions require use of special nickel superalloys and special casting techniques to manufacture airfoil castings with internal cooling passages that provide both high performance and longer engine life.

We use various casting technologies to produce turbine airfoils. We employ conventional casting processes to produce equiaxed airfoil castings, in which the metal grains are oriented randomly throughout the casting. A more advanced process enables us to produce directionally solidified ("DS") airfoil castings, in which the metal grains are aligned longitudinally. This alignment decreases the internal stress on the weakest portion of a metal part where the various grains adjoin, thereby providing increased strength and improved efficiencies in engine performance over equiaxed parts. An even more advanced process enables us to produce single crystal ("SX") airfoil castings, which consist of one large superalloy crystal without grain boundaries. SX castings provide greater strength and performance characteristics than either equiaxed or DS castings, as well as longer engine life.

**Exhibit X1**

As engine sizes grow to generate greater thrust for larger aircraft, the turbine sections of these engines must work harder and burn hotter. As a result, the major aircraft engine manufacturers have increasingly been designing their engines with DS and SX blades. The DS and SX cast airfoils we build, with their complex cooling passages, have been instrumental in enabling these engines to operate at higher temperatures. SX cast airfoils are used in both new and redesigned engines where performance requirements are higher, and blade life is shorter than in commercial engines.

The demand for aerospace airfoil castings is determined primarily by the number and type of engines required for new jet aircraft, the frequency of engine repairs and the inventory levels of replacement parts maintained by the principal jet aircraft engine manufacturers and repair centers. A jet engine's airfoil components have shorter useful lives than structural investment castings and are replaced periodically during engine maintenance. As a result, our sales of aerospace airfoil castings are less affected by the cyclical patterns of the aerospace industry than are our sales of structural investment castings. The timing for replacement of aerospace airfoil castings principally depends on the engine's time in service and the expected life of the airfoil casting. Based upon information from our major customers, we believe that approximately half of our sales of airfoil castings used in aircraft turbine engines are replacement parts.

*IGT Castings*

In fiscal 1994, we began to focus on the manufacture of investment castings for IGT engines. We targeted this market because (1) the performance and reliability standards we have developed in the manufacture of aerospace castings was applicable to the manufacture of IGT castings, (2) the worldwide market for IGT castings was large and growing, and (3) there was a small number of suppliers in this market. The current worldwide market for IGT castings is estimated to be in excess of $500 million and, due to recent contractual gains, our market share in calendar year 2002 is estimated to be approximately 40 percent. Our IGT products consist of airfoil castings and high-temperature combustion hardware used in large, land-based gas turbines designed for electrical power generation. In addition, we manufacture structural and airfoil castings for aircraft-derivative gas turbine engines, which

3

---

are also used for power generation, as well as for other industrial and military land and marine-based applications.

IGT manufacturers have significantly improved the efficiency and reduced the pollution profiles of industrial gas turbines, principally by incorporating advanced components in new engines as well as in refurbished and upgraded turbines in the field. We have leveraged our DS and SX airfoil casting knowledge from the aerospace market into the IGT market to produce blades and vanes that are better able to withstand the extreme heat and stresses of new higher-temperature gas turbines. IGT engines are built with investment castings that are similar, but generally larger, than blades and vanes manufactured by us for the aerospace market. Because of their size, IGT airfoils are more difficult to cast than smaller aerospace airfoils with the same properties.

Since industrial gas turbines are primarily used in electrical power generation, castings sales for new IGT engines are tied to the growth of global electricity consumption, while demand for replacement parts depends on the size and usage rate of the installed base. Gas turbine power generation has several advantages over other power-generation methods, such as coal and nuclear-powered facilities, including lower average capital cost, shorter installation and regulatory approval time, ease of adding a new industrial gas turbine engine to an existing power plant to increase output and the clean-burning characteristics of natural gas. We believe these advantages have led to the increased demand for gas turbine engines.

*Other Investment Casting Products*

Our strategy for profitable growth also includes the pursuit of new opportunities for our existing investment casting technology. We have been expanding the application of our investment casting technology in the automotive, medical prosthesis, satellite and general industrial markets by manufacturing such products as turbocharger wheels, artificial hips and knees, parts for satellite launch vehicles and impellers for pumps and compressors.

**Forged Products**

We are among the leading manufacturers of forged products for the aerospace and power generation markets. Our Forged Products segment consists of the forging operations of Wyman-Gordon Company. Forged Products' aerospace and IGT sales are primarily derived from the same large engine customers served by the Investment Cast Products segment, with additional aerospace sales from manufacturers of landing gear and other airframe components. Similarly, the dynamics of the aerospace and power generation markets, as described in the Investment Cast Products section above, are virtually the same for Forged Products.

The Forged Products segment accounted for approximately 27 percent of our sales in fiscal 2002.

**Exhibit X1**

We manufacture components from sophisticated titanium and nickel alloys for jet engines, including fan discs, compressor discs, turbine discs, seals, spacers, shafts, hubs and cases. Our airframe structural components are used on both commercial and military aircraft and include landing gear beams, bulkheads, wingspans, engine mounts, struts, wing hinges, wing and tail flaps and housings. These parts are made of titanium, steel or other alloys. We provide forged products for use in power plants worldwide, as well as in oil and gas industry applications. These products include discs, spacers and valve components for land-based steam turbine and gas turbine engines, and include shafts, cases and compressor and turbine discs for marine gas engines. We also produce a variety of mechanical and structural tubular forged products, primarily in the form of extruded seamless pipe, for the domestic and international energy markets, which include nuclear and fossil-fueled power plants, co-generation projects and retrofit and life-extension applications. For naval defense applications, we supply forged components for propulsion systems for nuclear submarines and aircraft carriers, as well as forgings for pumps, valves and structural applications.

4

---

Our forging business, which employs six different manufacturing processes, involves heating titanium, steel, or high-temperature nickel alloys, and then shaping them through pressing or extrusion, using hydraulic and mechanical presses with capacities ranging up to 55,000 tons. The process employed is determined based on the raw materials and the product application. The six manufacturing processes are summarized below:

*Open-Die Forging*—In this process, the metal is pressed between dies that never completely surround the metal, thus allowing it to be observed during the process. This manufacturing method is used to create relatively simple, preliminary shapes to be processed further by closed-die forging.

*Closed-Die Forging*—Closed-die forging involves pressing heated metal into required shapes and sizes determined by machined impressions in specially prepared dies that completely surround the metal. This process allows the metal to flow more easily within the die cavity and, thus, produces forgings with superior surface finish and tighter tolerances, with enhanced repeatability of the part shape.

*Hammer Forging*—This is a form of closed-die forging which uses multiple impact blows to shape a component between specially contoured dies. Forging hammers can be classified into two main types: single action and counterblow. Our counterblow hammers, which couple upper and lower ram movement to produce the impact forces required for large components, can offer improved near-net-shape capability compared to conventional press forging. Hammer forging is one of the oldest forging processes; however, computer-controlled technology has enabled the process to meet modern manufacturing requirements.

*Conventional/Multi-Ram*—The closed-die, multi-ram process, which is employed on our 20,000 and 30,000 ton presses, enables us to produce complex forgings with multiple cavities, such as valve bodies, in a single heating and pressing cycle. Dies may be split on either a vertical or a horizontal plane, and shaped punches may be operated by side rams, piercing rams or both. This process also optimizes grain flow and uniformity of deformation and reduces machining requirements.

*Isothermal Forging*—Isothermal forging is a closed-die process in which the dies are heated to the same temperature as the metal being forged, typically in excess of 1,900 degrees Fahrenheit. Because the dies may oxidize at these elevated temperatures, this process is performed in a vacuum or inert gas atmosphere. Our isothermal press produces near-net shape components, requiring less machining by our customers.

*Extrusion*—The extrusion process is capable of producing thick-wall, seamless pipe, with outside diameters of up to 48 inches and a wall thickness from 0.5 inches up to 7 inches for applications in the power generation and oil and gas industry, including tension leg platforms, riser systems and production manifolds. Our 35,000-ton vertical extrusion press is one of the largest and most advanced in the world. In addition to solid metals, powdered materials can be compacted and extruded into forging billets with this press.

We believe that we are the world leader in producing forged rotating components for use in jet aircraft engines. These parts are forged from purchased ingots that are converted to billets in our cogging presses and from metal powders (primarily nickel alloys) that are produced, consolidated and extruded into billets entirely in our own facilities.

5

---

The following table identifies major jet aircraft engines that incorporate investment castings and forgings produced by us.

**Exhibit X1**

https://www.sec.gov/Archives/edgar/data/79958/000091205702023829/a2082140z10-k.htm

| Aircraft | GE | Pratt & Whitney | Rolls-Royce | Joint Ventures |
|---|---|---|---|---|
| Boeing | | | | |
|   MD-90 | | | | V2525, V2528(2) |
|   717 | | | BR715 | |
|   737-NG | | | | CFM56-7(1) |
|   747-400/401 | CF6-80C2 | PW4000, 4056 | RB211-524G/H | |
|   757-200/300, 301 | | PW2037, 2040, 2043 | RB211-535E4 | |
|   757-PF | | PW2040, 2042, 2043 | | |
|   767-200/300/400 ER | CF6-80C2 | PW4000, 4052, 4056, 4060 | RB211-524H | |
|   777-200/300/X | GE90 | PW4084, 4090, 4098 | Trent 800, 8104 | |
|   C-17 | | F117 | | |
|   F-15 | F110 | F100 | | |
|   F-18 | F404, F414 | | | |
| Airbus Industrie | | | | |
|   A300-600/B2/B4 | CF6-80C2 | PW4158 | | |
|   A310-200/300 | CF6-80C2 | PW4152, 4156A | | |
|   A318 | | PW6122, 6162 | | CFM56-5B8/9(1) |
|   A319/A320/A321 | | | | CFM56-5A/B(1)<br>V2500, V2522,<br>V2524, V2527,<br>V2530, V2533(2) |
|   A330-200/300 | CF6-80E1 | PW4168 | Trent 768, 772B | |
|   A340-200/300 | | | | CFM56-5C(1) |
|   A340-500/600 | | | Trent 500, 553, 556 | |
| Lockheed Martin | | | | |
|   F-16 | F110 | F100 | | |
|   F-22 | | F119 | | |
| Bombardier | | | | |
|   CRJ700 | CF34-8C1 | PW305 | | |
| Embraer | | | | |
|   ERJ 190 | CF34-10E | | | |
|   ERJ 191 | CF34-8E | | | |
|   ERJ 170 | CF34-8E | | | |
|   ERJ 135—140—145 | | | AE3007 | |

(1)     Represents engines of CFM International ("CFMI"), a joint venture of GE and Snecma, a major French aerospace company.

(2)     Represents engines produced by International Aero Engines ("IAE"), a joint venture of Pratt & Whitney, Rolls-Royce, Motoren- und Turbinen-Union, FiatAvio and Japanese Aero Engine Corporation.

6

The following table identifies major industrial gas turbines that incorporate investment castings and forgings produced by us.

| Market | GE | Siemens Westinghouse | Alstom | Rolls-Royce | Solar Turbine | P&W | Other |
|---|---|---|---|---|---|---|---|
| 60 hz Domestic | 7FA | V84.3A2, 501F | GT24 | | | | |
| 60 hz Domestic | 7E | 501D | GT11N2 | | | | |
| 60 hz Domestic | 7FB | 501G | | | | | |
| 60 hz Domestic | 7H | | | | | | |
| 50 hz International | 9E | | GT13E2 | | | | |
| 50 hz International | 9FA | V94.3A2, 701F | GT26 | | | | |
| 50 hz International | 9H | | | | | | |
| 50 hz International | 9EC | | | | | | |
| 50 hz International | 9FB | | | | | | |
| 50/60 hz International | 6FA | V64.3A | | | | | |
| 50/60 hz International | 6B | C251B | GT11N2 | | | | |
| 50/60 hz International | 6C | | | | | | |
| Aero Der. Power | LM6000 | | | Industrial Trent | | PT8/GG8 | |

**Exhibit X1**

| Aero Der. Power | LM2500, LM2500+, LM5000 | | | | FT8 |
| Marine & Power | LM6000 | | | | |
| Small IGT | PGT 5 Nuovo Pignone, PGT 10 Nuovo Pignone | Typhoon, Tornado, Tempest, Cyclone | RT-56, RT-62, RT-44, RT-48, RT-61 | H25 Hitachi, Centaur, Mars, Saturn, Taurus, Mercury, Titan | H25 Hitachi |

*Fluid Management Products*

The Fluid Management Products segment includes all of the businesses within our subsidiary, PCC Flow Technologies. We entered the fluid management sector in fiscal 1997 with the acquisition of the NEWFLO Corporation. Subsequent acquisitions, which have included Crown Pumps, OIC Valves, Baronshire Engineering, Environment/One, TBV, Sterom, Reiss Engineering, MMG, Valtaco, Technova, ConVey, Wouter Witzel, C.W. Valve Services and AOP Industries, have enabled PCC Flow Technologies to further expand its product lines and markets.

The Fluid Management Products segment accounted for approximately 14% of our sales in fiscal 2002.

We design, manufacture, market and service a broad range of high-quality, fluid-handling industrial valves and pumps. Our finished fluid management products are manufactured primarily from castings, forgings and fabricated steel parts. We sell these products worldwide under well-established brand names to a wide range of end-user markets.

The manufacturing process for fluid management products requires knowledge of multiple metal-forming and processing technologies, including casting, machining, welding, heat treating, assembly and

7

processing of metal components. Testing procedures, materials management and traceability and quality control are also important aspects of our operations.

We use our substantial knowledge of fluid management technologies, complex metal component manufacturing techniques and our end-user markets to develop, produce and sell engineered valves and pumps that we believe provide customer benefits superior to those of other manufacturers. Many of the products we offer are customized to end-user requirements or designed for specialized applications. Our maintenance, repair and service centers, extensive distribution network and inventory of products enable us to provide responsive service and timely deliveries to customers, thereby enhancing the marketability of our products. We believe our brand names, quality products and responsive service network also lead to repeat orders, stable demand and customer loyalty.

*Valves*

We manufacture and market specialty industrial and general purpose valves, fittings and flanges, principally for the chemical, refining, energy, pulp and paper and marine markets. Our valve products consist primarily of multi-turn industrial valves, check valves, quarter-turn industrial ball and plug valves, double-block-and-bleed valves, dual-expanding plug valves, four-way diverter valves and valve operators, stainless steel butterfly valves, double flanged and wafer butterfly valves, corrosion-resistant titanium ball valves and double-eccentric heavy-duty valves. Many of our valves are manufactured under contract by ISO 9000-qualified offshore suppliers to precise industry and end-user standards. The valve designs are developed and modified by our engineering staff for particular applications as determined by market conditions and end-user applications. We market our valve products under several brand names, including General Valve, NEWCO, TECHNO, Barber, TBV, OIC, Sterom, Reiss, Technova, ConVey and Wouter Witzel, AOP and CW. We believe our General Valve positive shut-off, double-block-and-bleed valve and our Technocheck hinged check valves are among the most technologically advanced products of these types sold in the fluid control market.

*Pumps*

We manufacture and market a complete line of general purpose and specialty pumps for power, cogeneration, geothermal, municipal, residential and industrial (including petroleum, chemical, mining, marine and pulp and paper) applications. We also supply repair parts and provide service for pumps. Our pump products consist primarily of single-suction and double-suction centrifugal pumps, submersible and non-clog pumps, booster pump systems, vertical turbine, mixed-flow and axial-flow pumps and grinder pumps. We are one of the few pump manufacturers that produce large vertical pumps over 36 inches in diameter. The capacities of certain of our pumps extend up to heads of 3,400 feet and flows up to 230,000 gallons per minute. We market our pump products under several brand names, including

Exhibit X1

Case 3:16-cv-01735-YY   Document 43-1   Filed 10/07/20   Page 10 of 61

Johnston, PACO, Crown and E/One. We believe our Johnston vertical turbine pumps, our PACO booster systems and "Smart Pumps" and our E/One low-pressure sewer systems are among the leading products of these types sold in the fluid handling market.

*Services*

We maintain a number of service and repair facilities as well as stocking warehouses in the U.S. and Canada, which provide aftermarket maintenance, repair, pre-sale modification services and inventory availability for our large installed base of fluid management products, as well as repair and replacement of fluid management products of other manufacturers. The market for replacement units, repair parts and repair services generally offers us higher margins and is less dependent on industry economic conditions than the market for equipment for new industrial facilities.

8

---

### Industrial Products

The Industrial Products segment includes our subsidiaries PCC Specialty Products, J&L Fiber Services, Advanced Forming Technology ("AFT") and STW Composites. PCC Specialty Products manufactures both a broad range of cold-forming header and threader tools, gundrills and machines for vertical and horizontal boring, fastener production and gundrilling, principally for automotive and other applications. Our tooling business includes product lines manufactured by Reed-Rico®, Astro Punch® and Eldorado. Our machines business includes product lines manufactured by PCC Olofsson, Reed-Rico®, Hartford, Eldorado, Fastener Engineers Group and Lewis Machines. J&L Fiber Services produces refiner plates and screen cylinders for use in the pulp and paper industry and rebuilds refiner equipment that is used in the pulping process. AFT manufactures metal-injection-molded, metal-matrix-composite, and ThixoFormed™ components for numerous industrial applications. STW Composites designs and manufactures composite components principally for aerospace applications.

The Industrial Products segment accounted for approximately 7 percent of our sales in fiscal 2002.

We maintain leading positions in our served markets for industrial metalworking tools, and we have strong market positions in the manufacture of metalworking machines for general industrial markets. We entered these markets in March 1995 with the acquisition of Quamco, Inc. Since that time, we have increased our presence in the industrial metalworking tools and machines markets with two additional acquisitions. The acquisitions of Olofsson and Astro Punch®, acquired in fiscal 1997 and the acquisition of Fastener Engineers Group and Lewis Machines in fiscal 2001, complemented our capabilities as a leading manufacturer of highly engineered industrial metalworking tools and machines. In fiscal 1998, we acquired J&L Fiber Services, Inc., a manufacturer of metal refiner plates and screen cylinders for the pulp and paper industry. In fiscal 2000, we acquired STW Composites as part of our acquisition of Wyman-Gordon.

*Metalworking Tools*

We design, manufacture and distribute a wide variety of precision metalworking tools to industrial companies that serve the automotive, appliance, construction, farm equipment, medical and aerospace industries. Our industrial metalworking tools consist primarily of heading, threading and gundrilling tools. Our heading and threading tools are principally used to manufacture fasteners, and our gundrilling tools are used to drill precision holes to very close tolerances in such products as turbine engines, engine blocks, cylinder heads, transmission shafts, connecting rods and medical prostheses.

*Metalworking Machines*

We design, manufacture and distribute several types of metalworking machines primarily for the automotive industry. Our industrial metalworking machines include threading machines and attachments, gundrilling machines, computer-controlled specialized machine systems for boring and turning applications and wire processing machines. Our threading machines and attachments are used to form a variety of threaded parts and fasteners.

*Refiner Plates and Screen Cylinders*

We are the world leader in the design, manufacture and sale of refiner plates to the pulp and paper production markets. Refiner plates, which are highly engineered metal castings, are an integral part of the wood pulping process. Refiner plates separate wood chips into component fibers as pulp is transported through the system. The design of the refiner plate affects the ultimate quality of the paper produced. In addition, we manufacture conventional and rebuildable screen cylinders. Screen cylinders are metal filtering devices that separate the usable wood fiber from undesirable elements in the pulp slurry mix. We also rebuild refiner equipment that is used in the pulping process. Approximately 95 percent of J&L Fiber Services' sales are derived from replacement parts.

**Exhibit X1**

*Metal-Injection-Molded, Metal-Matrix-Composite and ThixoFormed™ Components*

We are the largest producer of powdered metal parts manufactured by the metal-injection-molding ("MIM") process. In addition, we manufacture advanced technology, lightweight, net-shape, metal-matrix-composite parts that are made by combining aluminum and silicon carbide ("AlSiC," a registered trademark of the Company) using a patented pressure-infiltration-casting process. We have also expanded into ThixoForming™, an advanced technology alternative to conventional die casting in which materials such as magnesium are injected in a semi-solid (thixotropic) state into a mold under vacuum conditions. The result is a high-density, complex component with superior materials properties and precise dimensional tolerances as compared to a die-cast part. We believe these businesses have the potential for rapid growth and complement our core competencies in metals, precision metalworking and the management of complex manufacturing processes.

The MIM process is particularly well-suited to high volume production of small, complicated metal parts for numerous industries, including computer peripherals, medical instruments, electronics, automotive, power tools and firearms. Metal-matrix-composite parts, which have high thermal conductivity and tightly controlled thermal expansion characteristics, are used in electronic applications that require heat dissipation and are used in automotive, telecommunication, aerospace and computer products. ThixoFormed™ components are used in automotive, electronic and other consumer products. We believe our broad range of products and high standards of craftsmanship offer growth opportunities in numerous industry applications.

*Carbon and Glass Fiber Composites*

We design and manufacture a wide variety of low-cost carbon and glass fiber composite components and assemblies such as replacement wing panels, wind tunnel blades and interior panels for the general aviation and commercial aircraft industries. In addition, we perform engineering design, FAA certification and assembly of lightweight aircraft.

