Joel A. Mullin, OSB #862533
joel.mullin@stoel.com
Brad S. Daniels, OSB #025178
brad.daniels@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205
(503) 224-3380

Robert H. Baron (admitted *pro hac vice*)
rbaron@cravath.com
Omid H. Nasab (admitted *pro hac vice*)
onasab@cravath.com
Justin C. Clarke (admitted *pro hac vice*)
jcclarke@cravath.com
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, NY 10019-7475
(212) 474-1000

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| NECA-IBEW PENSION TRUST FUND (THE DECATUR PLAN), et al., Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>- against -<br><br>PRECISION CASTPARTS CORP., et al.,<br><br>Defendants. | Case No. 3:16-cv-01756-YY<br><br>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON DAMAGES AND LOSS CAUSATION**<br><br>[PUBLIC REDACTED VERSION]<br><br>(Request for Oral Argument) |

## LOCAL CIVIL RULE 7-1(A) CERTIFICATION

In compliance with Local Civil Rule 7-1(a), attorneys for Defendants made a good faith effort and were unable to resolve the disputed matters through a telephone conference with attorneys for Plaintiffs.

## MOTION

Pursuant to Federal Rule of Civil Procedure 56, Defendants Precision Castparts Corp. ("PCC" or the "Company") and Mark Donegan, Don R. Graber, Lester L. Lyles, Ulrich Schmidt, Richard L. Wambold and Timothy A. Wicks (the "Director Defendants", and, together with PCC, the "Defendants") respectfully move the Court for an order awarding summary judgment in favor of Defendants on the issue of loss causation and damages. This motion is supported by the following memorandum of law and the accompanying declaration of Omid H. Nasab.

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ............................................................................................ iii

TABLE OF ABBREVIATIONS ...................................................................................... iv

MEMORANDUM OF LAW ..............................................................................................1

PRELIMINARY STATEMENT .........................................................................................1

STATEMENT OF FACTS ..................................................................................................3

ARGUMENT .....................................................................................................................10

I.    Plaintiffs Offer No Evidence of the Value of Their Shares "But For" the Alleged
      Wrongdoing. .............................................................................................................14

II.   Plaintiffs' Section 20 Claim Falls With Their Section 14 Claim......................................22

CONCLUSION..................................................................................................................22

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Basic, Inc. v. Levinson*, 485 U.S. 224 (1988)...............................................................................4

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...........................................................................10

*Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005).................................................................10, 15

*Gray v. Wesco Aircraft Holdings, Inc.*, No. 19-CV-8528, 2020 WL 1904019
    (S.D.N.Y. Apr. 16, 2020) ................................................................................................. passim

*In re GTx, Inc. Shareholders Litig.*, No. 19 CIV. 3239, 2020 WL 3439356
    (S.D.N.Y. June 23, 2020)..........................................................................................................12

*In re Ocera Therapeutics, Inc. Sec. Litig.*, 806 F. App'x. 603 (9th Cir. 2020) .............................12

*In re Real Estate Assocs. Ltd. P'ship Litig.*, 223 F. Supp. 2d 1142 (C.D. Cal.
    2002) .........................................................................................................................................11

*Mack v. Resolute Energy Corp.*, No. CV 19-77, 2020 WL 1286175 (D. Del. Mar.
    18, 2020) ................................................................................................................... passim

*Mills v. Elec. Auto-Lite Co.*, 552 F.2d 1239 (7th Cir. 1977).......................................................20

*New York City Emps.' Ret. Sys. v. Jobs*, 593 F.3d 1018 (9th Cir. 2010) .....................................10

*Steiner Corp. v. Benninghoff*, 5 F. Supp. 2d 1117 (D. Nev. 1998) ..............................................19

*Tracinda Corp. v. DaimlerChrysler AG (In re DaimlerChrysler AG Sec. Litig.)*,
    294 F. Supp. 2d 616 (D. Del. 2003)..........................................................................................11

*Trahan v. Interactive Intel. Grp., Inc.*, 308 F. Supp. 3d 977 (S.D. Ind. 2018) .......................10, 13

**Statutes & Rules**

Exchange Act Section 14(a), 15 U.S.C. § 78n(a) .............................................................10, 11, 20

Exchange Act Section 20(a), 15 U.S.C. § 78t(a) .........................................................................22

Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b)(4)................................10

## TABLE OF ABBREVIATIONS

| Ex. __ | Exhibits attached to the Declaration of Omid H. Nasab, filed concurrently herewith | |
|---|---|---|
| PCC | Defendant Precision Castparts Corp. | |
| _/_/_ Board Minutes | Minutes of Meeting of Board of Directors of PCC | Ex. _ |
| _/_/_ CS Pres. | Credit Suisse Presentation from the date in question | Ex. _ |
| _/_/_ PCC Form __ | PCC's [Form 8-K or 10-K] filed with the SEC | Ex. _ |
| 7/21/15 Value Sensitivities | Document titled "Project Spring Value Sensitivities", dated July 21, 2015 | Ex. T2 |
| 8/10/20 BH Form 10-Q | Berkshire Hathaway Inc.'s Quarterly Report (Form 10-Q) filed with the SEC on August 10, 2020 | Ex. J2 |
| Morris Rep. | Plaintiffs' Expert Report of Matthew Morris, March 13, 2020 | Ex. Q |
| Morris Reply | Plaintiffs' Reply Expert Report of Matthew Morris, June 26, 2020 | Ex. X |
| Proxy | PCC's Definitive Proxy Statement (Schedule 14A), filed with the SEC on October 13, 2015 | Ex. D2 |
| Ruback Rep. | Defendants' Expert Report of Richard S. Ruback, May 15, 2020 | Ex. S |
| SAC | Second Amended Class Action Allegation Complaint, January 27, 2020 (Dkt. 122) | |
| Scott Rep. | Defendants' Expert Report of Douglas C. Scott, May 15, 2020 | Ex. U |
| Scott Sur. Rep. | Defendants' Expert Surrebuttal Report of Douglas C. Scott, September 14, 2020 | Ex. A1 |
| Stowell Rep. | Defendants' Expert Report of David P. Stowell, May 15, 2020 | Ex. T |

## MEMORANDUM OF LAW

Defendants respectfully submit this memorandum of law in support of their motion for summary judgment on the issues of loss causation and damages.