10

## Sales and Distribution

We sell our complex metal components and products into six major market areas: aerospace, power generation, fluid management, machine tools, pulp and paper and general industrial and other. The percentage of sales to these markets is shown below for fiscal years 2002, 2001 and 2000.



**Fiscal 2002**
**Sales $2,557.4 million**

52% Aerospace
24% Power Generation
14% Fluid Management
3% Machine Tools
2% Pulp and Paper

**Exhibit X1**

5% General Industrial and Other

**Fiscal 2001**
**Sales $2,326.3 million**



53% Aerospace
19% Power Generation
14% Fluid Management
5% Machine Tools
3% Pulp and Paper
6% General Industrial and Other

11

---

**Fiscal 2000**
**Sales $1,673.7 million**



50% Aerospace
15% Power Generation
17% Fluid Management
8% Machine Tools
4% Pulp and Paper
6% General Industrial and Other

Our sales to the aerospace market of $1,335.5 million in fiscal 2002 increased 8 percent from $1,237.2 million in fiscal 2001. Sales to the aerospace market as a percentage of total net sales, however, decreased from 53 percent in fiscal 2001 to 52 percent in fiscal 2002, reflecting the impact of our market share gain in the industrial gas turbine market in fiscal 2002.

Our sales of investment castings and forged products are made through direct sales personnel located in each business operation and through field sales representatives located at U.S. and international locations near our major customers. Industrial metalworking tools,

**Exhibit X1**

industrial metalworking machines and other metal products are sold by both internal sales forces and sales representatives in the U.S., Europe, Asia, Australia and Latin America. Our fluid management products and services are also sold by a direct sales and marketing staff and through a worldwide network of independent sales representatives and distributors. Due to the sophisticated nature of our products, our sales efforts require technical personnel to work closely with customers to identify and assist in the development of new and modified products and to provide other services that are necessary to obtain new and repeat orders.

12

## Major Customers

Sales to General Electric were 22.8 percent, 21.9 percent and 15.8 percent of total sales in fiscal 2002, 2001 and 2000, respectively, as follows:

|  | Fiscal | | |
|---|---|---|---|
|  | 2002 | 2001 | 2000 |
| Investment Cast Products | $ 359.5 | $ 268.0 | $ 193.2 |
| Forged Products | 221.7 | 234.7 | 66.3 |
| Fluid Management Products | 3.0 | 5.8 | 3.9 |
| Industrial Products | — | — | 0.2 |
|  | $ 584.2 | $ 508.5 | $ 263.6 |

No other customer accounted for more than 10 percent of net sales.

## Backlog

The backlog of unfilled orders believed to be firm at the end of each of our last three fiscal years was $1,548.2 million as of March 31, 2002, $1,587.0 million as of April 1, 2001, and $1,322.2 million as of April 2, 2000. The majority of the backlog is for sales to aerospace customers in the Investment Cast Products and Forged Products segments.

The majority of sales to customers are made on individual purchase orders. Most of our orders are subject to termination by the customer upon payment of the cost of work in process plus a related profit factor. Historically, we have not experienced significant order cancellations.

## Competition

We are subject to substantial competition in all of the markets we serve. Components and products similar to those made by us can be made by competitors using either the same types of manufacturing processes or other forms of manufacturing. Although we believe our manufacturing processes, technology and experience provide advantages to our customers, such as high quality, competitive prices and physical properties that often meet more stringent demands, alternative forms of manufacturing can be used to produce many of the components and products made by us. Despite intense competition, we believe we are the number one or two supplier in most of our principal markets. Several factors, including long-standing customer relationships, technical expertise, state-of-the-art facilities and dedicated employees, aid us in maintaining our competitive advantages.

In the Investment Cast Products segment, our principal competitor is Howmet International, Inc. ("Howmet"), a subsidiary of Alcoa Inc. Howmet produces stainless steel, superalloy, aluminum and titanium investment castings principally for the aerospace and IGT markets. We believe that Howmet is capable of producing investment castings comparable to all but the largest and most complex of our structural investment castings. We also believe Howmet has the financial and technical resources to produce structural castings as large and complex as those produced by us, should they decide to do so. Many other companies throughout the world also produce stainless steel, superalloy, aluminum or titanium investment castings, and some of these companies currently compete with us in the aerospace and other markets. Others are capable of competing with us if they choose to do so.

In the Forged Products segment, our largest competitors are Ladish Co., Fortech, S.A. and Thyssen AG for aerospace turbine products, Alcoa Corporation and Schultz Steel Company for aerospace structural products, and Mannesmann A.G. and Sumitomo

Exhibit X1

Corporation for energy products. In the future, we may face increased competition from international companies as customers seek lower cost sources of supply.

13

International competition in the forging and casting processes may also increase in the future as a result of strategic alliances among aircraft prime contractors and foreign companies, particularly where "offset" or "local content" requirements create purchase obligations with respect to products manufactured in or directed to a particular country. Competition is often intense among the companies currently involved in the industry. We continue to strive to maintain competitive advantages with high quality products, low-cost manufacturing, excellent customer service and delivery and expertise in engineering and production.

In the Fluid Management Products and Industrial Products segments, we compete with a large number of companies in each of the markets served. The major competitive factors affecting these other business areas include product design and quality, performance characteristics, pricing and product availability.

**Research and Development**

We maintain separate research and development departments at PCC Structurals, PCC Airfoils, Wyman-Gordon and PCC Flow Technologies. The research and development effort at these locations is directed at the scientific aspects of developing new and improved manufacturing processes. These research and development expenditures amounted to $6.5 million in fiscal 2002, $7.1 million in fiscal 2001, $6.2 million in fiscal 2000. A substantial amount of our technological capability is the result of engineering work and experimentation performed in connection with process development and production of new parts. This engineering work and experimentation is charged to the cost of production and is not included in research and development expenditures.

**Employees**

At March 31, 2002 we employed approximately 13,800 people within our four segments, including 8,200 people in the Investment Cast Products segment, 2,400 people in the Forged Products segment, 2,100 people in the Fluid Management Products segment and 1,100 people in the Industrial Products segment. In addition, we employed 32 people in corporate functions. Approximately 27 percent of these employees are affiliated with unions or covered by collective bargaining agreements. We expect to negotiate two union contracts or collective bargaining agreements affecting less than 5 percent of the workforce during fiscal 2003. Management believes that labor relations in the Company have generally been satisfactory.

**Patents and Trade Secrets**

From time to time, we seek U.S. and foreign patent protection on certain of our processes and products. We have also federally registered several of our trademarks in the U.S. We do not view patents or trademarks as materially important to our business as a whole. We also have rights and obligations under various license agreements. We receive no significant royalty income from patents.

**Materials & Supplies**

We use a number of raw materials in our products, including certain metals such as cobalt, titanium, nickel, tantalum and molybdenum, which are found in only a few parts of the world. These metals are required for the alloys used in our investment castings and forged products. The availability and costs of these metals may be influenced by private or governmental cartels, changes in world politics, unstable governments in exporting nations and inflation. Similarly, supplies of the tool-grade steel we use may also be subject to variation in availability and cost. We have escalation clauses for nickel and other metals in certain of our long-term contracts with major customers. Shortages of and price increases for certain raw materials we use have occurred in the past and may occur in the future. Future shortages or price fluctuations in raw materials could have a material adverse effect on us.

14

**Government Regulations**

Certain of our products are manufactured and sold under U.S. government contracts or subcontracts. Consequently, we are directly and indirectly subject to various federal rules, regulations and orders applicable to government contractors. Violation of applicable

**Exhibit X1**

government rules and regulations could result in civil liability, in cancellation or suspension of existing contracts or in ineligibility for future contracts or subcontracts funded in whole or in part with federal funds.

**International Operations**

We purchase products from and supply products to businesses located outside the U.S. Certain risks are inherent in international operations, including the risk of government financed competition, changes in trade policies, tariff regulations, the relative stability of certain foreign currencies and difficulties in obtaining U.S. export and import licenses. We have been expanding our international activities during the past several years, primarily through acquisitions and the development of foreign subsidiaries. This expansion is part of our strategy to acquire and develop businesses that complement our core competencies, have strong growth prospects and maintain leading positions in their respective market niches. Information with respect to sales and assets by geographic area is incorporated herein by reference to the "Notes to Consolidated Financial Statements" in Exhibit 13, the "Financial Section of the 2002 Annual Report to Shareholders of Precision Castparts Corp."

**Environmental Compliance**

We are subject to federal, state and local environmental laws and regulations concerning, among other things, wastewater, air emissions, toxic use reduction and hazardous materials disposal. We conduct our operations at industrial sites where hazardous materials have been managed for many years, including periods before careful management of these materials was required or generally believed to be necessary. Consequently, we are subject to various environmental laws that impose compliance obligations and can create liability for historical releases of hazardous substances. Environmental legislation and regulations and related administrative policies have changed rapidly in recent years. It is likely that we will be subject to increasingly stringent environmental standards in the future (particularly under air quality laws, water quality laws and toxic use reduction programs) and that we will be required to make additional expenditures, which could be significant, relating to environmental matters on an ongoing basis. We own properties or conduct or have conducted operations at properties, including properties acquired in recent acquisitions, which have been contaminated with hazardous substances and for which further investigation and remediation is likely to be necessary.

Our financial statements include reserves for future costs arising from environmental issues relating to these properties and our operations. Our actual future expenditures, however, for installation of and improvements to environmental control facilities, remediation of environmental conditions at our properties and other similar matters cannot be conclusively determined. At March 31, 2002, we had accrued aggregate environmental reserves of $33.5 million, which included reserves of $26.2 million for Wyman-Gordon environmental matters. Although we have recorded these reserves for environmental matters, we cannot ensure that these reserves are adequate to cover the cost of remedial measures that may eventually be required by environmental authorities with respect to known environmental matters or related liabilities and the cost of claims that may be asserted by such authorities or private parties in the future with respect to matters about which we are not yet aware. Accordingly, the costs of environmental claims may exceed the amounts reserved.

The reserves cover expected cleanup expenses for: Wyman-Gordon's Worcester, Massachusetts facility, which is substantially closed and is expected to be sold; remediation projects at Wyman-Gordon's facilities in Houston, Texas, North Grafton/Millbury, Massachusetts, Groton, Connecticut and

15

Buffalo, New York; potential liability at a closed facility in Bad Axe, Michigan; potential liability in connection with our PCC Structurals plant in Portland, Oregon; commitments to the Romanian government with respect to the Sterom, S.A. plant; and various former plants and disposal sites that we no longer own.

We believe the Company's most significant potential environmental liabilities are associated with the Wyman-Gordon facility in North Grafton, Massachusetts. Pursuant to an agreement between Wyman-Gordon and the U.S. Air Force in connection with Wyman-Gordon's acquisition of the North Grafton facility in 1982, Wyman-Gordon agreed to make expenditures for environmental matters and remediation at that site totaling $20.8 million, substantially all of which has been spent as of March 31, 2002. These expenditures will not resolve Wyman-Gordon's obligations to federal and state regulatory authorities, which are not party to the agreement. We expect to incur an additional amount to comply with federal and state environmental requirements in connection with the investigation and remediation of contamination at the North Grafton facility. The North Grafton site is located in an area where regional groundwater has been impacted with a number of contaminants, including chlorinated solvents. The Massachusetts Department of Environmental Protection ("MADEP") also has asked Wyman-Gordon to investigate contamination in a brook and pond near the facility. Pursuant to a license from the Atomic Energy Commission, Wyman Gordon disposed of magnesium thorium alloys, which are low-level radioactive waste, at the North Grafton facility.

**Exhibit X1**

We, together with numerous other parties, have been named as a potentially responsible party under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") for the cleanup of the following Superfund sites: Salco Disposal Site, Monroe, Michigan; Operating Industries, Monterey Park, California (for which Wyman-Gordon's insurer has been paying defense costs); Casmalia Resources Site, Casmalia, California; PSC Resources, Palmer, Massachusetts; Pasco County Landfill, Pasco, Washington (for which our insurers have been paying defense costs); the Western Processing Site, Kent, Washington; and the Gemme/Fournier site; Leicester, Massachusetts and Peterson-Puritan site, Cumberland, Rhode Island (for which Wyman-Gordon's insurer has been paying defense costs). We have asserted indemnity and insurance claims for some of these sites and expect to recover a portion of our losses for these sites.

We also have potential liability associated with former facilities. The current owner of a former Arwood facility in Rockleigh, New Jersey has asserted claims for contamination at that property; Wyman-Gordon is entitled to indemnity of one half the amount of this claim from an escrow account established by Arwood Corporation, from which Wyman-Gordon acquired certain operations. In 1999, PCC Specialty Products, Inc. sold its former Merriman facility in Hingham, Massachusetts. PCC Specialty Products, Inc. made commitments to the new owner and the MADEP to undertake certain remedial action with respect to contamination at this facility. In February 2000, PCC Flow Technologies, Inc. sold its Penberthy operations in Prophetstown, Illinois. PCC Flow Technologies, Inc. is obligated to the landlord and the new owner of the Penberthy business to undertake certain investigation and remedial action at this former facility. We also have potential liability for contamination at other former facilities where we do not believe our liability will be material.

Wyman-Gordon has notified its insurer of potential liabilities at its various facilities and has asserted that it is entitled to recover its costs under various historic insurance policies. We also have notified our insurers of potential liabilities associated with the PCC Structurals facility in Portland, Oregon. Although we believe we are entitled to coverage for a substantial portion of our remediation costs at these sites, we do not yet know whether or to what extent our insurers will contest the claims.

On January 10, 2000, the State of Connecticut filed a complaint against Wyman-Gordon Investment Casting, Inc. in the Superior Court Judicial District of Hartford, Connecticut. The complaint alleges various violations by Wyman-Gordon's Groton, Connecticut facility of its wastewater discharge permit during the years 1995 through 1998 and seeks civil penalties. The complaint does not

16

allege any violations after 1998 or that any of the violations are ongoing. The parties have agreed to a tentative settlement of the matter that includes a supplemental environmental project and a civil penalty aggregating approximately $0.1 million.

**Forward-Looking Statements**

Information included within this Form 10K describing the projected growth and future results and events constitutes forward-looking statements, within the meaning of the Private Securities Litigation Reform Act of 1995. Actual results in future periods may differ materially from the forward-looking statements because of a number of risks and uncertainties, including but not limited to fluctuations in the aerospace, power generation, fluid management, machine tool, pulp and paper and other general industrial cycles; the relative success of the Company's entry into new markets, such as industrial gas turbine and airframe components; competitive pricing; the financial viability of the Company's significant customers; the availability and cost of energy, materials and supplies; equipment failures; relations with the Company's employees; the Company's ability to manage its operating costs and to integrate acquired businesses in an effective manner; governmental regulations and environmental matters; risks associated with international operations and world economies; the relative stability of certain foreign currencies; and implementation of new technologies and process improvements. Any forward-looking statements should be considered in light of these factors. The Company undertakes no obligation to publicly release any forward-looking information to reflect anticipated or unanticipated events or circumstances after the date of this document.

17

**ITEM 2.  PROPERTIES**

Our manufacturing plants and administrative offices, along with certain information concerning the products and facilities are as follows:

| Division | No. of | Building Space (sq. ft.) | | |
|---|---|---|---|---|

Exhibit X1

| | Facilities | Leased | Owned | Total |
|---|---|---|---|---|
| **Executive & Corporate Offices** | | | | |
| Domestic | 1 | 16,200 | — | 16,200 |
| Foreign | — | — | — | — |
| **Investment Cast Products** | | | | |
| Domestic | 29 | 510,600 | 2,402,000 | 2,912,600 |
| Foreign | 5 | 141,000 | 373,000 | 514,000 |
| **Forged Products** | | | | |
| Domestic | 6 | — | 2,932,300 | 2,932,300 |
| Foreign | 7 | 259,800 | 551,300 | 811,100 |
| **Fluid Management Products** | | | | |
| Domestic | 24 | 527,000 | 561,400 | 1,088,400 |
| Foreign | 20 | 163,300 | 698,700 | 862,000 |
| **Industrial Products** | | | | |
| Domestic | 14 | 251,200 | 754,100 | 1,005,300 |
| Foreign | 2 | 9,300 | 29,100 | 38,400 |
| **Total Company** | | | | |
| Domestic | 74 | 1,305,000 | 6,649,800 | 7,954,800 |
| Foreign | 34 | 573,400 | 1,652,100 | 2,225,500 |
| Total | 108 | 1,878,400 | 8,301,900 | 10,180,300 |

We continue to expand our manufacturing capacity to meet anticipated market demand for our products. See "Management's Discussion and Analysis," in Exhibit 13, the "Financial Section of the 2002 Annual Report to Shareholders of Precision Castparts Corp."

## ITEM 3. LEGAL PROCEEDINGS

For a description of claims relating to environmental matters, see "Item 1. Business—Environmental Compliance."

Various lawsuits arising during the normal course of business are pending against us. In the opinion of management, the outcome of these lawsuits will have no significant effect on our consolidated financial position, results of operations, cash flows or business.

## ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

Not applicable.

18

## ITEM 4A. EXECUTIVE OFFICERS OF THE REGISTRANT(a)

| Name | | Officer Since | Age | Position Held With the Registrant |
|---|---|---|---|---|
| William C. McCormick | (b) | 1985 | 68 | Chairman and Chief Executive Officer |
| Mark Donegan | (c) | 1992 | 45 | President and Chief Operating Officer |

**Exhibit X1**

| William D. Larsson | (d) | 1980 | 57 | Senior Vice President and Chief Financial Officer |
| Peter G. Waite | (e) | 1980 | 58 | Executive Vice President and President—PCC Airfoils |
| Wayne F. Robbins | (f) | 2002 | 51 | Executive Vice President and President—PCC Flow Technologies |
| Gregory M. Delaney | (g) | 1998 | 47 | Executive Vice President and President—PCC Specialty Products |
| Russell P. Gould | (h) | 2000 | 45 | Senior Vice President and President—PCC Structurals |
| Armand F. Lauzon Jr. | (i) | 2000 | 45 | Senior Vice President and President—Forgings East of Wyman-Gordon Company |
| James E. Houlden | (j) | 2002 | 49 | Senior Vice President and President—Forgings West of Wyman-Gordon Company |
| Roger A. Cooke | (k) | 2000 | 54 | Vice President—Regulatory and Legal Affairs and Secretary |
| Shawn R. Hagel | (l) | 1997 | 37 | Vice President, Corporate Controller and Assistant Secretary |
| Geoffrey A. Hawkes | (m) | 1999 | 43 | Vice President, Treasurer and Assistant Secretary |
| Mark R. Roskopf | (n) | 1999 | 40 | Vice President—Corporate Taxes and Assistant Secretary |
| Byron J. Gaddis | (o) | 2000 | 45 | Vice President and Chief Information Officer |

(a)   The officers serve for a term of one year and until their successors are elected. Unless otherwise indicated, all positions have been held for the last five years.

(b)   Elected Chairman in 1994, Chief Executive Officer in 1991 and Director in 1986. Served as President from 1985-1997 and Chief Operating Officer from 1985-1991. Will be retiring as Chief Executive Officer in the summer of 2002.

(c)   Elected President and Chief Operating Officer in 2001 and Executive Vice President in 1992. Named President—Wyman-Gordon in 1999. Previously served as President—PCC Structurals. Will become Chief Executive Office in the summer of 2002.

(d)   Elected Vice President—Finance in 1980. Named Vice President and Chief Financial Officer in 1993. Elected Senior Vice President in 2000.

19

---

(e)   Elected Executive Vice President and President—PCC Airfoils in 1986.

(f)   Elected Executive Vice President and President—PCC Flow Technologies in 2002. Prior to joining PCC in 2001 as vice president of strategic planning and business development—PCC Flow Technologies, he was President of DeZURIK, a subsidiary of SPX Corporation, which manufactures industrial control valves. Prior to 2000, he held the position of Vice President of Marketing and Research and Development for the same company.

(g)   Elected Executive Vice President and President—PCC Specialty Products in 1998. Prior to joining PCC, he was President of the Wiegand Industrial Division of Emerson Electric.

(h)

Exhibit X1

Elected Senior Vice President and President—PCC Structurals in 2000. Previously served as President—PCC Small Structurals Business Operation.

(i)      Elected Senior Vice President and President—Forgings East—Wyman-Gordon Company in 2000. Previously served as Division Vice President—PCC Airfoils.

(j)      Elected Senior Vice President and Vice President—Forgings West—Wyman-Gordon Company in 2002. He has held various leadership positions since joining Wyman-Gordon.

(k)      Elected Vice President—Regulatory and Legal Affairs and Secretary in 2000. Prior to joining PCC, he was Executive Vice President, Regulatory and Legal Affairs and Secretary at Fred Meyer, Inc.

(l)      Elected Corporate Controller and Assistant Secretary in 1997 and Vice President in 2000. Previously served as Corporate Financial Reporting Manager.

(m)      Elected Treasurer and Assistant Secretary in 1999 and Vice President in 2000. Prior to joining PCC, he was Director of Risk Management at Electronic Data Systems Corporation.

(n)      Elected Director of Corporate Taxes and Assistant Secretary in 1999 and Vice President—Corporate Taxes in 2000. Prior to joining PCC, he was Director, International Tax at Case Corporation.

(o)      Elected Chief Information Officer and Vice President in 2000. Previously served as Director of Airframe Development and Research and Development at PCC Structurals.