## PRELIMINARY STATEMENT

Plaintiffs are former shareholders of PCC who claim they were damaged when Berkshire Hathaway Inc. ("Berkshire") acquired their shares as part of a complete acquisition of PCC (the "Merger").[1]  Pursuant to the Merger, which was approved by a vote of PCC's shareholders, Plaintiffs received a cash payment of $235 per share.  This was a 21% (or $41 per share) premium above the $194 per share price at which PCC stock traded on the New York Stock Exchange just prior to announcement of the Merger agreement (the "Announcement"). Plaintiffs now claim that they were shortchanged because their shares were more valuable than $235 per share.  According to Plaintiffs' theory, had the proxy solicitation disclosed additional information about PCC's plans to continue making acquisitions, PCC's shareholders would not have been misled into accepting the Merger price of $235 per share and would instead have voted down the Merger and held on to their shares.  Plaintiffs bring claims pursuant to Sections 14 and 20 of the Securities Exchange Act and seek to recover the difference between what they actually received ($235 per share) and an amount their retained expert says he believes would have been "fair" (either $247 or $251 per share) had PCC's shareholders voted down the Merger.

---

[1] During merger negotiations, Credit Suisse and PCC referred to Berkshire and PCC as "Baltic" and "Pacific", respectively, and the potential transaction between the two as "Project Spring".  (Hagel Tr. 114:2-116:1 (Ex. I1).)  The code name "Project Spring" was also a name used internally by PCC to refer to internal financial analyses that the Company was performing starting in the Spring of 2015.  (*Id.*)

Page 1 –   DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON DAMAGES AND LOSS CAUSATION

Plaintiffs cannot prevail on these claims because Plaintiffs have no evidence of loss causation or damages as required by the federal securities laws. To make such showings, Plaintiffs would need evidence that the Merger caused Plaintiffs to suffer economic damage in the form of an out-of-pocket loss—a difference between the price they received for their shares and the price they would have received in the absence of wrongdoing. But it is beyond dispute that Plaintiffs received *more* in the Merger than they would or could have received elsewhere. There was no other bidder for PCC as a whole. And the market price of PCC's shares was just $194 per share prior to the Announcement. Plaintiffs do not identify anyone (other than Berkshire) who was willing to pay more than the market price for their PCC shares, much less someone who was willing to pay more than $235 per share. (Even after the Announcement, PCC's shares traded continuously below $235 per share until the Merger was consummated.) There is no evidence that, had PCC's shareholders rejected the Merger and forfeited their 21% premium, PCC's shares would have traded for any more than their pre-Announcement price of $194 per share and certainly not for more than $235 per share; to the contrary, uncontroverted evidence shows that upon rejection of the Merger, PCC's shares would have reverted to their pre-Announcement price, or to an even lower price. Plaintiffs therefore cannot show any out-of-pocket loss, and without evidence of such loss, Plaintiffs' claims fail.

Finally, it is no help to Plaintiffs that they have retained an expert, Mr. Morris, to offer a subjective opinion that the "fair" value of PCC *as a whole company* was the equivalent of $247 or $251 per share. Even ignoring its serious flaws, Mr. Morris' analysis of "the Company's enterprise value on a financial control basis" answers an irrelevant question. There is no evidence that any member of the putative class owned or could sell PCC on a "financial control basis". Nor is there any evidence of any other bidder who sought to own PCC on a financial

Page 2 –    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON DAMAGES AND
            LOSS CAUSATION

control basis—not at $235 per share and certainly not at $247 or $251 per share. Thus, in the

alternative scenario in which PCC's shareholders had rejected the Merger and spurned the 21%

premium Berkshire was offering, the price of Plaintiffs' shares would have been the market

price, which was $194 prior to the announcement of the Merger. As Mr. Morris admitted at his

deposition, he did not analyze what the market price would have been if the Merger had been

rejected:

> "Q. Okay. And have you done any analysis of what -- of where Precision
> Castparts shares would trade, in the event that the transaction was voted down?
>
> A. No, I have not. I don't know that it was relevant to what I was asked to do."
> (Morris Tr. 115:16-21 (Ex. W1).)

Because Mr. Morris cannot (and does not) say what he believes the market price

would have been had the Merger been rejected (including that it would have been anything other

than the pre-Announcement price of $194 per share), his analysis is irrelevant. And because

Plaintiffs have no other evidence of any out-of-pocket losses resulting from Defendants' alleged

misconduct, Defendants are entitled to summary judgment.

## STATEMENT OF FACTS

PCC is an Oregon corporation that produces investment castings, forgings,

fasteners and metals for aerospace, power and general industrial customers. PCC experienced a

period of rapid growth in the decade before its 2015 agreement to be purchased by Berkshire.

During Mark Donegan's tenure as CEO of PCC—beginning in August 2002—the Company had

a successful track record characterized by high-growth rates relative to its peers and the

successful execution of an M&A strategy. (5/28/15 PCC Form 10-K at 22 (Ex. A2).) Between

2002 and 2015, PCC's net income grew from $42.4 million (06/11/2002 PCC Form 10-K,

Exhibit 13 at 1 (Ex. X1)) to $1.533 billion (5/28/15 PCC Form 10-K at 21 (Ex. A2)), driving

Page 3 –    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON DAMAGES AND
            LOSS CAUSATION

PCC's stock price to an all-time high of $274 per share by early 2014 (7/21/15 CS Pres. at 4 (Ex. H)).