20

---

## PART II

## ITEM 5.  MARKET FOR REGISTRANT'S COMMON EQUITY AND RELATED STOCKHOLDER MATTERS

As of March 31, 2002 there were 6,143 shareholders of record of our common stock. Our common stock is listed on the New York Stock Exchange under the symbol PCP. It is also traded on the Chicago Stock Exchange, the Pacific Stock Exchange and the Philadelphia Stock Exchange. Additional information with respect to Market for Registrant's Common Equity and Related Stockholder Matters, including dividends, is incorporated herein by reference to the "Five-Year Summary of Selected Financial Data" and the "Quarterly Financial Information" in Exhibit 13, the "Financial Section of the 2002 Annual Report to Shareholders of Precision Castparts Corp." We expect to continue to pay quarterly cash dividends, subject to our earnings, financial condition and other factors.

On March 22, 2002, we issued 176,505 shares to the shareholders of Western Aerospace Limited in connection with our acquisition of a 50 percent equity interest in Western Australian Specialty Alloys Pty Ltd. The stock issued in the transaction was valued at $6.1 million. The shares were issued under Regulation S.

## ITEM 6.  SELECTED FINANCIAL DATA

Information with respect to Selected Financial Data is incorporated herein by reference to the "Five-Year Summary of Selected Financial Data" in Exhibit 13, the "Financial Section of the 2002 Annual Report to Shareholders of Precision Castparts Corp."

## ITEM 7.  MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

Information with respect to Management's Discussion and Analysis of Financial Condition and Results of Operations is incorporated herein by reference to "Management's Discussion and Analysis" in Exhibit 13, the "Financial Section of the 2002 Annual Report to Shareholders of Precision Castparts Corp."

Information included in "Management's Discussion & Analysis" in Exhibit 13, the "Financial Section of the 2002 Annual Report to Shareholders of Precision Castparts Corp." describing the segments relating to projected growth and future results and events constitutes forward-looking statements, within the meaning of the Private Securities Litigation Reform Act of 1995. Actual results in future periods

**Exhibit X1**

may differ materially from the forward-looking statements because of a number of risks and uncertainties, including but not limited to fluctuations in the aerospace, power generation, fluid management, machine tool, pulp and paper and other general industrial cycles; the relative success of the Company's entry into new markets, such as industrial gas turbine and airframe components; competitive pricing; the financial viability of the Company's significant customers; the availability and cost of energy, materials and supplies; equipment failures; relations with the Company's employees; the Company's ability to manage its operating costs and to integrate acquired businesses in an effective manner; governmental regulations and environmental matters; risks associated with international operations and world economies; the relative stability of certain foreign currencies; and implementation of new technologies and process improvements. Any forward-looking statements should be considered in light of these factors. The Company undertakes no obligation to publicly release any forward-looking information to reflect anticipated or unanticipated events or circumstances after the date of this document.

21

---

### ITEM 7a. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

At various times, the Company uses derivative financial instruments to limit exposure to changes in foreign currency exchange rates, interest rates and prices of strategic raw materials. Fluctuations in the market values of such derivative instruments are generally offset by reciprocal changes in the underlying economic exposures that the instruments are intended to hedge. Because derivative instruments are used solely as hedges and not for speculative trading purposes, they do not represent incremental risk to the Company. For further discussion of derivative financial instruments, refer to the "Summary of Significant Accounting Policies," "Fair Value of Financial Instruments" and "Financing Arrangements" notes in Exhibit 13, the "Financial Section of the 2002 Annual Report to Shareholders of Precision Castparts Corp."

*Interest Rate Risk*

As discussed in the "Summary of Significant Accounting Policies" and "Financing Arrangements" notes in Exhibit 13, the Company was committed to an interest rate swap on floating debt at March 31, 2002 and April 1, 2001. If market rates had averaged 10 percent higher than actual levels in either fiscal 2002 or fiscal 2001, the effect on the Company's interest expense and net income, after considering the effects of the interest rate swap contracts and interest rate cap, would not have been material.

*Foreign Currency Risk*

The majority of the Company's revenue, expense and capital purchasing activities is transacted in U.S. dollars; however, the Company is exposed to fluctuations in foreign currencies for transactions denominated in other currencies. As discussed in the "Summary of Significant Accounting Policies" note, the Company had several foreign currency hedges in place at March 31, 2002 and April 1, 2001 to reduce such exposure. The potential loss in fair value on such financial instruments from a hypothetical 10 percent adverse change in quoted foreign currency exchange rates would not have been material to the financial position of the Company as of the end of fiscal 2002 or fiscal 2001.

*Material Cost Risk*

As discussed in the "Summary of Significant Accounting Policies" note, the Company had entered into agreements to hedge the purchase price of strategic raw materials at March 31, 2002 and April 1, 2001. If market rates had averaged 10 percent higher than actual levels in either fiscal 2002 or 2001, the effect on the Company's cost of sales and net earnings, after considering the effects of the hedge agreements, would not have been material.

### ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

Information with respect to Financial Statements and Supplementary Data is incorporated herein by reference to Exhibit 13, the "Financial Section of the 2002 Annual Report to Shareholders of Precision Castparts Corp."

### ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

None.

**Exhibit X1**

# PART III

## ITEM 10.  DIRECTORS OF THE REGISTRANT

Information with respect to Directors of the Company is incorporated herein by reference to "Proposal 1: Election of Directors" continuing through "Report of the Compensation Committee on Executive Compensation" in our Proxy Statement to be filed for the 2002 Annual Meeting of Shareholders of the Registrant. The information required by this item with respect to our executive officers follows Part I, Item 4 of this document.

## ITEM 11.  EXECUTIVE COMPENSATION

Information with respect to Executive Compensation is incorporated herein by reference to "Compensation of Executive Officers" in the Proxy Statement to be filed for the 2002 Annual Meeting of Shareholders of the Registrant.

## ITEM 12.  SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

Information with respect to Security Ownership of Certain Beneficial Owners and Management is incorporated herein by reference to "Security Ownership of Certain Beneficial Owners," "Security Ownership of Directors and Executive Officers" and "Equity Compensation Plan Information" in the Proxy Statement to be filed for the 2002 Annual Meeting of Shareholders of the Registrant.

## ITEM 13.  CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

Information with respect to Certain Relationships and Related Transactions is incorporated herein by reference to "Board Compensation, Attendance and Committees" in the Proxy Statement to be filed for the 2002 Annual Meeting of Shareholders of the Registrant.

# PART IV

## ITEM 14.  EXHIBITS, FINANCIAL STATEMENT SCHEDULES AND REPORTS ON FORM 8-K

### (a)(1)  Financial Statements

The following financial statements, incorporated by reference from Exhibit 13, the "Financial Section of the 2002 Annual Report to Shareholders of Precision Castparts Corp.," are filed as part of this report.

| Statement | Page in Exhibit 13, the "Financial Section of the 2002 Annual Report to Shareholders of Precision Castparts Corp."* |
|---|---|
| Consolidated Statements of Income | 10 |
| Consolidated Balance Sheets | 11 |
| Consolidated Statements of Cash Flows | 12 |
| Consolidated Statements of Shareholders' Investment | 13 |
| Notes to Financial Statements | 14-34 |
| Report of Independent Accountants | 35 |

### (a)(2)  Financial Statement Schedule

The following schedule is filed as part of this report:

Schedule II—Valuation and Qualifying Accounts

Report of Independent Accountants on Financial Statement Schedule

23

**(a)(3)  Exhibits**

| | | |
|---|---|---|
| (3)A | — | Restated Articles of Incorporation of Precision Castparts Corp. as amended |
| (3)B | — | Bylaws of Precision Castparts Corp. Incorporated herein by reference to Exhibit 3 in the Form 10-Q, filed February 9, 2000) File number 1-10348) |
| (4)A | — | Indenture dated December 17, 1997 between Bank One Trust Company, N.A. (successor in interest to the First National Bank of Chicago) as Trustee and Precision Castparts Corp. (Incorporated herein by reference to Exhibit (4)A in the Form 10-K filed June 26, 1998.) (File number 1-10348) |
| (4)B | — | Officers' Certificate dated December 17, 1997 pursuant to Indenture dated December 17, 1997 |
| (4)C | — | Officers' Certificate dated March 3, 2000 pursuant to Indenture dated December 17, 1997 (Incorporated herein by reference to Exhibit 4.2 in the Form S-4 filed March 31, 2000.) (File number 333-33764) |
| (4)D | — | Form of Rights Agreement, dated as of December 3, 1998, between Precision Castparts Corp. and the Bank of New York (Incorporated by reference to Exhibit 4.1 in the Form 8-K filed December 4, 1998) (File No. 1-10348) |
| (4)E | — | Precision Castparts Corp. Guarantee of Subsidiaries dated July 1, 2001 |
| (10)B | — | Precision Castparts Corp. Non-Employee Directors' Stock Option Plan (Incorporated herein by reference to Exhibit (10)B in the Form 10-Q filed August 8, 1997.) (File number 1-10348) |
| (10)C | — | Precision Castparts Corp. 1994 Stock Incentive Plan as amended (Incorporated herein by reference to Appendix A in Registrant's June 28, 1999 Proxy Statement.) (File number 1-10348) |
| (10)D | — | Precision Castparts Corp. Non-Employee Directors' Deferred Compensation Plan dated January 1, 1995, 2001 Restatement |
| (10)E | — | Precision Castparts Corp. Executive Deferred Compensation Plan dated January 1, 1995, 2001 Restatement as amended effective January 1, 2002 |
| (10)F | — | Precision Castparts Corp. Executive Performance Compensation Plan (Incorporated herein by reference to Exhibit (10)G in the Form 10-Q filed August 8, 1997.) (File number 1-10348) |
| (10)H | — | Form of Change of Control Agreement for Officers and Executives of Precision Castparts Corp. (Incorporated herein by reference to Exhibit (10)H in the Form 10-K filed June 12, 2001) (File number 1-10348) |
| (10)I | — | Precision Castparts Corp. Supplemental Executive Retirement Program 1998 Restatement, dated January 1, 1998, conformed through amendment No. 2 |
| (10)J | — | Precision Castparts Corp. 1998 Employee Stock Purchase Plan, As Amended (Incorporated herein by reference to Exhibit B in Registrant's July 9, 2001 Definitive Proxy Statement) (File number 1-10348) |

24

| | | |
|---|---|---|
| (10)K | — | Bank of America Credit Agreement dated as of July 30, 1999 among Precision Castparts Corp., Bank of America, N.A. as Administrative Agent and Letter of Credit Issuing Bank and The Other Financial Institutions Party Hereto arranged |

**Exhibit X1**

by Banc of America Securities LLC. (Incorporated herein by reference to Exhibit (10)B in the Form 10-Q filed August 11, 1999.) (File number 1-10348)

(10)M — Form of Indemnity Agreement for Officers and Executives of Precision Castparts Corp. (Incorporated herein by reference to Exhibit (10)M in the Form 10-K filed June 12, 2001) (File number 1-10348)

(10)N — Amended and Restated Credit and Security Agreement dated as of January 31, 2001 among Precision Receivables Corp., as Borrower, Precision Castparts Corp., as Initial Servicer, Blue Ridge Asset Funding Corporation, as a Lender and Wachovia Bank, N.A., individually and as Agent (Incorporated herein by reference to Exhibit (10) in the Form 10-Q filed February 14, 2001.) (File number 1-10348)

(10)O — 2001 Stock Incentive Plan (Incorporated herein by reference to Exhibit C to Registrant's July 9, 2001 Definitive Proxy Statement) (File Number 1-10348)

(11) — Calculation of Earnings Per Share for the Year Ended March 31, 2002*

(13) — Financial Section of the 2002 Annual Report to Shareholders of Precision Castparts Corp. for the Year Ended March 31, 2002

(21) — Subsidiaries of Precision Castparts Corp.

(23) — Consent of Independent Accountants

    **(b) Reports on Form 8-K**

None.

    **(c) See a(3) above.**

    **(d) See a(2) above.**

---

* Information required to be presented in Exhibit 11 is incorporated herein by reference to the "Earnings per Share" note in Exhibit 13, the "Financial Section of the 2002 Annual Report to Shareholders of Precision Castparts Corp."

---

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**PRECISION CASTPARTS CORP.**

By: /s/ WILLIAM C. MCCORMICK

William C. McCormick
*Chairman of the Board,
Director and Chief Executive Officer*

Dated: June 11, 2002

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant in the capacities and on the dates indicated.

| Signature | Title | Date |
| --- | --- | --- |

**Exhibit X1**

As officers or directors of
Precision Castparts Corp.

| /s/  WILLIAM C. MCCORMICK | Chairman of the Board, Director and Chief Executive Officer | June 11, 2002 |
|---|---|---|
| William C. McCormick | | |
| /s/  MARK DONEGAN | President and Chief Operating Officer | June 11, 2002 |
| Mark Donegan | | |
| /s/  WILLIAM D. LARSSON | Senior Vice President and Chief Financial Officer (Principal Financial and Accounting Officer) | June 11, 2002 |
| William D. Larsson | | |
| /s/  PETER R. BRIDENBAUGH | Director | June 11, 2002 |
| Peter R. Bridenbaugh | | |
| /s/  DEAN T. DUCRAY | Director | June 11, 2002 |
| Dean T. Ducray | | |
| /s/  DON R. GRABER | Director | June 11, 2002 |
| Don R. Graber | | |
| /s/  VERNON E. OECHSLE | Director | June 11, 2002 |
| Vernon E. Oechsle | | |

26

| /s/  BYRON O. POND | Director | June 11, 2002 |
|---|---|---|
| Byron O. Pond, Jr. | | |
| /s/  STEVEN G. ROTHMEIER | Director | June 11, 2002 |
| Steven G. Rothmeier | | |
| /s/  J. FRANK TRAVIS | Director | June 11, 2002 |
| J. Frank Travis | | |

27

## SCHEDULE II
## PRECISION CASTPARTS CORP. AND SUBSIDIARIES
## VALUATION AND QUALIFYING ACCOUNTS
### For the years ended
### (000's Omitted)

Column C

## Exhibit X1

| Column A | Column B | Additions | | Column D | Column E |
|---|---|---|---|---|---|
| Classification | Balance at Beginning of Period | Charged to Costs and Expenses | Business Acquisitions | Deductions | Balance at End of Period |
| **Deducted from assets to which they apply:** | | | | | |
| **Reserve for doubtful accounts:** | | | | | |
| April 2, 2000 | $ 3,400 | $ 2,700 | $ 4,300 | $ 900(1) | $ 9,500 |
| April 1, 2001 | $ 9,500 | $ 700 | $ 2,600 | $ 3,400(1) | $ 9,400 |
| March 31, 2002 | $ 9,400 | $ 2,200 | $ — | $ 5,200(1) | $ 6,400 |
| **Deferred tax asset valuation allowance:** | | | | | |
| April 2, 2000 | $ 2,700 | $ — | $ 5,600 | $ 1,400(2) | $ 6,900 |
| April 1, 2001 | $ 6,900 | $ — | $ — | $ 4,600(3) | $ 2,300 |
| March 31, 2002 | $ 2,300 | $ 2,500(4) | $ — | $ — | $ 4,800 |

(1)     Write off of bad debts.

(2)     Utilization of tax benefits under capital-loss or operating loss carry-forwards.

(3)     Reduction of valuation reserves associated with business acquisitions.

(4)     Establishment of valuation allowances for capital loss carry-forwards or operating loss carry-forwards.

28

---

## REPORT OF INDEPENDENT ACCOUNTANTS ON
## FINANCIAL STATEMENT SCHEDULE

To the Board of Directors of Precision Castparts Corp.

Our audits of the consolidated financial statements referred to in our report dated April 29, 2002 appearing in the 2002 Annual Report to Shareholders of Precision Castparts Corp. (which report and consolidated financial statements are incorporated by reference in this Annual Report on Form 10-K also included an audit of the Financial Statement Schedule listed in Item 14(a)(2) of this Form 10-K. In our opinion, this Financial Statement Schedule presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements.

/s/  PRICEWATERHOUSECOOPERS LLP

PricewaterhouseCoopers LLP
Portland, Oregon
April 29, 2002

29

---

## INDEX TO EXHIBITS

**Exhibit X1**

| (3)A | — | Restated Articles of Incorporation of Precision Castparts Corp. as amended |
|---|---|---|
| (3)B | — | Bylaws of Precision Castparts Corp. Incorporated herein by reference to Exhibit 3 in the Form 10-Q, filed February 9, 2000) File number 1-10348) |
| (4)A | — | Indenture dated December 17, 1997 between Bank One Trust Company, N.A. (successor in interest to the First National Bank of Chicago) as Trustee and Precision Castparts Corp. (Incorporated herein by reference to Exhibit (4)A in the Form 10-K filed June 26, 1998.) (File number 1-10348) |
| (4)B | — | Officers' Certificate dated December 17, 1997 pursuant to Indenture dated December 17, 1997 |
| (4)C | — | Officers' Certificate dated March 3, 2000 pursuant to Indenture dated December 17, 1997 (Incorporated herein by reference to Exhibit 4.2 in the Form S-4 filed March 31, 2000.) (File number 333-33764) |
| (4)D | — | Form of Rights Agreement, dated as of December 3, 1998, between Precision Castparts Corp. and the Bank of New York (Incorporated by reference to Exhibit 4.1 in the Form 8-K filed December 4, 1998) (File No. 1-10348) |
| (4)E | — | Precision Castparts Corp. Guarantee of Subsidiaries dated July 1, 2001 |
| (10)B | — | Precision Castparts Corp. Non-Employee Directors' Stock Option Plan (Incorporated herein by reference to Exhibit (10)B in the Form 10-Q filed August 8, 1997.) (File number 1-10348) |
| (10)C | — | Precision Castparts Corp. 1994 Stock Incentive Plan as amended (Incorporated herein by reference to Appendix A in Registrant's June 28, 1999 Proxy Statement.) (File number 1-10348) |
| (10)D | — | Precision Castparts Corp. Non-Employee Directors' Deferred Compensation Plan dated January 1, 1995, 2001 Restatement |
| (10)E | — | Precision Castparts Corp. Executive Deferred Compensation Plan dated January 1, 1995, 2001 Restatement as amended effective January 1, 2002 |
| (10)F | — | Precision Castparts Corp. Executive Performance Compensation Plan (Incorporated herein by reference to Exhibit (10)G in the Form 10-Q filed August 8, 1997.) (File number 1-10348) |
| (10)H | — | Form of Change of Control Agreement for Officers and Executives of Precision Castparts Corp. (Incorporated herein by reference to Exhibit (10)H in the Form 10-K filed June 12, 2001) (File number 1-10348) |
| (10)I | — | Precision Castparts Corp. Supplemental Executive Retirement Program 1998 Restatement, dated January 1, 1998, conformed through amendment No. 2 |
| (10)J | — | Precision Castparts Corp. 1998 Employee Stock Purchase Plan, As Amended (Incorporated herein by reference to Exhibit B in Registrant's July 9, 2001 Definitive Proxy Statement) (File number 1-10348) |

30

---

| (10)K | — | Bank of America Credit Agreement dated as of July 30, 1999 among Precision Castparts Corp., Bank of America, N.A. as Administrative Agent and Letter of Credit Issuing Bank and The Other Financial Institutions Party Hereto arranged by Banc of America Securities LLC. (Incorporated herein by reference to Exhibit (10)B in the Form 10-Q filed August 11, 1999.) (File number 1-10348) |
|---|---|---|
| (10)M | — | Form of Indemnity Agreement for Officers and Executives of Precision Castparts Corp. (Incorporated herein by reference to Exhibit (10)M in the Form 10-K filed June 12, 2001) (File number 1-10348) |
| (10)N | — | Amended and Restated Credit and Security Agreement dated as of January 31, 2001 among Precision Receivables Corp., as Borrower, Precision Castparts Corp., as Initial Servicer, Blue Ridge Asset Funding Corporation, as a Lender |

**Exhibit X1**

and Wachovia Bank, N.A., individually and as Agent (Incorporated herein by reference to Exhibit (10) in the Form 10-Q filed February 14, 2001.) (File number 1-10348)

(10)O — 2001 Stock Incentive Plan (Incorporated herein by reference to Exhibit C to Registrant's July 9, 2001 Definitive Proxy Statement) (File Number 1-10348)

(11) — Calculation of Earnings Per Share for the Year Ended March 31, 2002*

(13) — Financial Section of the 2002 Annual Report to Shareholders of Precision Castparts Corp. for the Year Ended March 31, 2002

(21) — Subsidiaries of Precision Castparts Corp.

(23) — Consent of Independent Accountants

* Information required to be presented in Exhibit 11 is incorporated herein by reference to the "Earnings per Share" note in Exhibit 13, the "Financial Section of the 2002 Annual Report to Shareholders of Precision Castparts Corp."