Notwithstanding this period of accelerated growth, by 2015, PCC had begun facing headwinds. (*See* Scott Rep. ¶ 29 (Ex. U).) This was attributable to many factors. The oil and gas industry experienced a steep decline, which impacted PCC's oil and gas related business lines and caused revenues to slow. (Hagel Tr. 80:2-7 (Ex. I1).) The Company had experienced a customer destocking, aerospace programs were starting to slow down and the Chinese economy was suffering. (*Id.* at 80:7-17.) Concerns about slowing growth rates and an M&A pipeline that "was leaking some oil" (Graber Tr. 168:7 (Ex. C1)) drove a rotation in PCC's stockholder base, with "growth" investors, who were traditionally willing to pay higher price-to-earnings multiples, exiting the stock and "value" investors taking their place. (*Id.* at 56:22-57:1, 117:11-13; ███████████████████████████████████ Between May and October 2015, PCC reported three successive quarters of negative sales growth compared with the same quarters in the prior fiscal year. (5/13/2015 PCC Form 8-K, Exhibit 99.1 (Ex. Z1); 7/28/2015 PCC Form 8-K, Exhibit 99.1 (Ex. B2); 10/22/2015 PCC Form 8-K, Exhibit 99.1 (Ex. E2).)

## I.    PCC'S $194 MARKET PRICE PRIOR TO THE MERGER REFLECTED ALL PUBLICLY AVAILABLE INFORMATION CONCERNING THE COMPANY.

PCC's common stock traded at $194 per share on the last trading day before the Announcement. Federal securities law recognizes that "the market price of shares traded on well-developed markets reflects all publicly available information" about the company. *Basic, Inc. v. Levinson*, 485 U.S. 224, 246 (1988). This was true of PCC's shares, which traded on the New York Stock Exchange, the largest and most liquid U.S. stock exchange. (Proxy at 1 (Ex. D2); Ruback Rep. ¶ 129 (Ex. S).) PCC's stock exhibited all of the hallmarks of a stock

Page 4 –    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON DAMAGES AND LOSS CAUSATION

trading in an efficient market, including high trading volumes, coverage by numerous analysts, the existence of numerous market makers, and a "cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price". (Ruback Rep. ¶ 125 (internal quotation marks omitted) (Ex. S).)

In the year before the announcement of the Merger, PCC repeatedly informed its shareholders that the Company was continuing to pursue acquisition opportunities.  (*See, e.g.*, 5/13/15 Q4 2015 Earnings Tr. at 8-9 (Ex. N) ("[W]e'll continue to execute our acquisition strategy that we have established and have been executing over the last 12 years. . . .  We will continue to be a disciplined buyer, but we are targeting $3 billion to $5 billion over the next two years.").)  Plaintiffs themselves contend that prior to the Announcement PCC "repeatedly assured its investors that the Company would continue to complete acquisitions, as they were an integral part of the Company's business plan, and that the Company's shareholders could expect to continue to derive value from the Company's acquisition strategy in the upcoming years." (SAC ¶ 54 (Dkt. 122).)

Thus, as of August 7, 2015—the eve of the Announcement—the market was fully aware of PCC's acquisition strategy.  Based on that, and all other available information, the market valued PCC common stock at $193.88 per share.  (Ruback Rep. ¶ 131 (Ex. S).)

## II.    BERKSHIRE HATHAWAY OFFERS TO BUY PCC FOR A 21% PREMIUM.

In early July 2015, Berkshire offered to purchase PCC at a price of $235 per share, all in cash.  (Proxy at 25 (Ex. D2).)  The PCC Board of Directors (the "Board") met on July 11, 2015 and July 21, 2015 to discuss the offer.  (*Id.*)  At the Board's instruction, Mr. Donegan met with Mr. Buffett on July 25, 2015 in an effort to convince him to increase his offer. (*Id.*)  Mr. Buffett was "firm in their meeting that his offer of $235 per share in cash was his final

offer, having stated that it represented an EBITDA multiple well in excess of any acquisition [Berkshire] had undertaken in the past, and that he had no room to move from there".  (7/30/15 Board Minutes at 1 (Ex. D).)

    Following that meeting between Mr. Donegan and Mr. Buffett, the Board met and discussed "potential other acquirors of the Company, and the likelihood that any of them would be in a position to undertake an acquisition the size of the Company".  (*Id.* at 3.)  They recognized that any other realistic potential acquiror in the aerospace industry would have a "degree of 'channel conflict' with other customers of the Company who are competitors of the potential acquiror, [which] would likely cause such potential acquirors to be less interested in pursuing an acquisition of the Company".[2]  (7/30/15 Board Minutes at 3 (Ex. D).)  The Board also concluded that a bid from a private equity or foreign buyer was unlikely.  (*Id.*)

    While the Board considered conducting outreach to solicit other potential acquirors, they ultimately decided the risks outweighed the benefits of such an approach in light of the lack of potential acquirors who would not face regulatory hurdles, the risk of a leak and the risk that Berkshire would withdraw its proposal.  (*Id.*)  The Board determined that it was in the best interests of PCC and its shareholders to pursue the transaction with Berkshire "while retaining the ability to pursue and accept a superior proposal following announcement of [the]

---

  [2]  Board member Ulrich Schmidt testified the Board believed "that it was unlikely that another buyer at a higher price would materialize, given . . . it was out of the reach of private equity, given that there were very few really large players that had the wherewithal to do a deal of this size, and that . . . the people that might have the wherewithal to – to do it were primarily – were largely customers of – of PCC".  (Schmidt Tr. 127:3-129:1 (Ex. K1).)  *See also* Wicks Tr. 93:19-25 (Ex. D1) (testifying "there would be very few buyers who could acquire the company at the valuation being offered by Berkshire Hathaway"); Graber Tr. 184:5-22 (Ex. C1) (testifying there were "only a few companies that could be acquirers of PCC because of our market cap and because of the conflict issues"); Lipsky Tr. 44:10-47:13 (Ex. G1); Lodge Tr. 128:6-130:9 (Ex. F1).