31

QuickLinks

FORM 10-K ANNUAL REPORT TABLE OF CONTENTS
PART I

    ITEM 1. BUSINESS

    ITEM 2. PROPERTIES
    ITEM 3. LEGAL PROCEEDINGS
    ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS
    ITEM 4A. EXECUTIVE OFFICERS OF THE REGISTRANT(a)

PART II

    ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY AND RELATED STOCKHOLDER MATTERS
    ITEM 6. SELECTED FINANCIAL DATA
    ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS
    ITEM 7a. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK
    ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA
    ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

PART III

    ITEM 10. DIRECTORS OF THE REGISTRANT
    ITEM 11. EXECUTIVE COMPENSATION
    ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT
    ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

PART IV

    ITEM 14. EXHIBITS, FINANCIAL STATEMENT SCHEDULES AND REPORTS ON FORM 8-K

SIGNATURES
SCHEDULE II PRECISION CASTPARTS CORP. AND SUBSIDIARIES VALUATION AND QUALIFYING ACCOUNTS For the years

**Exhibit X1**

ended (000's Omitted)
REPORT OF INDEPENDENT ACCOUNTANTS ON FINANCIAL STATEMENT SCHEDULE
INDEX TO EXHIBITS

**Exhibit X1**

EX-13 9 a2082140zex-13.htm EXHIBIT 13

QuickLinks -- Click here to rapidly navigate through this document

EXHIBIT 13

## MANAGEMENT'S DISCUSSION AND ANALYSIS
Precision Castparts Corp. and Subsidiaries

**Business overview**

Fiscal 2002 was a successful year for the Company. PCC achieved record sales and earnings (before restructuring and asset impairment charges). These results reflected the impact of significant growth in the Power Generation market as well as strong business conditions in the aerospace sector during the first three quarters of the year, partially offset by a downturn in sales for commercial aircraft products following the tragic events of September 11, 2001. The Company responded to these events by taking swift action to right-size the entire organization and to prepare PCC's businesses for the expected future upturn. In addition, the results for the year were positively affected by continued share gains in key markets resulting from aggressive cost reduction efforts and a continued focus on customer satisfaction. Partially offsetting the positive impact of growth in the Power Generation and Aerospace markets during fiscal 2002 were unfavorable economic conditions in the Machine Tool and General Industrial markets.

Total sales for fiscal 2002 reached a record $2,557.4 million, an increase of $231.1 million, or 10 percent from fiscal 2001 sales of $2,326.3 million. The Company experienced substantial growth in the Investment Cast Products and Forged Products segments due to strong demand from the Power Generation market, coupled with increased aerospace sales achieved in the first half of the fiscal year, partially offset by declines in the second half of the year. Power generation sales improved 38 percent from fiscal 2001 levels, increasing from 19 percent of total sales in fiscal 2001 to 24 percent in fiscal 2002. Aerospace sales as a percent of total sales decreased from 53 percent in fiscal 2001 to 52 percent in fiscal 2002. The decrease reflects the impact of our diversification into non-aerospace markets, and the impact of substantial market share gains in the industrial gas turbine market in fiscal 2002. Over the past five years, total sales have increased at a compound annual growth rate of 21 percent.

Operating income before restructuring and asset impairment charges for fiscal 2002 totaled $346.6 million, or 13.6 percent of sales, a $47.6 million increase from fiscal 2001's operating income before restructuring and asset impairment charges of $299.0 million, or 12.9 percent of sales. The increase in operating profit was due to excellent results in both the Investment Cast Products and Forged Products segments as well as improved performance within the Fluid Management Products segment. Partially offsetting these improvements were lower profits in the Industrial Products segment, primarily due to the continuation of poor market conditions. Over the past five years, operating income before restructuring and other non-recurring charges has increased at a compound annual growth rate of 25 percent.

Fiscal 2002 net income of $42.4 million was lower than fiscal 2001 earnings of $124.9 million, and resulted in earnings per share of $0.81 (diluted), down 67 percent from the $2.45 per share (diluted) achieved last year. Excluding restructuring and asset impairment charges, earnings were $3.24 per share (diluted) in fiscal 2002, up 26 percent compared with $2.58 per share in fiscal 2001.

**Acquisitions of Businesses**

The Company completed five acquisitions during fiscal 2002, which complemented existing business lines and provided access to new domestic and international markets.

In the first quarter, the Company increased its ownership interest in Design Technologies International ("DTI") from 33 percent to 70 percent. DTI, which is located in Poland, is operated as part of the Industrial Products segment.

In the third quarter, the Company acquired American Oilfield Products ("AOP") located in Moore, Oklahoma. AOP manufactures floating and trunnion mounted ball valves and is operated as part of the Fluid Management Products segment.

In the fourth quarter, the Company completed three acquisitions. PCC increased its ownership interest in Western Australian Specialty Alloys Pty Ltd ("WASA") from 25 percent to 100 percent. WASA, located in Perth, Australia, produces casting and forging alloys for aircraft engine and industrial gas turbine manufacturers and is operated as part of the Forged Products segment. PCC also acquired Lake Erie Design, a manufacturer of ceramic cores for aerospace and industrial gas turbines and other precision casting

**Exhibit X1**

applications that are utilized in the Investment Cast Products segment. PCC also acquired CW Valve Services, located in Houston, Texas. CW Valve Services repairs and remanufacturers valves for the Fluid Management Products segment.

These acquisitions all fit with the Company's strategy of targeting acquisitions that (i) complement the Company's core competencies in metals, precision metalworking and the management of complex manufacturing process, (ii) have strong growth prospects and (iii) have leading positions in established market niches.

### *Disposition of Businesses*

During the third quarter of fiscal 2002, the Company sold the machinery, inventory, receivables and customer lists of the Carmet Company for $5.6 million. Carmet Company had operated within the Investment Cast Products segment. An impairment charge of $19.7 million was recorded in the second quarter of fiscal 2002, concurrent with management's decision to dispose of the business.

### *Restructuring and asset impairment charges*

The following table provides significant components of amounts recorded in the Consolidated Statements of Income related to the Company's restructuring and asset impairment charges.

| Fiscal | 2002 | 2001 | 2000 |
|---|---|---|---|
| Provision for restructuring: | | | |
| Severance | $ 11.6 | $ 3.5 | $ 7.4 |
| Other | 4.7 | 5.2 | — |
| Impairment of long-lived assets | 129.1 | 0.7 | 1.7 |
| | 145.4 | 9.4 | 9.1 |
| Income tax benefit | (18.5) | (3.0) | (3.8) |
| | $ 126.9 | $ 6.4 | $ 5.3 |

The following table provides a rollforward of amounts included in accrued liabilities for restructuring reserves:

| Fiscal | 2002 | 2001 | 2000 |
|---|---|---|---|
| Restructuring reserve at beginning of period | $ 5.8 | $ 6.7 | $ 1.1 |
| Current year charges | 16.3 | 8.7 | 7.4 |
| Current year utilization | (7.8) | (9.6) | (1.8) |
| Restructuring reserve at end of period | $ 14.3 | $ 5.8 | $ 6.7 |

During the second and third quarters of fiscal 2002, PCC recorded provisions for restructuring and impairment of long-lived assets totaling $145.4 million. The tax-effected impact of these charges totaled $126.9 million or $2.43 per share (diluted).

During the second quarter, PCC established a reserve totaling $5.6 million pursuant to restructuring plans to consolidate European valve production operations within the Fluid Management Products segment and downsize operations within the Industrial Products Segment. The reserve

consisted of $2.1 million for employee severance and $3.5 million for other exit costs, including incremental costs and contractual obligations for items such as leasehold termination payments and other facility exit costs incurred as a direct result of the restructuring plans. These restructuring plans provided for termination of approximately 105 employees. As of March 31, 2002, approximately 90 percent of the planned terminations had occurred, with the remaining terminations expected by June 30, 2002. The tax-effected impact of these charges totaled $4.0 million, or $0.08 per share (diluted).

Charges totaling $34.5 million were taken in the second quarter for impairment of long-lived assets. A $19.7 million charge provided for the write-down of the assets of an unprofitable business to net realizable value less exit costs. The business manufactured carbide products for various industrial markets and was included in the Investment Cast Products segment. Net realizable value was based on

Exhibit X1

estimates of proceeds upon sale or collection of the assets. Substantially all of the assets were sold in the third quarter of fiscal 2002. The second quarter impairment charge also included $12.6 million for the write-off of a long-term note receivable, included in other assets, from a previously owned company that has declared bankruptcy. Fixed asset costs of $2.2 million were also included in the impairment charge primarily for write-off of fixed associated with the restructuring of European operations within the Fluid Management Products segment. The tax-effected impact of these charges totaled $24.1 million, or $0.46 per share (diluted).

During the third quarter of fiscal 2002, PCC established a reserve of $10.7 million for employee severance ($9.5 million) and other exit costs ($1.2 million) associated with downsizings within the Investment Cast Products and Forged Products segments due to expected declines in commercial aerospace sales, continued downsizing of operations within the Industrial Products Segment and consolidation of European valve production operations within the Fluid Management Products segment. The other exit costs included lease termination costs resulting from the restructuring plans. The restructuring plan provided for terminations of approximately 900 employees, or 6 percent of the Company's workforce. As of March 31, 2002, approximately 90 percent of the planned terminations had occurred, with the remaining terminations expected by September 29, 2002. The tax-effected impact of these charges totaled $7.2 million, or $0.14 per share (diluted).

Also during the third quarter of fiscal 2002, the Company incurred charges for impairment of long-lived assets totaling $94.6 million. The Company recognized a non-cash asset impairment charge of $92.4 million related to PCC Specialty Products, a division within the Industrial Products segment. This charge consisted of $86.6 million for goodwill impairment and $5.8 million for impairment of property, plant and equipment. PCC Specialty Products has experienced substantial declines in sales and operating cash flow within its threading tool and punch component businesses as a result of the prolonged and significant downturn in the machine tool market, as well as the more recent deterioration in the automotive market. Given the significant changes in business conditions, PCC performed an evaluation of the recoverability of the long-lived assets of these businesses and determined that the estimated future undiscounted cash flows of the assets were insufficient to recover their related carrying values. Pursuant to SFAS No. 121, "Accounting for the Impairment of Long-Lived Assets and for Long-Lived Assets to Be Disposed Of," an impairment charge was recorded to reduce the carrying amount of the assets to fair value based on the estimated present value of expected future cash flows of the businesses. Also included in the asset impairment charge were the write-downs of fixed assets associated with the third quarter's restructuring activity, which totaled $2.2 million. The tax-effected impact of these charges totaled $91.6 million, or $1.75 per share (diluted).

### Outlook

The Company is expecting that fiscal 2003 sales will be negatively impacted by further declines in the Aerospace and Machine Tool markets, partially offset by modest improvements within the Fluid Management and General Industrial and other markets. In addition, the Company expects the Power Generation market will decline slightly in fiscal 2003 due to lower sales of large gas turbine and aeroderivative turbine engines. Overall sales are expected to decline by approximately 10-15 percent from fiscal 2002 levels. Operating margins will decline moderately due to the deleveraging effect of

---

lower sales, coupled with the impact of lower prices and higher fixed costs related to pension, insurance and depreciation expenses, partially offset by continued improvements in operating efficiency. Anticipated operating performance improvements within the Fluid Management Products and Industrial Products segments should also help to mitigate the overall decline.

### Financial results by segment

The Company reports its financial results by segment in accordance with Statement of Financial Accounting Standards 131, "Disclosures about Segments of an Enterprise and Related Information." The Statement requires that the Company present segment data based on the way that management organizes the businesses within the Company for making operating decisions and assessing performance. PCC has organized the Company's business segments along its four major product lines and reports financial results in the following four segments: Investment Cast Products, Forged Products, Fluid Management Products, and Industrial Products. Operating income amounts discussed below exclude restructuring and asset impairment charges.

### Investment Cast Products

The Investment Cast Products segment includes PCC Structurals, PCC Airfoils and the Wyman-Gordon Aluminum Casting operation. These three businesses manufacture investment castings for aircraft engines, industrial gas turbine ("IGT") engines, airframes, medical prostheses and other industrial applications.

*Fiscal 2002 compared with fiscal 2001*

**Exhibit X1**

Investment Cast Products reported fiscal 2002 sales of $1,332.0 million and operating income of $248.5 million. Fiscal 2002 sales increased 12 percent compared to the prior year's $1,187.6 million, and operating income improved by 16 percent over the prior year's $213.7 million. The increase in sales was due to strong growth in the Power Generation market, which grew by 32.7 percent, as well as strong results in the Aerospace market through the end of the third quarter of fiscal 2002. Operating margins benefited from the impact of leverage from higher sales coupled with improving IGT margins and continued cost reduction.

The Investment Cast Products segment is anticipating declining sales associated with both the Aerospace and Power Generation markets in fiscal 2003. Operating margins will decline in fiscal 2003 as a result of the deleveraging effect of reduced volume coupled with higher fixed costs related to pension, insurance and depreciation expenses, partially offset by continued improvements in operating efficiency.

### Fiscal 2001 compared with fiscal 2000

Investment Cast Products reported fiscal 2001 sales of $1,187.6 million and operating income of $213.7 million. Fiscal 2001 sales increased 22 percent the prior year's $970.8 million, and operating income improved by 33 percent over the prior year's $161.2 million. The increase in sales was principally due to a full year's results from Wyman-Gordon Castings, which was acquired during the third quarter of fiscal 2000, as well as continued strong demand for large IGT and aeroderivative engines sold to the Power Generation market. The increase was also driven by growing demand in the aerospace sector from regional jet engine programs and airframe programs, as well as continued demand from the segment's more traditional market, which consists of structural and airfoil castings used in large aircraft engines. Operating margins were favorably impacted by strong market conditions, coupled with continued productivity improvements within the segment and the realization of synergies related to the acquisition of Wyman-Gordon.

### Forged Products

The Forged Products segment consists of the forging operations of Wyman-Gordon. Forged Products' sales to the Aerospace and Power Generation markets primarily derive from the same large

---

engine customers served by the Investment Cast Products segment, with additional aerospace sales going to manufacturers of landing gear and other airframe components. The Forged Products segment also produces seamless pipe and other products for the oil and gas industry.

### Fiscal 2002 compared with fiscal 2001

Forged Products sales totaled $697.9 million for fiscal 2002, with operating income of $116.7 million. Fiscal 2002 sales increased 12 percent compared to the prior year's $620.7 million, and operating income improved by 21 percent over the prior year's $96.7 million. The increase in sales was principally due to growth in the Power Generation market. The segment also benefited from strong growth in sales of extruded pipe to power plant installations. The operating income improvement reflected both the leverage from higher sales and continued cost savings at Wyman-Gordon resulting from higher productivity and operating synergies.

Sales in fiscal 2003 within this segment will be negatively impacted by reduced demand from the Aerospace (turbine engines and airframes) and Power Generation markets, partially offset by anticipated growth in extruded pipe sales. The Forged Products segment's operating income will also be negatively impacted by the deleveraging effect of the lower sales, coupled with higher pension, insurance and depreciation expenses, partially offset by continued improvements In operating efficiency.

### Fiscal 2001 compared with fiscal 2000

Forged Products reported sales of $620.7 million for fiscal 2001, an increase of $428.6 million, with operating income of $96.7 million, an increase of $72.3 million from the fiscal 2000 level of $24.4 million. This segment consists entirely of operations purchased as part of the Wyman-Gordon acquisition, the acquisition of Wyman-Gordon Lincoln in the first quarter of fiscal 2001 and the acquisition of Wyman-Gordon Cleveland at the end of the third quarter of fiscal 2001. Since Wyman-Gordon was acquired in the third quarter of fiscal 2000, fiscal 2000's results include only eighteen weeks of comparative data. Forged Products, which serves the same major markets as Investment Cast Products, experienced strong demand from the Power Generation market and solid growth in its aerospace business during fiscal 2001. Operating margins were favorably impacted by the higher volume, improved productivity and the realization of synergies associated with the acquisition of Wyman-Gordon.

### Fluid Management Products

The Fluid Management Products segment includes all of the businesses of PCC Flow Technologies. The businesses that comprise this segment manufacture an extensive range of fluid management products under various brand names, which include PACO, Johnston and

Exhibit X1

Crown pumps for water and wastewater treatment, new construction, energy, and other applications; E/One grinder pumps for low-pressure sewer systems; and Newmans, General, TBV, TECHNO, Barber, OIC, PCC Ball Valves, Sterom, AOP, Reiss, Technova, Wouter Witzel, CW and ConVey valves for oil and gas, fuel distribution, food processing, severe services and other applications.

*Fiscal 2002 compared with fiscal 2001*

Fiscal 2002 sales for Fluid Management Products were $361.1 million, as compared to $318.7 million in fiscal 2001, an increase of 13 percent. The segment's operating income also increased from $11.8 million in fiscal 2001 to $18.4 million in fiscal 2002, an increase of 56 percent. The improved sales level was due to stronger demand from the municipal wastewater, petroleum exploration/processing, oil, gas and power generation markets. The operating income improvement was due to the higher sales levels coupled with cost reductions related to the consolidation of European operations.

Overall, the Fluid Management Products segment should benefit from top-line growth in fiscal 2003, and should experience improvements in operating profit from the increased volume coupled with

---

benefits realized from the consolidation of European manufacturing and the impact of material sourcing initiatives.

*Fiscal 2001 compared with fiscal 2000*

Fiscal 2001 sales for Fluid Management Products were $318.7 million, as compared to $291.6 million in fiscal 2000, an increase of 9 percent. The segment's operating income decreased from $15.0 million in fiscal 2000 to $11.8 million in fiscal 2001. The sales improvement was due to higher sales in the construction, municipal and power generation sectors. The segment's operating margins were adversely affected by delays in the consolidation of the European valve businesses, weakness in the oil and gas industry, soft market conditions in the general industrial sector, pricing and volume issues in Europe and increased ramp-up costs related to anticipated volume increases.

**Industrial Products**

The Industrial Products segment includes PCC Specialty Products, J&L Fiber Services, Advanced Forming Technology ("AFT") and STW Composites. PCC Specialty Products manufactures a broad range of cold-forming header and threader tools, gundrills and machines for vertical and horizontal boring, fastener production and gundrilling, principally for automotive and other general industrial applications. The tooling business includes product lines manufactured under various brand names, including Reed-Rico®, Astro Punch® and Eldorado. The machines business includes product lines manufactured under the brand names PCC Olofsson, Reed-Rico®, Hartford, Eldorado, Fastener Engineers Group and Lewis Machines. J&L Fiber Services produces refiner plates and screen cylinders for use in the pulp and paper industry, and rebuilds refiner equipment that is used in the pulping process. AFT manufactures metal-injection-molded, metal-matrix-composite, and ThixoFormed™ components for numerous industrial applications. STW Composites designs and manufactures composite components principally for aerospace applications.

*Fiscal 2002 compared with fiscal 2001*

The Industrial Products segment's sales decreased by 17 percent, from $199.3 million in fiscal 2001 to $166.4 million in fiscal 2002, and its operating income decreased by $5.6 million, from $1.1 million in fiscal 2001 to a loss of $4.5 million in fiscal 2002. The segment's sales decline was due to the continued impact of the downturn in the machine tool, automotive, electronics and general industrial markets, coupled with softness in the pulp and paper industry. Operating results were significantly impacted by the lower sales volume, partially offset by the benefit of restructuring efforts undertaken during the year.

The industrial products segment will continue to be impacted during fiscal 2003 by softness in the machine tool sector, partially offset by anticipated recovering demand from the automotive consumer parts and electronics markets, coupled with share gains in the pulp and paper market due to product line expansion and new product introductions. Operating margins should show improvement as a result of fiscal 2002 restructuring activities throughout the segment.

*Fiscal 2001 compared with fiscal 2000*

The Industrial Products segment's sales decreased by 9 percent, from $219.2 million in fiscal 2000 to $199.3 million in fiscal 2001, and its operating income decreased from $6.6 million to $1.1 million. The decline in sales was due to soft market conditions in the automotive sector and continued price pressures in the Machine Tool market, particularly in Europe, as a result of Asian competition. In addition, PCC Pittler was sold at the beginning of the fourth quarter, which further reduced sales volume in fiscal 2001. At J&L Fiber

**Exhibit X1**

Services, lower sales due to consolidation within the Pulp and Paper market negatively impacted both top and bottom-line performance. AFT, on the other hand, contributed solid results as the business expanded its customer base and improved productivity.

**Interest and taxes**

Net interest expense in fiscal 2002 was $66.2 million, as compared with $81.0 million in fiscal 2001. The lower expense reflects lower debt levels as a result of strong earnings, improved working capital management and lower effective borrowing rates during fiscal 2002.

The effective tax rate for the year was 69 percent, compared with 40 percent in the prior year. The increase in the fiscal 2002 rate was due to the Company receiving no tax benefits related to the $92.1 million write-off of goodwill included in the asset impairment charges in the second and third quarters. Excluding the impact of the restructuring and asset impairment charges, the effective tax rate would have been 40 percent.

**Liquidity and capital resources**

Total capitalization at March 31, 2002 was $1,853.3 million, consisting of $901.5 million of debt and $951.8 million of equity. The debt-to-capitalization ratio was 48.6 percent compared with 53.9 percent at the end of the prior fiscal year.

Cash requirements for the year included $125.3 million for capital expenditures, $47.9 million for business acquisitions, $153.1 million of net debt repayment and $6.2 million for dividends. These requirements were funded from cash generated by earnings of $258.6 million, $51.8 million of working capital decreases and $18.0 million from the sale of common stock through the Employee Stock Purchase Plan and stock option exercises.

Capital spending in fiscal 2002 principally provided for maintenance and growth in the Forged Products segment, increased IGT capacity in the Investment Cast Products segment, and manufacturing improvements in the Fluid Management segment. Fiscal 2003's capital spending, which is expected to be at least 15 percent lower than the spending in fiscal 2002, principally provides for product-line expansion and projects necessary to reduce costs and maintain production in the Forged Products segment, projects carried over from fiscal 2002 to support increased demand for IGT products and for cost savings within the Investment Cast Products segment, and additional investments in the Fluid Management Products and Industrial Products segments to provide for increased capacity and cost reductions, as well as for other normal requirements to maintain production and provide safety.