Page 6 –  DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON DAMAGES AND
      LOSS CAUSATION

transaction". (*Id.* at 4.) The Board specifically sought to negotiate a lower termination fee payable to Berkshire if the Company were to receive a higher offer from an alternative bidder and, in response, terminate the agreed-upon Merger with Berkshire. (*Id.* at 3; 8/4/15 Board Minutes at 2 (Ex. E).) On August 7, Mr. Donegan met with Mr. Buffett in Omaha, Nebraska to negotiate the amount of the termination fee. Mr. Donegan noted that the Board would not agree to proceed with a $1 billion termination fee as Berkshire originally proposed, and Mr. Buffett ultimately agreed to a below-market termination fee of $600 million, or approximately 1.9% of the Company's equity value. (Proxy at 27 (Ex. D2); Wicks Tr. 93:2-95:21 (Ex. D1) (testifying the termination fee was "below market"); Graber Tr. 194:4-12 (Ex. C1) (same).)

The Board unanimously approved the final merger agreement (the "Merger Agreement") on August 8, 2015, and the transaction was announced on August 10, 2015. (Proxy at 27 (Ex. D2).) The $235 per share price represented a 21% premium over PCC's common stock closing price of $193.88 the trading day before the announcement of the Merger, August 7, 2015, and a 21% premium over PCC's 1-week average and 1-month average common stock price prior to the announcement of the transaction. (Ruback Rep. ¶ 132 (Ex. S); 8/8/15 CS Pres. at 1 (Ex. I).) The Berkshire offer additionally reflected an EV/EBITDA multiple of 12.3x, which was higher than any Berkshire had paid for its past acquisitions. (8/8/15 CS Pres. at 1 (Ex. I); 7/30/15 Board Minutes at 1 (Ex. D).)

## III.    NO OTHER BUYERS COME FORWARD.

After the Merger was announced, no alternative buyers stepped forward with potential offers, or even expressed any interest in a potential offer. (*See* Lodge Tr. 128:6-130:9 (Ex. F1); *see also* 8/11/15 Board Minutes at 1 (Ex. F).) That was not surprising because, as PCC board member Rick Schmidt explained, "it was unlikely that another buyer at a higher price

Page 7 –    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON DAMAGES AND
            LOSS CAUSATION

would materialize, . . . given, again, it was out of the reach of private equity, given that there were very few really large players that had the wherewithal to do a deal of this size, and that . . . the people that might have the wherewithal to [do so] . . . were largely customers of -- of PCC". (Schmidt Tr. 127:3-129:1 (Ex. K1).)

The absence of any alternative bidder was further confirmed by PCC's post-Announcement market price.  On August 10, 2015, PCC's stock price closed at $230.92 per share, an increase of 19.10% from the prior trading day close of $193.88.  (Stowell Rep., Exhibit 3A (Ex. T).)  Between that date and the date the Merger closed, the market price for PCC stock never exceeded $235.  (*Id*.)  The highest price at which the stock traded during that period was $234.95 per share on the day of the closing.  (*Id*.)  As explained by Defendants' expert Richard S. Ruback, "[t]he fact that PCC's post-announcement stock price was not higher than $235 in the approximately six-month period between the announcement of the Transaction on August 10, 2015 and [the closing on] January 29, 2016 suggests that the stock market did not, at any point, expect another bidder to bid higher than $235."  (Ruback Rep. ¶ 137 (Ex. S).)

## IV.    PCC'S PEERS EXPERIENCE A MARKET DOWNTURN.

Following the Announcement, PCC's peers in the aerospace and metals industries experienced a significant market downturn. ████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

███████████████████████████████

███████████████████████████████

Page 8 –    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON DAMAGES AND
LOSS CAUSATION

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████

## V.    THE MERGER IS APPROVED.

On October 13, 2015, PCC issued its Definitive Proxy Statement (the "Proxy"), recommending that its stockholders vote to approve the Merger.  At the shareholder vote on November 19, 2015, over 83% of shares were voted in favor of the Merger (11/19/15 PCC Form 8-K (Ex. G2)), and the transaction closed on January 29, 2016 (2/4/16 PCC Form 8-K (Ex. H2)).

In the years since the Merger closed, the headwinds the Company was facing in 2015 have persisted.  PCC has significantly *underperformed* the Company Forecasts that PCC included in the Proxy as "management's most up-to-date and accurate" in every year since the Merger closed.  (Hagel Decl. ¶ 22.)  On August 8, 2020, Berkshire announced a $9.8 billion writedown of goodwill and certain identifiable intangible assets in connection with its acquisition of PCC.  (8/10/20 BH Form 10-Q at 15, 43 (Ex. J2).)  Goodwill refers to the difference between the amount a company pays for a set of assets and the book value of those assets.  (Scott Sur. Rep. ¶ 16 (Ex. A1).)  "If the fair value of the asset drops below the book value, a goodwill impairment is taken."  (*Id*.)  "[W]hen a company records a goodwill impairment, it is telling the market that the value of the acquired assets has fallen below what the company paid for them."  (*Id.*)  The writedown by Berkshire represented 30% of the total deal size, or a reduction of $71.23 per share against the value Berkshire paid for PCC.  (*Id.* ¶¶ 16-17.)

Page 9 –    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON DAMAGES AND
LOSS CAUSATION

# ARGUMENT

On summary judgment, the moving party is "entitled to a judgment as a matter of law" where "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof". *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

A Section 14 plaintiff must prove the elements of loss causation and damages. This requires "proving that the act or omission of the defendant alleged to violate [Section 14] caused the loss for which the plaintiff seeks to recover damages". 15 U.S.C. § 78u-4(b)(4); *see New York City Emps.' Ret. Sys. v. Jobs*, 593 F.3d 1018, 1023 (9th Cir. 2010) ("In well-pleaded § 14(a) claims, loss causation connects the proxy misstatements with an actual economic harm."), *overruled on other grounds by Lacey v. Maricopa Cty.*, 693 F.3d 896 (9th Cir. 2012). It is insufficient for a plaintiff merely to prove that a misrepresentation affected the price of a transaction, because an affected price "will not itself constitute or proximately cause the relevant economic loss" and a plaintiff "must prove that the defendant's fraud caused an economic loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 338, 342 (2005).