Management believes that the Company can fund the requirements for capital spending, cash dividends and potential acquisitions from cash generated from operations, borrowing from existing or new bank credit facilities, issuance of public or privately placed debt securities, or the issuance of equity instruments.

**Contractual obligations and commercial commitments**

The Company is obligated to make future payments under various contracts such as debt agreements and lease agreements. The following table represents the significant contractual cash obligations of PCC as of March 31, 2002 (in millions).

| Contractual Cash Obligations | Total | 2003 | 2004 | 2005 | 2006 | 2007 | Thereafter |
|---|---|---|---|---|---|---|---|
| Long-term debt | $ 748.2 | $ 51.2 | $ 80.3 | $ 290.3 | $ 172.3 | $ 0.3 | $ 153.8 |
| Operating leases | 46.4 | 10.7 | 9.2 | 7.1 | 5.8 | 4.7 | 8.9 |
| | $ 794.6 | $ 61.9 | $ 89.5 | $ 297.4 | $ 178.1 | $ 5.0 | $ 162.7 |

**Critical accounting policies**

The Company has identified the policies below as critical to PCC's business operations and the understanding of its results of operations. The impact and any associated risks related to these policies on PCC's business operations are discussed throughout the Management's Discussion and Analysis where such policies affect reported and expected financial results. For a detailed discussion on the application of these and other significant accounting policies, see the Notes to the Consolidated

**Exhibit X1**

Financial Statements of this Annual Report. Note that the preparation of this Annual Report requires management to make estimates and assumptions that affect the reported amount of assets and liabilities, disclosure of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenue and expenses during the reporting period. Actual results may differ from those estimates.

### Revenue recognition

The Company recognizes revenue when the earnings process is complete. This generally occurs when products are shipped to the customer in accordance with the contract or purchase order, ownership and risk of loss have passed to the customer, collectibility is reasonably assured, and pricing is fixed and determinable. In instances where title does not pass to the customer upon shipment, the Company recognizes revenue upon delivery or customer acceptance, depending on terms of the sales agreement. Service sales, representing aftermarket repair and maintenance and engineering activities, are recognized as services are performed.

### Accounts receivable reserve

The Company evaluates the collectibility of its accounts receivable based on a combination of factors. In circumstances where PCC is aware of a customer's inability to meet its financial obligations (e.g., bankruptcy filings), a specific reserve for bad debts against amounts due is recorded to reduce the receivable to the amount the Company reasonably expects will be collected. In addition, the Company recognizes reserves for bad debts based on estimates developed by using standard quantitative measures based on historical write-offs and current economic conditions. The establishment of reserves requires the use of judgment and assumptions regarding the potential for losses on receivable balances. Although the PCC considers these balances adequate and proper, changes in economic conditions in the markets in which the Company operates could have a material effect on the required reserve balances.

### Valuation of inventories

All inventories are stated at the lower of the cost to purchase or manufacture the inventory or the current estimated market value of the inventory. Cost for work in process and metal inventories at a significant number of the Company's operations is determined on a last-in, first-out ("LIFO") basis. The average inventory cost method is utilized for most other inventories. The Company regularly reviews inventory quantities on hand and records a provision for excess or obsolete inventory equal to the difference between the cost of the inventory and the estimated market value based upon assumptions about future demand and market conditions. If actual future demand or market conditions are less favorable than those projected by management, additional inventory write-downs may be required. Therefore, although management makes every effort to ensure the accuracy of forecast demand, any significant unanticipated changes in demand could have a significant impact on the value of PCC's inventories and reported operating results.

### Goodwill and acquired intangibles

From time to time, the Company acquires businesses in purchase transactions that typically result in goodwill and other intangible assets, which may affect the amount of future period amortization expense and possible impairment charges. The determination of the value of such intangible assets requires management to make estimates and assumptions that affect the consolidated financial statements.

### Recently issued accounting standards

In June 2001, the Financial Accounting Standards Board ("FASB") issued SFAS No. 141, "Business Combinations," and SFAS No. 142, "Goodwill and Other Intangible Assets." SFAS No. 141 requires that all business combinations be accounted for by the purchase method of accounting and

---

changes the criteria for recognition of intangible assets acquired in a business combination. The provisions of SFAS No. 141 apply to all business combinations initiated after June 30, 2001. PCC does not expect that the adoption of SFAS No. 141 will have a material effect on its consolidated financial position or results of operations. SFAS No. 142 requires that goodwill and intangible assets with indefinite useful lives no longer be amortized; however, these assets must be reviewed at least annually for impairment. Intangible assets with finite useful lives will continue to be amortized over their respective useful lives. The standard also establishes specific guidance for testing for impairment of goodwill and intangible assets with indefinite useful lives. The Company will be required to adopt SFAS No. 142 for the fiscal year beginning April 1, 2002. However, goodwill and intangible assets acquired after June 30, 2001 are subject immediately to the non-amortization provisions of SFAS No. 142. PCC does not believe that the adoption of SFAS No. 142 will result in an impairment charge. Goodwill amortization expense for fiscal 2002 was $28.1 million.

In July 2001, the FASB issued SFAS No. 143, "Accounting for Asset Retirement Obligations." SFAS No. 143 requires entities to record the fair value of a liability for an asset retirement obligation in the period in which it is incurred. When the liability is initially

Exhibit X1

recorded, the entity is required to capitalize the cost by increasing the carrying amount of the related long-lived asset. The liability is accreted to its present value each period, and the capitalized cost is depreciated over the useful life of the related asset. SFAS No. 143 is effective for the Company for the fiscal year beginning April 1, 2003. The Company does not believe that the implementation of this standard will have a significant impact on its financial statements.

In October 2001, the FASB issued SFAS No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets." SFAS No. 144 requires that long-lived assets that are to be disposed of by sale be measured at the lower of book value or fair value less cost to sell. Additionally, SFAS No. 144 expands the scope of discontinued operations to include all components of an entity with operations that (1) can be distinguished from the rest of the entity and (2) will be eliminated from the ongoing operations of the entity in a disposal transaction. SFAS No. 144 is effective for the Company for the fiscal year beginning April 1, 2002. The Company does not believe that the implementation of this standard will have a significant impact on its financial statements.

In April 2002, the FASB issued SFAS No. 145, "Rescission of FASB Statement No. 4, 44, and 64, Amendment of FASB Statement No. 13, and Technical Corrections." SFAS No. 145, which updates, clarifies and simplifies existing accounting pronouncements, addresses the reporting of debt extinguishments and accounting for certain lease modifications that have economic effects that are similar to sale-leaseback transactions. The Company is required and plans to adopt the provisions of SFAS No. 145 effective March 31, 2003. The Company has not yet assessed the impact of SFAS No. 145 on its financial statements.

**Forward-looking statements**

Information included within this Annual Report describing the projected growth and future results and events constitutes forward-looking statements, within the meaning of the Private Securities Litigation Reform Act of 1995. Actual results in future periods may differ materially from the forward-looking statements because of a number of risks and uncertainties, including but not limited to fluctuations in the aerospace, power generation, fluid management, machine tool, pulp and paper and other general industrial cycles; the relative success of the Company's entry into new markets, such as industrial gas turbine and airframe components; competitive pricing; the financial viability of the Company's significant customers; the availability and cost of energy, materials and supplies; equipment failures; relations with the Company's employees; the Company's ability to manage its operating costs and to integrate acquired businesses in an effective manner; governmental regulations and environmental matters; risks associated with international operations and world economies; the relative stability of certain foreign currencies; and implementation of new technologies and process improvements. Any forward-looking statements should be considered in light of these factors. The Company undertakes no obligation to publicly release any forward-looking information to reflect anticipated or unanticipated events or circumstances after the date of this document.

---

## CONSOLIDATED STATEMENTS OF INCOME
## PRECISION CASTPARTS CORP. AND SUBSIDIARIES

|  | Fiscal Years Ended | | |
| --- | --- | --- | --- |
| *(In millions, except per share data)* | March 31, 2002 | April 1, 2001 | April 2, 2000 |
| Net sales | $ 2,557.4 | $ 2,326.3 | $ 1,673.7 |
| Cost of goods sold | 1,977.6 | 1,809.8 | 1,306.9 |
| Selling and administrative expenses | 233.2 | 217.5 | 176.2 |
| Provision for restructuring | 16.3 | 8.7 | 7.4 |
| Impairment of long-lived assets | 129.1 | 0.7 | 1.7 |
| Other income | — | — | 4.2 |
| Interest expense, net | 66.2 | 81.0 | 47.1 |
| Income before provision for income taxes | 135.0 | 208.6 | 138.6 |
| Provision for income taxes | 92.6 | 83.7 | 53.3 |
| Net income | $ 42.4 | $ 124.9 | $ 85.3 |
| Net income per common share (basic) | $ 0.82 | $ 2.50 | $ 1.74 |
| Net income per common share (diluted) | $ 0.81 | $ 2.45 | $ 1.73 |

Net income per common share data for the fiscal year ended April 2, 2000 have been restated for the effects of a two-for-one stock split in September 2000.

**Exhibit X1**

*See Notes to Consolidated Financial Statements on pages 34 through 44.*

## CONSOLIDATED BALANCE SHEETS
### PRECISION CASTPARTS CORP. AND SUBSIDIARIES

| *(In millions, except share data)* | | **March 31, 2002** | | **April 1, 2001** |
|---|---|---:|---|---:|
| **Assets** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ | 38.1 | $ | 40.1 |
| Receivables, net of reserves of $6.4 in 2002 and $9.4 in 2001 | | 352.3 | | 398.0 |
| Inventories | | 412.6 | | 363.3 |
| Prepaid expenses | | 21.7 | | 17.9 |
| Deferred income taxes | | 53.8 | | 41.8 |
| Total current assets | | 878.5 | | 861.1 |
| Property, plant and equipment: | | | | |
| Land | | 22.1 | | 21.3 |
| Buildings and improvements | | 194.7 | | 189.6 |
| Machinery and equipment | | 690.8 | | 590.5 |
| Construction in progress | | 69.8 | | 60.2 |
| | | 977.4 | | 861.6 |
| Less—accumulated depreciation | | (387.3) | | (326.8) |
| Net property, plant and equipment | | 590.1 | | 534.8 |
| Goodwill and acquired intangibles, net of accumulated amortization of $90.2 in 2002 and $78.8 in 2001 | | 994.0 | | 1,073.7 |
| Deferred income taxes | | 17.5 | | 15.6 |
| Other assets | | 84.8 | | 87.7 |
| | $ | 2,564.9 | $ | 2,572.9 |
| **Liabilities and Shareholders' Investment** | | | | |
| Current liabilities: | | | | |
| Short-term borrowings | $ | 153.3 | $ | 152.8 |
| Long-term debt currently due | | 51.2 | | 61.4 |
| Accounts payable | | 242.4 | | 199.7 |
| Accrued liabilities | | 237.3 | | 226.3 |
| Income taxes payable | | 42.9 | | 21.3 |
| Total current liabilities | | 727.1 | | 661.5 |
| Long-term debt | | 697.0 | | 838.5 |
| Pension and other postretirement benefit obligations | | 151.0 | | 132.0 |
| Other long-term liabilities | | 38.0 | | 39.1 |
| Commitments and contingencies | | | | |
| Shareholders' investment: | | | | |
| Common stock, $1 stated value, authorized—300,000,000 shares; issued and outstanding 2002—52,158,364 and 2001—51,340,758 shares | | 52.2 | | 51.3 |
| Paid-in capital | | 214.8 | | 191.6 |
| Retained earnings | | 731.7 | | 695.5 |
| Accumulated other comprehensive loss, net: | | | | |

**Exhibit X1**

| | | |
|---|---:|---:|
| Foreign currency translation | (38.0) | (36.6) |
| Derivatives qualifying as hedges | (6.1) | — |
| Minimum pension liability | (2.8) | — |
| Total shareholders' investment | 951.8 | 901.8 |
| | $ 2,564.9 | $ 2,572.9 |

*See Notes to Consolidated Financial Statements on pages 34 through 44.*

## CONSOLIDATED STATEMENTS OF CASH FLOWS
## PRECISION CASTPARTS CORP. AND SUBSIDIARIES

| | Fiscal Years Ended | | |
|---|---|---|---|
| *(In millions)* | March 31, 2002 | April 1, 2001 | April 2, 2000 |
| Cash flows from operating activities: | | | |
| Net income | $ 42.4 | $ 124.9 | $ 85.3 |
| Non-cash items included in income: | | | |
| Depreciation and amortization | 100.7 | 102.4 | 74.2 |
| Deferred income taxes | (13.6) | 15.8 | (16.9) |
| Write-down of long-lived assets | 129.1 | 0.7 | 1.7 |
| Changes in operating working capital, excluding effects of acquisitions: | | | |
| Receivables | 43.0 | (54.4) | 44.9 |
| Inventories | (37.5) | (23.3) | 15.7 |
| Payables, accruals and current taxes | 50.3 | 8.5 | (17.3) |
| Other | (4.0) | 3.5 | (5.9) |
| Net cash provided by operating activities | 310.4 | 178.1 | 181.7 |
| Cash flows from investing activities: | | | |
| Acquisitions of businesses | (47.9) | (74.2) | (675.0) |
| Capital expenditures | (125.3) | (90.2) | (49.3) |
| Dispositions of businesses and other | 3.5 | 28.7 | 64.4 |
| Net cash used by investing activities | (169.7) | (135.7) | (659.9) |
| Cash flows from financing activities: | | | |
| Issuance of long-term debt | 212.6 | 81.3 | 612.3 |
| Repayment of long-term debt | (364.5) | (113.2) | (247.4) |
| Net (decrease) increase in short-term borrowings | (1.2) | 8.5 | 124.9 |
| Common stock issued | 18.0 | 36.1 | 3.9 |
| Cash dividends | (6.2) | (5.9) | (5.9) |
| Other | (1.4) | (26.7) | (6.8) |
| Net cash (used) provided by financing activities | (142.7) | (19.9) | 481.0 |
| Net (decrease) increase in cash and cash equivalents | (2.0) | 22.5 | 2.8 |
| Cash and cash equivalents at beginning of year | 40.1 | 17.6 | 14.8 |
| Cash and cash equivalents at end of year | $ 38.1 | $ 40.1 | $ 17.6 |

**Exhibit X1**

Supplemental disclosures of cash flow information:

Cash paid during the year for:

| | | | | | | |
|---|---|---|---|---|---|---|
| Interest | $ | 69.5 | $ | 85.3 | $ | 44.5 |
| Income taxes, net of refunds received | $ | 74.3 | $ | 81.8 | $ | 31.9 |

Non-cash investing and financing activity:

| | | | | | | |
|---|---|---|---|---|---|---|
| Common stock issued for business acquisition | $ | 6.1 | $ | — | $ | — |

*See Notes to Consolidated Financial Statements on pages 34 through 44.*

## CONSOLIDATED STATEMENTS OF SHAREHOLDERS' INVESTMENT
## PRECISION CASTPARTS CORP. AND SUBSIDIARIES

| (In millions) | Common Stock Outstanding | | Paid-in Capital | Retained Earnings | Accumulated Other Comprehensive Loss | Total Comprehensive Income |
|---|---|---|---|---|---|---|
| | Shares | Amount | | | | |
| Balance at March 28, 1999 | 24.5 $ | 24.5 $ | 178.4 $ | 497.1 $ | (2.6) | |
| Common stock issued | 0.1 | 0.1 | 3.8 | — | — | |
| Cash dividends ($0.12 per share) | — | — | — | (5.9) | — | |
| Net income | — | — | — | 85.3 | — $ | 85.3 |
| Translation adjustments | — | — | — | — | (6.8) | (6.8) |
| Balance at April 2, 2000 | 24.6 | 24.6 | 182.2 | 576.5 | (9.4) $ | 78.5 |
| Common stock issued | 1.9 | 1.9 | 34.2 | — | — | |
| Cash dividends ($0.12 per share) | — | — | — | (5.9) | — | |
| Two-for-one stock split | 24.8 | 24.8 | (24.8) | — | — | |
| Net income | — | — | — | 124.9 | — $ | 124.9 |
| Translation adjustments | — | — | — | — | (27.2) | (27.2) |
| Balance at April 1, 2001 | 51.3 $ | 51.3 $ | 191.6 $ | 695.5 $ | (36.6) $ | 97.7 |
| Common stock issued pursuant to stock plans | 0.7 | 0.7 | 17.3 | | — | |
| Common stock issued for business acquisition | 0.2 | 0.2 | 5.9 | — | — | |
| Cash dividends ($0.12 per share) | — | — | — | (6.2) | — | |
| Net income | — | — | — | 42.4 | — $ | 42.4 |
| Translation adjustments | — | — | — | — | (1.4) | (1.4) |
| Gains (losses) on derivatives: | | | | | | |
| Cumulative accounting changes, net of $3.0 tax | — | — | — | — | (4.9) | (4.9) |
| Periodic revaluations, net of $4.1 tax | — | — | — | — | (6.7) | (6.7) |
| Realized in income, net of $3.4 tax | — | — | — | — | 5.5 | 5.5 |
| Minimum pension liability, net of $1.8 tax | | | | | (2.8) | (2.8) |
| Balance at March 31, 2002 | 52.2 $ | 52.2 $ | 214.8 $ | 731.7 $ | (46.9) $ | 32.1 |

*See Notes to Consolidated Financial Statements on pages 34 through 44.*

**Exhibit X1**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**Precision Castparts Corp. and Subsidiaries**

*(In millions, except option share and per share data)*

**Summary of significant accounting policies**

Certain reclassifications have been made to prior year amounts to conform to the current year presentation. Such reclassifications had no effect on previously reported shareholders' investment or net income.

*Principles of consolidation*

The consolidated financial statements include the accounts of Precision Castparts Corp. ("PCC" or "the Company") and its wholly-owned subsidiaries after elimination of intercompany accounts and transactions. PCC's fiscal year is based on a 52-53 week year ending the Sunday closest to March 31.

*Cash and cash equivalents*

Cash and cash equivalents include highly liquid short-term investments with an original maturity of three months or less. These investments are available-for-sale with market values approximating cost.

*Valuation of inventories*

All inventories are stated at the lower of cost or current market values. Cost for work in process and metal inventories at a significant number of the Company's operations is determined on a last-in, first-out ("LIFO") basis. The average inventory cost method is utilized for most other inventories. Costs utilized for inventory valuation purposes include labor, material and manufacturing overhead.

*Property, plant and equipment*

Property, plant and equipment are stated at cost. Depreciation of plant and equipment is computed using the straight-line or declining balance method based on the estimated service lives of the assets. Estimated service lives are 20-30 years for buildings and improvements, 5-15 years for machinery and equipment and 3-5 years for computer hardware and software. Depreciation expense was $69.5 million, $70.1 million and $51.0 million in fiscal 2002, 2001 and 2000, respectively. Gains and losses from the disposal of property, plant and equipment are included in the consolidated statements of income and were not material. Expenditures for maintenance, repairs and minor improvements are charged to expense as incurred.

*Goodwill and acquired intangibles*

Goodwill represents costs in excess of fair values assigned to the underlying net assets of acquired companies and has been amortized using the straight-line method generally over 40 years. Effective July 1, 2001, the Company adopted the provisions of Statement of Financial Accounting Standards ("SFAS") No. 141, "Business Combinations," and SFAS No. 142, "Goodwill and Other Intangible Assets," applicable to business combinations initiated after June 30, 2001. In accordance with these standards, goodwill acquired after June 30, 2001 has not been amortized. See "Recently Issued Accounting Standards."

Acquired intangibles are amortized using the straight-line method and include the following: territory access rights, 30 years; non-compete agreements, 3-6 years; customer base, 5-15 years; and developed technology, 10-20 years.

*Long-lived assets*

When events or circumstances indicate the carrying value of a long-lived asset may be impaired, the Company uses an estimate of the future undiscounted cash flows to be derived from the remaining useful life of the asset to assess whether or not the asset is recoverable. If the future undiscounted cash

---

flows to be derived over the life of the asset do not exceed the asset's net book value, the Company then considers estimated fair market value versus carrying value in determining any potential impairment.

*Derivative financial instruments*

**Exhibit X1**

At various times, the Company uses derivative financial instruments to limit exposure to changes in foreign currency exchange rates, interest rates and prices of natural gas and strategic raw materials. The Company has controls in place that limit the use of derivative financial instruments and ensure that all such transactions receive appropriate management attention.

The Company accounts for derivatives pursuant to SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities," as amended. This standard requires that all derivative financial instruments be recorded in the financial statements and measured at fair value. Changes in the fair value of derivative financial instruments are either recognized periodically in income or shareholders' investment (as a component of accumulated other comprehensive income) depending on whether the derivative is being used to hedge changes in fair value or cash flows. The adoption of SFAS No. 133 in the first quarter of fiscal 2002 resulted in an unrecognized loss of $4.9 million, net of tax, as a cumulative effect adjustment of accumulated other comprehensive income.