For this reason, in a Section 14(a) case, "a plaintiff cannot say that the merger consideration should have been greater than it was, and that shortfall is the measure of the harm, because to do so then would mean that it was not the material omission that caused the harm, but that the failure [] to negotiate a better deal was the cause of the harm." *Mack v. Resolute Energy Corp.*, No. CV 19-77, 2020 WL 1286175, at *11 (D. Del. Mar. 18, 2020); *Trahan v. Interactive Intel. Grp., Inc.*, 308 F. Supp. 3d 977, 1000 (S.D. Ind. 2018) ("*Dura Pharmaceuticals* teaches that Trahan's complaint fails to allege loss causation simply by pleading that the share price of $60.50 per share of Interactive stock on the date of sale was depressed because of an actionable

Page 10 –    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON DAMAGES AND LOSS CAUSATION

misrepresentation, that is, by pleading that Interactive shareholders were induced to approve the Merger at that price by an actionable misrepresentation.").  Section 14 of the Securities Exchange Act is not a federal appraisal statute.  Even where a plaintiff might succeed in establishing an entitlement to relief under a state law appraisal statute, that does *not* mean it has suffered economic loss under the securities laws.  *Mack*, 2020 WL 1286175, at *13 n.7 (while plaintiffs suffered no economic loss under the securities laws, "Plaintiffs do not find themselves entirely without recourse.  Under Delaware law, there is an appraisal rights procedure for determining the true value of shares.").

The generally accepted measure of economic loss in a Section 14 case is "out-of-pocket" damages.  *In re Real Estate Assocs. Ltd. P'ship Litig.*, 223 F. Supp. 2d 1142, 1152 n.9 (C.D. Cal. 2002); *Tracinda Corp. v. DaimlerChrysler AG (In re DaimlerChrysler AG Sec. Litig.)*, 294 F. Supp. 2d 616, 626 (D. Del. 2003).  "[O]ut-of-pocket damages [is] defined as the difference between the price paid for the security and its true value absent the fraud on the date of the transaction."  *In re Real Estate Assocs.*, 223 F. Supp. 2d at 1152 n.9.  Proving out-of-pocket damages requires a comparison between the value plaintiffs received in the transaction and the alternative value plaintiffs would have been able to realize "but for" the alleged wrongdoing.  *Mack*, 2020 WL 1286175, at *10 ("As a general matter, loss causation requires some comparison between what did happen and what would have happened *but for* the alleged wrong." (emphasis added)); *Gray v. Wesco Aircraft Holdings, Inc.*, No. 19-CV-8528, 2020 WL 1904019, at *27 (S.D.N.Y. Apr. 16, 2020) ("[W]hat is fatal to Plaintiff's claim is the failure to allege facts plausibly establishing that the foregone alternative—an independent [company]— would have created more shareholder value than the . . . Merger").

Page 11 –   DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON DAMAGES AND
              LOSS CAUSATION

Where, as here, "Plaintiffs' theory is . . . that if the material omissions had not occurred, the shareholders would have voted the merger down" and "retained their [] stock", plaintiffs will have out-of-pocket damages only if they can show that the value of their retained shares would have been greater than the merger consideration (here, $235 per share). *Mack*, 2020 WL 1286175, at *10. For these purposes, it is insufficient "to speculate that at some undetermined time in the future, the stock would appreciate enough to exceed what was given in the merger", *id.* at *11, nor is it sufficient "to recover damages on the assumption that had the Company remained independent, it would have achieved the results reflected in" management's projections, *Gray*, 2020 WL 1904019, at *27. Courts both within and outside the Ninth Circuit have repeatedly rejected efforts to establish economic loss on the basis of hypothetical or subjective valuations that ignore actual market prices. *See In re Ocera Therapeutics, Inc. Sec. Litig.*, 806 F. App'x. 603 (9th Cir. 2020) (rejecting economic loss allegations based on opinions of market analysts and undisclosed management projections because "the actual market price of [the defendant company's] shares on the date of the entry into the merger agreements" was below the merger consideration); *In re GTx, Inc. Shareholders Litig.*, No. 19 CIV. 3239, 2020 WL 3439356, at *5 (S.D.N.Y. June 23, 2020) ("To permit Plaintiffs to recover on the assumption that had the [c]ompany remained independent, [it] would have achieved a hypothetically higher stock value, would improperly result in the windfall damages prohibited by Second Circuit precedent." (internal quotation marks omitted)); *Gray*, 2020 WL 1904019, at *26 (rejecting plaintiff's "conclusory assertion that his 'shares were worth significantly more than the Merger Consideration' . . . based on the fact that the 'Initial Management Projections indicated that stockholders' shares were worth [more than the deal consideration], and the prices analysts indicated they believed would be warranted"); *Mack*, 2020 WL 1286175, at *10 (rejecting theory

Page 12 –    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON DAMAGES AND
LOSS CAUSATION

of economic harm where "Plaintiffs allege, generally, that the shares were undervalued, [but] they make no statement about the value of Resolute stock prior to the announcement of the merger, nor do they offer any facts or theories about what the value of Resolute stock might have been in any reasonable period after the announcement, had the merger not taken place"); *Trahan*, 308 F. Supp. 3d at 1000 (rejecting economic loss theory that "depends on the marketplace eventually valuing [the defendant company's stock] at higher than [the deal consideration] at some indeterminate future date").