As discussed in the "Financing Arrangements" note, the Company was committed to an interest rate swap on floating debt at March 31, 2002. Other immaterial instruments in place at year end included hedges to cover exposures related to foreign currencies and raw materials used in certain of the Company's facilities. At March 31, 2002, and April 1, 2001, there was no material off-balance-sheet risk from derivative financial instruments. The Company does not hold or issue financial instruments for trading purposes.

### Certain risks and uncertainties

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

### Revenue recognition

The Company recognizes revenue when the earnings process is complete. This generally occurs when products are shipped to the customer in accordance with the contract or purchase order, ownership and risk of loss have passed to the customer, collectibility is reasonably assured, and pricing is fixed and determinable. In instances where title does not pass to the customer upon shipment, the Company recognizes revenue upon delivery or customer acceptance, depending on terms of the sales agreement. Service sales, representing aftermarket repair and maintenance and engineering activities, are recognized as services are performed.

### Environmental costs

The estimated future costs for known environmental remediation requirements are accrued on an undiscounted basis when it is probable that a liability has been incurred and the amount of remediation costs can be reasonably estimated. When only a range of amounts is established, and no amount within the range is better than another, the minimum amount of the range is recorded. Recoveries of environmental remediation costs from other parties are recorded as assets when collection is probable. Total environmental reserves accrued at March 31, 2002 and April 1, 2001 were $33.5 million and $34.2 million, respectively. The amounts accrued relate to estimated liabilities at multiple locations, with no single location having a material exposure.

---

### Foreign currency translation

Assets and liabilities of the Company's foreign affiliates, other than those located in highly inflationary countries, are translated at current exchange rates, while income and expenses are translated at average rates for the period. For entities in highly inflationary countries, a combination of current and historical rates is used to determine currency gains and losses resulting from financial statement translation and those resulting from transactions. Translation gains and losses are reported as a component of shareholders' investment, except for those associated with highly inflationary countries, which are reported directly in the Consolidated Statements of Income.

Transaction gains and losses that arise from exchange rate fluctuations on transactions denominated in a currency other than the functional currency, except those transactions which have been designated as hedges of identifiable foreign currency commitments or investment positions, are included in the results of operations as incurred.

### Recently Issued Accounting Standards

In June 2001, the Financial Accounting Standards Board ("FASB") issued SFAS No. 141, "Business Combinations," and SFAS No. 142, "Goodwill and Other Intangible Assets." SFAS No. 141 requires that all business combinations be accounted for by the purchase method of accounting and changes the criteria for recognition of intangible assets acquired in a business combination. The provisions of SFAS No. 141 apply to all business combinations initiated after June 30, 2001. The adoption of SFAS No. 141 did not have a material

Exhibit X1

effect on PCC's consolidated financial position or results of operations. SFAS No. 142 requires that goodwill and intangible assets with indefinite useful lives no longer be amortized; however, these assets must be reviewed at least annually for impairment. Intangible assets with finite useful lives will continue to be amortized over their respective useful lives. The standard also establishes specific guidance for testing for impairment of goodwill and intangible assets with indefinite useful lives. The Company will be required to adopt SFAS No. 142 for the fiscal year beginning April 1, 2002. However, goodwill and intangible assets acquired after June 30, 2001 are subject immediately to the non-amortization provisions of SFAS No. 142. PCC does not believe that the adoption of SFAS No. 142 will result in an impairment charge. Goodwill amortization expense for fiscal 2002 was $28.1 million.

In July 2001, the FASB issued SFAS No. 143, "Accounting for Asset Retirement Obligations." SFAS No. 143 requires entities to record the fair value of a liability for an asset retirement obligation in the period in which it is incurred. When the liability is initially recorded, the entity is required to capitalize the cost by increasing the carrying amount of the related long-lived asset. The liability is accreted to its present value each period, and the capitalized cost is depreciated over the useful life of the related asset. SFAS No. 143 is effective for the Company for the fiscal year beginning April 1, 2003. The Company does not believe that the implementation of this standard will have a significant impact on its financial statements.

In October 2001, the FASB issued SFAS No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets." SFAS No. 144 requires that long-lived assets that are to be disposed of by sale be measured at the lower of book value or fair value less cost to sell. Additionally, SFAS No. 144 expands the scope of discontinued operations to include all components of an entity with operations that (1) can be distinguished from the rest of the entity and (2) will be eliminated from the ongoing operations of the entity in a disposal transaction. SFAS No. 144 is effective for the Company for the fiscal year beginning April 1, 2002. The Company does not believe that the implementation of this standard will have a significant impact on its financial statements.

In April 2002, the FASB issued SFAS No. 145, "Rescission of FASB Statement No. 4, 44, and 64, Amendment of FASB Statement No. 13, and Technical Corrections." This Statement, which updates, clarifies and simplifies existing accounting pronouncements, addresses the reporting of debt extinguishments and accounting for certain lease modifications that have economic effects that are similar to sale-leaseback transactions. The Company is required and plans to adopt the provisions of

---

SFAS No. 145 effective March 31, 2003. The Company has not yet assessed the impact of this Statement on its financial statements.

**Common stock split**

On August 16, 2000, the Company's Board of Directors declared a two-for-one stock split effected in the form of a 100% stock dividend paid at the close of business on September 21, 2000 to shareholders of record on September 1, 2000. All earnings per share amounts, references to common stock and shareholders' investment amounts have been restated as if the stock dividend had occurred as of the earliest period presented.

**Acquisitions and dispositions of businesses**

*Acquisitions*

The following acquisitions were accounted for by the purchase method of accounting and, accordingly, the results of operations have been included in the Consolidated Statements of Income since the acquisition dates. Pursuant to SFAS No. 142, goodwill acquired after June 30, 2001, which includes the Company's acquisitions in the third and fourth quarters of fiscal 2002, is not amortized. Goodwill generated from acquisitions on or before June 30, 2001 is being amortized using the straight-line method generally based on a 40-year life. Effective April 1, 2002, remaining goodwill will no longer be amortized but will be tested for impairment at least annually.

*Fiscal 2002*

In fiscal 2002, PCC acquired the following five entities for a total cost of $54.0 million, of which $47.9 million was paid in cash and $6.1 million was paid in 176,505 shares of PCC common stock based on the market value of the stock at the date of acquisition. Goodwill recognized in these transactions totaled $27.2 million, which is not expected to be deductible for tax purposes. Goodwill was assigned to the Investment Cast Products, Forged Products, Fluid Management Products and Industrial Products segments in the amounts of $0.8 million, $17.6 million, $6.7 million, and $2.1 million, respectively.

In the first quarter, the Company increased its ownership interest in Design Technologies International ("DTI") from 33 percent to 70 percent for $0.3 million. DTI, which is located in Poland, is operated as part of the Industrial Products segment. The purchase generated $2.1 million of goodwill.

**Exhibit X1**

In the third quarter, the Company acquired American Oilfield Products ("AOP") located in Moore, Oklahoma. AOP manufactures floating and trunnion mounted ball valves and is operated as part of the Fluid Management Products segment. The purchase price of $13.9 million generated $6.5 million of goodwill.

In the fourth quarter, the Company increased its ownership interest in Western Australian Specialty Alloys Pty Ltd ("WASA") from 25 percent to 100 percent for $27.6 million in cash and 176,505 shares of PCC common stock with a market value of $6.1 million at the date of acquisition. WASA, located in Perth, Australia, produces casting and forging alloys for aircraft engine and industrial gas turbine manufacturers and is operated as part of the Forged Products segment. The purchase generated $17.6 million of goodwill.

Also during the fourth quarter, PCC acquired Lake Erie Design, a manufacturer of ceramic cores for aerospace and industrial gas turbines and other precision casting applications that are utilized in the Investment Cast Products segment. The purchase price of $5.2 million generated $0.8 million of goodwill.

Also during the fourth quarter, PCC acquired CW Valve Services. CW Valve Services, located in Houston, Texas, repairs and remanufactures valves for the Fluid Management Products segment. The purchase price of $0.9 million generated $0.2 million of goodwill. Intangible assets acquired were valued at $0.4 million and included a customer base and non-compete agreements.

---

*Fiscal 2001*

During the first quarter of fiscal 2001, PCC acquired the stock of Fastener Engineers Group, which is located in Rockford, Illinois. Fastener Engineers Group is a designer and manufacturer of wire-processing equipment and is operated as part of the Industrial Products segment. The purchase price of $5.3 million generated $1.1 million of goodwill.

Also during the first quarter, PCC acquired the stock of ConVey Engineering, which is located in Germany. ConVey Engineering is a manufacturer of double-eccentric heavy-duty valves and is included in the operations of the Fluid Management Products segment. The purchase price of $0.5 million generated $0.5 million of goodwill.

PCC also acquired the assets of the aerospace division of United Engineering Forgings (Aero) in the first quarter. Located in Lincoln, England, Aero manufactures forged aircraft engine discs, shafts and engine-mounting brackets. Aero has been renamed Wyman-Gordon Lincoln and is included in the operations of the Forged Products segment. The purchase price of $34.3 million generated $23.9 million of goodwill.

During the third quarter of fiscal 2001, PCC acquired the assets of the valve division of Wouter Witzel, which is located in the Netherlands, the United Kingdom and Germany. Wouter Witzel manufactures double-flanged and wafer butterfly valves and is operated as part of the Fluid Management Products segment. The purchase price of $13.8 million generated $2.4 million of goodwill.

Also during the third quarter, PCC acquired the stock of Drop Dies and Forgings Company, located in Cleveland, Ohio. Renamed Wyman-Gordon Cleveland, this company manufactures both ferrous and non-ferrous forgings and is included in the operations of the Forged Products segment. The purchase price of $22.8 million generated $11.5 million of goodwill.

*Fiscal 2000*

During the third quarter of fiscal 2000, PCC purchased 98% of the outstanding shares of common stock of Wyman-Gordon Company ("Wyman-Gordon") pursuant to a cash tender offer. PCC acquired the remaining outstanding shares of common stock of Wyman-Gordon pursuant to a merger on January 12, 2000. The transaction, financed from borrowings under Credit Agreements with Bank of America, N.A., as Agent, was valued at approximately $784.0 million, reflecting shares acquired in the tender offer and merger at $20 per share ($731.0 million), PCC's tender for and subsequent payment of Wyman-Gordon's 8% Senior Notes due 2007 ($150.0 million), less Wyman-Gordon's cash ($97.0 million). The transaction generated goodwill of approximately $571.0 million. Wyman-Gordon, headquartered in Millbury, Massachusetts, is the market leader in high-quality, technologically advanced forgings for aircraft engine components, and is also a leading manufacturer of investment castings for the aerospace industry and forgings for the Power Generation and the Oil & Gas and Other Energy markets. Wyman- Gordon's casting businesses operate as part of the Investment Cast Products segment, and the forging businesses comprise the Forged Products segment.

Pursuant to an FTC consent order regarding PCC's purchase of Wyman-Gordon, the large cast parts operation of Wyman-Gordon in Groton, Connecticut, was divested. This divestiture was sold at its adjusted net book value recorded at the time of purchase of Wyman-Gordon. In addition, pursuant to the FTC consent order, PCC divested the titanium investment casting operation located in Albany, Oregon.

**Exhibit X1**

The following represents the pro forma results of the ongoing operations for PCC and Wyman-Gordon as though the acquisition of Wyman-Gordon had occurred at the beginning of fiscal 2000. The pro forma information, however, is not necessarily indicative of the results that would have resulted

had the acquisition occurred at the beginning of fiscal 2000, nor is it necessarily indicative of future results.

| Fiscal | 2000 |
| --- | --- |
|  | (Unaudited) |
| Net sales | $   2,087.4 |
| Net income | $       59.3 |
| Earnings per share (basic) | $         1.21 |
| Earnings per share (diluted) | $         1.21 |

Also during the third quarter of fiscal 2000, PCC acquired the stock of Valtaco, which was headquartered in Switzerland. Valtaco manufactures quarter-turn three-piece ball valves and sells these valves along with complementary valve products through subsidiaries in Switzerland, Germany and Scotland. The purchase price of $7.0 million generated $4.2 million of goodwill. Valtaco operates as part of the Fluid Management Products segment.

PCC also acquired the assets of Reiss Engineering, which was located in England, in the third quarter of fiscal 2000. Reiss manufactures quarter-turn knife gate valves and operates as part of the Fluid Management Products segment. The purchase price of $2.7 million generated $1.9 million of goodwill.

During the fourth quarter of fiscal 2000, PCC acquired the stock of Technova, which was headquartered in Switzerland, and its two subsidiaries. Technova manufactures high-performance engineered plastic or polymer lined valves for systems designed to handle corrosive and/or abrasive fluids and pure liquids. The subsidiaries are sales and distribution operations, which were located in Germany and the U.S. The purchase price of $14.0 million generated $8.0 million of goodwill. The Company also acquired a small U.S.-based distributor, MMG, for $0.3 million. Technova and MMG operate as part of the Fluid Management Products segment.

### Dispositions

#### Fiscal 2002

During the third quarter of fiscal 2002, the Company sold the machinery, inventory, receivables and customer lists of the Carmet Company for $5.6 million. Carmet Company had operated within the Investment Cast Products segment. An impairment charge of $19.7 million was recorded in the second quarter of fiscal 2002, concurrent with management's decision to dispose of the business.

#### Fiscal 2001

During the third quarter of fiscal 2001, the Company sold the assets of Scaled Composites, Inc. for $6.0 million. Scaled Composites was acquired as part of the acquisition of Wyman-Gordon and had been classified as an asset-held-for-sale. The disposition generated no gain or loss for the Company.

During the fourth quarter of fiscal 2001, the Company received a $14.4 million 10-year note receivable for the Company's interest in Pittler GmbH, which had been operated as part of the Industrial Products segment. During the second quarter of fiscal 2002, the note was written off due to the bankruptcy of Pittler. The write-off was recorded as a charge to impairment of long-lived assets.

#### Fiscal 2000

During the fourth quarter of fiscal 2000, the Company sold the titanium castings operation of Wyman-Gordon as required under the FTC Consent Order for $26.6 million. Prior to completing this transaction, the Company purchased the minority interest in the titanium casting operation from Titanium Metals Corporation (TIMET). In addition, during the fourth quarter, the Company sold the Water Specialties business for $12.7 million and the Penberthy business for $20.0 million. Water Specialties and Penberthy were considered to be non-core to the Fluid Management Products segment. These dispositions resulted in no significant gain or loss for the Company.

**Exhibit X1**

**Restructuring, asset impairment and other non-recurring charges**

The following table provides significant components of amounts recorded in the Consolidated Statements of Income related to the Company's restructuring and asset impairment charges.

| Fiscal | 2002 | 2001 | 2000 |
|---|---|---|---|
| Provision for restructuring: | | | |
| Severance | $ 11.6 | $ 3.5 | $ 7.4 |
| Other | 4.7 | 5.2 | — |
| Impairment of long-lived assets | 129.1 | 0.7 | 1.7 |
| | 145.4 | 9.4 | 9.1 |
| Income tax benefit | (18.5) | (3.0) | (3.8) |
| | $ 126.9 | $ 6.4 | $ 5.3 |

The following table provides a rollforward of amounts included in accrued liabilities for restructuring reserves:

| Fiscal | 2002 | 2001 | 2000 |
|---|---|---|---|
| Restructuring reserve at beginning of period | $ 5.8 | $ 6.7 | $ 1.1 |
| Current year charges | 16.3 | 8.7 | 7.4 |
| Current year utilization | (7.8) | (9.6) | (1.8) |
| Restructuring reserve at end of period | $ 14.3 | $ 5.8 | $ 6.7 |

*Fiscal 2002*

During the second and third quarters of fiscal 2002, PCC recorded provisions for restructuring and impairment of long-lived assets totaling $145.4 million. The tax-effected impact of these charges totaled $126.9 million or $2.43 per share (diluted).

During the second quarter of fiscal 2002, PCC established a reserve totaling $5.6 million pursuant to restructuring plans to consolidate European valve production operations within the Fluid Management Products segment and downsize operations within the Industrial Products Segment. The reserve consisted of $2.1 million for employee severance and $3.5 million for other exit costs, including incremental costs and contractual obligations for items such as leasehold termination payments and other facility exit costs incurred as a direct result of the restructuring plans. These restructuring plans provided for termination of approximately 105 employees. As of March 31, 2002, approximately 90 percent of the planned terminations had occurred, with the remaining terminations expected by June 30, 2002. The tax-effected impact of these charges totaled $4.0 million, or $0.08 per share (diluted).

Charges totaling $34.5 million were taken in the second quarter of fiscal 2002 for impairment of long-lived assets. A $19.7 million charge provided for the write-down of the assets of an unprofitable business to net realizable value less exit costs. The business manufactured carbide products for various industrial markets and was included in the Investment Cast Products segment. Net realizable value was based on estimates of proceeds upon sale or collection of the assets. Substantially all of the assets were sold in the third quarter of fiscal 2002. The second quarter impairment charge also included $12.6 million for the write-off of a long-term note receivable, included in other assets, from a previously owned company that has declared bankruptcy. Fixed asset costs of $2.2 million were also included in the impairment charge primarily for write-off of fixed assets associated with the restructuring of European operations within the Fluid Management Products segment. The tax-effected impact of these charges totaled $24.1 million, or $0.46 per share (diluted).

During the third quarter of fiscal 2002, PCC established a reserve of $10.7 million for employee severance ($9.5 million) and other exit costs ($1.2 million) associated with downsizings within the Investment Cast Products and Forged Products segments due to expected declines in commercial

aerospace sales, continued downsizing of operations within the Industrial Products Segment and consolidation of European valve production operations within the Fluid Management Products segment. The other exit costs included lease termination costs resulting from the restructuring plans. The restructuring plan provided for terminations of approximately 900 employees, or 6 percent of the Company's

**Exhibit X1**

workforce. As of March 31, 2002, approximately 90 percent of the planned terminations had occurred, with the remaining terminations expected by September 29, 2002. The tax-effected impact of these charges totaled $7.2 million, or $0.14 per share (diluted).

Also during the third quarter of fiscal 2002, the Company incurred charges for impairment of long-lived assets totaling $94.6 million. The Company recognized a non-cash asset impairment charge of $92.4 million related to PCC Specialty Products, a division within the Industrial Products segment. This charge consisted of $86.6 million for goodwill impairment and $5.8 million for impairment of property, plant and equipment. PCC Specialty Products has experienced substantial declines in sales and operating cash flow within its threading tool and punch component businesses as a result of the prolonged and significant downturn in the machine tool market, as well as the more recent deterioration in the automotive market. Given the significant changes in business conditions, PCC performed an evaluation of the recoverability of the long-lived assets of these businesses and determined that the estimated future undiscounted cash flows of the assets were insufficient to recover their related carrying values. Pursuant to SFAS No. 121, "Accounting for the Impairment of Long-Lived Assets and for Long-Lived Assets to Be Disposed Of," an impairment charge was recorded to reduce the carrying amount of the assets to fair value based on the estimated present value of expected future cash flows of the businesses. Also included in the asset impairment charge were the write-downs of fixed assets associated with the third quarter's restructuring activity, which totaled $2.2 million. The tax-effected impact of these charges totaled $91.6 million, or $1.75 per share (diluted).

### Fiscal 2001

During the third quarter of fiscal 2001, PCC recorded pre-tax charges of $9.4 million related to restructuring activities and other non-recurring items. Reserves totaling $8.7 million were established for the write-off of the Company's investment in a joint venture in India ($4.8 million), as well as for severance costs ($3.5 million) and other exit costs ($0.4 million) associated with the closure of a small aerospace repair operation within the Investment Cast Products segment and the elimination of machining operations in Scotland as the machining operations are now being performed in a new machining plant in the Czech Republic within the Forged Products segment. As of March 31, 2002, these actions had been substantially completed as planned. In addition, asset impairment charges totaling $0.7 million were taken to write down property, plant and equipment as a result of the restructuring activities. The tax-effected impact of these charges totaled $6.4 million or $0.13 per share (diluted).

### Fiscal 2000

During the third quarter of fiscal 2000, the Company recorded pretax charges totaling $9.1 million related to restructuring activities and asset impairments. A $7.4 million reserve was established for severance associated with the consolidation and downsizing of operations within the Industrial Products segment. The restructuring efforts were substantially completed as planned in fiscal 2001. The asset impairment charges totaling $1.7 million were provided for the write-down of assets in the Industrial Products and Investment Cast Products segments, partially offset by the favorable disposition of a previous non-recurring charge. The tax-effected impact of these charges totaled $5.3 million or $0.11 per share (diluted).

### Other Income

During the fourth quarter of fiscal 2000, the Company recorded $4.2 million of other income upon termination of a portion of an interest rate hedge that was entered into in anticipation of the Company's issuance of the 8.75% Notes.

---

### Fair value of financial instruments

Cash and cash equivalents, receivables, payables, accrued liabilities and short-term borrowings are reflected in the financial statements at cost, which equals fair value because of the short-term maturity of these instruments.

The fair value of long-term debt was estimated using the Company's year-end incremental borrowing rate for similar types of borrowing arrangements. The amounts reported in the consolidated balance sheets for long-term debt approximate fair value. The fair value of the interest rate protection related to the swap underlying the term loan was $10.0 million at March 31, 2002 and $7.8 million at April 1, 2001.

### Concentration of credit risk

Approximately 52 percent of PCC's business activity in fiscal year 2002 was with companies in the aerospace industry, and 23 percent of total sales were to General Electric. Accordingly, PCC is exposed to a concentration of credit risk for this portion of receivables. The Company has long-standing relationships with its aerospace customers and management considers the credit risk to be low.