> Rather, where, as here, there was no competing bidder offering a greater premium over the market trading price, the value of plaintiffs' retained shares is the price at which the shares would have traded in the market absent the merger. *Mack*, 2020 WL 1286175, at *13 ("Under *Dura*, economic loss . . . must mean not some hypothetical loss between the true value post-merger, or even the day of the merger, and the merger consideration, but the difference compared to *what shares would have actually been trading for* in the absence of the merger." (emphasis added)); *see also Gray*, 2020 WL 1904019, at *28 ("There is no allegation that [defendant] Wesco traded in an inefficient market or that the stock-market-value of Wesco was otherwise distorted leading up to the merger. Thus there is no reason to doubt that that value— and not the fictional value Plaintiff ascribes to Wesco stock in the complaint—represented the true alternative to the merger consideration."). Ultimately, plaintiffs must show that following their rejection of the merger, the market price of their shares would have exceeded the merger consideration. This is a difficult showing because "the merger consideration is usually going to be greater than the market value or actual value of the shares without consideration of the merger. . . . because of the so-called 'merger premium.'" *Mack*, 2020 WL 1286175, at *11.

Page 13 –  DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON DAMAGES AND
            LOSS CAUSATION

## I.    PLAINTIFFS OFFER NO EVIDENCE OF THE VALUE OF THEIR SHARES "BUT FOR" THE ALLEGED WRONGDOING.

Plaintiffs in this case are shareholders who owned PCC stock at the time of the Merger.  They allege that the Proxy "misrepresented and omitted material information about the Company's business plans and intrinsic value, which misled PCC's public shareholders into voting in favor of the Merger without material information regarding the critical decision they faced."  (SAC ¶ 253 (Dkt. 122).)  What Plaintiffs do not allege—and what they have utterly failed to prove—is that they actually could have realized more value in the absence of the Merger than the $235 per share they received as a result of it.  That is fatal to their claim.

### A.    There Is No Evidence of any Alternative Acquiror.

As noted above, there is no evidence that any buyer other than Berkshire was willing to make, or even interested in exploring, a higher bid to acquire PCC.  Plaintiffs have not alleged, and their experts have not opined, that there was any bidder willing to top Berkshire's offer of $235 per share.  (Morris Tr. 118:25-119:24 (Ex. W1); Post Tr. 200:13-19 (Ex. U1).)[3] Moreover, the individuals who were involved in the negotiation of the Merger consistently testified that no alternative bidder existed or was expected.  (*See* Lodge Tr. 128:6-130:9 (Ex. F1); Schmidt Tr. 127:3-129:1 (Ex. K1).)

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████

███████████████ *see also* Stowell Rep. ¶ 58 (Ex. T).)  Not surprisingly, the trading history of PCC stock

---

[3] Indeed, in light of the $600 million termination fee, for another bidder to have provided more value to Plaintiffs, the competing bidder would have had to offer more than $235 per share plus an additional $600 million.  That equates to an offer of more than $239 per share.

Page 14 –    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON DAMAGES AND LOSS CAUSATION

following the Announcement is consistent with the absence of any prospect of a topping bidder. (Ruback Rep. ¶ 137 (Ex. S).)

B.  **There Is No Evidence PCC's Market Price Would Have Traded Higher in the Absence of the Merger.**

Thus, in order to show economic loss, Plaintiffs must put forth evidence that but for the Merger, the shareholders would have been able to realize a real-world market price for their shares in excess of the $235 per share they received from Berkshire. *Mack*, 2020 WL 1286175, at *13 (citing *Dura Pharms.*, 544 U.S. at 347) (economic loss means "the difference compared to what shares would have actually been trading for in the absence of the merger"); *Gray*, 2020 WL 1904019, at *27 (refusing to permit the plaintiff to recover based on a "fictional value" of the stock, on the assumption that had the Company remained independent, it would have achieved the results reflected in its "Initial Management Projections"). Plaintiffs have not even attempted to show that the stock would have traded above $235 per share if the Merger had been rejected by PCC's shareholders.

Prior to the Announcement, PCC shares were heavily traded and highly liquid, and market participants had a wealth of information about PCC, both from its extensive SEC filings and from numerous independent stock analysts who followed and reported regularly on the company. (*See* Ruback Rep., Appendix ¶¶ 4-9, 45 (Ex. S); Scott Rep. ¶¶ 24-26 (Ex. U).) Based on the total mix of information available to it, the market concluded that PCC stock was worth approximately $194 in the absence of the Berkshire offer. (Stowell Rep., Ex. 3A (Ex. T); Ruback Rep. ¶¶ 131, 133, 139, 142 (Ex. S).) That was *before* a major deterioration in market conditions for companies in PCC's industries, ███ ███████████████

███████████████████████████████████████████████

███████████████████████████████████████████

████████████████████

   The unrebutted opinions of PCC's experts conclude that had the Merger not closed, the price of PCC stock would be expected to revert back to the unaffected market price of approximately $194 per share, or lower.  (Stowell Rep. ¶ 29 (Ex. T).)  As PCC's expert Douglas Scott noted, "by the time shareholders voted on the deal, the all-cash premium looked even more attractive because the price of publicly traded companies that were comparable to PCC traded significantly *lower*."  (Scott Sur. Rep. ¶ 13 (Ex. A1) (emphasis added).)  So, had the Merger not closed, ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████  Plaintiffs cannot demonstrate that they suffered any loss by receiving $235 per share for stock that, in the absence of the deal, would have traded at or well below $194.

    Plaintiffs have not alleged, and have not put forth any evidence, that any PCC investor would have had the ability to sell their shares for more than $235 per share in the absence of the Merger.  Their damages expert, Matthew Morris, simply never addresses the question of the real-world market value PCC shareholders could have received for their stock.  Mr. Morris admitted that he had not "done any analysis . . . of where Precision Castparts shares would trade, in the event that the transaction was voted down" (Morris Tr. 115:16-21 (Ex. W1)) and that his analysis disregards how actual market participants valued PCC stock (*id.* 139:17-21 ("Q.  What weight did you give to the unaffected trading price of Precision Castparts stock, when you came up with your valuation of Precision Castparts?  A.  Zero percent.")).