### Inventories

**Exhibit X1**

Inventories consisted of the following:

|  | March 31, 2002 | | April 1, 2001 |
|---|---|---|---|
| Finished goods | $ | 66.8 | $ 76.0 |
| Work-in-process | | 214.0 | 195.1 |
| Raw materials and supplies | | 116.1 | 87.3 |
|  | | 396.9 | 358.4 |
| LIFO Provision | | 15.7 | 4.9 |
|  | $ | 412.6 | $ 363.3 |

Approximately 50 percent of total inventories at March 31, 2002 were valued on a LIFO basis.

**Goodwill and acquired intangibles**

Goodwill and acquired intangibles consisted of the following:

|  | March 31, 2002 | | April 1, 2001 |
|---|---|---|---|
| Goodwill | $ | 1,074.3 | $ 1,152.5 |
| Acquired intangibles | | 9.9 | — |
| Accumulated amortization | | (90.2) | (78.8) |
|  | $ | 994.0 | $ 1,073.7 |

During fiscal 2002, the Company acquired $0.4 million of intangible assets with the acquisition of CW Valve Services and $9.5 million through the purchases of territory access rights and a product line. The gross carrying amount of the Company's acquired intangible assets were as follows:

|  | March 31, 2002 | | April 1, 2001 |
|---|---|---|---|
| Territory access rights | $ | 5.8 | $ — |
| Non-compete agreements | | 1.5 | — |
| Customer base | | 1.7 | — |
| Developed technology | | 0.9 | — |
|  | $ | 9.9 | $ — |

Amortization expense for acquired intangible assets in fiscal 2002 was not significant. Future amortization expense related to intangible assets acquired as of March 31, 2002 is estimated to be $0.6 million for each of the succeeding five fiscal years.

**Accrued liabilities**

Accrued liabilities consisted of the following:

|  | March 31, 2002 | | April 1, 2001 |
|---|---|---|---|
| Salaries and wages payable | $ | 91.0 | $ 87.6 |
| Other accrued liabilities | | 146.3 | 138.7 |
|  | $ | 237.3 | $ 226.3 |

**Exhibit X1**

**Financing arrangements**

Long-term debt is summarized as follows:

| | March 31, 2002 | April 1, 2001 |
|---|---|---|
| 8.75% Notes due fiscal 2005 | $   200.0 | $   200.0 |
| 6.75% Notes due fiscal 2008 | 150.0 | 150.0 |
| Term Loan, 6.9% at March 31, 2002, payable quarterly in various amounts through fiscal 2006 | 310.0 | 370.0 |
| Revolving credit facility due fiscal 2006, 2.9% at March 31, 2002 | 82.0 | 30.0 |
| Commercial paper | — | 143.3 |
| Industrial Development Revenue Bonds and other, variable interest rates, 2-4% at March 31, 2002, payable annually through fiscal 2016 | 6.2 | 6.6 |
| | 748.2 | 899.9 |
| Less: Long-term debt currently due | 51.2 | 61.4 |
| | $   697.0 | $   838.5 |

Long-term debt maturing in each of the next five fiscal years is $51.2 million in 2003, $80.3 million in 2004, $290.3 million in 2005, $172.3 million in 2006 and $0.3 million in 2007.

The Company has a bank credit agreement for $710.0 million ("Credit Agreement"). The Credit Agreement includes a $310.0 million term loan facility and a $400.0 million revolving credit facility. At March 31, 2002, $312.0 million of the Credit Agreement was unused and available for borrowing. Borrowings under both the term loan and the revolving credit facility include a margin based on the Company's credit ratings.

The Credit Agreement contains various standard financial covenants, including maintenance of minimum net worth, fixed charge coverage ratio and leverage ratio. The 6.75% Notes and 8.75% Notes also contain various standard financial covenants. The Company's debt agreements also contain cross default provisions. At March 31, 2002, the Company was in compliance with all restrictive provisions of its loan agreements.

At March 31, 2002, the Company had swapped floating rate term loan debt into fixed rate debt at 5.9%. The amount of the swap decreases as the term loan is repaid through September 2005. In connection with issuance of the 8.75% Notes, the Company hedged the underlying Treasury bond rate in June 1999 and realized a $5.6 million benefit on the hedge, which is being amortized over the life of the 8.75% Notes. The benefit resulted in an effective reduction of the coupon rate to 8.19%. An additional portion of the hedge was terminated before the bonds were sold, resulting in a $4.2 million gain, which was included in "Other Income" in the fourth quarter of fiscal 2000.

Short-term borrowings at March 31, 2002 include $150.0 million under a 364-day Credit and Security Agreement ("Receivable Facility"). The amount of borrowings allowable under the Receivable Facility is a function of the level of eligible trade accounts receivable, which cannot exceed $150.0 million. The weighted average interest rate on short-term borrowings was 2.2% at March 31, 2002 and 5.7% at April 2, 2001.

**Income taxes**

Income before provision for income taxes was:

| Fiscal | 2002 | 2001 | 2000 |
|---|---|---|---|
| Domestic | $   129.5 | $   193.3 | $   129.6 |
| Foreign | 5.5 | 15.3 | 9.0 |
| Total pretax income | $   135.0 | $   208.6 | $   138.6 |

**Exhibit X1**

The provision for income taxes consisted of the following:

| Fiscal | 2002 | 2001 | 2000 |
|---|---|---|---|
| Current taxes: | | | |
|    Federal | $ 86.5 | $ 65.4 | $ 49.8 |
|    Foreign | 5.4 | 9.8 | 9.8 |
|    State | 14.6 | 7.4 | 7.6 |
| | 106.5 | 82.6 | 67.2 |
| Change in deferred income taxes | (13.9) | 1.1 | (13.9) |
| Provision for income taxes | $ 92.6 | $ 83.7 | $ 53.3 |

United States income taxes have not been provided on undistributed earnings of international subsidiaries. The Company's intention is to reinvest these earnings and repatriate the earnings only when it is tax efficient to do so. Accordingly, the Company believes that any United States tax on repatriated earnings would be substantially offset by foreign tax credits. As of March 31, 2002, undistributed earnings of international subsidiaries were $90.4 million.

Certain acquisitions yielded nondeductible goodwill, which is reflected in the tax rate reconciliation below, and the tax impact of purchase accounting adjustments is reflected in deferred taxes.

A reconciliation of the United States federal statutory rate to the effective income tax rate follows:

| Fiscal | 2002 | 2001 | 2000 |
|---|---|---|---|
| Statutory federal rate | 35% | 35% | 35% |
| Effect of: | | | |
|    State taxes, net of federal benefit | 6 | 2 | 3 |
|    Goodwill amortization and impairment | 30 | 4 | 4 |
|    Foreign Sales Corporation tax benefit | (4) | (2) | (3) |
|    Valuation allowance | 2 | 1 | 1 |
|    Other, net | — | — | (2) |
| Effective rate | 69% | 40% | 38% |

The increase in the fiscal 2002 effective rate was due to the Company receiving no tax benefits related to the $92.1 million write-off of goodwill included in impairment of long-lived assets. Excluding the impact of the restructuring and asset impairment charges, the effective tax rate would have been 40 percent.

Deferred income taxes result from temporary differences in the recognition of income and expenses for financial and income tax reporting purposes, and differences between the fair value of assets acquired in business combinations accounted for as purchases for financial reporting purposes

and their corresponding tax bases. Deferred income taxes represent future tax benefits or costs to be recognized when those temporary differences reverse.

Significant components of the Company's deferred tax assets and liabilities were as follows:

| | March 31, 2002 | April 1, 2001 |
|---|---|---|
| Deferred tax assets arising from: | | |

**Exhibit X1**

| | | | |
|---|---|---:|---:|
| Expense accruals | $ | **62.0** $ | 51.8 |
| Post-retirement benefits other than pensions | | **20.9** | 20.9 |
| Pension accruals | | **34.4** | 25.2 |
| Tax loss carryforwards | | **2.5** | 0.2 |
| Tax credit carryforwards | | **3.2** | 3.2 |
| Inventory reserves | | **18.5** | 10.9 |
| Foreign operations | | **0.1** | 0.1 |
| Valuation allowances | | **(4.8)** | (2.3) |
| Gross deferred tax assets | | **136.8** | 110.0 |
| Deferred tax liabilities arising from: | | | |
| Depreciation/amortization | | **(43.9)** | (37.5) |
| Inventory basis differences | | **(18.0)** | (11.5) |
| Foreign operations | | **(2.8)** | (2.8) |
| Other | | **(0.8)** | (0.8) |
| Gross deferred tax liabilities | | **(65.5)** | (52.6) |
| Net deferred tax asset | $ | **71.3** $ | 57.4 |

The Company has provided valuation allowances for domestic and foreign net operating loss carryforwards to reduce the related future income tax benefits to zero.

**Earnings per share**

The Company reports earnings per share in accordance with Statement No. 128, "Earnings per Share." Basic earnings per share have been computed based on the weighted average number of common shares outstanding during the periods. Diluted earnings per share also consider common shares issuable under an employee stock purchase plan and stock option plans. Share data for fiscal 2000 have been restated for the effects of a two-for-one stock split in September 2000.

| | 2002 | | 2001 | | 2000 | |
|---|---|---|---|---|---|---|
| Fiscal | **Basic** | **Diluted** | **Basic** | **Diluted** | **Basic** | **Diluted** |
| Net income | $ **42.4** $ | **42.4** | $ 124.9 $ | 124.9 | $ 85.3 $ | 85.3 |
| Average shares outstanding | **51.6** | **51.6** | 50.0 | 50.0 | 49.0 | 49.0 |
| Common shares issuable | **—** | **0.7** | — | 0.9 | | 0.2 |
| Average shares outstanding assuming dilution | **51.6** | **52.3** | 50.0 | 50.9 | 49.0 | 49.2 |
| Net income per common share | $ **0.82** $ | **0.81** | $ 2.50 $ | 2.45 | $ 1.74 $ | 1.73 |

Stock options to purchase 1.1 million shares for fiscal 2002, 0.4 million shares for fiscal 2001 and 1.1 million shares for fiscal 2000 were not dilutive, and therefore, were not included in the computations of diluted net income per common share amounts.

---

**Pension and other postretirement benefit plans**

The Company and its subsidiaries sponsor many domestic and foreign defined benefit pension plans. Benefits provided by these plans generally are based on years of service and compensation. PCC's funding policy for the domestic plans is to satisfy the funding requirements of the Employee Retirement Income Security Act. PCC also provides postretirement medical benefits for certain eligible

**Exhibit X1**

employees who have satisfied plan eligibility provisions, which include age and/or service requirements. The following information is provided for the plans discussed above.

| Fiscal | Pension Benefits | | Other Postretirement Benefits | |
|---|---|---|---|---|
| | 2002 | 2001 | 2002 | 2001 |
| **Change in plan assets:** | | | | |
| Beginning fair value of plan assets | $ **496.9** | $ 502.7 | $ **—** | $ — |
| Actual return on plan assets | **(27.6)** | 6.9 | **—** | — |
| Business acquisition | **—** | 8.2 | **—** | — |
| Company contributions | **12.4** | 11.2 | **7.5** | 6.5 |
| Plan participants' contributions | **2.7** | 2.5 | **—** | — |
| Benefits paid | **(23.3)** | (22.4) | **(7.5)** | (6.5) |
| Exchange rate and other | **(0.2)** | (12.2) | **—** | — |
| Ending fair value of plan assets | $ **460.9** | $ 496.9 | $ **—** | $ — |
| **Change in projected benefit obligations:** | | | | |
| Beginning projected benefit obligations | $ **542.9** | $ 477.6 | $ **59.9** | $ 60.3 |
| Service cost | **21.6** | 19.4 | **0.3** | 0.3 |
| Interest cost | **37.6** | 35.2 | **4.4** | 4.7 |
| Plan participants' contributions | **2.7** | 2.5 | **—** | — |
| Amendments | **0.3** | (1.2) | **—** | — |
| Business acquisition | **—** | 9.3 | **—** | — |
| Actuarial losses | **12.1** | 34.1 | **10.6** | 1.1 |
| Benefits paid | **(23.3)** | (22.5) | **(7.5)** | (6.5) |
| Exchange rate and other | **(0.3)** | (11.5) | **—** | — |
| Ending projected benefit obligations | $ **593.6** | $ 542.9 | $ **67.7** | $ 59.9 |
| **Reconciliation to balance sheet amounts:** | | | | |
| Fair value of plan assets less than projected benefit obligations | $ **(132.7)** | $ (46.0) | $ **(67.7)** | $ (59.9) |
| Unrecognized net loss (gain) | **85.3** | 6.4 | **7.8** | (3.1) |
| Unrecognized prior service cost | **9.1** | 9.6 | **(0.5)** | (0.5) |
| Unrecognized net transition obligation | **3.7** | 3.7 | **—** | — |
| Net pre-tax amount recognized | $ **(34.6)** | $ (26.3) | $ **(60.4)** | $ (63.5) |
| **Amounts recognized in the balance sheets:** | | | | |
| Other assets | $ **32.6** | $ 28.3 | $ **—** | $ — |
| Accrued liabilities | **(8.5)** | (2.3) | **—** | — |
| Pension and postretirement benefit obligations | **(63.3)** | (52.3) | **(60.4)** | (63.5) |
| Accumulated comprehensive income | **4.6** | — | | |
| Net pre-tax amount recognized | $ **(34.6)** | $ (26.3) | $ **(60.4)** | $ (63.5) |

Other assets include $26.4 million of prepaid benefit cost and $6.2 million intangible assets.

Assets of the pension plans are invested primarily in equities and fixed income investments.

**Exhibit X1**

Included in the aggregated data in the above tables are amounts applicable to the Company's pension plans with accumulated benefit obligations in excess of plan assets. Amounts related to such plans were as follows:

| Fiscal | 2002 | 2001 |
|---|---|---|
| Projected benefit obligation | $ (100.7) | $ (51.7) |
| Accumulated benefit obligation | $ (92.4) | $ (46.9) |
| Fair value of plan assets | $ 54.0 | $ 18.4 |

The assumptions used in determining the benefit obligations in 2002 and 2001 were as follows:

| | Pension Benefits | | Other Postretirement Benefits | |
|---|---|---|---|---|
| Fiscal | 2002 | 2001 | 2002 | 2001 |
| Discount rate | 7.25% | 7.50% | 7.25% | 7.50% |
| Expected return on plan assets | 9.00% | 9.00% | — | — |
| Rate of compensation increase | 5.00% | 5.00% | — | — |

The health care cost trend rate to be used in fiscal 2003 ranges from 5% to 12% and is expected to be 5% thereafter. A one-percentage-point change in assumed health care cost trend rates would have the following effects:

| | 1 percentage point increase | 1 percentage point decrease |
|---|---|---|
| Effect on total of service and interest cost components | $ 0.4 | $ (0.3) |
| Effect on postretirement benefit obligation | $ 4.8 | $ (4.2) |

The net cost for the Company's pension plans consisted of the following components:

| Fiscal | 2002 | 2001 | 2000 |
|---|---|---|---|
| Service cost | $ 21.6 | $ 19.4 | $ 17.1 |
| Interest cost | 37.6 | 35.2 | 20.7 |
| Expected return on plan assets | (42.4) | (42.6) | (22.4) |
| Other, net | 2.2 | — | 0.4 |
| Net pension cost | $ 19.0 | $ 12.0 | $ 15.8 |

The cost of postretirement benefits other than pensions consisted of the following components:

| Fiscal | 2002 | 2001 | 2000 |
|---|---|---|---|
| Service cost | $ 0.3 | $ 0.3 | $ 0.3 |
| Interest cost | 4.4 | 4.7 | 1.4 |
| Other, net | (0.2) | (0.2) | (1.5) |
| Postretirement benefit cost | $ 4.5 | $ 4.8 | $ 0.2 |

The cost of contributions to the Company's 401(k) savings plans was $9.2 million, $8.9 million and $7.1 million in 2002, 2001 and 2000, respectively.

**Commitments and contingencies**

The Company leases certain facilities, office space and equipment under operating leases for varying periods. Future minimum rental payments under noncancelable operating leases with initial or remaining terms of one year or more at March 31, 2002 are as follows:

**Exhibit X1**

| Fiscal year | | |
|---|---|---|
| 2003 | $ | 10.7 |
| 2004 | | 9.2 |
| 2005 | | 7.1 |
| 2006 | | 5.8 |
| 2007 | | 4.7 |
| Thereafter | | 8.9 |
| | $ | 46.4 |

Total rent expense for all operating leases was $11.1 million, $9.5 million and $9.5 million for fiscal 2002, 2001 and 2000, respectively.

Various lawsuits arising during the normal course of business are pending against PCC. In the opinion of management, the outcome of these lawsuits, either individually or in the aggregate, will not have a material effect on PCC's consolidated financial position, results of operations, cash flows or business.

**Shareholders' investment**

Authorized shares of common stock without par value consisted of 300.0 million shares at March 31, 2002, April 1, 2001, and April 2, 2000. Authorized and unissued no par serial preferred stock consisted of 1.0 million shares at March 31, 2002, April 1, 2001, and April 2, 2000.

**Stock-based compensation plans**

PCC has stock incentive plans for certain officers, key salaried employees and directors. The officer and employee stock incentive plans allow for the grant of stock options, stock bonuses, stock appreciation rights, cash bonus rights and sale of restricted stock. The Compensation Committee of the Board of Directors determines awards under the officer and employee stock incentive plans. To date, all awards under the stock incentive plans have been nonqualified stock option grants. The Committee fixes the time limit within which options may be exercised and other exercise terms. In fiscal 2002, the directors' plan was amended to provide for the granting of options for 2,000 shares annually to each outside director. Option prices of the plans to date have been at the fair market value on the date of grant. Options become exercisable in installments from one to four years from the date of grant and generally expire seven to ten years from the date of grant.

Summarized information relative to the Company's stock incentive plans is as follows:

| | Option Shares | Average Price(1) |
|---|---|---|
| Outstanding at March 28, 1999 | 2,828,000 | 22.11 |
| Granted | 1,798,000 | 14.00 |
| Exercised | (104,000) | 9.23 |
| Expired or cancelled | (274,000) | 24.12 |
| Outstanding at April 2, 2000 | 4,248,000 | 18.86 |
| Granted | 1,263,000 | 34.20 |
| Exercised | (1,236,000) | 18.09 |
| Expired or cancelled | (104,000) | 22.41 |
| Outstanding at April 1, 2001 | 4,171,000 | 23.64 |
| **Granted** | **1,578,000** | **24.64** |
| **Exercised** | **(384,000)** | **19.85** |
| **Expired or cancelled** | **(355,000)** | **23.32** |
| **Outstanding at March 31, 2002** | **5,010,000** | $ **24.27** |

**Exhibit X1**

| | | |
|---|---|---|
| Exercisable at April 2, 2000 | 1,396,000 | $ 20.27 |
| Exercisable at April 1, 2001 | 1,036,000 | $ 22.32 |
| **Exercisable at March 31, 2002** | **1,663,800** | **$ 23.71** |

(1)     Weighted average exercise price.

The outstanding options for stock incentive plan shares have expiration dates ranging from fiscal 2003 to fiscal 2012. At March 31, 2002, 3,053,000 stock incentive plan shares were available for future grants.

Summarized information about stock options outstanding and exercisable at March 31, 2002, is as follows:

| | Outstanding | | | Exercisable | |
|---|---|---|---|---|---|
| **Exercise Price Range** | **Option Shares** | **Average Life(1)** | **Average Price(2)** | **Option Shares** | **Average Price(2)** |
| **Under $14.0** | 1,147,000 | 7.4 | $ 13.69 | 430,000 | $ 13.50 |
| **$14.1 to $24.0** | 903,000 | 6.3 | 22.05 | 594,000 | 22.07 |
| **$24.1 to $24.5** | 1,500,000 | 9.6 | 24.14 | — | — |
| **$24.6 to $35.0** | 406,000 | 5.7 | 30.11 | 381,000 | 29.91 |
| **Over $35.0** | 1,054,000 | 8.6 | 35.62 | 259,000 | 35.29 |
| | 5,010,000 | 8.0 | $ 24.27 | 1,664,000 | $ 23.71 |

(1)     Weighted average contractual life remaining in years.

(2)     Weighted average exercise price.

PCC also has an employee stock purchase plan whereby the Company is authorized to issue shares of common stock to its full-time employees, nearly all of whom are eligible to participate. Under the terms of the plan, employees can choose to have up to 10 percent of their annual base earnings withheld to purchase the Company's common stock. The purchase price of the stock is the lower of 85 percent of the fair market value of the stock on the date of grant or on the date purchased.