Page 16 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON DAMAGES AND
    LOSS CAUSATION

The only justification that Plaintiffs have advanced for disregarding the actual, real-world market pricing for PCC's stock is that allegedly material information was withheld from shareholders when the stock traded at $194 per share, prior to the announcement of the merger agreement with Berkshire. The allegedly non-public information relates to PCC's acquisition strategy and related forecasts and valuations. But Plaintiffs' own pleadings in this action have contended the exact opposite—that PCC actually touted the value of the acquisition strategy to shareholders prior to Berkshire's offer. To quote the Complaint,

> "Consistent with its well-developed acquisitions program, PCC was a vigorous acquirer in the years leading up to the Merger. During this period, PCC completed numerous acquisitions . . . . [and] repeatedly assured its investors that the Company would continue to complete acquisitions, as they were an integral part of the Company's business plan, and that the Company's shareholders could expect to derive value from the Company's acquisition strategy in the upcoming years." (SAC ¶¶ 52, 54 (Dkt. 122).)

That information was undisputedly reflected in the $194 per share price. (Ruback Rep. at ¶ 120 (Ex. S).)

But even if information about PCC's acquisition strategy somehow was not reflected in PCC's stock price *at all*, Plaintiffs still have not adduced any evidence that the allegedly withheld information, if disclosed, would have caused PCC's stock price to increase from the $194 per share market price to more than the $235 per share Merger price—a differential of more than $41 per share. To the contrary, the testimony of Plaintiffs' own expert was that the value of PCC's acquisition pipeline (based on the assumption that PCC would *fully* meet its aspirational M&A goals) was only $12 or $16 per PCC share. (Morris Tr. 216:14-20 (Ex. W1) ("Q. Okay. In ballpark terms, what is the value per share that your valuation ascribes to Precision Castparts' M&A program? A. I believe as of the November valuation date, that would be $12 per share. And, as of the January valuation date, $16 per share").) This accords

Page 17 –   DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON DAMAGES AND LOSS CAUSATION

with the value that PCC contemporaneously put on the potential, but uncertain, "opportunity" of achieving 100% of its aspirational M&A goals. (Hagel Decl. ¶ 21; 7/21/15 Value Sensitivities (Ex. T2).) The math does not add up. Even if $12 to $16 is added to PCC's unaffected market price of $193.88, the highest alternative prices Plaintiffs could claim are $205.88 and $209.88, both of which are, of course, significantly below the $235 per share that shareholders received. Plaintiffs still would have no out-of-pocket losses.

In short, prior to the announcement of the Berkshire deal, the market valued PCC stock at approximately $194 per share. Defendants' experts establish that PCC's stock would have traded far below $235 per share if the Berkshire deal had been rejected by shareholders. Plaintiffs have put forward no evidence to the contrary. And an analysis by Plaintiffs' own expert concludes that the per-share value of the entirety of PCC's acquisition program was between $12 and $16, far less than the $41 premium Plaintiffs received in the merger. Accordingly, Plaintiffs cannot prove that they suffered any loss caused by the alleged misstatements or omissions.

**C.    Mr. Morris' Damages Analysis Has Nothing To Do with the Issues in this Case.**

Unable to point to any bidder that would pay more than $235 per share for PCC or any proof that PCC shares would have traded above $235 absent the merger offer, Plaintiffs nonetheless insist that PCC shareholders were damaged by receiving $235 per share. To do so, Plaintiffs put forward the opinion of one person—their expert, Mr. Morris. (Morris Rep. at 4 (Ex. Q).) But rather than provide any opinion or analysis of the price at which PCC's shares would have traded in the real world absent a merger transaction (the relevant issue under the governing law and an issue that PCC's experts directly address), Mr. Morris prepared an opinion as to "the indicated fair market value of the Company's enterprise value *on a financial control*

*basis*".  (Morris Rep. at 31, 39-40 (Ex. Q) (emphasis added).)  In other words, he tried to

determine a fair price to buy (and control) or sell (and give up control) *all of* PCC, not the price

at which shares of a publicly traded PCC would have traded absent the Merger.  As Mr. Morris

says himself, those two things are "apples" and "oranges".  (Morris Reply at 17 (Ex. X).)

        Although it renders Mr. Morris's opinion irrelevant to this case, the choice to try

to value all of PCC at once, rather than to value its shares traded as a public company, was

hardly an accident.  Doing it this way allowed Mr. Morris to include a "financial control"

premium, which is "an increase in the price of shares sold as part of a majority block, which

someone will pay in order to gain control of a company".  *Steiner Corp. v. Benninghoff*,

5 F. Supp. 2d 1117, 1124 (D. Nev. 1998).  But that premise—that shareholders would receive a

control premium if the Merger was rejected—is faulty.  PCC's shareholders did not own shares

on a controlling basis, as they were minority shareholders in a publicly traded company.

(Ruback Rep. ¶ 105 (Ex. S).)  They were not presented with an alternative between receiving a

control premium from Berkshire and a control premium from an alternative acquiror.  They were

presented with an alternative between receiving a control premium from Berkshire and owning

non-controlling shares in a standalone PCC, as Morris himself acknowledges:  "PCC

shareholders were asked to make a one-time choice between i.) holding their shares and

benefitting from its long-term cash flow, and ii.) selling their shares for a one-time payment" by

Berkshire.  (Morris Reply at 8 (Ex. X).)  In other words, in the absence of the Berkshire

transaction, shareholders could have sold their stock only at a *non-controlling* price.  (*See* Morris

Tr. 114:6-11 (Ex. W1) ("Q.  If the shareholders had voted down a transaction with Berkshire, the

next day, they would be, again, shareholders with a non-controlling interest in Precision

Castparts.  Their stock.  Right?  A.  Presumably, yes.").)