Disclosures required by Statement No. 123, "Accounting for Stock-Based Compensation," are as follows:

| Fiscal | | 2002 | | 2001 | | 2000 |
|---|---|---|---|---|---|---|
| Weighted average fair value of grants: | | | | | | |
|    Per option(1) | $ | 9.87 | $ | 12.40 | $ | 5.23 |
|    Per purchase right(1)(2) | $ | 7.90 | $ | 4.35 | $ | 3.62 |
| Valuation assumptions: | | | | | | |
|    Risk-free interest rate | | 4.9% | | 4.7% | | 6.4% |
|    Dividend yield | | 0.6% | | 0.6% | | 0.6% |
|    Volatility | | 37.8% | | 34.7% | | 32.0% |
|    Expected life (years) | | 5 | | 5 | | 5 |
| Pro forma effects: | | | | | | |
|    Net income(3) | $ | 35.4 | $ | 120.5 | $ | 81.7 |
|    Net income per common share (basic) | $ | 0.69 | $ | 2.41 | $ | 1.67 |
|    Net income per common share (diluted) | $ | 0.68 | $ | 2.37 | $ | 1.66 |

(1)     Estimated using Black-Scholes option pricing model

(2)

**Exhibit X1**

https://www.sec.gov/Archives/edgar/data/79958/000091205702023829/a2082140zex-13.htm

Purchase rights granted under employee stock purchase plan

(3)    Net income in millions

**Shareholder rights plan**

Effective December 3, 1998, PCC declared a dividend of one preferred stock purchase right for each outstanding share of common stock of the Company to shareholders of record at the close of business on December 16, 1998. Under certain conditions, each right may be exercised to purchase $^{1}/_{100}$ of a share of series A no par serial preferred stock at a purchase price of $200 per share, subject to adjustment. The rights will be exercisable only (i) if a person or group has acquired, or obtained the right to acquire, 15 percent or more of the outstanding shares of common stock, (ii) following the commencement of a tender or exchange offer that would result in a person or group beneficially owning 15 percent or more of the outstanding shares of common stock, or (iii) after the Board of Directors of PCC declares any person who owns more than 10 percent of the outstanding common stock to be an Adverse Person. Each right will entitle its holder to receive, upon exercise, common stock of the Company (or, in certain circumstances, cash, property or other securities of PCC) having a value equal to two times the exercise price of the right. If the rights become exercisable, and (i) PCC is acquired in a merger or other business combination in which PCC does not survive or in which its common stock is exchanged for stock or other securities or property, or (ii) 50 percent or more of the Company's assets or earning power is sold or transferred, each right will entitle its holder to receive, upon exercise, common stock of the acquiring company having a value equal to two times the exercise price of the right. The rights expire on December 16, 2008, and may be redeemed by PCC for $0.001 per right at any time until a determination is made that any person is an Adverse Person, or 10 days following the time that a person has acquired 15 percent or more of the outstanding common stock, or in connection with certain transactions approved by the Board of Directors. The rights do not have voting or dividend rights and, until they become exercisable, have no dilutive effect on the earnings of PCC.

**Derivatives and hedging activities**

Effective April 2, 2001, the Company adopted Statement of Financial Accounting Standards (SFAS) No. 133, "Accounting for Derivative Instruments and Hedging Activities," as amended. This standard requires that all derivative financial instruments be recorded in the financial statements and measured at fair value. Changes in the fair value of derivative financial instruments are either recognized periodically in income or shareholders' investment (as a component of accumulated other comprehensive income) depending on whether the derivative is being used to hedge changes in fair

---

value or cash flows. The adoption of SFAS No. 133 resulted in an unrecognized loss of $4.9 million as a cumulative effect adjustment of accumulated other comprehensive income relating to cash flow hedges discussed below. Of the $6.1 million loss relating to derivative activity remaining in accumulated comprehensive income at March 31, 2002, approximately $5.6 million is expected to be transferred to net earnings over the next twelve months when the forecasted transactions actually occur. No material gains or losses due to ineffectiveness were recognized in fiscal 2002.

The Company holds and issues derivative financial instruments for the purpose of hedging the risks of certain identifiable and anticipated transactions. In general, the types of risks hedged are those relating to the variability of future earnings and cash flows caused by movements in foreign currency exchange rates and changes in commodity prices and interest rates. The Company documents its risk management strategy and hedge effectiveness at the inception of and during the term of each hedge. In the normal course of business, the Company executes the following types of hedge transactions:

*Fair value hedges*

The Company has sales and purchase commitments denominated in foreign currencies. Foreign currency forward contracts are used to hedge against the risk of change in the fair value of these commitments attributable to fluctuations in exchange rates. Changes in the fair value of the derivative instrument are generally offset in the income statement by changes in the fair value of the item being hedged.

*Cash flow hedges*

The Company has variable rate debt obligations that expose the Company to interest rate risk. PCC has entered into an interest rate swap to eliminate this risk on a portion of its variable rate debt. The notional amount of the swap decreases through September 2005 as this debt is repaid. At March 31, 2002, the notional amount of the swap was $310.0 million. The notional amount represents the interest to be paid as of fiscal year end and does not represent the Company's exposure on the swap. The Company also purchases natural gas for its operations under variable price contracts. In order to hedge against increases in the price of natural gas, the Company has entered into commodity swaps for a portion of its anticipated purchases. For these cash-flow hedge transactions, changes in the fair value of the derivative instruments are reported in other comprehensive income. The gains and losses on cash flow hedge transactions that are reported

**Exhibit X1**

in other comprehensive income are reclassified to earnings in the periods in which earnings are affected by the variability of the cash flows of the hedged item. The ineffective portions of all hedges, which were not material for fiscal 2002, are recognized in current period earnings.

The Company believes that there is no significant credit risk associated with the potential failure of any counterparty to perform under the terms of any derivative financial instrument.

### Segment information

The Company's operations are classified into four reportable business segments: Investment Cast Products, Forged Products, Fluid Management Products and Industrial Products. The Company's four reportable business segments are managed separately based on fundamental differences in their operations.

#### Investment Cast Products

The Investment Cast Products segment includes PCC Structurals, PCC Airfoils and the Wyman-Gordon Aluminum Casting business. These three businesses manufacture investment castings for aircraft engine, industrial gas turbine (IGT), airframe, medical prostheses and other industrial applications.

---

#### Forged Products

The Forged Products segment comprises all of the forging businesses of Wyman-Gordon. Aerospace and IGT sales are primarily derived from the same large engine customers served by the Investment Cast Products segment, with additional aerospace sales to manufacturers of landing gear and other airframe components. The Forged Products segment also produces seamless pipe and other products for the oil and gas industry.

#### Fluid Management Products

The Fluid Management Products segment includes all of the businesses of PCC Flow Technologies. The businesses that comprise this segment manufacture an extensive range of fluid management products that include pumps for water and wastewater treatment, low-pressure sewer systems, new construction, processing, energy and other applications; and valves for oil and gas, fuel distribution, food processing, severe services and other applications.

#### Industrial Products

The Industrial Products segment includes PCC Specialty Products, J&L Fiber Services, Advanced Forming Technology (AFT) and STW Composites. PCC Specialty Products manufactures a broad range of cold-forming header and threader tools, gundrills and machines for vertical and horizontal boring, fastener production and gundrilling, principally for automotive and other machine tool applications. J&L Fiber Services produces refiner plates and screen cylinders for use in the pulp and paper industry and rebuilds refiner equipment that is used in the pulping process. AFT manufactures metal-injection-molded, metal-matrix-composite, and ThixoFormed™ components for a wide variety of applications. STW Composites designs and manufactures composite components principally for aerospace applications.

The Company evaluates performance and allocates resources based on operating income. The accounting policies of the reportable segments are the same as those described in "Summary of

---

Significant Accounting Policies." There are no material intersegment sales. Segment results are as follows:

| Fiscal | | 2002 | | 2001 | | 2000 |
|---|---|---|---|---|---|---|
| Net sales | | | | | | |
| Investment Cast Products | $ | 1,332.0 | $ | 1,187.6 | $ | 970.8 |
| Forged Products | | 697.9 | | 620.7 | | 192.1 |
| Fluid Management Products | | 361.1 | | 318.7 | | 291.6 |
| Industrial Products | | 166.4 | | 199.3 | | 219.2 |

**Exhibit X1**

| | 2002 | 2001 | 2000 |
|---|---|---|---|
| Consolidated net sales | $ 2,557.4 | $ 2,326.3 | $ 1,673.7 |
| | | | |
| Segment operating income | | | |
| Investment Cast Products | $ 248.5 | $ 213.7 | $ 161.2 |
| Forged Products | 116.7 | 96.7 | 24.4 |
| Fluid Management Products | 18.4 | 11.8 | 15.0 |
| Industrial Products | (4.5) | 1.1 | 6.6 |
| Corporate expense | (32.5) | (24.3) | (16.6) |
| | | | |
| Operating income | 346.6 | 299.0 | 190.6 |
| Restructuring and other charges | (16.3) | (8.7) | (7.4) |
| Impairment of long-lived assets | (129.1) | (0.7) | (1.7) |
| Other income | — | — | 4.2 |
| Interest expense, net | (66.2) | (81.0) | (47.1) |
| | | | |
| Consolidated income before provision for income taxes | $ 135.0 | $ 208.6 | $ 138.6 |
| | | | |
| Total assets | | | |
| Investment Cast Products | $ 578.5 | $ 607.5 | $ 569.5 |
| Forged Products | 876.5 | 781.8 | 700.6 |
| Fluid Management Products | 487.0 | 473.2 | 445.8 |
| Industrial Products | 268.6 | 372.6 | 369.4 |
| Corporate(1) | 354.3 | 337.8 | 330.4 |
| | | | |
| Consolidated total assets | $ 2,564.9 | $ 2,572.9 | $ 2,415.7 |
| | | | |
| Depreciation and amortization expense | | | |
| Investment Cast Products | $ 31.2 | $ 33.9 | $ 30.8 |
| Forged Products | 37.1 | 35.3 | 12.0 |
| Fluid Management Products | 15.0 | 14.6 | 14.2 |
| Industrial Products | 15.8 | 15.9 | 14.8 |
| Corporate | 1.6 | 2.7 | 2.4 |
| | | | |
| Consolidated depreciation and amortization expense | $ 100.7 | $ 102.4 | $ 74.2 |
| | | | |
| Capital expenditures | | | |
| Investment Cast Products | $ 58.2 | $ 29.7 | $ 23.8 |
| Forged Products | 41.6 | 36.7 | 1.3 |
| Fluid Management Products | 11.7 | 13.1 | 9.8 |
| Industrial Products | 13.6 | 10.4 | 13.8 |
| Corporate | 0.2 | 0.3 | 0.6 |
| | | | |
| Consolidated capital expenditures | $ 125.3 | $ 90.2 | $ 49.3 |

(1)    Corporate assets consist principally of accounts receivable (Precision Receivables Corp. established in fiscal 2000), cash and cash equivalents, deferred income taxes and other assets.

Sales to General Electric were 22.8 percent, 21.9 percent and 15.8 percent of total sales in fiscal 2002, 2001 and 2000, respectively, as follows:

| Fiscal | 2002 | 2001 | 2000 |
|---|---|---|---|
| Investment Cast Products | $ 359.5 | $ 268.0 | $ 193.2 |

**Exhibit X1**

| | | | | | |
|---|---|---:|---:|---:|
| Forged Products | | **221.7** | 234.7 | 66.3 |
| Fluid Management | | **3.0** | 5.8 | 3.9 |
| Industrial Products | | **—** | — | 0.2 |
| | | **$ 584.2** | $ 508.5 | $ 263.6 |

No other customer accounted for more than 10 percent of net sales.

    The Company's business is conducted on a global basis with manufacturing, service and sales undertaken in various locations throughout the world. Net sales are attributed to geographic areas based on the location of the assets producing the revenues. Long-lived assets consist of property, plant and equipment and certain other tangible long-term assets of the continuing operations. Geographic Information regarding the Company's net sales and long-lived assets is as follows:

| Fiscal | | 2002 | 2001 | 2000 |
|---|---|---:|---:|---:|
| United States | $ | **2,180.1** | $ 1,919.9 | $ 1,377.3 |
| United Kingdom | | **235.7** | 262.1 | 167.1 |
| Other countries | | **141.6** | 144.3 | 129.3 |
| Net sales | $ | **2,557.4** | $ 2,326.3 | $ 1,673.7 |
| United States | $ | **524.7** | $ 517.1 | $ 481.4 |
| United Kingdom | | **64.2** | 69.1 | 68.6 |
| Other countries | | **61.3** | 38.4 | 29.2 |
| Total tangible long-lived assets | $ | **650.2** | $ 624.6 | $ 579.2 |

## REPORT OF INDEPENDENT ACCOUNTANTS

To the Shareholders and Board of Directors of Precision Castparts Corp.:

    In our opinion, the accompanying consolidated balance sheets and the related consolidated statements of income, cash flows and shareholders' investment present fairly, in all material respects, the financial position of Precision Castparts Corp. and its subsidiaries at March 31, 2002 and April 1, 2001, and the results of their operations and their cash flows for each of the three years in the period ended March 31, 2002, in conformity with accounting principles generally accepted in the United States of America. These financial statements are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States of America, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

*PricewaterhouseCoopers LLP*
*April 29, 2002*

## REPORT OF MANAGEMENT

    The management of PCC has prepared the consolidated financial statements and related financial data contained in this Annual Report. The financial statements were prepared in accordance with generally accepted accounting principles appropriate in the circumstances and reflect judgments and estimates with appropriate consideration to materiality. Management is responsible for the integrity and objectivity of the financial statements and other financial data included in the report.

**Exhibit X1**

PCC maintains a system of internal accounting controls to provide reasonable assurance that assets are safeguarded and that transactions are properly executed and recorded. The system includes policies and procedures, internal audits and reviews by Company officers.

PricewaterhouseCoopers LLP, independent accountants, provide an objective, independent review of management's discharge of its obligation related to the fairness of reporting operating results and financial condition. PricewaterhouseCoopers LLP performs auditing procedures necessary in the circumstances to render an opinion on the financial statements contained in this report.

The Audit Committee of the Board of Directors is composed solely of outside directors. The Committee meets periodically and, when appropriate, separately with representatives of the independent accountants and the internal auditors to monitor the activities of each.


*William C. McCormick*
*Chairman and Chief Executive Officer*

*William D. Larsson*
*Senior Vice President and Chief Financial Officer*

---

## FIVE-YEAR SUMMARY OF SELECTED FINANCIAL DATA
### Precision Castparts Corp. and Subsidiaries

*(Unaudited)*
*(In millions, except employee and per share data)*

| | 2002 | 2001 | 2000 | 1999 | 1998 | 1997 |
|---|---|---|---|---|---|---|
| Net sales | $ 2,557.4 | $ 2,326.3 | $ 1,673.7 | $ 1,471.9 | $ 1,316.7 | $ 972.8 |
| Net income | $ 42.4 | $ 124.9 | $ 85.3 | $ 103.3 | $ 86.1 | $ 56.5 |
| Return on sales | 1.7% | 5.4% | 5.1% | 7.0% | 6.5% | 5.8% |
| Return on beginning shareholders' investment | 4.7% | 16.1% | 12.2% | 17.4% | 17.1% | 18.6% |
| Net income per common share (basic) | $ 0.82 | $ 2.50 | $ 1.74 | $ 2.12 | $ 1.78 | $ 1.30 |
| Net income per common share (diluted) | $ 0.81 | $ 2.45 | $ 1.73 | $ 2.11 | $ 1.77 | $ 1.29 |
| Cash dividends declared per common share | $ 0.12 | $ 0.12 | $ 0.12 | $ 0.12 | $ 0.12 | $ 0.12 |
| Average shares of common stock outstanding | 51.6 | 50.0 | 49.0 | 48.8 | 48.4 | 43.6 |
| Working capital | $ 151.4 | $ 199.6 | $ 160.4 | $ 252.3 | $ 246.0 | $ 205.2 |
| Total assets | $ 2,564.9 | $ 2,572.9 | $ 2,415.7 | $ 1,449.6 | $ 1,274.6 | $ 1,070.1 |
| Total debt | $ 901.5 | $ 1,052.7 | $ 1,068.2 | $ 425.9 | $ 372.2 | $ 300.5 |
| Total equity | $ 951.8 | $ 901.8 | $ 773.9 | $ 697.4 | $ 595.3 | $ 504.4 |
| Total debt as a percent of total debt and equity | 48.6% | 53.9% | 58.0% | 37.9% | 38.5% | 37.3% |
| Book value per share | $ 18.23 | $ 17.58 | $ 15.73 | $ 14.25 | $ 12.25 | $ 10.52 |
| Capital expenditures | $ 125.3 | $ 90.2 | $ 49.3 | $ 74.8 | $ 82.9 | $ 52.8 |
| Number of employees | 13,813 | 14,288 | 13,090 | 12,335 | 10,367 | 9,280 |
| Number of shareholders of record | 6,143 | 5,691 | 3,868 | 3,800 | 3,715 | 2,267 |

Share and per share data for fiscal years prior to 2001 have been restated for the effects of a two-for-one stock split in September 2000.

---

## QUARTERLY FINANCIAL INFORMATION
### Precision Castparts Corp. and Subsidiaries

*(Unaudited)*
*(In millions, except per share data)*

| 2002 | 1st Quarter | 2nd Quarter(2) | 3rd Quarter(3)(4) | 4th Quarter |
|---|---|---|---|---|

**Exhibit X1**

| | 1st Quarter | 2nd Quarter | 3rd Quarter | 4th Quarter |
|---|---|---|---|---|
| Net sales | $ 638.8 | $ 661.5 | $ 625.8 | $ 631.3 |
| Gross profit | $ 138.5 | $ 144.5 | $ 140.1 | $ 156.7 |
| Net income (loss) | $ 40.5 | $ 12.1 | $ (59.1) | $ 48.9 |
| Net income (loss) per common share(1): | | | | |
| Basic | $ 0.79 | $ 0.23 | $ (1.15) | $ 0.94 |
| Diluted | $ 0.77 | $ 0.23 | $ (1.15) | $ 0.93 |
| Cash dividends per share | $ 0.03 | $ 0.03 | $ 0.03 | $ 0.03 |
| Common stock prices: | | | | |
| High | $ 48.80 | $ 39.45 | $ 27.82 | $ 36.07 |
| Low | $ 32.00 | $ 18.30 | $ 20.88 | $ 26.29 |
| End | $ 37.42 | $ 22.20 | $ 27.82 | $ 35.41 |

| 2001 | 1st Quarter | 2nd Quarter | 3rd Quarter(5) | 4th Quarter |
|---|---|---|---|---|
| Net sales | $ 549.5 | $ 566.4 | $ 580.4 | $ 630.0 |
| Gross profit | $ 121.9 | $ 124.5 | $ 127.4 | $ 142.7 |
| Net income | $ 28.3 | $ 30.8 | $ 26.4 | $ 39.4 |
| Net income per common share(1)(6): | | | | |
| Basic | $ 0.57 | $ 0.62 | $ 0.53 | $ 0.77 |
| Diluted | $ 0.57 | $ 0.61 | $ 0.51 | $ 0.75 |
| Cash dividends per share(6) | $ 0.03 | $ 0.03 | $ 0.03 | $ 0.03 |
| Common stock prices(6): | | | | |
| High | $ 25.66 | $ 41.59 | $ 45.56 | $ 42.50 |
| Low | $ 18.16 | $ 22.31 | $ 33.10 | $ 29.38 |
| End | $ 22.63 | $ 38.38 | $ 42.06 | $ 33.05 |

(1) Net income per common share for each quarter is computed using the weighted-average number of shares outstanding during that quarter, while net income per share for the full year is computed using the weighted-average number of shares outstanding during the year. Thus, the sum of the four quarters' net income per common share does not equal the full-year net income per common share.

(2) During the second quarter of fiscal 2002, the Company recorded charges related to restructuring activities and impairment of long-lived assets. These charges principally provided for the exit of a business, write off of a note receivable and lease termination costs, severances and asset write-downs associated with consolidation and downsizing of operations within two of the Company's business segments.

(3) During the third quarter of fiscal 2002, the Company recorded charges related to restructuring activities. These charges principally provided for severance costs to reduce operations impacted by the downturn in the commercial aerospace market, additional costs associated with the consolidation of European operations within the Fluid Management Products segment and severance costs to reduce operations within the Industrial Products segment.

(4) During the third quarter of fiscal 2002, the Company recorded impairment charges related to the write-down of long-lived assets (primarily goodwill) of several operations within the Industrial Products segment. The impairment charges were taken pursuant to Statement of Financial Accounting Standards No. 121, "Accounting for the Impairment of Long-Lived Assets and for Long-Lived Assets to be Disposed Of."

(5) During the third quarter of fiscal 2001, the Company recorded charges related to restructuring activities and impairment of long-lived assets. These charges principally provided for severance costs and the write-off of an international joint venture.

(6) Net income per common share, cash dividends per share and common stock prices for all periods prior to the second quarter of fiscal 2001 have been restated to reflect the two-for-one stock split effective in September 2000.

QuickLinks

Exhibit X1

EXHIBIT 13

CONSOLIDATED STATEMENTS OF INCOME PRECISION CASTPARTS CORP. AND SUBSIDIARIES
CONSOLIDATED BALANCE SHEETS PRECISION CASTPARTS CORP. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF CASH FLOWS PRECISION CASTPARTS CORP. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF SHAREHOLDERS' INVESTMENT PRECISION CASTPARTS CORP. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS Precision Castparts Corp. and Subsidiaries
REPORT OF INDEPENDENT ACCOUNTANTS
REPORT OF MANAGEMENT
FIVE-YEAR SUMMARY OF SELECTED FINANCIAL DATA Precision Castparts Corp. and Subsidiaries
QUARTERLY FINANCIAL INFORMATION Precision Castparts Corp. and Subsidiaries

**Exhibit X1**