Page 19 –   DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON DAMAGES AND
                LOSS CAUSATION

The law of loss causation requires that Plaintiffs demonstrate what shareholders would have received *absent the alleged misconduct*—which here means: if the shareholders had voted down the deal and the merger with Berkshire did not close. *Mack*, 2020 WL 1286175, at *12 ("Plaintiffs have alleged that the sales price of Resolute stock in the merger has been too low. But Plaintiffs do not state, and are unable plausibly to state that, had the shareholders retained their Resolute stock without a merger, the market value of their shares would have been greater than $35 per share."). That is precisely why courts look to the trading price for a company's shares (without a control premium) when no alternative bidder emerges. *Mack*, 2020 WL 1286175, at *13; *Gray*, 2020 WL 1904019, at *28. In sum, Mr. Morris's analysis has no relevance to whether Plaintiffs suffered an out-of-pocket loss under the federal securities laws.

Mr. Morris's analysis is irrelevant for another reason. When assessing damages in a Section 14 merger case, as a matter of law an individual's "abstract judgment" cannot be "substitut[ed] . . . for that of the market". *Mills v. Elec. Auto-Lite Co.*, 552 F.2d 1239, 1247 (7th Cir. 1977). "[W]hen market value is available and reliable, other factors should not be utilized in determining whether the terms of a merger were fair." *Id.* But that is precisely what Mr. Morris purports to do—his analysis is nothing more than his view of the supposed "fair" value of PCC stock, not an obtainable market price. Indeed, Mr. Morris not only tries to substitute his view for the market's price, but admittedly disregards the market's view entirely. (Morris Tr. 139:17-21 (Ex. W1) ("Q. What weight did you give to the unaffected trading price of Precision Castparts stock, when you came up with your valuation of Precision Castparts? A. Zero percent.").)

Mr. Morris says that in his judgment, and based on his own assumptions, PCC had a value of between $247 and $251 dollars per share. But that is clearly not the same thing as the price that could actually be achieved for a liquid, freely traded stock. Even at the motion to

Page 20 –   DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON DAMAGES AND
            LOSS CAUSATION

dismiss stage, Courts disregard such analyses as irrelevant because they describe "an alternate reality where not only did the shareholders reject the merger, but also in which [the company] achieved all of the results that management . . . projected that it could achieve. It thus relies on 'hypothesis about what the parties would have done if the circumstances surrounding their transaction had been different.'" *Gray*, 2020 WL 1904019, at *26 (citation omitted). Accordingly, as the court in *Gray* explained, such an analysis cannot be the basis for a damages calculation because it would provide Plaintiffs an inappropriate "windfall". *Id.* at *27. *See also Mack*, 2020 WL 1286175, at *13 ("[E]conomic loss . . . must mean not some hypothetical loss between the true value post-merger, or even the day of the merger, and the merger consideration, but the difference compared to what shares would have actually been trading for in the absence of the merger.").

Ultimately, Mr. Morris does not opine that he, or any other person, could actually have obtained more than $235 in exchange for a share of PCC, nor could he, given the lack of any topping bidders and the unaffected trading price of $194. In other words, Mr. Morris's opinion is not evidence of what a willing buyer would have paid for shares of PCC stock in the absence of a deal with Berkshire. It therefore has no relevance to this case.

With the full benefit of discovery, Plaintiffs have adduced *zero* evidence that any willing buyer would have paid more than $235 per share for PCC stock in the absence of the Merger, at any time during or after August 2015. (*See, e.g.*, Morris Tr. 24:2-8 (Ex. W1) (admitting he had not done "any work to determine whether" the judgments and assumptions he made in his analysis "were consistent, or inconsistent, with . . . the assumptions that investors in Precision Castparts stock made when they valued the stock"); *id.* 117:9-24 (Morris testifying "I don't know" to whether he was "aware of any company, or any person, that was willing to pay

Page 21 –    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON DAMAGES AND
             LOSS CAUSATION

any price above $235 a share, for PCC stock, at any point in time, during or after August 2015");
*id.* 118:25-119:9 ("Q. Okay. And no -- have you seen any suggestion that any other bidder of any kind -- another company, or another private equity company -- expressed any interest, in any forum, in paying more than $235 a share for Precision Castparts stock? A. I haven't seen evidence of, one way or the other, whether they thought that was a good price; or they thought it was worth more. I haven't seen anything with respect to that.").) Indeed, as discussed above, Plaintiffs do not even try to put forward evidence on that key question. (*Id.* 115:16-21 (Mr. Morris testifying that he had not done any analysis "of where Precision Castparts shares would trade, in the event that the transaction was voted down").)

Mr. Morris's opinion fails to create a genuine dispute of material fact that PCC shareholders suffered any damages by receiving $235, a 21% premium to the stock's trading price and a price that no other buyer was willing to top.

## II.    PLAINTIFFS' SECTION 20 CLAIM FALLS WITH THEIR SECTION 14 CLAIM.

Defendants are also entitled to summary judgment on Count II of the Second Amended Complaint for violation of Section 20(a) of the Securities Exchange Act of 1934. (SAC ¶¶ 327-334 (Dkt. 122).) Because Plaintiffs' Section 20 claim is premised on Defendants' violation of Section 14(a), their Section 20 claim also fails for the reasons discussed above. (*See id.* ¶ 334.)

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant their motion for summary judgment on the issues of loss causation and damages.

DATED:  October 6, 2020

/s/ Brad S. Daniels
Joel A. Mullin, OSB #862533
Brad S. Daniels, OSB #025178
STOEL RIVES LLP
    760 SW Ninth Avenue, Suite 3000
        Portland, OR 97205
        (503) 224-3380
            joel.mullin@stoel.com
                brad.daniels@stoel.com

/s/ Robert H. Baron
Robert H. Baron (admitted *pro hac vice*)
Omid H. Nasab (admitted *pro hac vice*)
Justin C. Clarke (admitted *pro hac vice*)
CRAVATH, SWAINE & MOORE LLP
    825 Eighth Avenue
        New York, NY 10019-7475
        (212) 474-1000
            rbaron@cravath.com
                onasab@cravath.com
                    jcclarke@cravath.com

*Attorneys for Defendants Precision Castparts*
*Corp., Mark Donegan, Don R. Graber, Lester L.*
*Lyles, Ulrich Schmidt, Richard L. Wambold and*
*Timothy A. Wicks*